**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. S4 1:19-cr-0833 (SHS) |
| v. | **ORAL ARGUMENT REQUESTED** |
| JENNIFER SHAH, | |
| Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT JENNIFER SHAH'S PRE-TRIAL MOTIONS**

Daniel R. Alonso
Michael Chu
BUCKLEY LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 600-2400
dalonso@buckleyfirm.com
mchu@buckleyfirm.com

Henry Asbill
BUCKLEY LLP
2001 M Street NW
Washington, DC 20036
Tel: (202) 349-8000
hasbill@buckleyfirm.com

*Attorneys for Defendant Jennifer Shah*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................... **1**

**BACKGROUND** ................................................................................... **1**

**ARGUMENT** ........................................................................................ **3**

**I.**     **THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT AS INSUFFICIENT AND FOR FAILING TO ALLEGE MATERIALITY** ................... **3**

    **A.**     **The Superseding Indictment Fails to Allege Adequately Specific Facts to Establish that the Conspirators Agreed to Commit an Actionable Wire Fraud, or that They Did So Willfully and with the Specific Intent to Harm the Purchasers** ................................ **6**

    **B.**     **The Indictment Fails Adequately to Allege that the Purported Misrepresentations Were Material, Which Is an Essential Elements of the Underlying Object Crime of Wire Fraud** ................................................................................................... **14**

**II.**     **THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE A BILL OF PARTICULARS** ........................................................................ **16**

    **A.**     **Background** ................................................................................ **17**

    **B.**     **Legal Standard for Bills of Particulars** .................................. **19**

    **C.**     **The Court Should Order the Government to Disclose the Requested Particulars** ........... **23**

**III.**     **ALL FRUITS OF TWO SEARCH WARRANTS SHOULD BE SUPPRESSED, OR THE COURT SHOULD HOLD A *FRANKS* HEARING, BECAUSE THE WARRANTS WERE OBTAINED VIA MATERIALY FALSE STATEMENTS OR OMISSIONS IN THE AFFIDAVITS PRESENTED** ................................... **28**

    **A.**     **Legal Standard Under *Franks*** ............................................... **30**

    **B.**     **Misrepresentations Made Deliberately or With Reckless Disregard** ................. **31**
       1.    Statements that none of the "victims" made any of the promised return ................. 31
       2.    Statements that Ms. Shah "operated" Thrive ................................ 33
       3.    Statements that Ms. Shah "operated" Red Steele ............................. 35

    **C.**     **The Statements and Omissions were Material to Probable Cause** ................... **37**
       1.    Cell-site Affidavit ................................................................... 38
       2.    Email Affidavit ..................................................................... 39

**IV.**     **THE COURT SHOULD ORDER DISCLOSURE OF THE GRAND JURY MINUTES OR ALTERNATIVELY REVIEW THEM *IN CAMERA*** ................... **40**

**V.**     **THE COURT SHOULD COMPEL PRODUCTION OF CERTAIN *BRADY*, AND *GIGLIO* MATERIAL, AS WELL AS THE POST-ARREST STATEMENTS OF STUART SMITH** ................................................................................. **42**

    **A.**     **Information Regarding Purchasers Who Made Money or Who Understood That Any Earnings Promises Were Not Part of the Purchase** ..................... **44**

    **B.**     **Post-Arrest Statement of Co-Defendant Stuart Smith** ...................... **46**

   C.      *Giglio* **Material as Soon as it is Identified** ................................................................ **48**

**VI.**    **MS. SHAH'S POST-ARREST STATEMENTS SHOULD BE SUPPRESSED BECAUSE HER WAIVER OF RIGHTS WAS OBTAINED THROUGH AFFIRMATIVE MISREPRESENTATIONS BY THE ARRESTING OFFICER** .. **48**

   **A.**      **The March 30, 2021 Statement Was Coercive and Should be Suppressed** ........................ **48**

       1.    Facts of Ms. Shah's Arrest ................................................................. 49

       2.    Police Misrepresentation Led to a Coerced Waiver and Statement ..................................... 51

**VII.**   **DEFENDANT SHOULD BE PERMITTED TO FILE ADDITIONAL AND SUPPLEMENTAL MOTIONS, AND TO JOIN THE CO-DEFENDANTS' MOTIONS** .................................................................................................... **56**

**CONCLUSION** ........................................................................................................... **57**

# TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*
373 U.S. 83 (1963) .................................................................................. 42

*Bruton v. United States*
391 U.S. 123 (1968) ................................................................................ 46

*Colorado v. Connelly*
479 U.S. 157 (1986) ................................................................................ 52

*Colorado v. Spring*
479 U.S. 564 (1987) ................................................................................ 52

*Durland v. United States*
161 U.S. 306 (1896) .................................................................................. 7

*Franks v. Delaware*
438 U.S. 154 (1978) ................................................................. 1, 29, 30, 35

*Green v. Scully*
850 F.2d 894 (2d Cir. 1988) ................................................................... 53

*Hawthorne v. Schneiderman*
695 F.3d 192 (2d Cir. 2012) ................................................................... 52

*Illinois v. Gates*
462 U.S. 213 (1983) ................................................................................ 37

*Lynumn v. Illinois*
372 U.S. 528 (1963) ................................................................................ 52

*Miranda v. Arizona*
384 U.S. 436 (1966) ................................................................................ 48

*National Organization for Women v. Scheidler*
510 U.S. 249 (1994) ................................................................................ 15

*Neder v. United States*
527 U.S. 1 (1999) ...........................................................................*Passim*

*People v. Blanchard*
90 N.Y. 314 (1882) ................................................................................... 7

*People v. Norman*
85 N.Y.2d 609 (1995) ............................................................................... 7

*People v. Oliver*
368 Ill. App. 3d 690 (2006) .................................................................... 41

*Russell v. United States*
369 U.S. 749 (1962) ....................................................................... 4, 5, 8, 9

*Salinas v. United States*
522 U.S. 52 (1997) .................................................................................. 14

*Time Warner Cable, Inc. v. DIRECTV, Inc.*
497 F.3d 144 (2d Cir. 2007) ................................................................... 11

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*
822 F.3d 650 (2d Cir. 2016) ..................................................................... 7

*United States v. Abakporo*
959 F. Supp. 2d 382 (S.D.N.Y. 2013) .................................................... 47

*United States v. Agurs*
   427 U.S. 97 (1976) ................................................................................ 43

*United States v. Anderson*
   929 F.2d 96 (2d Cir. 1991) ..................................................................... 52

*United States v. Angulo-Aguirre*
   07 Cr. 387, 2008 WL 11345907 (S.D.N.Y. Mar. 14, 2008) ................... 47

*United States v. Armstrong*
   517 U.S. 456 (1996) .............................................................................. 47

*United States v. Awadallah*
   349 F.3d 42 (2d Cir. 2003) ..................................................................... 30

*United States v. Bagley*
   473 U.S. 667 (1985) .............................................................................. 43

*United States v. Barnes*
   158 F.3d 662 (2d Cir. 1998) .............................................................. 19, 20

*United States v. Barrett*
   153 F. Supp. 3d 552 (E.D.N.Y. 2015) ................................................... 27

*United States v. Basurto*
   497 F.2d 781 (1974) .............................................................................. 41

*United States v. Bin Laden*
   92 F. Supp. 2d 225 (S.D.N.Y. 2000) ...............................................*Passim*

*United States v. Bortnovsky*
   820 F.2d 572 (2d Cir. 1987) .............................................................*Passim*

*United States v. Camp*
   541 F.2d 737 (8th Cir. 1976) ................................................................... 4

*United States v. Canfield*
   212 F.3d 713 (2d Cir. 2000) ................................................................... 30

*United States v. Chalmers*
   410 F. Supp. 2d 278 (S.D.N.Y. 2006) ................................................... 26

*United States v. Comyns*
   248 U.S. 349 (1919) ................................................................................ 7

*United States v. Cook*
   348 F. Supp. 2d 22 (S.D.N.Y. 2004) ..................................................... 30

*United States v. Cruikshank*
   92 U.S. 542 (1875) .................................................................................. 4

*United States v. Curtis*
   506 F.2d 985 (10th Cir. 1974) ............................................................... 12

*United States v. D'Amato*
   39 F.3d 1249 (2d Cir. 1994) ................................................................... 10

*United States v. Davidoff*
   845 F.2d 1151 (2d Cir. 1988) ............................................... 19, 20, 24, 25

*United States v. Dunn*
05 Cr. 127 (KMK), 2005 WL 1705303 (S.D.N.Y. July 19, 2005) ........... 41

*United States v. Dupree*
870 F.3d 62 (2d Cir. 2017) ......................................................................... 4

*United States v. Elia*
   07 Cr. 543 2008 WL 11423878 (S.D.N.Y. Mar. 28, 2008) .................... 47

*United States v. Falkowitz*
214 F. Supp. 2d 365 (S.D.N.Y. 2002) ............................................... 27

*United States v. Falso*
544 F.3d 110 (2d Cir. 2008) ............................................................. 38

*United States v. Feola*
651 F. Supp. 1068 (S.D.N.Y. 1987) ................................................. 26

*United States v. Ferguson*
758 F.2d 843 (2d Cir. 1985) ....................................................... 31, 37

*United States v. Foley*
73 F.3d 484 (2d Cir. 1996) ......................................................... 14, 15

*United States v. Gibson*
175 F. Supp. 2d 532 (S.D.N.Y. 2001) .............................................. 40

*United States v. Gil*
297 F.3d 93 (2d Cir. 2002) .......................................................... 43, 46

*United States v. Gonzalez*
686 F.3d 122 (2d Cir. 2012) .............................................................. 4

*United States v. Gray*
367 F.3d 1263 (11th Cir. 2004) ....................................................... 13

*United States v. Haak*
884 F.3d 400 (2d Cir. 2018) ........................................................ 52, 53

*United States v. Ikoli*
16 Cr. 148, 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) ........... 19, 20, 21, 27

*United States v. Ivic*
700 F.2d 51 (2d Cir. 1983) .............................................................. 14

*United States v. Jergensen*
16 Cr. 235, 2017 WL 11458078 (N.D.N.Y. June 14, 2017) .................. 6

*United States v. Kaplan*
758 F. App'x. 34 (2d Cir. 2018) ...................................................... 11

*United States v. Kaplan*
02 Cr. 883, 2003 WL 22880914 (S.D.N.Y. Dec. 5, 2003) ................... 22

*United States v. Karro*
257 F.3d 112 (2d Cir. 2001) .............................................................. 6

*United States v. Ketabchi*
17 Cr. 243 (SHS) (S.D.N.Y.) ....................................................... 1, 31

*United States v. Kirton*
20 Cr. 322, 2021 WL 1550423 (S.D.N.Y. Apr. 20, 2021) .................. 40

*United States v. Klein*
476 F.3d 111 (2d Cir. 2007) ............................................................ 15

*United States v. Lauria*
19 Cr. 449 2020 WL 5743523 (S.D.N.Y. Sept. 25, 2020) ................... 30

*United States v. Leung*
40 F.3d 577 (2d Cir. 1994) .............................................................. 40

*United States v. Mitchell*
966 F.2d 92 (2d Cir. 1992) .............................................................. 52

*United States v. Murgio*
209 F. Supp.3d 698 (S.D.N.Y. 2016) ............................................... 47

*United States v. Nachamie*
  91 F. Supp. 2d 565 (S.D.N.Y. 2000) ................................... 20, 22, 26, 27
*United States v. Nance*
  533 F.2d 699 (D.C. Cir. 1976) ........................................................ 12
*United States v. Okwumabua*
  828 F.2d 950 (2d Cir. 1987) ..................................................... 52, 54
*United States v. Orena*
  32 F.3d 704 (2d Cir. 1994) .............................................................. 24
*United States v. Peter*
  17 Cr. 054, 2018 WL 5282878 (S.D.N.Y. Oct. 24, 2018) ............... 52
*United States v. Pirro*
  212 F.3d 86 (2d Cir. 2000) ......................................................... 5, 14
*United States v. Pisani*
  773 F.2d 397 (2d Cir. 1985) ............................................................ 21
*United States v. Plugh*
  648 F.3d 118 (2d Cir. 2011) ............................................................ 52
*United States v. Polanco*
  19 Cr. 354, 2020 WL 1503672 (S.D.N.Y. Mar. 30, 2020) ........... 30, 31
*United States v. Rajaratnam*
  719 F.3d 139 (2d Cir. 2013) ....................................................... 31, 37
*United States v. Resendiz-Ponce*
  549 U.S. 102 (2007) ......................................................................... 15
*United States v. Rosenblatt*
  554 F.2d 36 (2d Cir. 1977) .............................................................. 14
*United States v. Rybicki*
  354 F.3d 124 (2d Cir. 2003) .............................................................. 6
*United States v. Salameh*
  152 F.3d 88 (2d Cir. 1998) .............................................................. 37
*United States v. Savin*
  00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. Mar. 7, 2001) ......... 21, 27
*United States v. Solomonyan*
  451 F. Supp. 2d 626 (S.D.N.Y. 2006) ............................................. 26
*United States v. Starr*
  816 F.2d 94 (2d Cir. 1987) .......................................................... 6, 10
*United States v. Stavroulakis*
  952 F.2d 686 (2d Cir. 1992) ............................................................ 13
*United States v. Stein*
  424 F. Supp. 2d 720 (S.D.N.Y. 2006) ............................................. 47
*United States v. Thompson*
  141 F. Supp. 3d 188 (E.D.N.Y. 2015) ............................................ 5, 14
*United States v. Torres*
  901 F.2d 205 (2d Cir. 1990) ....................................................... 19, 26
*United States, v. Torres*
  20 Cr. 608, 2021 WL 1947503 (S.D.N.Y. May 13, 2021) ................... 4
*United States v. Tribunella*
  749 F.2d 104 (2d Cir. 1984) ............................................................ 35

*United States v. Troxel*
   564 F. Supp. 2d 1235 (D. Kan. 2008) ........................................................... 35
*United States v. Walker*
   191 F.3d 326 (2d Cir. 1999) ......................................................................... 6
*United States v. Washington*
   97- 5709, 1998 U.S. App. LEXIS 27862 (6th Cir. Oct. 27, 1998) ......................... 12
*United States v. Wedd*
   993 F.3d 104 (2d Cir. 2021) ......................................................................... 4
*United States v. Williams*
   504 U.S. 36 (1992) ................................................................................... 40
*Williams v. Affinion Grp., LLC*
   889 F.3d 116 (2d Cir. 2018) ......................................................................... 6
*Williams v. Aztar Ind. Gaming Corp.*
   351 F.3d 294 (7th Cir. 2003) ................................................................... 11, 13

