# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

In re: Warrant and Order For Historical
Location Information for the Cellphones
Assigned Call Numbers 801 597 3434
and 385 775 9584, USAO Reference No.
2018R01583

------------------------------------------------------------

**AGENT AFFIDAVIT**

**21** Mag. **2397**

**Agent Affidavit in Support of Warrant and Order
for Cellphone Location and Pen Register Information**

STATE OF NEW YORK      )
                                          ) ss.
COUNTY OF NEW YORK   )

CHRISTOPHER BASTOS, being duly sworn, deposes and states:

## I.  Introduction

1.   I am a Detective with the New York City Police Department ("NYPD") and a Task

Force Officer with the Department of Homeland Security – Homeland Security Investigations

("HSI").  I have been a Detective with the NYPD for approximately 21 years and a Task Force

Officer with HSI for approximately five years.  While with HSI, I have participated in

investigations of fraud and money laundering offenses, and am familiar with some of the means

and methods used to commit such offenses, including the use of electronic devices and

cellphones.  I have experience executing warrants involving cellphone location information.

2.   **Requested Information.** I respectfully submit this Affidavit pursuant to 18 U.S.C.

§§ 2703(c) and (c)(1)(A) and the applicable procedures of Federal Rule of Criminal Procedure 41;

18 U.S.C. §§ 2703(d) & 2705; and 18 U.S.C. §§ 3121-3126, in support of a warrant and order for

historical  location  information  for  the  Target  Cellphones  identified  below  (collectively,  the

"Requested Information").

2019.07.24

US_588083

3. **Basis for Knowledge.** This Affidavit is based upon my participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals, as well as my training and experience. Because this Affidavit is being submitted for the limited purpose of obtaining the Requested Information, it does not include all the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. In addition, unless otherwise indicated, statements by others referenced in this Affidavit were not necessarily made to me, but may have been provided to me by someone else to whom I have spoken or whose report I have read (and who in turn may have had either direct or indirect knowledge of the statement). Similarly, unless otherwise indicated, information in this Affidavit resulting from surveillance does not necessarily set forth my personal observations, but may have been provided to me by other law enforcement agents who observed the events, and to whom I have spoken or whose report I have read.

4. **Target Cellphone, Subscriber, Target Subject, and Service Provider.** The Target Cellphones referenced in this Affidavit are

a. the cellphone assigned call number 801 597 3434 ("Target Cellphone-1"). As further discussed below, Target Cellphone-1 is subscribed to in the name of "Jennifer Shah" (the "Subscriber"). The Subscriber is believed to use the Target Cellphone and is a Target Subject of this investigation. From approximately August 2009 until at least May 29, 2020, AT&T ("Service Provider-1") was the Service Provider for Target Cellphone-1;

b. the cellphone assigned call number 385 775 9584 ("Target Cellphone-2," together with Target Cellphone-1, the "Target Cellphones"). As further discussed below, Target

2

2019.07.24

US_588084

Cellphone-2 is subscribed to in the name of "Jennifer Shah" -- the Subscriber and a Target Subject of this investigation. The Subscriber is believed to use the Target Cellphone. Since approximately March 2015, Verizon Wireless ("Service Provider-2," together with Service Provider-1, the "Service Providers") has been the Service Provider for Target Cellphone-2.

5. **Precision Location Capability.** Cellphone service providers have technical capabilities that allow them to collect at least two kinds of information about the locations of the cellphones to which they provide service: (a) precision location information, also known as E-911 Phase II data, GPS data, or latitude-longitude data, and (b) cell site data, also known as "tower/face" or "tower/sector" information. Precision location information provides relatively precise location information about a cellphone, which a provider can typically collect either via GPS tracking technology built into the phone or by triangulating the device's signal as received by the provider's nearby cell towers. Cell site data, by contrast, reflects only the cell tower and sector thereof utilized in routing any communication to and from the cellphone, as well as the approximate range of the cellphone from the tower during the communication (sometimes referred to as "per-call measurement" ("PCM") or "round-trip time" ("RTT") data). Because cell towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas, cell site data is typically less precise than precision location information. Based on my training and experience, I know that the Service Providers have the technical ability to collect precision location information from any cellphone on its network, including by initiating a signal on a Service Provider's network to determine the phone's location. I further know that cell site

