# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of a Warrant for All Content and Other Information Associated with the Email Account jenshah@comcast.net Maintained at Premises Controlled by Comcast Communications LLC, USAO Reference No. 2018R01583

---

# 20 MAG 9129

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

### Agent Affidavit in Support of Application for a Search Warrant for Stored Electronic Communications

STATE OF NEW YORK )
) ss.
COUNTY OF NEW YORK )

CHRISTOPHER BASTOS, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

1. I am a Detective with the New York City Police Department ("NYPD") and a Task Force Officer with the Department of Homeland Security – Homeland Security Investigations ("HSI"). I have been a Detective with the NYPD for approximately 20 years and a Task Force Officer with HSI for more than four years. While with HSI, I have participated in investigations of fraud and money laundering offenses, and am familiar with some of the means and methods used to commit such offenses, including the use of electronic devices and cellphones. I have experience executing search warrants involving electronic evidence, including email and cloud computing accounts.

### B. The Provider, the Subject Account and the Subject Offenses

2. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the email account

2

US_588038

jenshah@comcast.net (the "Subject Account"), maintained and controlled by Comcast Communications LLC (the "Provider"), headquartered at 650 Centerton Road, Moorestown, New Jersey. The information to be searched is described in the following paragraphs and in Attachment A to the proposed warrant.

3. As detailed below, there is probable cause to believe that the Subject Account, which is used by JEN SHAH, contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 and 1349 (wire fraud and conspiracy to commit wire fraud), relating to certain telemarketing fraud schemes (the "Business Opportunity Scheme" and the "Debt Relief Scheme," collectively, the "Telemarketing Scheme"), Section 1956 (money laundering), and Section 1957 (engaging in monetary transactions in property derived from specified unlawful activity) (collectively, the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of email in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## C. Services and Records of the Provider

4. I have learned the following about the Provider:

a. The Provider offers email services to the public. In particular, the Provider allows subscribers to maintain email accounts under the domain name comcast.net. A subscriber using the Provider's services can access his or her email account from any computer connected to the Internet.

3

US_588039

b. The Provider maintains the following records and information with respect to every subscriber account:

i. *Email contents*. In general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

ii. *Address book.* The Provider also allows subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

iii. *Subscriber and billing information.* The Provider collects and maintains (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Provider also maintains records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Provider maintains records of the subscriber's means and source of payment, including any credit card or bank account number.

iv. *Transactional information.* The Provider also typically retains certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Provider's website).

4

US_588040

v. *Customer correspondence.* The Provider also typically maintains records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

vi. *Preserved and backup records*. The Provider also maintains preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Provider may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

**D. Jurisdiction and Authority to Issue Warrant**

5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

5

US_588041

**II. Probable Cause**

    **A. Probable Cause Regarding the Subject Offenses and the Subject Account**

    8. Since 2016, the NYPD and HSI have been investigating a group of telemarketing companies (the "Telemarketing Companies") that operate a fraudulent scheme (the "Business Opportunity Scheme"), described in more detail below. From my participation in that investigation, I have learned, among other things, that:

    a. Participants in the Business Opportunity Scheme induced victims (the "Victims"), many of whom are over the age of 70, to make payments through the false promise and pretense that the Telemarketing Companies and related entities would establish online businesses on the Victims' behalf, and that those online businesses would generate revenue and investment returns for the Victims.

    b. The purported online businesses, ostensibly but not actually established by the perpetrators of the Business Opportunity Scheme, and used to induce payment by the Victims, included businesses said to be online marketplaces and online merchant processing businesses. In connection with the sale of those purported businesses, participants in the Business Opportunity Scheme would sell "services" purporting to make the management of those businesses more efficient or profitable, including tax preparation or website design services. At the outset of the Business Opportunity Scheme, a Victim would receive electronic or paper "pamphlets" and so-called "coaching sessions" regarding these purported online businesses, but at no point did the Victims actually earn any of the promised return on their intended investment.

    c. In the course of investing with the Telemarketing Companies, Victims frequently charged up to tens of thousands of dollars on their personal credit cards in order to fund their investments or make other payments to the Telemarketing Companies, but have not received any of the so-called returns they were promised.