**Statutes**

18 U.S.C. § 666 ........................................................................................ 15
18 U.S.C. § 1341 ...................................................................................... 21
18 U.S.C. § 1343 ........................................................................... 6, 14, 21
18 U.S.C. § 1349 .......................................................................... 1, 6, 21
18 U.S.C. § 1956(c)(7)(A) ............................................................................ 21
18 U.S.C. § 1956(h) ............................................................................. 1, 21
18 U.S.C. § 1961(1) ................................................................................... 21
18 U.S.C. § 1962(c) ................................................................................... 15
18 U.S.C. § 3500 ................................................................................. 43, 45

**Rules**

Fed. R. Crim. P. 5(f) ................................................................................. 42
Fed. R. Crim. P. 6(e)(3)(E)(ii) ...................................................................... 40
Fed. R. of Crim. P. 7(c)(1) ...................................................................... 4, 9
Fed. R. Crim. P. 7(f) .......................................................................... 16, 19
Fed. R. Crim. P. 12(b)(3)(B)(iii) ..................................................................... 4
Fed. R. Crim. P. 14 ................................................................................... 46
Fed. R. Crim. P. 16(a)(1)(E) ......................................................................... 47
Fed. R. Evid. 403 ................................................................................ 51, 55
N.Y. Rule of Prof. Conduct [22 NYCRR 1200.0] Rule 3.8(b) ........................ 44
ABA Model Rule of Prof'l Conduct R. 3.8(d) ...................................... 44

**Other Authorities**

ABA Formal Op. 09-454 ........................................................................ 44
Indictment, *United States v. Hong*
   16 Cr. 360 (SHS) (S.D.N.Y. filed Oct. 13, 2016) ................................... 28
Rakoff, *The Federal Mail Fraud Statute*
   18 Duq. L. Rev. 771 (1980) ..................................................................... 21

## PRELIMINARY STATEMENT

Defendant Jennifer Shah, through her counsel, respectfully submits this memorandum of law in support of her motions (a) to dismiss the superseding indictment for insufficiency; (b) for a bill of particulars; (c) to suppress evidence seized pursuant to two defective search warrants, or alternatively for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978); (d) to compel disclosure—or alternatively *in camera* review—of the grand jury minutes; (e) to compel discovery of *Brady* and *Giglio* material, as well as the post-arrest statements of co-defendant Stuart Smith; (f) to suppress Ms. Shah's post-arrest interrogation statements in their entirety; and (g) to grant leave to file additional and supplemental motions and to join co-defendants' motions, as appropriate.

## BACKGROUND

Ms. Shah was charged in a superseding indictment returned on March 25, 2021, along with co-defendant Stuart Smith, with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, and one count of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). The fact that this particular docket was pending for 16 months, and the broader set of apparently related cases before this Court since 2017, s*ee United States v. Ketabchi et al.*, No. 17 Cr. 243 (SHS) (S.D.N.Y.), has required Ms. Shah's counsel to play catch-up as compared to others, but it has also provided us with a perspective that has exposed multiple flaws in the theory of this case, the investigation, and the government's position with respect to certain disclosures to the defense. We note here, and in our argument below concerning the motion to dismiss the indictment, that this appears to be the first time in the four-year history of these related cases that a defendant has challenged the government's theory of criminal fraud.

The superseding indictment presents a bare-bones wire fraud and conspiracy theory that

does not adequately allege either the required elements of intent to defraud or materiality, and appears to rely on a false promise theory involving specific returns on purchasers' investments, which could be mere breaches of contract, or, in theory, deceptive sales practice violations that fall under the jurisdiction of the Federal Trade Commission (FTC). Additionally, the superseding indictment is not at all clear as to its precise theory, nor which co-conspirators, companies, sales floors, victims, and time frames constitute the allegations against Ms. Shah. The government has thus far, with the limited exceptions described below, declined to provide additional particulars. That position is particularly confounding in light of the truly massive number of documents and other items that have been produced in discovery—numbering well in excess of 1.3 million documents and the additional contents of hundreds of electronic devices. This information cannot be adequately reviewed in a lifetime, and requires, as we argue below, that the government particularize the charges in a way that this relatively bare-bones superseding indictment does not. Finally, the flawed theory of criminality here, at least as to Ms. Shah, led to a number of affirmative misrepresentations by the case agent, Det. Christopher Bastos, some of which led to the issuance of search warrants and others that induced Ms. Shah to waive her *Miranda* rights.

Because of the massive volume of documents, there simply has not been enough time to review, nor has Ms. Shah's team yet received, any of the electronic devices seized throughout the course of this long investigation. As to some of these, Ms. Shah would have standing to challenge the search, and others could have relevant evidence that could suggest or supplement pre-trial motion, which we respectfully request the right to do.

This memorandum of law relies on the authorities cited, the accompanying declarations of Daniel R. Alonso and Jennifer Shah, the files and records in this case, any matters as to which the Court may take judicial notice, and such evidence as may be presented at pre-trial hearings.

# ARGUMENT

## I. THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT AS IN-SUFFICIENT AND FOR FAILING TO ALLEGE MATERIALITY

The indictment in this case has the character of an FTC complaint for deceptive sales practices masquerading as a criminal charge. Using vague language and sleight-of-hand, the government has described a nine-year telemarketing "scheme"[1] that, boiled down to its core, alleges that an unspecified number of "Participants" from around the country conspired to devise a scheme to defraud by representing that certain coaching and business services "would make the management of the victims' purported online businesses more efficient and/or profitable, when, in actuality, the 'services' *would* provide *little or no* value to the victims' businesses, which were *essentially* non-existent." ECF No. 186 (Superseding Indictment) ¶ 7 (emphasis added). As to what the two defendants charged in the indictment—Ms. Shah and Stuart Smith—purportedly did to join this alleged conspiracy, the indictment says that they "traffic[ked] in lists of *potential* victims, or 'leads,'" purportedly "with the *knowledge* that the individuals they had identified as 'leads' *would be* defrauded by the other Participants." *Id.* ¶¶ 2–3 (emphasis added). Nowhere does the indictment allege, as required, facts sufficient to establish that Ms. Shah joined this purported conspiracy willfully and with the specific intent to defraud the telemarketing purchasers. Worse, it is not clear *which* promises supposedly made by the Participants were allegedly fraudulent—that they would actually provide the business services they offered, or that those services "would make management" of the purchasers' businesses "more efficient and/or profitable." *Id.* ¶ 7. The latter are not

---

[1] ECF No. 1 (Indictment) ¶ 2. Ms. Shah appears to be charged only with respect to the "Business Opportunity Scheme" reflected in the original indictment under this docket. She is not charged with the "Debt Relief Scheme." *Compare* ECF No. 1 ¶¶ 2, 4, *with* ECF No. 186 ¶ 1.

the types of definite and concrete promises, made with *no* intention that they would come true, that are necessary to distinguish criminal wire fraud from a mere breach of contract.

Thus, this indictment should be dismissed because the facts it alleges, even if taken as true, are insufficient to support the crimes charged. Fed. R. Crim. P. 12(b)(3)(B)(iii). Under Federal Rule of Criminal Procedure 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The rule imposes two requirements: "the statement of the essential facts *and* the citation of the statute" being charged. *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) (emphasis in original) (quoting *United States v. Camp*, 541 F.2d 737, 740 (8th Cir. 1976)). Additionally, under the Fifth Amendment right to be indicted by a grand jury, indictments must set forth "all of the essential elements of the offense charged." *United States v. Dupree*, 870 F.3d 62, 70 (2d Cir. 2017) (citing *Gonzalez*, 686 F.3d at 127). The Fifth Amendment similarly requires that the indictment inform the court "of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had," *see United States v. Cruikshank*, 92 U.S. 542, 558 (1875), and cautions that "a defendant must not be "convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him," *see Russell v. United States*, 369 U.S. 749, 770 (1962).

Faced with the above authorities, the government will inevitably and predictably respond that the indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (internal quotations omitted); *United States, v. Torres,* No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *3 (S.D.N.Y. May 13, 2021). While this is true as far as it goes, there is clearly more to it than merely tracking the language of the statute, as the Second Circuit

made clear in *United States v. Pirro*, 212 F.3d 86, 92–93 (2d Cir. 2000). There, the court affirmed the pre-trial dismissal of a tax fraud indictment that adequately tracked the language of the statute but did not allege facts that established the materiality of an alleged false statement. The court recognized the truism about "little more" than "track[ing] the language of the statute," but pointed out crucial limitations established by the Supreme Court:

> [W]here the definition of an offence, whether it be at common law or by statute, includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,— *it must descend to particulars*…. Undoubtedly, the language of the statute may be used in the general description of an offense, but it *must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense*, coming under the general description, with which he is charged.

*Id.* (quoting *Russell*, 369 U.S. at 765) (emphasis added) (internal citations omitted); *see United States v. Thompson*, 141 F. Supp. 3d 188, 195 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d Cir. 2018) (same). In the *Pirro* court's words, "for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, [it] must state some fact specific enough to describe a particular criminal act, rather than a type of crime." 212 F.3d at 93.

Before turning to the specifics of why this indictment fails under these standards, we note that we are aware that other individuals have pled guilty to engaging in similar schemes to the ones charged in the indictment, both in the apparently related *Ketabchi* case, as well as defendants in earlier indictments under this docket who have pled guilty. We submit that those cases are irrelevant to this one, as due process in criminal cases is, of course, particular to the person accused. But more importantly, we have examined the dockets in these two cases carefully, and it appears that, up until now, no one has challenged the government's theory of the various cases nor the way

they have been pled. Even though we know that the Court will examine this motion and the defendant's case without regard to defendants in other cases, we nevertheless want to stress that this case is different—both in terms of how far afield Ms. Shah's alleged actions are from the criminality suggested, and simply because it is, as far as we can tell, the first challenge in this series of cases to the government's expansive theory.

A. **The Superseding Indictment Fails to Allege Adequately Specific Facts to Establish that the Conspirators Agreed to Commit an Actionable Wire Fraud, or that They Did So Willfully and with the Specific Intent to Harm the Purchasers**

Both Ms. Shah and her co-defendant, Stuart Smith, are charged under 18 U.S.C. § 1349 with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343. In addition to its other elements, conspiracy requires that the defendant "knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy." *United States v. Jergensen*, No. 16 Cr. 235 (BKS), 2017 WL 11458078, at *3 (N.D.N.Y. June 14, 2017). The object crime of Count One, wire fraud, requires, in addition to its other elements, a "scheme to defraud" that includes both (a) "proof of a material misrepresentation," *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018) (citing *Neder v. United States*, 527 U.S. 1, 25 (1999)); and (b) "the *specific intent to harm or defraud the victims* of the scheme," *see e.g., United States v. Rybicki*, 354 F.3d 124, 151 (2d Cir. 2003) (*en banc*) (internal quotations omitted) (emphasis added) (requiring "intent to harm" for mail and wire fraud convictions); *United States v. Karro*, 257 F.3d 112, 117 (2d Cir. 2001) (requiring "intent to harm" for mail fraud convictions); *United States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999) (same). Importantly, "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *United States v. Starr,* 816 F.2d 94, 98 (2d Cir. 1987). Count Two, the only other count, charges conspiracy to commit money laundering, which requires the commission of the predicate offense listed, which

again is wire fraud. ECF No. 186 ¶ 10. Because of that, if the Court dismisses Count One on this motion, we submit that it should also dismiss Count Two.

Although criminal fraud charges, like this one, involving false promises rather than statements of current or past fact have been sanctioned by the Supreme Court for well over a century, *Durland v. United States,* 161 U.S. 306, 313 (1896), such cases bring with them the risk of criminalizing mere breaches of contract. *See People v. Norman*, 85 N.Y.2d 609, 618–19 (1995) ("The judicial reluctance to criminalize such conduct [before the law changed] was principally derived in concerns about jailing individuals for mere nonpayment of debt and in the courts' sensitivity to the potential chilling effect that criminalizing such conduct might have on business"); *see also People v. Blanchard,* 90 N.Y. 314, 325 (1882) (declining to criminalize false promises), *abrogated by* N.Y. Penal Law § 155.05(1)(d) (1965). For that reason, the Second Circuit has held that "where the relevant representation is made within a contract," a breach of that contract is not sufficient to prove fraud. *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 659 (2d Cir. 2016). Instead, in false promise cases, the government must allege that the defendant had a contemporaneous intent, at the time that the contract was executed, never to uphold their end of the bargain. *See id.* at 662 ("a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution."). The allegations here clearly involve contractual promises, and indeed, strongly imply the existence of *written* contracts between the salespeople and the purchasers. *See* ECF No. 186 ¶ 1 ("selling those Victims so-called 'business services' in connection with … purported online businesses…"); *id.* ¶ 4 (certain Participants "provided so-called 'coaching sessions' regarding these purported online businesses…"). But even if contracts were not involved, the rule is the same for all false promise cases. *See United States v. Comyns,* 248 U.S. 349, 353 (1919) (mail fraud includes using "the mails in

order to carry out a scheme for getting money by the making of promises or agreements which…there is no intention to perform").

Reading through the meager factual assertions in this indictment, one struggles to understand precisely (a) where the allegations of willful intent to harm the purchasers on the part of Ms. Shah are; (b) *what* the alleged misrepresentations made to the purchasers were; and (c) whether the misrepresentations were made at the time of the interactions with the purchasers and with contemporaneous knowledge of their falsity—rather than as promises that turned out not to be fulfilled. Notwithstanding the superseding indictment's generalities about the unspecified "Participants" carrying "out a wide-ranging telemarketing scheme that defrauded hundreds of victims," it is pointedly vague on exactly what it means by the conclusory term "defrauded," and what Ms. Shah is purported to have actually done. Crucially, Ms. Shah is *not* alleged to have actually spoken to any purchaser nor to have made any misrepresentations whatsoever. Instead, the essence of the claim appears to be that, either by herself or acting with others, Ms. Shah sold the names and contact information of people ("leads") to "telemarketing sales floors with the knowledge that the individuals they had identified as 'leads' would be defrauded by the other Participants." *See* ECF No. 186 ¶ 3. But as mentioned, the phrase "would be defrauded" is conclusory and tells us nothing about Ms. Shah's specific intent. Moreover, "knowing" is only one part of the mental state required to allege this crime—the rest being *willfully* joining the conspiracy, *intending* to further its illegal purposes, and specifically *intending* to defraud the purchasers. Although the superseding indictment does recite the word "willfully" twice (*id.* ¶¶ 6–7), the use of that "generic term[]" in rote recitation of statutory allegations, as in the two paragraphs where it is used, is not enough to "descend to particulars" about Ms. Shah's specific intent to defraud and harm the purchasers, *Russell*, 369 U.S. at 765.