2019.07.24

3

US_588085

data is routinely collected by the Service Providers in the course of routing calls placed to or from any cellphone on their networks.[1]

## II.  Facts Establishing Probable Cause

### A.  Probable Cause Regarding the Subject Offenses

6.  I respectfully submit that probable cause exists to believe that the Requested Information will lead to evidence of violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud and conspiracy to commit wire fraud), relating to a telemarketing fraud scheme (the "Business Opportunity Scheme"), 1956 (money laundering), and 1957 (engaging in monetary transactions in property derived from specified unlawful activity) (collectively, the "Subject Offenses"), including the location(s) of the Target Subject who is engaged in the Subject Offenses.

7.   Since 2016, the NYPD and HSI have been investigating a group of telemarketing companies (the "Telemarketing Companies") that operate a fraudulent scheme (the "Business Opportunity Scheme"), described in more detail below. From my participation in that investigation, I have learned, among other things, that:

a.   Participants in the Business Opportunity Scheme induced victims (the "Victims") to make payments through the false promise and pretense that the Telemarketing Companies and related entities would establish online businesses on the Victims' behalf, and that those online businesses would generate revenue and investment returns for the Victims.

b.   The purported online businesses, ostensibly but not actually established by the perpetrators of the Business Opportunity Scheme, and used to induce payment by the Victims, included businesses said to be online marketplaces and online merchant processing businesses.

---

[1] Toll records are sometimes necessary or helpful in order to obtain or interpret historical cell site data and are therefore also requested herein.

2019.07.24

4

In connection with the sale of those purported businesses, participants in the Business Opportunity Scheme would sell "services" purporting to make the management of those businesses more efficient or profitable, including "coaching" services, tax preparation, or website design services. At the outset of the Business Opportunity Scheme, a Victim would receive electronic or paper "pamphlets" and/or so-called "coaching sessions" regarding these purported online businesses, but at no point did the Victims actually earn any of the promised return on their intended investment.

c.   In the course of investing with the Telemarketing Companies, Victims frequently charged up to tens of thousands of dollars on their personal credit cards in order to fund their investments or make other payments to the Telemarketing Companies, but have not received any of the so-called returns they were promised.

8.   Based on my interviews of more than 100 Victims (the "Victim Interviews") and my participation in this investigation, I have learned, in substance and in part, the following regarding the Business Opportunity Scheme:

a.   Each Victim was contacted via phone by a representative of one of the Telemarketing Companies, who offered the Victim an opportunity to earn money by making a cash investment.  Each Victim was promised the opportunity to earn money through purported marketing websites or online businesses that would be created for the Victim (in some cases, Victims did not own or know how to operate a computer). Each Victim was told that the only step necessary for participating in this purported opportunity was an initial cash investment.

b.   Many Victims invested thousands of dollars with the Telemarketing Companies, typically in the form of (1) a check drawn on the Victim's bank account, or (2) a

5

2019.07.24

US_588087

credit card payment, sometimes by a cash advance against a credit card the Victim opened following the suggestion of the Telemarketing Companies.

c.    After making the initial investment, each of the Victims received repeated phone calls and emails from different Telemarketing Companies offering "coaching" or marketing services, seeking additional investments purportedly to support the Victims' own businesses, including tax preparation and business development services, and, eventually, debt relief services.

d.    None of the Victims earned the investment returns they were promised.  When a Victim called to inquire with the Telemarketing Companies regarding promised investment returns, the Victim was directed to managers who either did not answer the Victim's calls; told the Victim to invest more money to secure a return on investment; or promised to follow up with the Victim at a later time, but never did.