12.06.2018

US_588042

d.  After the Telemarketing Companies sold the Victims various services as part of the Business Opportunity Scheme, the Telemarketing Companies effectively leveraged their Victims' participation in the Business Opportunity scheme into a new scheme. The Telemarketing Companies would capitalize on the Business Opportunity Scheme Victims' credit card debts by offering to consolidate or settle the Victims' debt in exchange for an up-front payment to one of the Telemarketing Companies (the "Debt Relief Scheme").

9.  Based on my interviews of more than 100 Victims (the "Victim Interviews") and my participation in this investigation, I have learned, in substance and in part, the following regarding the Business Opportunity Scheme:

e.  Each Victim was first contacted via phone by a representative of one of the Telemarketing Companies, who offered the Victim an opportunity to earn money by making a cash investment.  Each Victim was promised the opportunity to earn money through purported marketing websites that would be created for the Victim (in some cases, Victims, who in the course of this scheme tended to be elderly, did not own or know how to operate a computer). Each Victim was told that the only step necessary for participating in this purported opportunity was an initial cash investment.

f.  Many Victims, the majority of whom are over 70 years old, invested thousands of dollars with the Telemarketing Companies, typically in the form of (1) a check drawn on the Victim's bank account, or (2) a credit card payment, often by a cash advance against a credit card the Victim opened following the suggestion of the Telemarketing Companies.

g.  After making the initial investment, each of the Victims received repeated phone calls and emails from different Telemarketing Companies offering "coaching" or

12.06.2018

US_588043

marketing services, seeking additional investments purportedly to support the Victims' own businesses, tax preparation and business development services, and, eventually, debt relief services.

h. None of the Victims earned the investment returns they were promised. When a Victim called to inquire with the Telemarketing Companies regarding promised investment returns, the Victim was directed to managers who either did not answer the Victim's calls; told the Victim to invest more money to secure a return on investment; or promised to follow up with the Victim at a later time, but never did.

10. Since in or about December 2016, in connection with this investigation, more than 15 individuals have pleaded guilty or have been convicted following trial of various federal criminal offenses, including the Subject Offenses, related to their respective roles operating certain of the Telemarketing Companies. The individuals who have pleaded guilty include several cooperating witnesses, including CW-1 and CW-3, who have agreed to provide information to the Government in the hope of receiving leniency at sentencing, and CW-2 who has agreed to provide information to the Government in the hope of receiving a reduction in CW-2's sentence.

11. Based on my interviews of CW-1 and my review of email and other documents obtained from CW-1, I have learned the following, among other things:

a. From in or about 2012 until in or about March 2017, CW-1 operated several Telemarketing Companies based in New Jersey, including Olive Branch Marketing ("Olive Branch"), which participated in the Business Opportunity Scheme, primarily by selling so-called "business services" to Victims in connection with the Victims' purported online businesses. In order to perpetrate the Business Opportunity Scheme, the Telemarketing Companies, including Olive Branch, used lists of potential victims or "leads," many of whom had previously made an

12.06.2018

US_588044

initial investment to create an online or "work from home" business with another Telemarketing Company. In general, the purchaser of a set of leads pays the seller (1) an upfront fee for the leads themselves, and/or (2) a royalty payment in the event that the purchaser of the leads is able to sell a product or service to a customer on the list.

b. In order to accept credit card payments from Victims, the Telemarketing Companies used merchant accounts established at various banks and through various third parties across the country to process the Victims' payments (the "Merchant Accounts"). If one of the Merchant Accounts received a large number of customer claims for a refund, called "chargebacks," the Merchant Account was shut down. Therefore, the Telemarketing Companies sometimes made arrangements with individuals or entities that had operational Merchant Accounts – sometimes other Telemarketing Companies – to use those accounts to process Victim credit card payments, often for a fee. An individual or entity that permitted a Telemarketing Company to use their Merchant Account was colloquially said to "process" or "provide processing" for that Telemarketing Company.

c. In addition, the Telemarketing Companies relied on "fulfillment" companies to communicate regularly with the Victims after they had been contacted by the Telemarketing Companies. The purpose of a fulfillment company was to provide tangible products – such as pamphlets, videos, or other services – that were easily documented in order to prevent the Victims from successfully disputing charges from the Telemarketing Companies on their credit cards. If a Telemarketing Company could demonstrate to a credit card company that a Victim had received some sort of product, the chance that the Victim would win a dispute was greatly decreased. In reality, the products that fulfillment companies provided were generally boilerplate and did not actually assist the Victims.