Surprisingly, the indictment is also confusing with respect to the requirement of falsity. It is not clear whether this indictment alleges that the unspecified other Participants lied to the purchasers about (a) whether they would indeed receive what the indictment calls "so-called 'coaching' and 'business services,'" or (b) whether such coaching and business services would "make the management of the victims' purported online businesses more efficient and/or profitable." ECF No. 186 ¶ 7. It seems potentially to suggest both, but in its discussion of the defendants' intent, it only refers to the latter: "at no point did the defendants intend that the Victims would actually earn any of the promised return on their intended investment." *Id.* ¶ 4. By its own terms, however, the indictment alleges that the contracts at issue were for "coaching" and "business services," *see id.* ¶ 7, not a promised return on investment. If that is correct, then the government would have to establish at trial that the conspirators never intended to provide such services at all. Even more confusing is that the indictment at times drops the mention of coaching and business services altogether, and instead focuses on "tax preparation or website design services." *Id.*

All of this is a far cry from the "plain… and definite written statement of the essential facts constituting the offense charged" required by Rule 7(c)(1), or the specificity required by the Fifth Amendment when pleading a statute that contains general terms. *Russell*, 369 U.S. at 765. As a matter of simple common sense, the contracts alluded to in the superseding indictment appear to have been simply for the purchase of some combination of business services rather than a *specific promised monetary return*, as it would be a strange business model indeed for someone to promise a specific amount of earnings to customers who are merely being coached, having a web site designed, or having their taxes prepared. If that is the case, then the superseding indictment is devoid of sufficient allegations, as required, that the Participants intended *at inception* that these services would not be provided—much less that Ms. Shah had any such intent. Indeed, the superseding

indictment at one point says the opposite: "Participants employed by a purported fulfillment company… provided so-called 'coaching sessions.'" ECF No. 186 ¶ 4.

In terms of a *criminal fraud* charge, that should be the end of the story, notwithstanding the assertion later in the same sentence that the defendants (whether or not they had any idea *which* Participant was providing the coaching sessions) "at no point … intend[ed] that the Victims would actually earn *any* of the promised return on their intended investment…" *Id.* (emphasis added). This itself is backwards, as wire fraud (and, by extension, conspiracy) requires an allegation of an *affirmative* intent to harm, not, as alleged here, the *lack* of an intent for things to turn out well. *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994) (in mail fraud prosecution, "[b]ecause the defendant must intend to harm the fraud's victims, 'misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution.'") (quoting *Starr*, 816 F.2d at 98). In any event, this odd formulation, too, is contradicted by the allegation a few paragraphs later that purchasers received "little or no value" for the services—meaning that at least some "victims" did in fact receive value from their purchases. ECF No. 186 ¶ 7.

But even if, contrary to the most logical reading of these charges, the contractual relationship at issue is that Participants (but not Ms. Shah) made promises that the purchasers would make a specified amount of money, the allegations in that regard are so vague that they are tantamount to no allegations at all. The indictment non-specifically alleges that Participants represented that the services "would make the management of the victims' purported online businesses more efficient and/or profitable, when, in actuality, the 'services' would provide little or no value to the victims' businesses…" *Id.* In the first place, this is *precisely* what false promise cases are not supposed to do: allege a crime based on a promise that is not ultimately fulfilled. Note that the sentence first states the promise, and then the result—that the services ended up providing "little

or no value." *Id.* Equally importantly, the "and/or" formulation leaves open the possibility that certain purchasers were not even made the supposed promise, but rather merely a promise that their businesses would be made "more efficient," a term so imprecise that it hardly provides notice of anything. *Id.* Without specificity that is lacking here, there is a real risk that Ms. Shah will be held criminally liable for mere sales puffery, which the Second Circuit has defined as "[s]ubjective claims about products, which cannot be proven either true or false," or "an exaggeration or over-statement expressed in broad, vague, and commendatory language." *See United States v. Kaplan*, 758 F. App'x. 34, 38 (2d Cir. 2018) (internal quotations omitted) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 159 (2d Cir. 2007)); *see also Williams v. Aztar Ind. Gaming Corp.,* 351 F.3d 294, 299 (7th Cir. 2003) (rejecting mail fraud predicate in RICO claim: "even if the statements in these communications could be considered 'false' or 'misrepresentations,' it is clear that they are nothing more than sales puffery on which no person of ordinary prudence and comprehension would rely"). At best, that is precisely what these vague allegations—about profits that did not materialize, value that only sometimes came, and services that were in fact provided—make out.

The repeated use of quotation marks and the words "so-called" and "purported" does not save this otherwise defective indictment. *See* ECF No. 186 ¶ 1 ("so-called 'business services'"); *id.* ¶ 3 (repeatedly putting "coaching," "fulfillment," and "products" in quotation marks); *id.* ¶ 4 ("alleged services," "purported fulfillment companies," and "so-called 'coaching sessions'"); *id.* ¶ 7 ("so-called 'coaching' and 'business services,'" and "services" in quotes). The problem is that the indictment does not tell us what the quotes are supposed to mean. Substandard services? Illusory services? Sarcasm? Are they words articulated by a witness before the grand jury that were then quoted in the indictment? The answer is simply that we have no idea, which is no answer at

all in a criminal indictment. *Compare United States v. Curtis,* 506 F.2d 985, 992 (10th Cir. 1974) (dismissing mail fraud indictment that "pleads little more than the statutory language without any fair indication of the nature or character of the scheme or artifice relied upon, or the false pretenses, misrepresentations or promises forming a part of it" and finding that allegations of falsity "did more to confuse than to clarify.") *with United States v. Nance,* 533 F.2d 699, 702 (D.C. Cir. 1976) (approving mail fraud indictment that specified misrepresentations). The government and the grand jury could easily have solved these problems by actually presenting a plain and definite indictment. That they did not suggests that the grand jury was unable to allege, in good faith, what the conspiracy and wire fraud statutes require—something to the effect of, "the defendants intended that the victims would be promised coaching, tax preparation, and web design services, when as they well knew and intended at that time, such services would not be provided." *See also United States v. Washington*, No. 97-5709, 1998 U.S. App. LEXIS 27862, at *3 (6th Cir. Oct. 27, 1998) (upholding conviction for wire fraud conspiracy where the indictment alleged that defendant "would and did falsely represent to victims that they had been specially selected to receive a valuable award or bonus," and that "they would have to purchase products…to receive their prizes.").

Finally, in two particular areas, the indictment plainly fails to allege facts that support the materiality element of wire fraud, as required under *Neder v. United States,* 527 U.S. 1 (1999).[2] One allegation is that some Participants (though not Ms. Shah) sold some of the "Victims" (though we are not told what proportion) web design services even though they "did not own a computer." ECF No. 186 ¶ 4. But such purchasers presumably were well-aware that they did not own a computer, making misrepresentations in connection with those services unlikely to be important to them in making such a decision. *Neder*, 527 U.S. at 16 (internal quotations omitted) (defining

---

[2] As we argue in the next subsection, the superseding indictment fails to allege materiality at all.

materiality as having "a natural tendency to influence," or being "capable of influencing"). Notably, for purposes of mail and wire fraud, the required misrepresentations must be "reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Gray*, 367 F.3d 1263, 1268 (11th Cir. 2004) (internal quotations omitted); *see also Aztar Ind. Gaming Corp.,* 351 F.3d at 299 (alleged mail fraud misrepresentations were "nothing more than sales puffery on which no person of ordinary prudence and comprehension would rely."). Likewise, the allegation that the "victims' *purported* online businesses…were essentially non-existent," ECF No. 186 ¶ 7, is puzzling, as again, purchasers would presumably be aware if they do or do not have online businesses, making this veiled suggestion of misrepresentations in that respect immaterial. In other words, offering business services to people of ordinary prudence who do not actually have businesses simply could not have a "natural tendency to influence" them. *Neder,* 527 U.S. at 16.

Ultimately, the failures in this indictment expose Ms. Shah to all of the dangers that the Fifth and Sixth Amendments and Rule 7 are meant to prevent. The vagueness and lack of detail—about the conspiracy, the "victims," the sales floors and fulfillment companies involved, the services sold, the nature of the representations, and Ms. Shah's individual acts—create a strong risk that she could be tried on allegations that do not make out a crime and may not have even been presented to the grand jury. It is not hard to understand the reason that the superseding indictment is so imprecise: Ms. Shah was well removed from the representations made to the purchasers and, in a nine-year business arrangement, it strains credulity to think that she would *not* want the purchasers of these services to make money. All of this undermines Ms. Shah's ability to prepare a defense, because it effectively shifts onto her the burden to prove that all of her various business activities over the past nine years were legitimate. Finally, the lack of detail about the purported

victims puts Ms. Shah in intolerable risk of double jeopardy. *See United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

### B. The Indictment Fails Adequately to Allege that the Purported Misrepresentations Were Material, Which Is an Essential Elements of the Underlying Object Crime of Wire Fraud

Compounding the deficiencies recited above, including certain failures to establish the materiality of some of the representations alleged, the indictment additionally fails to actually allege that the representations made to the purchasers were in fact material to their decisions to buy the coaching and other business services referred to. In *Neder,* the Supreme Court held that "materiality of falsehood" is an implicit element of the wire fraud statute, 18 U.S.C. § 1343, notwithstanding that it does not appear in the text of the law. 527 U.S. at 25. As the Second Circuit has made clear, where "one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996), *overruled on other grounds, Salinas v. United States*, 522 U.S. 52 (1997); *Pirro*, 212 F.3d at 93; *see also Thompson*, 141 F. Supp. 3d at 195 (dismissing counts of an indictment and noting, "'where the definition of an offense . . . includes generic terms,' such as fraud, 'it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species, it must descend to particulars.'") (citing *United States v. Rosenblatt*, 554 F.2d 36, 41 (2d Cir. 1977)). The court in *Foley* applied this principle to reverse a conviction and remand for dismissal of the indictment for failure to allege an offense, because the government had neither pled nor proven an implicit element of the federal program bribery statute, 18 U.S.C. § 666. *Foley,* 73 F.3d at 488, 494. Similarly, in *United States v. Ivic,* 700 F.2d 51, 65 (2d Cir. 1983), the court held that a RICO indictment does not state a crime under 18 U.S.C. § 1962(c) where it "does not

charge that an enterprise or the predicate acts have any financial purpose"—an element that, like wire fraud materiality, appears nowhere in the text of section 1962.[3]

The Second Circuit has addressed only in the plain error context the question of whether materiality under *Neder* must be alleged in the indictment. Thus, in *United States v. Klein*, 476 F.3d 111, 113–14 (2d Cir. 2007), where the defendant failed to make the motion Ms. Shah now makes, the court held that it was not *plain* error for a bank fraud indictment to fail to allege materiality, because materiality is implicit in the term "fraud." Unfortunately, the opinion did not analyze, or even cite, any of the court's own precedents cited above (*Pirro, Foley, Ivic*), which require implicit terms to be pled in the indictment. Instead, it justified its plain error determination by citing to an "exception" to the general rule articulated by the Supreme Court in the case of attempted crimes. *Klein*, 476 F.3d at 113–14; *see United States v. Resendiz-Ponce,* 549 U.S. 102, 111 (Scalia, J., dissenting) (noting the majority's "special 'attempt' exception"). And *Klein*'s formulation is odd in any event, because whether the concept of "materiality" was implicit in the word "fraud" was far from obvious before *Neder* resolved the question in 1999. *See Neder*, 527 U.S. at 20 ("The Court of Appeals concluded that the failure to submit materiality to the jury was not error because the fraud statutes do not require that a 'scheme to defraud' employ *material* falsehoods. We disagree.") (emphasis in original).

There is therefore reason to believe that, on a properly preserved record, the Second Circuit will apply its longstanding rule regarding implicit elements of federal statutes and require that materiality be pled in fraud indictments. We therefore urge this Court to dismiss Count One on that ground.

---

[3] Eleven years later, in *National Organization for Women v. Scheidler*, 510 U.S. 249 (1994), the Supreme Court abrogated *Ivic*'s holding about the requirement of economic motivation. But its applicability to pleading requirements was unaffected by *Scheidler*.

## II.  THE COURT SHOULD ORDER THE GOVERNMENT TO PRODUCE A BILL OF PARTICULARS

Ms. Shah respectfully requests that the Court order the government to provide a bill of particulars pursuant to Fed. R. Crim. P. 7(f). As described in detail above, the face of the indictment is so vague that it is exceedingly difficult to understand the contours of the charges against the defendant. Although it was certainly within the government's power to allege that hundreds or thousands of people were defrauded in separate incidents over nine years, through multiple companies, in just *one* count, their choice in pleading the case this way cries out for particulars. Ms. Shah is charged with participating in two long conspiracies with unspecified co-conspirators in unspecified places and selling unspecified products and services to unspecified victims, while laundering the money through unspecified accounts with unspecified financial institutions at unspecified times over an eight- or nine-year period. She simply does not have enough specificity to prevent surprise at trial, to protect against double jeopardy, or to prepare a defense. And, although we appreciate that the government has provided discovery, it is vast: at last count, roughly 227 GB of material—nearly a million documents and more than 36 hours of audio and video recording—from more than 500 different sources, including hundreds of thousands of pages of financial records, Google drives associated with hundreds of accounts, and more than 400 electronic devices. Declaration of Daniel R. Alonso ("Alonso Dec.") ¶ 16. Moreover, some of the "individual" documents produced by the government included tens of thousands of pages within one document, with at least one at more than a hundred thousand pages. These productions came with 22 cover letters covering separate entries, the vast majority of which were sent to other defendants long before Ms. Shah was indicted. *Id.* As we explain below, this daunting trove of documents is far from adequate to allow the defense to discern the particulars required by law.