9.    Since in or about December 2016, in connection with this investigation, more than 20 individuals have pleaded guilty or have been convicted following trial of various federal criminal offenses, including the Subject Offenses, related to their respective roles operating certain of the Telemarketing Companies.  The individuals who have pleaded guilty include several cooperating witnesses, including CW-1, who have agreed to provide information to the Government in the hope of receiving leniency at sentencing, and CW-2 who has agreed to provide information to the Government in the hope of receiving a reduction in CW-2's sentence.

10. Based on my interviews of CW-1 and my review of email and other documents obtained from CW-1, I have learned the following, among other things:

a.    From in or about 2012 until in or about March 2017, CW-1 operated several Telemarketing Companies based in New Jersey, including Olive Branch Marketing ("Olive

6

2019.07.24

US_588088

Branch"), which participated in the Business Opportunity Scheme, primarily by selling so-called "business services" to Victims in connection with the Victims' purported online businesses. In order to perpetrate the Business Opportunity Scheme, the Telemarketing Companies, including Olive Branch, used lists of potential victims or "leads," many of whom had previously made an initial investment to create an online or "work from home" business with another Telemarketing Company. In general, the purchaser of a set of leads pays the seller (1) an upfront fee for the leads themselves, and/or (2) a royalty payment in the event that the purchaser of the leads is able to sell a product or service to a customer on the list.

b.    In order to accept credit card payments from Victims, the Telemarketing Companies used merchant accounts established at various banks and through various third parties across the country to process the Victims' payments (the "Merchant Accounts"). If one of the Merchant Accounts received a large number of customer claims for a refund, called "chargebacks," the Merchant Account was shut down. Therefore, the Telemarketing Companies sometimes made arrangements with individuals or entities that had operational Merchant Accounts – sometimes other Telemarketing Companies – to use those accounts to process Victim credit card payments, often for a fee. An individual or entity that permitted a Telemarketing Company to use their Merchant Account was colloquially said to "process" or "provide processing" for that Telemarketing Company.

c.    In addition, the Telemarketing Companies relied on "fulfillment" companies to communicate regularly with the Victims after they had been contacted by the Telemarketing Companies. The purpose of a fulfillment company was to provide a tangible products – such as pamphlets, videos, or other services – that were easily documented in order to prevent the Victims from successfully disputing charges from the Telemarketing Companies on their credit cards. If a

7

2019.07.24

US_588089

Telemarketing Company could demonstrate to a credit card company that a Victim had received some sort of product, the chance that the Victim would win a dispute was greatly decreased. In reality, the products that fulfillment companies provided were generally boilerplate and did not actually assist the Victims.

d. From approximately 2015 through March 2017, CW-1 operated a Telemarketing Company that effectively refinanced Victims' participation in the Business Opportunity scheme into a new scheme: After the Telemarketing Companies sold the Victims various services as part of the Business Opportunity Scheme, CW-1's company and other Telemarketing Companies would capitalize on the Business Opportunity Scheme Victims' credit card debts by offering to consolidate or settle the Victims' debt in exchange for an up-front payment to one of the Telemarketing Companies (the "Debt Relief Scheme").

e. CW-2 operated Prestige Worldwide Enterprises ("Prestige"), which was a company that provided fulfillment services to Olive Branch and other Telemarketing Companies. Prestige provided such services to Olive Branch from at least 2014 until at least late 2015 or early 2016. When an Olive Branch Victim attempted to dispute a credit card charge, Olive Branch employees would contact CW-2 in order to obtain records regarding the so-called products and services that had been provided to the Victim, and would submit those records to the credit card company to support the charge.

f. CW-2 also provided fulfillment services to a Telemarketing Company operated by an individual who has since been charged in connection with his role in the Business