9

US_588045

d. CW-2 operated Prestige Worldwide Enterprises ("Prestige"), which was a company that provided fulfillment services to Olive Branch and other Telemarketing Companies. Prestige provided such services to Olive Branch from at least 2014 until at least late 2015 or early 2016. When an Olive Branch Victim attempted to dispute a credit card charge, Olive Branch employees would contact CW-2 in order to obtain records regarding the so-called products and services that had been provided to the Victim, and would submit those records to the credit card company to support the charge.

e. CW-2 also provided fulfillment services to a Telemarketing Company operated by ANTHONY CHEEDIE.[1]

i. In approximately 2016 and 2017, CHEEDIE provided CW-1 with leads for the Debt Relief Scheme. CW-1's understanding was that those leads had already been contacted by CHEEDIE's Telemarketing Company in connection with the Business Opportunity Scheme and were individuals who had already made payments to the Telemarketing Companies and as a result had incurred significant credit card debt.

j. From at least 2013 until at least 2014, Olive Branch also did business with a company called Thrive, which was operated by JEN SHAH. Thrive generated leads that were then sold to Telemarketing Companies participating in the Business Opportunity Scheme. Thrive also provided fulfillment services to Telemarketing Companies participating in the Business Opportunity Scheme, generally "coaching services" (and was therefore colloquially referred to as a "coaching floor"). At times, Thrive would also "upsell" additional products to Victims who had

---

[1] On or about November 19, 2019, a grand jury sitting in the Southern District of New York returned an indictment charging CHEEDIE and others with wire fraud conspiracy arising from their roles in perpetrating the Business Opportunity Scheme (the "Indictment"). A copy of the Indictment is attached as Exhibit A and incorporated by reference herein.

12.06.2018

US_588046

already purchased services from the Telemarketing Companies in connection with the Business Opportunity Scheme and pay a royalty to the Telemarketing Company.

12. Based on my interviews with CW-3, I have learned the following, among other things:

a. From in or about 2012 until in or about 2013, CW-3 operated a Telemarketing Company based in Utah. From approximately 2013 through approximately 2016, CW-3 worked primarily as a "lead broker," acting a middleman between lead sources, which are generally based in Arizona, Utah and other states in the western United States, and Telemarketing Companies in New York and New Jersey. From approximately 2016 through January 2019, CW-3 worked at other New Jersey-based Telemarketing Companies , which participated in the Business Opportunity Scheme, by selling so-called "business services" to Victims in connection with the Victims' purported online businesses, as described above.

b. In approximately 2012 and while CW-3 was acting as a lead broker, SHAH provided leads to CW-3.

c. SHAH operated a company called Thrive.

d. Recently, SHAH operated a Telemarketing Company in the New York City area. CHEEDIE provided processing for SHAH's New York Telemarketing Company.

13. Based on my participation in this investigation, my interviews of CW-2, and my review of materials provided by CW-2 and bank records, I have learned the following, among other things:

a. CW-2 owned Prestige, which provided fulfillment services to Telemarketing Companies run by CHEEDIE (the "Cheedie Companies") from approximately 2013 through

11

12.06.2018

US_588047

early 2018, which included providing Victims with purported business plans, bookkeeping services, video "tutorials," and logo designs.

b. In order to obtain fulfillment services, employees of the Cheedie Companies would provide Prestige with information regarding the Victims, including the Victims' name, contact and payment information, and what product(s) the Victims had purchased. One method by which the Cheedie Companies provided this information to CW-2 was by uploading it to a web-hosted customer relationship manager ("CRM"), which CW-2 had set up. Prestige employees would then contact the Victims by phone and/or by email.