## A.    Background

Counsel for Ms. Shah twice requested a bill of particulars and has also participated in multiple Rule 16.1 conferences with government counsel. *See* Letter from Henry W. Asbill to Kiersten A. Fletcher et al. (Apr. 29, 2021), Alonso Dec., Exhibit A; Letter from Daniel R. Alonso to Robert B. Sobelman (May 11, 2021), Alonso Dec., Ex. C. After our first request, the government responded that it "does not intend to provide further particulars because under the well-established law of this Circuit it has no obligation to do so," and cited cases that denied defense requests for bills of particulars. Letter from Robert B. Sobelman to Henry W. Asbill (May 5, 2021), Alonso Dec., Ex. B. In response, we cited Judge Sand's decision in *United States v. Bin Laden,* 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008), in which he wrote that the "oft-repeated generalities" of the sort the government had cited "provide little guidance" to a court seeking to exercise of its discretion in granting a bill of particulars. Alonso Dec., Ex. C, at 3. We then suggested a path forward as an alternative to "burden[ing] the Court with more motion practice":

> [W]hat we're asking ought to be relatively simple. We understand that, in essence, you contend that Ms. Shah's role, either herself or acting with others, was to provide leads to sales floors in exchange for money, knowing that those sales floors were committing criminal fraud and intending for the targets of the scheme to be harmed financially. The twin problems here are the lack of specificity in the indictment, mentioned above, and that you have provided us with what is likely more than a million pages of information from two separate sets of indictments involving more than two dozen defendants, hundreds of electronic devices, and electronic information from dozens of different sources.

*Id.* at 4. Hoping to come to an agreement, we narrowed Ms. Shah's request to seven items, none of which sought either evidentiary detail or a roadmap to the government's case-in-chief: (a) which sales floors are alleged to be part of the fraud conspiracy in Count One, including which the government alleges to have interacted with the defendant; (b) which fulfillment companies are alleged to be part of the fraud conspiracy in Count One, including which the government alleges to have

17

interacted with the defendant; (c) which companies with merchant processing accounts are alleged to be part of the fraud conspiracy in Count One, including which the government alleges to have interacted with the defendant; (d) whether the government contends that every one of the many claimed "victims" Ms. Shah may have interacted with over nine years is alleged to have been a target of the conspiracy, and if not, which of them are contended to be part of the charged conspiracy (as to this request, we specifically noted how important the information is to Ms. Shah's ability to plead double jeopardy in a future prosecution); (e) the alleged co-conspirators, whether charged or not; (f) the identification of the bank accounts through which the government contends Ms. Shah laundered or conspired to launder money, and which of the transactions are alleged to constitute money laundering; and (g) the approximate time frame of key events in the charged conspiracies. *Id.*

The government persisted in its denial of our request, with two exceptions provided "only as a courtesy": (1) a list of 49 individuals and companies that it said are included in the scheme charged in the indictment "as related to the defendant," and (2) a purported time frame for "the key events of the scheme charged." Letter from Robert B. Sobelman to Daniel R. Alonso (May 26, 2021), at 3–4, Alonso Dec., Ex. D. With respect to the list, the government disclaimed that it was the "list of individuals who conspired with" Ms. Shah that we had requested, and flatly denied our actual request, claiming it "has no obligation to provide" such information. *Id.* at 3–4. With respect to the request for the dates of key events, the government provided ice in winter: "The key events of the scheme charged in the Superseding Indictment occurred between in or about 2012 and in or about March 2021"—which is the precise nine-year range already alleged in the superseding indictment. *Id.* at 4. As to all other requests, the government referred back to its earlier letter

stating that the indictment, "voluminous discovery," and "discussions with counsel" were all sufficient to put Ms. Shah on notice of the charges against her.[4] *Id.*; Alonso Dec., Ex. B at 6.

## B.     Legal Standard for Bills of Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure permits a motion for a bill of particulars "in order to identify with sufficient particularity the nature of the charge pending against [her], thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should [s]he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). The Court may grant such a motion "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which [s]he is accused.'" *United States v. Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681, at \*5 (S.D.N.Y. Jan. 26, 2017) (internal quotations omitted) (quoting *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990)). Although the decision of whether or not to grant a bill of particulars rests within the sound discretion of the district court, *United States v. Barnes,* 158 F.3d 662, 665 (2d Cir. 1998), the Second Circuit will reverse for abuse of that discretion when particulars cannot be readily discerned from a massive volume of discovery materials, *see Bortnovsky*, 820 F.2d at 574, or when the court denies the motion and the government later seeks to prove acts that had not been particularized, *see United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). In exercising their discretion, courts "must examine the totality of the information available to the defendant—through the indictment, affirmations, and general pre-trial discovery—and determine whether, in light of the charges that the defendant is required to answer, the filing of a bill of particulars is warranted." *Bin Laden*, 92 F. Supp. 2d at 233.

---

[4] Although we have had discussions with counsel, they have mainly been about discovery. The responses we received about particulars were too vague and non-specific to accomplish what we sought in our formal requests and what we seek on this motion.

Bills of particulars are especially crucial in factually complex cases like this one. *See Ikoli*, 2017 WL 396681, at *5–6 (insufficient particulars where five-page indictment broadly alleged long conspiracy to defraud financial institutions, without providing key dates, naming specific financial institutions defrauded, identifying which defendants were involved with each fraudulent transaction, even where government provided "thousands of pages of discovery"); *Bin Laden*, 92 F. Supp. 2d at 237–38 (bill of particulars necessary where, without it, defense would have had to "examine any activity in which [defendant] was engaged from 1989 until the date the Indictment was filed (June 16, 1999), which might be the basis for an accusation that he 'traveled' or engaged in a 'financial' or 'business transaction[] on behalf of [defendant organization].'"); *United States v. Nachamie*, 91 F. Supp. 2d 565, 572–73 (S.D.N.Y. 2000) (bill of particulars required where indictment alleging Medicare fraud did not specify which claims were false and voluminous discovery related to 2,000 different Medicare claims.); *see also Barnes,* 158 F.3d at 665 (where indictment did not provide sufficient particulars of drug conspiracy, "the defendant was entitled to be otherwise apprised of the conduct that he was alleged to have undertaken in furtherance of this multi-faceted, if not multiple, conspiracy.").

The Second Circuit has also cautioned the government and courts to take particular care with requests to particularize charges under especially broad criminal statutes. *See, e.g.*, *Davidoff*, 845 F.2d at 1154 (RICO conspiracy). The RICO conspiracy statute at issue in *Davidoff* afforded "wide latitude… [to] the prosecution to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity.'" *Id.* But with that latitude "comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope." *Id.*

The same reasoning applies here: aside from perhaps RICO, few crimes in the federal criminal code are broader than conspiracy to commit wire fraud under 18 U.S.C. § 1349, which criminalizes conspiring—no overt act required—to devise or intend to devise a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."[5] 18 U.S.C. § 1343. This Court is well familiar with the legendary breadth of mail and wire fraud, including Judge Rakoff's famous quip that mail fraud is the federal prosecutor's "true love." *See United States v. Pisani*, 773 F.2d 397, 409 (2d Cir. 1985) (noting that "versatility" of the mail fraud statute gave rise to the observation that "[t]o federal prosecutors of white collar crime, the mail fraud statute is … our true love. We may flirt with RICO, show off with 10b–5, and call the conspiracy law 'darling,' but we always come home to the virtues of 18 U.S.C. § 1341") (quoting Jed S. Rakoff, *The Federal Mail Fraud Statute* (Part 1), 18 Duq. L. Rev. 771, 771 (1980)). But with great versatility, we submit, comes great responsibility. When the "darling" of prosecutors (conspiracy) is joined with its "true love" (wire fraud) in a charge that spans nine years, the least the prosecutors can do is ensure that the defendant be specifically informed before trial the particulars of what she is alleged to have done.

A corollary to the "complex case" principle is that the government cannot, as it has attempted to do in this case, fulfill its notice obligations "by providing mountains of documents to defense counsel" without guidance as to which documents are relevant or the information necessary to understand the charges fully. *Ikoli*, 2017 WL 396681, at *5 (citing *Bortnovsky*, 820 F.2d at 575); *see United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (ordering bill of particulars to prevent defendant from being "forced to comb through this

---

[5] Money laundering conspiracy under 18 U.S.C. § 1956(h) is arguably even broader, as the conspiracy requires an object crime (money laundering), which in turn requires that the proceeds in fact be the proceeds of specified unlawful activity (wire fraud) *See* 18 U.S.C. § 1956(c)(7)(A); 18 U.S.C. § 1961(1).

veritable mountain of documents" where government produced "100,000 pages of discovery"); *Bin Laden*, 92 F. Supp. 2d at 234 ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars."); *Nachamie*, 91 F. Supp. 2d at 571 (bill of particulars required where "200,000 pieces of paper in hundreds of boxes and files" produced did not inform defendants which claims were false and in what way); *see also United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *16 (S.D.N.Y. Dec. 5, 2003) (denying a motion for bill of particulars in part because defendant was not being "required to 'waste precious pre-trial preparation time guessing which statements he has to defend against or which contributors may be witnesses against him at trial.'").

The seminal Second Circuit case of *United States v. Bortnovsky* is particularly instructive here. *Bortnovsky* was decided in a simpler time when a mere 4,000 documents constituted "mountains" sufficient to require a bill of particulars. 820 F.2d at 575. The indictment charged the defendants with faking burglaries to obtain insurance money fraudulently, but it did not identify which of 12 different burglaries the government would prove were faked. *Id.* at 573–74. Additionally, the government before trial provided 4,000 documents, which contained information about all 12 burglaries, but only alleged at trial that three were faked. *Id.* at 574. The Second Circuit reversed the conviction because the district court erred in denying the request for a bill of particulars identifying "the dates of the fake burglaries and identity of the fraudulent documents." *Id.* The court noted that the path the government took effectively meant that "the burden of proof impermissibly was shifted to" the defendants to "explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending." *Id.* at 574–75. In this case,

we are of course dealing with *far* more than 12 transactions, and we have no idea which transactions the government intends to claim at trial were fraudulent or constituted money laundering. And of course, we have potentially millions more than 4,000 documents to review.

### C.   The Court Should Order the Government to Disclose the Requested Particulars

A bill of particulars is necessary in this case. The government's position that it "has no obligation" to provide particulars in a case like this, *see* Alonso Dec., Ex. D at 4, is counter to the cases cited above and will consign the defendant's team to the imprecise and likely futile task of digging through an entire hayfield to find a few needles—all to divine specificity that the government could have readily provided. In effect, "the burden of proof impermissibly [will] shift[]" to the defendant to prove her innocence. *Bortnovsky*, 820 F.2d at 575. The Court should therefore order the government to provide the following particulars:

1. "Victims" – we do *not* ask at this stage whom the government intends to call, but we need to know which of the thousands of names on the thousands of documents to which we now have access are alleged to have been targeted by the scheme alleged;

2. Sales Floors – a list of all "sales floors operating in, among other places, Arizona, Nevada, and Utah," as referenced in paragraph 2 of the indictment; a list of the "several telemarketing sales floors in the New York and New Jersey area"; and a list of any other sales floors that the government alleges were involved with Ms. Shah's activities;

3. Fulfillment companies – a list of all "firm(s)" selected "to provide 'fulfillment' services," as referenced in paragraph 3 of the indictment;

4. Business Services/Coaching – what the "so-called 'business services'" referenced in paragraph 1 are alleged to have been, sufficient to reasonably identify them, including whether they include more than the "coaching," "website design services," and "tax preparation" services mentioned in paragraphs 3 and 4;

5. Co-conspirators – a list of individuals, charged or not, alleged to have conspired with Ms. Shah in both Counts One and Two;

6. Timeline – taking into consideration the detail requested above, we request that the time frame for the operation of particular aspects of the conspiracy be specified, such as, for example, the time frame when Ms. Shah is alleged to have conspired with particular sales floors and fulfillment companies; and

7. "Money Laundering" Activities – with respect to Count Two, a list of the "financial transactions," with dates, that the defendants "would and did conduct and attempt to conduct," as alleged in paragraph 10, and a list of the cash transactions, with dates, alleged to have been "structured to avoid currency transaction reporting requirements"

We discuss each in turn.

*Alleged Victims.* It is odd that the superseding indictment does not identify any particular alleged victims of the scheme, given that it focuses so intently on them, and indeed, even pleads a sentencing enhancement based on 10 or more victims over age 55. ECF No. 186 ¶ 6. In *Davidoff*, the Second Circuit reversed a conviction for this reason, holding that the district judge "exceeded his discretion in this RICO prosecution by denying a bill of particulars identifying at least the victims of discrete extortionate schemes that the prosecution intended to prove." 845 F.2d at 1154. Similarly here, the defense at this point can only speculate as to who the victims are from among thousands of names in the discovery materials. As in *Davidoff*, it would be the height of unfairness to force Ms. Shah to prepare to meet allegations of fraud against these thousands, solicited by dozens if not hundreds of sales floors, only to have the government at trial present, say, six victims from two sales floors.[6] *See also United States v. Orena,* 32 F.3d 704, 714–15 (2d Cir. 1994) (approving government's response to request for victims in conspiracy indictment where "Government provided all the [victim] information that was available to it" at the time). These authorities represent a stark contrast with the government's response to our two requests for identification of the victims: "the Government has no obligation to do so." Alonso Dec., Ex. D at 4.

Just as importantly, Ms. Shah needs the information to protect herself against double jeopardy. If Ms. Shah is acquitted in this case, she would not be able to clearly demonstrate in a future prosecution exactly which victims she was absolved of conspiring to defraud. And even if the

---

[6] This is not theoretical; in the related *Ketabchi* case, the Government presented the testimony of just *four* purchasers.

answer is to be "all of them," the nature of the discovery is such that we would need to know "all of which?" Hundreds of sales floors are mentioned in the discovery materials, the vast majority of which are unlikely to have had any contact with Ms. Shah. For example, US_613607, which is just one of the documents the government produced, is a spreadsheet identifying hundreds of different sales floors. *See* Alonso Dec. ¶ 16.