8

2019.07.24

US_588090

Opportunity Scheme and is now cooperating with law enforcement in the hope of, but without the promise of, achieving leniency in sentencing ("CS-1").[2]

g. In approximately 2016 and 2017, CS-1 provided CW-1 with leads for the Debt Relief Scheme. CW-1's understanding was that those leads had already been contacted by CS-1's Telemarketing Company in connection with the Business Opportunity Scheme and were individuals who had already made payments to the Telemarketing Companies and as a result had incurred significant credit card debt.

h. From at least 2013 until at least 2014, Olive Branch also did business with a company called Thrive, which was operated by Target Subject JEN SHAH. Thrive, including through SHAH, sold leads to Telemarketing Companies participating in the Business Opportunity Scheme. Thrive also provided fulfillment services to Telemarketing Companies participating in the Business Opportunity Scheme, generally "coaching services" (and was therefore colloquially referred to as a "coaching floor"). At times, Thrive would also "upsell" additional products to Victims who had already purchased services from the Telemarketing Companies in connection with the Business Opportunity Scheme and pay a royalty to the Telemarketing Company.

11. Based upon my interviews of CS-1, I have learned the following, among other things:

a. From in or about 2012 until in or about 2019, CS-1 operated a Telemarketing Company based in the New York and New Jersey area. CS-1's Telemarketing Company participated in the Business Opportunity Scheme by selling so-called "business services" to Victims in connection with the Victims' purported online businesses, as described above. During that time period, CS-1 purchased leads from JEN SHAH and understood that SHAH

---

[2] CS-1's information has been corroborated by other evidence gathered in this investigation, including bank records, phone records and the statements of other witnesses.

9

US_588091

also provided leads to other Telemarketing Companies.  SHAH also operated a company that provided fulfillment services to Telemarketing Companies.

      b.    Although SHAH was often based in Utah, SHAH operated a Telemarketing Company based in Manhattan that sold so-called "business services" as part of the Business Opportunity Scheme as recently as 2019.  CS-1 purchased that company's leads from SHAH and sold additional products to Victims of SHAH's Telemarketing Company.  CS-1 also provided processing for SHAH's Telemarketing Company.

      c.    In approximately 2015 and 2016, CS-1 employed CAMERON BREWSTER[3] to maintain the relationships between CS-1's Telemarketing Companies and lead sources in Utah.

12. Based on my interviews of another individual who has been charged in connection with his role in the Business Opportunity Scheme and is now cooperating with law enforcement in the hope of, but without the promise of, achieving leniency in sentencing ("CS-2"),[4] I have learned the following, among other things:

      a.    For several months at the end of 2018 and beginning of 2019, CS-2 and BREWSTER were partners in E-Commerce Consulting, a Telemarketing Company located in Las Vegas, Nevada that sold "coaching" packages.  Another individual ("Individual-1") was the manager of E-Commerce Consulting and ran its day-to-day operations. The partnership between CS-2 and BREWSTER ended in approximately March 2019.

---

[3] BREWSTER and others have been charged in connection with their participation in the Business Opportunity Scheme in *United States v. Cheedie, et al.*, 19 Cr. 833 (SHS), attached hereto as Exhibit A.

[4]   CS-2's information has been corroborated by other evidence gathered in this investigation, including bank records, phone records and the statements of other witnesses.

2019.07.24

US_588092

b.   BREWSTER provided leads to Telemarketing Companies operated by SHAH and another individual, including a company called Red Steele.

13. Based on my interviews of CW-2, I have learned the following, among other things:

a.   CW-2 owned Prestige, which provided fulfillment services to Telemarketing Companies run by CS-1 (the "CS-1 Companies") from approximately 2013 through early 2018, which included providing Victims with purported business plans, bookkeeping services, video "tutorials," and logo designs.

b.   In order to obtain fulfillment services, employees of the CS-1 Companies would provide Prestige with information regarding the Victims, including the Victim's name, contact and payment information, and what product(s) the Victim had purchased.  One method by which the CS-1 Companies provided this information to CW-2 was by uploading it to a web-hosted customer relationship manager ("CRM"), which CW-2 had set up.

c.   JEN SHAH operated a set of companies that provided fulfillment services to the Telemarketing Companies.  In or about early 2018, CW-2 set up a CRM for SHAH's companies to use to provide fulfillment services to Telemarketing Companies.  SHAH paid a deposit to CW-2 for the CRM in or about December 2017.