c. National Business Development LLC, Atlantic Business Co. LLC, and Success Business Development were three of the Cheedie Companies.

d. JACOB SHAK was CHEEDIE's partner in at least some of the Cheedie Companies.

e. JEN SHAH operates a set of companies, including Thrive, that provide fulfillment services to the Telemarketing Companies. In or about early 2018, CW-2 set up a CRM for SHAH's companies to use to provide fulfillment services to Telemarketing Companies. SHAH paid a deposit to CW-2 for the CRM in or about December 2017.

f. In 2015, Prestige provided fulfillment services to SHAH's companies in connection with sales that SHAH's companies made to Victims, including purported business plans, bookkeeping services, video "tutorials," and logo designs. At SHAH's direction, Prestige maintained a toll-free phone number that Victims could use to contact Prestige about the purported products they had purchased from SHAH's companies.

14. Based on my review of email records, I have learned that on or about September 3, 2015, SHAH, using the Subject Account, sent an email to CW-2, which stated "[CW-2,] here is

12.06.2018

US_588048

the logo in case you need it." That same day, CW-2 responded by email to the Subject Account, stating "Great News – we have the toll free number and site up for our new msg fulfillment."

15. Based on my review of bank records, I have learned the following, among other things:

a. CHEEDIE and SHAK are both authorized signatories on a bank account held in the name "Atlantic Business Company, LLC."

b. SHAK is the authorized user of an ATM/debit card issued in connection with a bank account held in the name "National Business Development, LLC."

16. Based on my review of email records, I have learned the following, among other things:

a. On or about June 5, 2018, the Subject Account sent an email to SHAK, attaching a spreadsheet named "5%2F14-5%F18 Upsell Spreadsheet." The spreadsheet contains the name of an individual, as well as contact information for that individual and columns titled "Initial Amount Collected," "Products," "Coach," "Sales Floor," and "Mentor Group."

b. On or about June 5, 2018, the Subject Account sent an email to SHAK, attaching a spreadsheet named "5%2F21-5%F25 Upsell Spreadsheet." The spreadsheet contains the names of two individuals, including Victim-1, as well as contact information for those individuals and columns titled "Initial Amount Collected," "Products," "Coach," "Sales Floor," and "Mentor Group." With respect to Victim-1, the "Initial Amount Collected" column reads "$6,500," and the "Products" column reads "12 Weeks coaching, ebay training/dropshipping, and webbuilder."

c. On or about June 16, 2018, the Subject Account sent an email to SHAK, attaching a spreadsheet named "6%2F4-6%2F8 Upsell Spreadsheet."[2] The spreadsheet contains

---

[2] I have reviewed SHAK's reply to the Subject Account, which acknowledges receipt of the spreadsheet, and which indicates that the original email attached a document titled "6%2F4-6%2F8 Upsell Spreadsheet.xlsx," but does not include the original attachment. I have also reviewed a

12.06.2018

US_588049

the names of three individuals, as well as contact information for those individuals and columns titled "Initial Amount Collected," "Products," "Coach," "Sales Floor," and "Mentor Group."

    d. On or about August 19, 2018, the Subject Account sent an email to SHAK, attaching a spreadsheet named "AWF – AWB." The spreadsheet contains several tabs, which contain entries that include the names of individuals, as well as contact information for those individuals and columns titled "Package," "Amount," "Add-On," and "Domain Name."

17. Based on my interview of Victim-1, I have learned the following, among other things:

    a. Victim-1 viewed a video advertisement for a home-based business on YouTube. According to Victim-1, the video made it seem that the business would automatically generate money. Victim-1 provided her contact information in response to the advertisement.

    b. Subsequently, Victim-1 received a telephone call -- which she understood to be the result of her providing her contact information in response to the video advertisement -- during which the caller sold Vicitm-1 a package whereby a website would be built for her and she would learn to operate an online business using Amazon and EBay.

    c. After Vicitm-1 purchased the package, she received telephone calls twice per week for several weeks from "coaches," who purported to teach her about her online business.

    d. Victim-1 also received additional phone calls during which the caller attempted to sell Victim-1 additional products for her business.

    e. Victim-1 never made any money from her purported online business.