*Sales Floors and Fulfillment Companies.* As the Court is aware, the government's theory is that lead brokers sold leads to sales floors, which in turn sent converted sales to fulfillment companies. But the indictment does not mention any specific sales floors or fulfillment companies that Ms. Shah is alleged to have conspired with. Like the names of victims, this information is necessary for Ms. Shah to prepare her defense. In various capacities, she has likely interacted with many companies since 2012, and cannot reasonably or legally be expected to defend every one of those transactions before or at trial. Moreover, discovery reveals that there are potentially *hundreds* of sales floors, not one of which is specified in the indictment. *See, e.g.*, Alonso Dec. ¶ 16; *see also Bortnovsky*, 820 F.2d at 574–75 (reversing conviction where defendants in insurance fraud case "were forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending.").

*"So-Called 'Business Services.'"* As explained in greater detail in Section I.A above, the indictment does not specify what specific business services the "Participants" sold, why they are "so-called," and whether they were even the same services across all nine years. This information is necessary to prepare a defense and prevent surprise at trial: Ms. Shah will be unable to defend herself adequately if she is forced to defend every business service sold by any of the hundreds of sales floors mentioned in discovery materials. *See Davidoff*, 845 F.2d at 1155 (reversing conviction

where defendants were led to believe certain victims/organizations were not relevant to the case, only for government to introduce evidence about those victims/organizations at trial).

*Co-Conspirators.* When a defendant requests the identities of unindicted co-conspirators, the Court must engage in a "highly fact-specific inquiry." *United States v. Solomonyan*, 451 F. Supp. 2d 626, 641 (S.D.N.Y. 2006) (citing *United States v. Chalmers,* 410 F. Supp. 2d 278, 286 (S.D.N.Y. 2006)); *Torres,* 901 F.2d at 233–34; *United States v. Feola,* 651 F. Supp. 1068, 1131–34 (S.D.N.Y. 1987)). "The question is whether the names of unindicted coconspirators are necessary to prepare a defense and avoid surprise." *Solomonyan*, 451 F. Supp. 2d at 641 (citing *Chalmers*, 410 F. Supp. 2d at 286–87). The Court should consider the following six factors: "(1) the number of co-conspirators; (2) the duration and breadth of the alleged conspiracy; (3) whether the Government otherwise has provided adequate notice of the particulars; (4) the volume of pre-trial disclosure; (5) the potential danger to co-conspirators and the nature of the alleged criminal conduct; and (6) the potential harm to the Government's investigation." *Solomonyan*, 451 F. Supp. 2d at 642 (quoting *Nachamie*, 91 F. Supp. 2d at 572–73).

These factors all weigh in favor of disclosure. The government has alleged eight- and nine-year-long conspiracies, and has given the defense a non-exhaustive, non-exclusive, non-binding list of 49 individuals and organizations, and has specifically maintained that this is *not* a list of co-conspirators. *See* Alonso Dec., Ex. D at 3–4. Both the length of the conspiracies and the large numbers of co-conspirators—the list undoubtedly goes beyond the 49 in the government's letter—weigh in favor of disclosure so as to prevent unfair surprise. *See Nachamie*, 91 F. Supp. 2d at 573 (eight defendants with unknown numbers of unindicted co-conspirators and a more-than-three-year-long conspiracy weighed in favor of disclosure); *see also United States v. Falkowitz*, 214 F. Supp. 2d 365, 391 (S.D.N.Y. 2002) ("unspecified number of co-conspirators" and four-year-long

conspiracy weighed in favor of disclosure); *Savin*, 2001 WL 243533, at *5 (six-year-long conspiracy involving "six corporations, each with its own personnel" weighed in favor of disclosure). The volume of pretrial disclosure, as noted, is massive, and the specificity of the indictment is severely lacking. *See Nachamie*, 91 F. Supp. 2d at 571, 573 (200,000 pages weighed in favor of disclosure); *see also United States v. Barrett*, 153 F. Supp. 3d 552, 573 (E.D.N.Y. 2015) ("equivalent of at least tens of thousands of pages of documents" weighed in favor of disclosure). And finally, there is no danger to the government's investigation nor to the co-conspirators. Most of the people in the government's letter have been indicted, testified in prior trials, or both, and, if the government is to be believed, the co-conspirators can in any event be gleaned from the million–plus pages of material already in the defense's possession.

    *Timeline.* The indictment alleges eight- and nine-year-long conspiracies without mentioning a single event date—whether when Ms. Shah joined the conspiracy, sold leads, communicated with co-conspirators or alleged victims, or dates of specific financial transactions. *See Ikoli*, 2017 WL 396681, at *5–6 (a three-year conspiracy with no alleged key dates was too broad to put defendant "on notice of the nature of the charges"). Even a broad conspiracy can easily be broken down into key players, alleged victims, accounts, transactions, specific criminal acts, and an actual recitation of the manner, means, and object of a conspiracy. In fact, it is done all the time. *See, e.g.,* Indictment, *United States v. Hong*, No. 16 Cr. 360 (SHS), ECF No. 4 (S.D.N.Y. filed Oct. 13, 2016) (charging, among other things, conspiracy to commit wire fraud).[7]

---

[7] We pointed this out in our second letter request to the government, in response to the government's characterization of the superseding indictment: "We respectfully disagree that the indictment in this case is a 'detailed speaking indictment,' and refer you to the many (many) indictments over the last 30 years in the Southern and Eastern Districts of New York that continue for scores of pages, include charts, and typically specify dates, locations, events, participants, uncharged but related parties, and victims." Alonso Dec., Ex. C at 3.

*"Money Laundering" Activities.* The indictment fails to identify any of the alleged accounts or transactions through which Ms. Shah allegedly committed or intended to carry out the money laundering conspiracy. Again, this information is necessary to narrow down the roughly eight years of financial transactions at issue in Count Two. *See Bin Laden*, 92 F. Supp. 2d at 237–38 (requiring a bill of particulars where defendant would have had to "examine any activity in which [the defendant] was engaged from 1989 until the date the Indictment was filed (June 16, 1999), which might be the basis for an accusation that he 'traveled' or engaged in a 'financial' or 'business transaction[] on behalf of al Qaeda.'").

### III. ALL FRUITS OF TWO SEARCH WARRANTS SHOULD BE SUPPRESSED, OR THE COURT SHOULD HOLD A *FRANKS* HEARING, BECAUSE THE WARRANTS WERE OBTAINED VIA MATERIALLY FALSE STATEMENTS OR OMISSIONS IN THE AFFIDAVITS PRESENTED

The government likely intends to offer at trial, among other things, documentary, electronic, and other evidence seized pursuant to several search warrants, two of which were based in part on false and misleading statements. The first warrant, issued by Magistrate Judge Lehrburger on March 2, 2021, was for historical cellphone location information for the cellphone numbers (801) 597-3434 and (385) 775-9584—Ms. Shah had a privacy interest as to both, Declaration of Jennifer Shah ("Shah Dec.") ¶¶ 26–27—between December 1, 2017 and May 29, 2020. *See* Agent Affidavit in Support of Warrant and Order for Cellphone Location and Pen Register Information (the "Cell-site Affidavit"), ¶¶ 15, 17, Alonso Dec., Ex. E. The second warrant, issued by Magistrate Judge Freeman on August 26, 2020, was for records relating to the email address jenshah@comcast.net, an email address used by Ms. Shah. *See* Agent Affidavit in Support of Application for a Search Warrant for Stored Electronic Communications (the "Email Affidavit" and collectively, the "Affidavits"), ¶ 2, Alonso Dec., Ex. F. Both Affidavits were sworn to by Det. Christopher Bastos of the New York Police Department, cross-designated as a task force officer with Homeland

Security Investigations (HIS), who is the lead case agent and has worked on the investigation since 2016. Cell-site Aff. ¶ 1; Email Aff. ¶ 1.

The Court should note that the government has informed us that it did not receive anything from the provider in response to the warrant issued pursuant to the Email Affidavit. If there were not two warrants with similar issues in this case, we would not include the Email Affidavit in this motion, but in our experience, providers sometimes make mistakes about what evidence they do and do not possess, and it appears from other emails produced in discovery that Ms. Shah did use the email account in question during the relevant time. For that reason, entertaining our motion as to both would be consistent with judicial economy, though we of course understand if the Court chooses to defer consideration of the Email Affidavit at this time.

Ms. Shah moves to suppress the fruits of both warrants, or in the alternative asks for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on the ground that each warrant was based upon intentionally or recklessly false and misleading statements and omissions by the affiant. The excerpts specified below must be understood in the context of the story told by the Affidavits, which closely hewed to one theory in the current superseding indictment discussed at length in Section I.A, above, to the effect that the purchasers were promised financial returns and did not receive them. The Affidavits also sought to bolster the weight of Det. Bastos's statements about the business arrangements he described by highlighting how thoroughly familiar he was with the evidence, having participated in the investigation since 2016 interviewed "more than 100 Victims" (Cell-site Aff. ¶ 8), questioned cooperators, and reviewed voluminous documentary and physical evidence—all of which makes ignorance of the facts we argue that he omitted highly unlikely. In the Affidavits, he additionally painted Ms. Shah as someone who was not only a "Participant" (as the indictment calls the alleged schemers), but instead an "operat[or]" of companies.

*See* Cell-site Aff. ¶¶ 8, 10(h), 12(b); Email Aff. ¶¶ 9, 11(j), 12(c), 13(e). This is crucial, as the only real evidence of her knowledge and intent within the four corners of the Affidavits, apart from wholly conclusory statements about "fraud," is the inference to be drawn from the claim that Ms. Shah actually *ran* companies.

We allege three categories of deliberate or reckless falsehoods by Det. Bastos, discussed in detail below:

- Materially omitting the fact that (a) at least some alleged "victims" in fact made money, and (b) that alleged "victims" were explicitly told that no earnings promises were being made;

- Falsely stating that Ms. Shah "operated" Thrive; and

- Falsely stating that Ms. Shah "operated" Red Steele.

## A. Legal Standard Under *Franks*

"To obtain a *Franks* hearing, a defendant must make a 'substantial preliminary showing' by a preponderance of the evidence that an affidavit in support of the search warrant contained a deliberate falsehood or a statement made with reckless disregard for the truth which was material to the probable cause determination." *United States v. Polanco*, No. 19 Cr. 354 (LTS), 2020 WL 1503672, at *3 (S.D.N.Y. Mar. 30, 2020) (citing *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)). "A misrepresentation or omission is intentional when the 'claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth.'" *United States v. Lauria*, No. 19 Cr. 449 (NSR), 2020 WL 5743523, at *9 (S.D.N.Y. Sept. 25, 2020) (quoting *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003)). "To meet this standard, a defendant must support his allegations of deliberate falsehood with 'an offer of proof,'" *Lauria*, 2020 WL 5743523, at *9 (quoting *United States v. Cook*, 348 F. Supp. 2d 22, 29 (S.D.N.Y. 2004) and *Franks*, 438 U.S. at 171) and show "that the affiant in fact entertained serious doubts as to the

truth of their allegations," *Polanco*, 2020 WL 1503672, at *3 (citing *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013)). Material omissions "are governed by the same rules." *See United States v. Ferguson,* 758 F.2d 843, 848 (2d Cir. 1985).

### B. Misrepresentations Made Deliberately or With Reckless Disregard

### 1. <u>Statements that none of the "victims" made any of the promised return</u>

In both affidavits, Det. Bastos represented in various ways that none of the purchasers made any money: For instance, he wrote in the Email Affidavit that "at *no* point did the Victims actually earn *any* of the promised return on their investment." Email Aff. ¶ 8(b) (emphasis added). He also reported that customers charged thousands of dollars to their credit cards, "but have not received *any* of the so-called returns they were promised." *Id.* ¶ 8(c) (emphasis added). He made similar claims in the Cell-site affidavit. Cell-site Aff. ¶ 7(b)–(c) ("but have not received *any* of the so-called returns they were promised.") (emphasis added); *id.* ¶ 8(d) ("None of the victims earned the investment returns they were promised"). These statements were not attributed to any informant, but were simply declared, based on "my participation in that investigation." Cell-site Aff. ¶ 7; Email Aff. ¶ 8.

As Det. Bastos well knew, however, some customers did make money purchasing products from the companies involved in the arrangement that he termed the "Business Opportunity Scheme." At the trial held before this Court in *United States v. Ketabchi*, which involved what the government says is the same broad scheme, cooperating witness William Sinclair, who worked at a sales floor, testified in Det. Bastos's presence that he was aware of at least a few customers who made money by purchasing these products. *See* Trial Transcript at 176:24–177:2, 226:4–227:3, *United States v. Ketabchi et al.*, No. 17 Cr. 243 (SHS) (Oct. 24, 2018) ("*Ketabchi* Transcript"), ECF Nos. 326–50, Alonso Dec. Ex. G. To be sure, he said he could count them on one hand, but that is very different than "none," "any," and "at no point," to which Det. Bastos swore in the

Affidavits. *See* Cell-site Aff. ¶¶ 7(b), 8(d); Email Aff. ¶¶ 8(b)–(c), 9(h). Additionally, at that same trial, the government and the defense stipulated that if Det. Bastos had taken the witness stand, he would have testified that during a post-arrest interview, Sinclair had gone much further and said that "more than half" of people that Det. Bastos understood to be Sinclair's customers, were "happy." Alonso Dec., Ex. G, at 1472:21–1473:16.