**B.   Probable Cause Regarding the Target Cellphones**

**1.   Target Cellphone-1**

14. Based on my interviews of CW-2, I have learned that, between in or about March 2018 and May 2018, JEN SHAH, using Target Cellphone-1, communicated with CW-2 regarding the CRM that CW-2 was establishing for SHAH's companies.

15. Based on my review of records obtained from Service Provider-1, I have learned that "Jennifer Shah" was the subscriber for Target Cellphone-1 from at least August 2009 through May 29, 2020.

11

2019.07.24

US_588093

### 2. Target Cellphone-2

16. Based on my review of text messages between Individual-1 and Target Cellphone-2, I have learned the following, among other things:

    a.   The contact name in Individual-1's phone for Target Cellphone-2 is "Jen Shah."

    b.   Between on or about June 29, 2019 and July 1, 2019, Individual-1 and Target Cellphone-2 engaged in the following text message exchange:

| | |
|---|---|
| **Individual-1:** | Hi it [Individual-1] from cams office here is our wire information<br>Ecommerce web development<br>2121 e Tropicana ave<br>Las Vegas NV 89119<br>Bank of America |
| **Target Cellphone-2:** | Hi [Individual-1]! Thank you for sending the wire information. I'll get that sent out. |
| **Individual-1:** | Hey cam said you were having a hard time getting leads. Did you receive your verification email to reset the password |
| **Target Cellphone-2:** | We haven't received anything yet. Can you have your side double check the email address they're using? |
| **Individual-1:** | Yes. |
| **Target Cellphone-2:** | Thank you! |
| **Individual-1:** | That was just re sent |
| **Target Cellphone-2:** | Ok I'll check |
| **Target Cellphone-2:** | Are they using this email?<br>customersupport@redsteeleco.com |

17. Based on my review of records obtained from Service Provider-2, I have learned that "Jennifer Shah" has been the subscriber for Target Cellphone-2 from at least March 2016 through at least October, 2020.

18. Accordingly, the Requested Information is likely to reveal evidence, fruits, or instrumentalities of the Subject Offenses, including the locations at which evidence of the Subject

2019.07.24

US_588094

Offenses may be stored, the location of additional Telemarketing Companies, and the identities of co-conspirators in the Business Opportunity Scheme.

### III.  Request for Warrant and Order

19. Based on the foregoing I respectfully request that the Court require the Service Providers to provide the Requested Information as specified further in the Warrant and Order proposed herewith, including, with respect to Target Cellphone-1, historical cell site data and toll records for the period from December 1, 2017 through May, 29, 2020 and, with respect to Target Cellphone-2, historical cell site data and toll records for the period from December 1, 2017 through the date of this Order.

20. **Nondisclosure.** Although several individuals have already been charged in connection with this investigation, the scope of the ongoing criminal investigation are not publicly known.  As a result, premature public disclosure of this affidavit or the requested Warrant and Order could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.

13

2019.07.24

US_588095

21. Accordingly, there is reason to believe that, were the Service Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized.  Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Service Provider be directed not to notify the subscriber or others of the existence of the Warrant and Order for a period of one year, and that the Warrant and Order and all supporting papers be maintained under seal until the Court orders otherwise, as specified in the Application submitted in conjunction with this Affidavit.

S/ by the Court with permission
_____
Det. Christopher Bastos, Task Force Officer
Department of Homeland Security
Homeland Security Investigations

Sworn to before me this
__2nd___ day of March 2021

_____
HONORABLE ROBERT W. LEHRBURGER
United States Magistrate Judge
Southern District of New York

14

2019.07.24

US_588096