---

spreadsheet, obtained from SHAK, titled "6_2F4-6_2F8 Upsell Spreadsheet.xlsx." Based on my familiarity with how different software applications display non-alphanumeric characters in file or document names, as well as my review of the emails and spreadsheets discussed in paragraphs 16(a) and 16(b), I believe that the spreadsheet titled "6_2F4-6_2F8 Upsell Spreadsheet.xlsx" is the spreadsheet that was attached to the original email that was sent to SHAK from the Subject Account on or about June 16, 2018.

12.06.2018

US_588050

18. Based on my participation in this investigation, including the information discussed above, I believe that the individuals listed in the spreadsheets discussed in paragraph 16 above are Victims of the Business Opportunity Scheme, and that SHAH, using the Subject Account, sent those spreadsheets to SHAK in order to either track "upsales" by SHAH's company to Victims that had previously made purchases from SHAK and CHEEDIE's companies (and for which SHAH would owe a royalty to SHAK and CHEEDIE), or provide leads to SHAK and CHEEDIE for potential Victims to whom SHAH's company had already provided "coaching" services so that the Cheedie Companies could "upsell" those Victims (and for which SHAK and CHEEDIE would owe a royalty to SHAH).

## B. Evidence, Fruits and Instrumentalities

19. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Providers' servers associated with the Subject Account will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

20. In particular, I believe the Subject Account is likely to contain the following information:

      a.   evidence of the identities of the subscribers and/or users of the Subject Account;

      b.   evidence of the identities of victims of the Subject Offenses;

      c.   evidence of participation in the Subject Offenses, by the subscribers and/or user of the Subject Account, including, but not limited to, communications among co-conspirators;

      d.   evidence of communications in furtherance of the Business Opportunity Scheme and/or the Debt Relief Scheme, including but not limited to, communications with Victims of the scheme that include misrepresentations and/or omission in furtherance of the scheme,

12.06.2018

US_588051

communications regarding chargebacks and/or payment disputes, and communications regarding products and services provided to victims;

e. transactional information, including records of session times and durations, log files, dates and times of connecting, methods of connecting, and ports;

f. documents, spreadsheets and ledgers tracking the Business Opportunity Scheme and/or the Debt Relief Scheme;

g. evidence regarding financial transactions conducted in connection with the Business Opportunity Scheme;

h. information pertaining to the location of other evidence, including the location of individuals and entities participating in the Business Opportunity Scheme and/or the Debt Relief Scheme and any computers and/or mobile devices used to communicate with co-conspirators and/or victims, or to access the Subject Account;

i. passwords, keys, or other information needed to access the Subject Account, information contained in the Subject Account, or other computers or online accounts.

**III. Review of the Information Obtained Pursuant to the Warrant**

21. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service. Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and

16

US_588052

instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

22. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Account. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV. Request for Non-Disclosure and Sealing Order**

23. While several individuals have been publicly charged in the Indictment, the scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets, including SHAH and her associates, that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. In particular, given that targets of the investigation are known to use computers and electronic communications in furtherance of their activity, the targets could easily delete, encrypt, or

17

US_588053

otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation.  *See* 18 U.S.C. § 2705(b)(3).

24. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of one year from issuance, subject to extension upon application to the Court, if necessary.

25. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**V. Conclusion**

26. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C.

12.06.2018

US_588054

§ 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the

relevant provisions of Federal Rule of Criminal Procedure 41.

s/Christopher Bastos, by the Court, with permission
_____

Detective Christopher Bastos
Task Force Officer
Department of Homeland Security –
    Homeland Security Investigations

Sworn to me through the transmission of this
Affidavit by reliable electronic means (FaceTime),
pursuant to  Federal Rules of Criminal Procedure 41(d)(3)
and 4.1, this __26__ day of August, 2020

_____
HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

19

US_588055