Moreover, the question of whether the purchasers were "promised" any "return" at all was at the heart of both warrant applications. Det. Bastos wrote that the alleged activity involved "the false promise and pretense that the Telemarketing Companies and related entities would establish online businesses on the Victims' behalf, and that those online businesses would generate revenue and investment returns for the Victims." Cell-site Aff. ¶ 7(a). He additionally used the term "promised" seven times to refer to returns that the purchasers were supposedly expecting. *Id.* ¶¶ 7(b)–(c), 8(a), 8(d). Yet nowhere did Det. Bastos mention what he knew to be the case: that the way this business arrangement worked was that salespeople were trained specifically *not* to promise particular earnings to their customers, and the sales involved written agreements that specifically disclaimed that any such promise had been made. For example, on May 8, 2013, someone with a Thrive email address (with a cc to Ms. Shah) sent someone who appears to be at a sales floor a sample "Coaching Program Compliance" form, which was represented to be a "script," and which required the customer to be told:

> Lastly I need to ensure that there were no earnings claims made. During your conversation with **(Closer Name)** did they make any promises or guarantees that you would make any amount of money in any amount of time with this education? **(Yes or No) Must say no to continue!**

Email from Tucker Stoffers to Ryan Jensen copying Jennifer Shah (May 8, 2013), Alonso Dec. Ex. H (emphasis in original). Similarly, a February 2014 "enrollment agreement" between eLearning LLC and two purchasers provides:

> Our program is educational in nature. We cannot guarantee or represent that you will earn any specific amount of money. However, if you are not a success story for the program or we have not met or exceed your expectations we will continue to work with you at our own expense until you are.

eLearning, LLC Enrollment Agreement (Feb. 14, 2017), at 3, Alonso Dec., Ex. I. And finally, Sinclair also testified about earnings claims at the *Ketabchi* trial, flatly stating that "[s]pecific earnings claims were not allowed," Alonso Dec., Ex. G, at 543:3; salespeople "could not make blatant earnings claims," *id.* at 272:3–14; and that he had fired people for doing so, *id.* at 277:1–10. Although he also testified that salespeople often broke that rule, it nevertheless *was* a rule.

Det. Bastos disclosed none of this to the magistrate judge in either Affidavit. Although the government may well take the position that the scripts and contracts were designed to cover for earnings claims that salespeople at times in fact made, it is an incontrovertible fact that these documents and policies existed and Det. Bastos knew about them. Swearing to a magistrate judge multiple times that "promises" had been made, without telling the judge that documents existed that indicated exactly the opposite, is highly misleading. The existence of these documents and testimony can negate the inference that any criminal fraud was committed, or at the very least, that Ms. Shah had criminally fraudulent intent. It is therefore clearly something a reasonable judge would want to know before deciding a warrant application.[8]

### 2. **Statements that Ms. Shah "operated" Thrive**

Similarly, the Email and Cell-site Affidavits both contain the falsehood, attributed to various interviews of cooperating witnesses and Det. Bastos's "participation in this investigation," that a particular sales floor "did business with a company called Thrive, which was operated by Target Subject JEN SHAH" and that Ms. Shah "operated" Thrive. *See* Cell-site Aff. ¶¶ 8, 10(h); Email

---

[8] The issue of whether purchasers made money will be a continuing theme in this case, as in, for example, our motion to compel production of *Brady* material. *See* Section V, below.

Aff. ¶¶ 9, 11(j), 12(c), 13(e). Ms. Shah decidedly did *not* operate Thrive, as shown by materials produced by the government relating to an FTC matter involving Thrive and its successor company, Guidance. One of these items, an organizational chart contained within an extensive slide deck that appears to have been put together to attract investors, clearly shows that Ms. Shah was at best middle management (a vice-president) and was clearly not the "operator" of the company. Indeed, no fewer than four executives are listed above her on the chart—two partners, a CEO, and a CFO. Thrive Confidential Information Memorandum (Nov. 2011), Alonso Dec., Ex. J. In another item, the transcript of a 2015 deposition of Ms. Shah, she described her role at Thrive as involving "business development" rather than in any way operating or managing the company. Deposition of Jennifer Shah, *In the Matter of Top Shelf Marketing, et al.*, FTC No. 1423228 (April 7, 2015), at 9:4–14, 10:5–14, Alonso Dec., Ex. K. The citation of the deposition is particularly significant, because in a separate affidavit from a different warrant (the "House Affidavit," not at issue on this motion), Det. Bastos made clear that, at least at that time, he had read the FTC deposition. House Aff., Alonso Dec., Ex. L, ¶ 13(a). Indeed, the House Affidavit repeats the false statement about "operat[ing] Thrive, but also, based on the deposition, contains the more accurate statement that Ms. Shah merely "worked for" Thrive. *Id.* ¶ 13(b). Finally, the FTC filed a civil complaint against Thrive in 2017, which it ultimately settled without admission of wrongdoing, which named the two partners shown in the organizational chart as defendants; Ms. Shah was not mentioned. *See FTC v. Thrive Learning, LLC*, No. 17 C. 529 (DN), ECF No. 2, (D. Utah filed June 6, 2017), Alonso Dec., Ex. M.

In light of the evidence recited above, these statements—by a case agent who relied both on his "participation in the investigation" and his interviews with the CWs—were made in reckless disregard of the true fact that Ms. Shah did not operate Thrive. To be sure, the *Franks* doctrine

concerns "the affiant, not…any nongovernmental informant." *Franks,* 438 U.S. at 171; *see United States v. Tribunella,* 749 F.2d 104, 112 (2d Cir. 1984). But we are not relying on the false statements of the CWs. Rather, because the documents noted above were part of an FTC investigation into Thrive, it is a reasonable inference that they were either in Det. Bastos's possession or available to him. In fact, the Thrive court documents are readily available through a simple internet search, so it would have taken little effort for him to confirm that one of the subjects of his investigation did not, as he alleged, "operate" Thrive. His failure to mention these sources so the Magistrate Judge could understand that far more reliable sources contradicted the CWs constitutes at least reckless disregard of the truth. *See also United States v. Troxel*, 564 F. Supp. 2d 1235, 1246 (D. Kan. 2008) (finding reckless disregard for truth where officer's affidavit for a complete search of a residence stated that officers had earlier performed only a "walk through" search of a house when they had actually already conducted a warrantless full search).

### 3. Statements that Ms. Shah "operated" Red Steele

Det. Bastos swore in the Cell-site Affidavit, based on information from an unnamed source (CS-2) that separately-charged defendant Cameron Brewster "provided leads to Telemarketing Companies operated by SHAH and another individual, including a company called Red Steele." Cell-site Aff. ¶ 12(b). In actual fact, as the investigative files and secret recordings provided by the government demonstrate, Ms. Shah did not operate Red Steele, which was instead owned and operated by others. At a deposition taken by the FTC on June 19, 2018, provided by the government in discovery in this case, co-defendant Stuart Smith was asked about his own role at Red Steele, which he said was a company that brokered leads:

> Q.    Does Red Steele have employees?
>
> A.    Yes. It is small. There's three total.
>
> Q.    Who are they?

A.    Mike Brunsvold, who owns the company, and then myself, and Jared Peterson.

Deposition of Stuart Smith, at 6:16–20, *FTC v. Vision Solution Mtg.*, No. 18 Cv. 356 (TC) (Jun.

19, 2018), Alonso Dec., Ex. N. At two later points, Smith confirmed that Brunsvold was "the

owner." *Id.* at 8:10–16, 125:14–21. Ms. Shah is nowhere mentioned in the deposition transcript

with respect to Red Steele, and her name only came up once, in regard to Thrive, when Smith

confirmed that she had been an account manager just like him. *Id.* at 23:8–18.

Just as significantly, at a time when he did not know he was under investigation and had

no motive to lie, Smith was asked about Red Steele by a cooperating witness, interviewed on

multiple occasions by Det. Bastos, who was secretly recording the call:

> CW:    What—what're you do—d—wh—dude, I thought Red Steele was just,
> like, your personal S Corp that you—
>
> SS:    – No, no, Red Steele is not me. Nope, no. It was not me. There's, uh, an-
> other group—I mean, uh, I obviously have to set up to do the lead stuff but
> those guys—those guys are pieces of shit, so [pause]
>
> CW:    Who the fuck are—
>
> SS:    – Uh—
>
> CW:    – who was the Red Steele guys?
>
> SS:    They're—they're ju—dude, it was just—it—it was people that Ari knew
> that put him over it and they had no idea what they were doing.
>
> CW:    Oh.
>
> SS:    They're A-Holes.

Phone call between CW and Stuart Smith, April 17, 2020, at 22:27–22:59, Alonso Dec. ¶ 17.

Without the claim that Ms. Shah was *operating* Red Steele, the magistrate judge was left only with

the far weaker information, in paragraph 16(b) of the Cell-site affidavit, that a cellphone associated

with Ms. Shah texted someone from Brewster's office to send a password reset email to a "red-

steelco.com" email address—hardly an incriminating claim, and fully consistent with Ms. Shah's

simply working or being associated with Red Steele, like Smith. The false allegation that she operated Red Steele was far weightier.

Again, because he was either clearly in possession of this information (the recording), or it is a reasonable inference that he was (the deposition transcript), Det. Bastos acted with reckless disregard of the truth.

### C.     The Statements and Omissions were Material to Probable Cause

The above facts and documents make out the required showing that the affiant made false statements and omitted material information, either deliberately or in reckless disregard of the truth. The next step in the *Franks* inquiry is to establish that the false information or omissions were material. *See United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998). In the case of false statements, the task is to put aside the false information and determine whether "there remains a residue of independent and lawful information sufficient to support probable cause." *Ferguson*, 758 F.2d at 849. For material omissions, the test is "to …insert the omitted truths revealed at the suppression hearing" and determine whether the newly-constituted affidavit would support probable cause. *Rajaratnam*, 719 F.3d at 146. A judicial determination of probable cause requires "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

We address each affidavit in turn, and draw the Court's attention to what is common to both: even without the deletions and additions we request here, these affidavits do not allege sufficient facts to establish probable cause that Ms. Shah (a) knew what the sales floors were or were not doing, and (b) intended to defraud the purchasers of services, *see* Section III.B above, which

undermines the conclusion that there was probable cause that her location data and her email would contain evidence of a crime. She is said to have operated fulfillment and telemarketing companies, sold leads, purchased a CRM, and used cellphones and email to conduct business. But all of this is perfectly legal, and no insistence that everyone in this entire industry, in all transactions, was making false promises can provide the necessary knowledge to establish that this defendant was committing a crime, and that her data might therefore constitute evidence. And that is all *before* we delete the false statements and add in what Det. Bastos should have included in the first place.

### 1. <u>Cell-site Affidavit</u>

Once the allegations relating to Thrive and Red Stele are corrected to reflect the truth—that Ms. Shah, at best, worked at those companies rather than operating them—the only allegations about Ms. Shah are non-specific: she "operated" an unnamed telemarketing company and an unnamed fulfillment company at various times, Cell-site Aff. ¶¶ 11(a)–(b), 12(b), 13(c); purchased "customer relationship manager" tools (essentially, a sales database) from a cooperating witness, *id.* ¶ 13(b); and sold leads at Thrive to certain telemarketing companies, *id.* ¶ 10(h). Not one of these allegations contains a hint or a suggestion that, even if these companies were engaged in a fraud conspiracy, Ms. Shah had any *knowledge* of that fact, such that her cellphone location information would constitute evidence of a crime. There is no "telemarketing fraud" exception to the general rule that probable cause determinations require that a *crime,* complete with *mens rea,* be committed using the target instruments. Absent that, as to Ms. Shah, all of this information is consistent with legitimate business practices.

Moreover, even as to the fraudulent nature of the alleged scheme, a very different picture emerges when the omitted information contradicting the repeated statements that customers were "promised" returns and that none of them made money is added into the Cell-site Affidavit. Instead

of "promised," he would have had to write "promised, but the documents contradict that," or something similar. And he would not have been able to swear, as he did, that no "victim" ever made money—deflating his otherwise powerful statements. The Affidavit would become a contradictory set of allegations, alleging a "fraud" that does not appear particularly certain or particularly criminal. Buying and selling leads, finding companies to fulfill sales, upselling, and even finding ways to deal with customers who cannot pay their debts are all legitimate business practices and not illegal in and of themselves. At best, the renewed complaint would have alleged that unspecified "Telemarketing Companies" involved in the "scheme" have sleazy customer service practices that make it difficult to ask for refunds. To be sure, the Cell-site Affidavit noted that Brewster and others had been charged in connection the outlined scheme, but it did not connect those charges to the specified transactions with Ms. Shah, noting only that Brewster had sold leads to companies operated by Ms. Shah (*id.* ¶ 12(b)) and that an employee of Brewster's had had a text exchange with her (*id.* ¶ 16(b)).

## 2. **Email Affidavit**

In the same way, removing or correcting the references to Thrive, false promises, and universal failures to make money undermines the Email Affidavit as well (Red Steele was not mentioned). Once we remove all references to Thrive, customers making money, and promises about returns, there is very little difference between the Affidavits. The only real difference is that the Email Affidavit includes several allegations that Ms. Shah exchanged relatively innocuous emails with individuals charged in the conspiracy, and, on occasions, sent them spreadsheets to allegedly track upselling. *See* Email Aff. ¶¶ 14, 16(a)–(d). Again, none of this—even upselling—makes out criminal activity of any kind. Accordingly, the scope of the *Franks* hearing should also include the Email Affidavit, and all evidence seized as a result of that warrant (if it materializes) should be suppressed.

## IV.  **THE COURT SHOULD ORDER DISCLOSURE OF THE GRAND JURY MINUTES OR, ALTERNATIVELY, REVIEW THEM *IN CAMERA***

The false and misleading statements by a government agent that give rise to our *Franks* motion provide strong reason to believe that the government may have relied on false or otherwise unreliable evidence before the grand jury. For that reason, Ms. Shah moves for disclosure of the grand jury minutes under Fed. R. Crim. P. 6(e)(3)(E)(ii), or alternatively, *in camera* review by the Court, for the limited purpose of determining whether the indictment against Ms. Shah was secured through false and misleading testimony. We stress that we do not know at this point what occurred before the grand jury. But the false sworn statements given by Det. Bastos to the two magistrate judges—whether made deliberately or with reckless disregard for the truth—coupled with the fact that the principal witness before the grand jury in federal cases is typically the case agent, create a reasonable inference that similar testimony was presented to the grand jury.

Traditionally, the grand jury has served as a "buffer or referee between the Government and the people," in part to protect from unfounded accusations. *See United States v. Williams,* 504 U.S. 36, 47 (1992). And although its proceedings are secret, the Federal Rules of Criminal Procedure permit the Court to authorize disclosure of grand jury minutes "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Although grand jury proceedings enjoy a presumption of regularity, that can be overcome if a defendant makes "concrete allegations of government misconduct." *United States v. Leung,* 40 F.3d 577, 582 (2d Cir. 1994). To invoke disclosure under this Rule, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity." *United States v. Kirton*, No. 20 Cr. 322 (PMH), 2021 WL 1550423, at *1 (S.D.N.Y. Apr. 20, 2021) (quoting *United States v. Gibson*, 175

F. Supp. 2d 532, 534 (S.D.N.Y. 2001)). This standard applies both to *in camera* review and disclosure to the parties of grand jury minutes. *United States v. Dunn*, No. 05 Cr. 127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005).

As set forth in the previous section, review of the discovery provided thus far shows that Det. Bastos either deliberately or recklessly misrepresented highly relevant information for the purposes of securing two search warrants. *See* Section III.B, above. One of them, the Cell-site warrant, was issued on March 2, 2021. Because the indictment in this case was returned a few weeks later, on March 25, 2021, it is a reasonable inference that Det. Bastos or another government agent told the grand jury the same thing he told the magistrate judge—that the purchasers had all been "promised" particular returns on their investments and that no one received the returns they were promised. *See* Section III.B.1, above. These are not merely peripheral statements, but they go to the heart of whether the government established probable cause to believe there was criminal fraud and that Ms. Shah intended to harm the purchasers. Similarly, the false allegations that Ms. Shah "operated" Thrive and Red Steele are highly prejudicial to her, and little other evidence cited in the Affidavits tied her to actual criminal activity—as opposed to legitimate business association with businesses and individuals that the government claims were committing fraud. If, as it is reasonable to infer, the grand jury heard testimony consistent with the Affidavits before it deliberated as to whether to indict Ms. Shah, then the grand jury proceedings are defective because they were based on false, and potentially perjured, testimony. *See United States v. Basurto*, 497 F.2d 781, 787 (9th Cir. 1974) (reversing conviction where indictment was obtained in part on perjured testimony in front of grand jury); *cf. People v. Oliver*, 368 Ill. App. 3d 690, 696–97, 699–700 (2006) (affirming dismissal of two counts for deceptive testimony in front of grand jury in violation

of Fifth Amendment to the United States Constitution). The Court should therefore order review of the minutes of the grand jury proceedings.

## V. THE COURT SHOULD COMPEL PRODUCTION OF CERTAIN *BRADY,* AND *GIGLIO* MATERIAL, AS WELL AS THE POST-ARREST STATEMENTS OF STUART SMITH

The government and Ms. Shah have engaged in several discussions and written communications regarding discovery, including as to *Brady* material, and have resolved some issues but not others. Indeed, we continue to work in good faith to resolve issues short of intervention by this Court, and hope to propose a scheduling order in the near future that would set out a timetable for production and permission to seek the Court's intervention when issues arise. The three issues we raise on this motion are all related to some of the themes raised in our other motions: in order to prepare adequately for trial, Ms. Shah's team needs to have information that tends to show either that the details of the "promises" to the purchasers were not as cut and dried as the government has made them out to be, or that Ms. Shah did not know or intend that promises of specific earnings would be made to those purchasers.

As it does in every case, the government has assured us that it is aware of its obligations under *Brady* and *Giglio.* In this case, under Fed. R. Crim. P. 5(f), the Court issued an order on May 28 setting forth its expectations of the government's lawyers. It provided in pertinent part:

> *Brady v. Maryland*, 373 U.S. 83. 83 S, Ct 1194, 10 L, Ed, 2d 215 (1963), and the decisions that have built upon it establish that [the government] has an affirmative duty to seek out and provide to the defense all material evidence that is favorable to the accused and that is known to the Government…. This duty applies to evidence that affirmatively tends to exculpate the defendant, as well as information that impeaches the credibility of the Government's witnesses, at both the guilt and sentencing phases. Even inadmissible evidence may be material if it could lead to the discovery of admissible evidence. The Government must disclose such evidence to the defense promptly after its existence becomes known to the Government, so as to enable the defense to have an opportunity to make effective use of the evidence in preparing its case and at trial, including a reasonable opportunity to investigate the information. This is a continuing obligation and applies to materials

> that become known to the Government in the future. Additionally, if information is otherwise subject to disclosure, it must be disclosed regardless of whether the Government credits it.

Order, ECF No. 246 (citations omitted). Our requests on this motion require application of these principles. We add that where *Brady* material does exist, the Second Circuit takes a dim view when the government buries it in a large volume of documents or does not provide it in a timely manner. *See United States v. Gil,* 297 F.3d 93, 106–07, 108 (2d Cir. 2002) (reversing mail fraud conviction where one document negating fraudulent intent "was among five reams" of 18 U.S.C. § 3500 material); *cf. Bortnovsky*, 820 F.2d at 574–75 (reversing mail fraud and other convictions based on denial of bill of particulars, even though all the information had been provided by the government before trial within a group of 4,000 documents). Here, as discussed previously, we have been given well in excess of one million documents up to this point, which, as we wrote to the government in the bill of particulars context, "can't be analyzed in a lifetime without some amount of narrowing." Alonso Dec., Ex. C at 4.

As to the materiality standard of *United States v. Bagley*, 473 U.S. 667 (1985), we note two prudential principles. First, the Court's Rule 5(f) order points out that because *Bagley* sets out the standard for hindsight review on appeal, "'a prudent prosecutor will resolve doubtful questions in favor of disclosure.'" ECF No. 246, at 1 (quoting *United States v. Agurs*, 427 U.S. 97 (1976)). Indeed, the Justice Department's own policy "requires disclosure by prosecutors beyond that which is 'material' to guilt" under the standard of review articulated by the Supreme Court. U.S. Dep't of Just., Just. Manual § 9-5.001(c) (2018). Second, although not a legal standard, the prosecutors' ethical obligations under Rule 3.8(b) of the New York Rules of Professional Conduct requires that they turn over favorable information—unlike *Brady,* only if personally known to them—*without* regard to the question of materiality. NY ST RPC (22 NYCRR 1200.0) Rule 3.8(b);

*see* N.Y. City Bar, Formal Op. 2016-3 (Aug. 29, 2016) ("Rule 3.8(b) . . . does not contain the materiality limitation of state or federal constitutional law"); ABA Formal Op. 09-454 (same with respect to equivalent ABA Model Rule 3.8(d)).

### A. Information Regarding Purchasers Who Made Money or Who Understood That Any Earnings Promises Were Not Part of the Purchase

A central issue in this case is whether the sales floors invariably promised purchasers financial returns that, at the time of those representations, they knew and intended would not come to pass. *See* Section I.A, above (discussing wire fraud standard). The other crucial issue will be whether, whatever those salespeople might have known and intended at the time they sold services to the purchasers, *Ms. Shah* was aware that they were making such representations, and whether she joined their conspiracy willfully and with the intent to defraud the purchasers. For both of these reasons, the government should be required to disclose any information that tends to show that customers were *not* being made such promises—or that contradicts the government's evidence that they were—as well as information about all purchasers who made at least some money. Because it would clearly contradict the government's likely theory of the case, any such information is favorable to the defense. Information of this sort will also be relevant to Ms. Shah's intent, because if some, but not all, alleged victims were made earnings promises, then it would be less likely that Ms. Shah—steps removed from the sales floors to begin with—intended that these individuals be harmed. The same holds true if some "victims" made money and others did not.

Even with respect to purchasers that the government believes received promises for specific earnings, it should nevertheless be required to produce any information that tends to suggest that the purchasers understood that the oral promises by the salespeople had been contradicted or disavowed—because, for example, they signed contracts that disclaimed any earnings promises, or were otherwise told no such promises were being made. In other words, for every purchaser the

44

government contends was made a specific earnings promise, the government should be required to provide any information that that customer was *also* told that they were *not* being made earnings promises. As noted in Section III.B.1 above, we have located some such information, but what little we have found is insufficient given the time frame and scope of the alleged conspiracy. Some such information might be buried within more than a million pages of a document database, to say nothing of the more than 400 phones, thumb drives and computers that the government has made available but not included in the database. And some may only have been communicated orally to the government, or perhaps communicated in writing but not yet disclosed. All such information should be specifically identified.

The government might contend that such information is "merely" impeachment material under *Giglio,* which they will provide before trial with the § 3500 material. That would be incorrect, for two reasons. First, although what we request could certainly be used to impeach certain witnesses, it also would negate key aspects of the government's case independent of particular witnesses. Whether or not a particular witness is called to testify, the information requested could be admissible on its own, lead to other evidence, suggest witnesses for the defense to call, or be used on cross-examination of others. But just as importantly, even if it is characterized as impeachment material, the Court's Rule 5(f) order makes no distinction as to the timing of disclosure of *Brady* versus *Giglio* material: as to either, "[t]he Government must disclose such evidence to the defense promptly after its existence becomes known to the government, so as to enable the defense to have an opportunity to make effective use of the evidence in preparing its case and at trial, including a reasonable opportunity to investigate the information." ECF No. 246, at 2.

The Court should note that the government has advised Ms. Shah's team that it is in the process of identifying "witness statements" to ascertain whether purchasers "made at least some

money," and has endeavored to provide such information "to the extent it has not already been provided." Alonso Dec., Ex. D at 2. We appreciate the government's attention to its obligations, but note two issues with its phrasing. First, as detailed above, this request is broader than simply identification of people who made money, and it includes not just the content of witness statements, but any type of information the government has within its control (e.g., scripts, training materials, contracts, and communications). Second, the disclaimer "to the extent it has not already been provided" implicates the recurring problem, discussed in Section II above, that of favorable information provided to the defense but buried within staggering amounts of data. As this information, to the extent it exists, is classic *Brady* material, it should be identified as such. *See Gil*, 297 F.3d 93 at 106–07.

## B. Post-Arrest Statement of Co-Defendant Stuart Smith

On the same day Ms. Shah was arrested, co-defendant Stuart Smith was also arrested and made a recorded post-arrest statement. Such a statement could implicate the need for a severance or redaction pursuant to *Bruton v. United States,* 391 U.S. 123 (1968) and Fed. R. Crim. P. 14. Based on *Bruton* and the potential that the recording contained *Brady* material, we requested the entire statement. The government denied our request, but apparently agreed that at least some of it contains *Brady* material, as it disclosed five sets of statements from the interview to the defense. Among these disclosures were that Smith said he believed that the coaching services provided value, some customers did earn money, and that he believed that people could succeed in online business. Alonso Dec., Ex. D at 5-6. In response to our request to provide Smith's entire statement in time to file the present omnibus motions, the government advised that it would provide it "sufficiently in advance of trial to enable you to file any *Bruton* motion." *Id.* at 6.

We request that the Court order the government to provide the entire statement as soon as practicable, either under *Bruton* or under Fed. R. Crim. P. 16(a)(1)(E) as "material to the preparation of the defense." Under Rule 16, information that is material to the defense "means defendant's response to the Government's case in chief." *United States v. Armstrong*, 517 U.S. 456, 462 (1996). Here, the government will seek to prove that both Smith and Ms. Shah had knowledge and intent, and unless they tell the Court otherwise, Smith's statement will be part of their case in chief. Although most courts hold that discovery of co-defendant statements that could implicate *Bruton* is not mandatory, *United States v. Stein,* 424 F. Supp. 2d 720, 727 (S.D.N.Y. 2006), some do not. Most notably, Judge McMahon has on multiple occasions required production out of a concern for "proper case management." *See, e.g.*, *United States v. Elia*, No. 07 Cr. 543 (CM), 2008 WL 11423878, at *8 (S.D.N.Y. Mar. 28, 2008) (ordering notice of such statements within a week because "proper case management requires that such statements be provided to the defense sufficiently in advance of trial so that those issues can be resolved pre-trial."); *United States v. Angulo-Aguirre*, No. S4 07 Cr. 387 (CM), 2008 WL 11345907, at *5–6 (S.D.N.Y. Mar. 14, 2008) (same, but giving 3 days instead of one week); *accord United States v. Abakporo,* 959 F. Supp. 2d 382, 394 (S.D.N.Y. 2013) (ordering production of co-defendant statements with proposed redactions and proffer of agent's testimony within 20 days, notwithstanding government's characterization of "request for *Bruton* relief as premature"). And some courts who do not require prosecutors to turn such statements over nevertheless observe that it would be "wise" for prosecutors to do so in any event. *E.g.*, *United States v. Murgio,* 209 F. Supp.3d 698, 725 (S.D.N.Y. 2016).

For these reasons, we request that the Court order the government to provide Smith's post-arrest statement in its entirety.

### C.    *Giglio* Material as Soon as it is Identified

Although the government has taken the position that it will produce impeachment material "sufficiently in advance of trial," the Court's Rule 5(f) order makes no distinction as to the timing of disclosure of *Brady* versus *Giglio* material, requiring both to be disclosed "promptly after its existence becomes known to the Government," in part so the defense can have "a reasonable opportunity to investigate the information." ECF. No. 246, at 2. With respect to its cooperating witnesses, at least, the government is already aware of most if not all of the impeachment material it has available. Commendably, the government has already made some disclosures of what can properly be characterized as *Brady* material. We ask that the Court enforce the terms of the Rule 5(f) order and require production of *Giglio* material as well, at least to the extent that its existence becomes known to the government.

### VI.    MS. SHAH'S POST-ARREST STATEMENTS SHOULD BE SUPPRESSED BE-CAUSE HER WAIVER OF RIGHTS WAS OBTAINED THROUGH AFFIRMA-TIVE MISREPRESENTATIONS BY THE ARRESTING OFFICER

### A.    The March 30, 2021 Statement Was Coercive and Should be Suppressed

Ms. Shah moves to suppress her March 30, 2021 post-arrest interrogation statements, or in the alternative for a suppression hearing, on the grounds that they were involuntary under the Fifth Amendment Due Process clause, and that her waiver of rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), was also involuntary. At the time she waived her rights, Ms. Shah was in a very vulnerable emotional state due to the combination of strange phone calls she received the morning of her arrest and her history with a convicted felon who had victimized her in New York. This caused her will to be overborne easily by Det. Bastos and several affirmative misrepresentations he made in order to secure a waiver of rights.

There is no dispute that the interrogation was custodial or that Ms. Shah waived her *Miranda* rights both orally and in writing.

1. **Facts of Ms. Shah's Arrest**

On March 30, 2021, Ms. Shah was arrested in Salt Lake City, Utah, while on the road on her way to recording an episode of "Real Housewives of Salt Lake City" for the Bravo network. Shah Dec. ¶ 8. Shortly before she was stopped, a person who did not identify himself telephoned her and said that her husband had told this unknown person to call her. The unknown caller told Ms. Shah that she should return home. *Id.* ¶ 9. Ms. Shah immediately tried calling her husband, but he did not pick up even after she called twice. Ms. Shah began to worry for him. *Id.* ¶ 10.

Soon after, Ms. Shah received another call, this time from a 917 number. The caller identified himself as Det. Christopher Bastos of the New York Police Department. *Id.* ¶ 11. Ms. Shah was confused why an NYPD detective would be calling her, given that she was in Utah at the time. *Id.* ¶ 13. Her first thought and apprehension was that the matter was related to a different NYPD matter, in which Ms. Shah had been granted a permanent order of protection by a judge in Supreme Court, New York County, against a man who had victimized her ("Individual-1"). *Id.* ¶¶ 3–6, 12; *see* Shah Dec., Ex. A. Individual-1 was convicted, among other things, of felony criminal contempt for an incident in Manhattan in February 2017, in which Individual-1 had stolen from Ms. Shah and later violated a temporary order of protection by assaulting her in Salt Lake City. Shah Dec. ¶¶ 3–6. She wondered if Det. Bastos was calling about that and was in any event eager to know the reason for the call. *Id.* ¶ 12.

Det. Bastos did not tell her why he was calling, but instead told Ms. Shah to pull over, and minutes later, he pulled up in a car with other agents. She was walked to the back of the car, placed in handcuffs, and told that they had a warrant for her arrest. *Id.* ¶ 13. Ms. Shah was at this point incredibly confused and emotionally off-balance from the strange series of events, and believed she might have been the victim of a false identification. *Id.* ¶ 14. She repeatedly asked Det. Bastos for clarification, including "Am I under arrest?" and "Am I going to jail?" which were phrases she

used interchangeably and thought of as the same thing. *Id.* ¶ 15. Det. Bastos never answered either question, but repeatedly said words to the effect of, "We just want to talk to you" and "I promise we just want to talk to you." He also told her more than once that "We just want to make sure you're OK." *Id.* ¶ 16. Ms. Shah was consumed with a desire to know why she had been placed in handcuffs and apparently arrested. *Id.* ¶ 17. Unbeknownst to Ms. Shah at that time, Det. Bastos well knew who Individual-1 was. For one thing, although he does not appear to have been criminally charged in this case, Individual-1 is on the government's list of people involved in the scheme charged in Ms. Shah's indictment. Alonso Dec., Ex. D at 4. And separately, Det. Bastos and Ms. Shah discussed Individual-1 and Individual-1's brother during her interrogation. Shah Dec. ¶ 18.

Det. Bastos drove Ms. Shah to ICE headquarters and took her to a break room with a circular table and three chairs. He and an HSI agent handcuffed Ms. Shah to one of the chairs and then joined her at the table. Det. Bastos read Ms. Shah *Miranda* warnings from a printed paper. He also handed her a copy to sign as she read along. *Id.* ¶ 19. Although she heard the words Det. Bastos read, Ms. Shah's contact lenses, which were in her eyes, were dry, and she did not have her reading glasses, so her vision was blurry and she was unable to read the paper in front of her. *Id.* ¶ 20. Even while being read her rights, Ms. Shah did not know what was going on, and still thought it might be a potential misidentification. She was eager to find out what was going on, what Det. Bastos "just wanted to talk to" her about, and why he "wanted to make sure [she was] OK." She believed the only way she was finally going to get an answer was to sign the paper and waive her rights. *Id.* ¶ 21.

Each time Det. Bastos asked if she understood her rights, he told her to initial next to the relevant statement of rights. At one point, she signed next to the wrong line because she could not see the paper. Det. Bastos re-read the missed line to make sure she knew what she had signed.

After Ms. Shah stated that she understood that she could stop the questioning at any time for the purpose of consulting an attorney, Det. Bastos told her that she "gotta sign there." Ms. Shah followed his instructions. *Id.* ¶ 22. After she signed the waiver, even though she could not read it, but before Det. Bastos began his questioning, Ms. Shah informed the detective that her contact lenses were blurry. Det. Bastos and the agent found her contact solution in her bag, uncuffed her, and allowed her to fix the contact. They then re-cuffed one hand to the chair and began the interrogation. *Id.* ¶ 23.

Det. Bastos recorded the conversation but did not tell Ms. Shah he was doing so. *Id.* ¶ 24. Not until near the very end of the 1 hour, 20-minute interrogation, right after he said, "I want to conclude," did Det. Bastos finally tell Ms. Shah the truth about what she was being charged with. *Id.* ¶ 25. Notably, the interrogation itself corroborates that the agents had no intention of telling Ms. Shah the true purpose of the interrogation, and instead presents another highly misleading set of interactions between Det. Bastos and Ms. Shah. Under the guise of asking for information about other people he was "interested" in, he sought an admission of knowledge that the entire industry was a "fraud" (his words). Although it did not work—at no time did Ms. Shah admit to committing fraud, as Det. Bastos tried repeatedly to get her to do—he elicited her apparent knowledge of certain people, companies, government investigations, and the like, at least some of which the government will seek to offer at trial. (As noted at the end of this section, should this motion fail, we intend to move *in limine* to exclude the entire statement under Fed. R. Evid. 403.)

### 2.  Police Misrepresentation Led to a Coerced Waiver and Statement

Although Ms. Shah waived her *Miranda* rights, she did not do so voluntarily, but rather as a direct result of law enforcement deception and trickery calculated to overpower her will. In cases where, as here, the defendant signs an express waiver of her *Miranda* rights, the question becomes whether the "decision to 'sign[ ] the *Miranda* waiver w[as] knowingly and voluntarily made.'"

*United States v. Peter*, No. 17 Cr. 054 (NRB), 2018 WL 5282878, at \*4 (S.D.N.Y. Oct. 24, 2018)

(citing *Hawthorne v. Schneiderman*, 695 F.3d 192, 198 (2d Cir. 2012)). "The decision was know-

ing so long as [the defendant] understood [her] *Miranda* rights (and thus the consequences of

abandoning them), and it was voluntary so long as it was not the product of coercion." *Peter,* 2018

WL 5282878, at \*4 (citing *United States v. Plugh*, 648 F.3d 118, 127–28 (2d Cir. 2011)). A state-

ment is voluntary unless coercive police conduct "overbear[s] the defendant's will." *See United*

*States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing *Lynumn v. Illinois,* 372 U.S. 528, 534

(1963)). Courts should evaluate whether police conduct overbore defendants by looking at the

totality of the circumstances. *See United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (citing

*Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

  The Supreme Court has held that affirmative misrepresentations by police can invalidate a

waiver of a suspect's Fifth Amendment rights, *Lynumn,* 372 U.S. at 534 (misrepresentation that

suspect would lose financial aid for dependent child if did not cooperate), but it has not yet ruled

whether affirmatively misrepresenting the scope of an interrogation is grounds to invalidate a

waiver of *Miranda*. *See Colorado v. Spring*, 479 U.S. 564, 576, n.8 (1987). The Second Circuit

has taken a dim view of affirmative misrepresentations in general. *See Anderson*, 929 F.2d at 100

(invalidating *Miranda* waiver where arresting officer told defendant that he had to choose between

calling an attorney and being cooperative with the government). Law enforcement officers' con-

cealment of the true nature of their purpose will not compel a finding that a *Miranda* waiver was

involuntary unless the agents "affirmatively misled [defendant] about the true nature of the inves-

tigation." *United States v. Okwumabua,* 828 F.2d 950, 953 (2d Cir. 1987); *accord United States v.*

*Mitchell,* 966 F.2d 92, 100 (2d Cir. 1992).

In deciding the question of voluntariness, courts should look at "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Haak*, 884 F.3d at 409 (quoting and citing *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988)). With respect to the characteristics of the accused, a combination of circumstances unique to Ms. Shah weigh in her favor. First, her experience in the case against Individual-1, who in 2017 stole from and assaulted Ms. Shah while violating a court order, was traumatic. Shah Dec. ¶¶ 3–6. He has since been convicted of felonies in New York, and a felony order of protection is in effect until 2026. Shah Dec., Ex. A. Ms. Shah's lack of sophistication with these matters is shown by the fact that she automatically conflates in her own mind "arrest" and "going to jail." Shah Dec. ¶ 15. Additionally, as she avers in her declaration and is corroborated by the recording, at the time of the interrogation, Ms. Shah also had trouble reading the *Miranda* waiver because she did not have her reading glasses and her contact lenses were blurry, at one point causing her to initial the document in the wrong place. Shah Dec. ¶¶ 20, 22–23. We are not asserting that she did not hear the warnings, but we submit this circumstance as one additional factor in the required assessment of the totality of the circumstances.

The conditions of Ms. Shah's interrogation and the circumstances leading up to it also made Ms. Shah vulnerable to the arresting agents' misrepresentations. She received a strange call from an unknown person telling her that her husband—whom she was unable to reach—told them to call and to tell her to head home. Shah Dec. at ¶¶ 9–10. Minutes later, she received a call from an NYPD detective, which was extremely strange given that she lived in Utah, leading her to think immediately of the terrifying situation involving Individual-1. *Id.* ¶¶ 11–12. But upon his arrival, Det. Bastos placed her in handcuffs, pointedly did not tell her for what charge, and then misrepresented his intentions (see below), causing her to think it must be a case of mistaken identity. *Id.* ¶¶

13–17. All of these factors came together to put her in a vulnerable emotional state, worried for herself, her husband, and about a potentially violent felon tracking her down across multiple states. It manifested in her intense desire to find out what this was all about, which she understood could only happen if she waived her rights. *Id.* ¶ 21.

In terms of the third factor, the conduct of law enforcement, the agent here affirmatively misrepresented the true nature of his investigation, which can serve to invalidate a *Miranda* waiver. *See Okwumabua,* 828 F.2d at 953 (concealing true nature of their purpose will not invalidate *Miranda* waiver unless agents "affirmatively misled [defendant] as to the true nature of the investigation"). Here, although Det. Bastos identified himself as a police officer and placed Ms. Shah in handcuffs, he met her repeated questions about why she was being arrested with affirmative misrepresentations about the purpose of his transporting her to HSI and his desire to talk to her. Shah Dec. ¶¶ 11, 15–16. Specifically, he said, "We *just* want to talk to you," and "I promise we *just* want to talk to you." *Id.* ¶ 16. Both statements were plainly untrue, as he well knew that he would be taking Ms. Shah to a magistrate judge that day based on her having been indicted in New York. To be sure, he desperately did want to talk with her—but he did not *just* want to do so. These misrepresentations were especially coercive in context because they were in response to questions like "Am I under arrest?" and "Am I going to jail?" *See id.* ¶ 15. By telling Ms. Shah that his only desire was to talk, Det. Bastos misled her into believing that law enforcement was just trying to clear up an issue, if not trying to help her. And because two issues were in her head—the Individual-1 situation and her thought that there must be a mistake as to her identity, *id.* ¶¶ 12, 14—she wrongly believed that the only way to clear these two important issues up was to waive her rights, *id.* ¶ 21. Det. Bastos's further false statement, "We *just* want to make sure you're OK," *id.* ¶ 16, made matters even worse—not only because it was affirmatively misleading, but because it made

her wonder if she was in danger from a violent felon in Det. Bastos's jurisdiction, and led her to believe that the police might in fact be there to help her, *id.* ¶ 17.

Thus, by the time Ms. Shah entered the interrogation room (which was simply the break room of the agents' headquarters), she was scared and confused. She was confused about whether the police were trying to protect or imprison her, and scared that Individual-1 might somehow be involved. In light of what Det. Bastos said, and that he refused to tell her anything more, Ms. Shah believed that the only way to find out what was going on was to sign the paper in front of her. All of these factors, in their totality, overbore Ms. Shah's will, invalidating her waiver of her *Miranda* rights and rendering her statements involuntary. At a minimum, these allegations are sufficient to call the government's tactics into question and require a suppression hearing.

\* \* \* \*

Although motions *in limine* are premature at this stage, it is worth noting that if the Court denies the present suppression motion, we intend to move at the appropriate time to exclude the entire statement under Fed. R. Evid. 403. The interrogation that followed the waiver of rights was so misleading that it would confuse the jury and create a substantial danger of unfair prejudice. That is because Det. Bastos did two things during his questioning that no reasonable interrogator interested in the truth would have done. First, in a case that is principally about knowledge and intent, he elicited many pieces of information about what Ms. Shah knew or had heard about specific people and companies, but let the answers stand without clarifying *what* exactly she was acknowledging she knew, her basis of knowledge, the time-frame of her knowledge (e.g. on the day of the interrogation versus during transactions years ago), or whether what she knew was rank rumor. Second, at several points when, in response to his leading questions about leads and sales, Ms. Shah attempted to give answers that contradicted him or were otherwise exculpatory, Det.

Bastos repeatedly changed the subject or cut off Ms. Shah before she could fully do so. We provide that preview now as context to the present motion.

### VII. DEFENDANT SHOULD BE PERMITTED TO FILE ADDITIONAL AND SUPPLEMENTAL MOTIONS, AND TO JOIN THE CO-DEFENDANTS' MOTIONS

As stated, the discovery in this case is so voluminous, we have barely begun to understand what we have been provided. In particular, we have not yet received the contents of any electronic device that has been seized, nor been told by the government what from the more than 400 devices they intend to offer into evidence. It therefore may prove necessary to file additional motions once we have had the benefit of full discovery and additional particulars. We respectfully request leave to do so if such motions become appropriate during the course of the case. Finally, we join those motions set forth in defendant Cameron Brewster's October 13, 2020 memorandum of law delineated A, D, E, and F.

## **CONCLUSION**

The Court should grant defendant's motions in their entirety, and order whatever additional

relief it deems just and proper.

Dated:        New York, New York
                June 14, 2021

                        BUCKLEY LLP

                        /s/ Daniel R. Alonso
                        Daniel R. Alonso
                        Michael Chu

                        1133 Avenue of the Americas, Suite 3100
                        New York, New York 10036
                        Tel: (212) 600-2400
                        dalonso@buckleyfirm.com
                        mchu@buckleyfirm.com

                        Henry Asbill
                        2001 M Street NW, Suite 500
                        Washington, DC 20036
                        Tel: (202) 349-8000
                        hasbill@buckleyfirm.com

                        *Attorneys for Defendant Jennifer Shah*