**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

      Plaintiff,     No. S4 1:19-cr-0833 (SHS)

    v.

JENNIFER SHAH,

      Defendant.

## DECLARATION OF JENNIFER SHAH

   JENNIFFER SHAH declares the following under penalty of perjury, pursuant to 28 U.S.C.

§ 1746:

   1.  I am the defendant in the above-captioned case.

   2.  I make this declaration in support of my pre-trial motions in the above-captioned

case, filed by my attorneys. I have personal knowledge of the facts stated.

### Background—Individual-1

   3.  In 2017, I was the victim of multiple crimes by an individual known to me (Individual-1), who stole money from me, violated an order of protection issued by a judge, and assaulted me, causing my physical injuries. In brief, he was arrested on February 5, 2017 for, among other things, stealing from me in New York County, New York. The arresting officer was a detective of the New York Police Department (NYPD).

   4.  After his initial arrest and arraignment, a judge issued a temporary order of protection, which required Individual-1 to stay away from me.

5.      He did not stay away from me, and instead physically assaulted me on March 27, 2017 in Salt Lake City, Utah, causing physical injuries documented by photographs and a trip to the hospital. He has also made multiple threats against me on multiple occasions.

6.      As a result of his crimes against me, Individual-1was convicted in New York State court of multiple felonies, including Aggravated Criminal Contempt for violating the temporary order of protection. Among the provisions of his sentence was a final order of protection issued on November 28, 2018, which will be in effect until January 2026. Since the order was issued, I have remained concerned that Individual-1 will again violate an order and contact me further.

7.      Attached as Exhibit A is a true and correct copy of the order, redacted to remove Individual-1's name.

**Events of March 30, 2021**

8.      On March 30, 2021, I was arrested in Salt Lake City, Utah, while on the road on my way to recording an episode of "Real Housewives of Salt Lake City" for the Bravo network.

9.      Shortly before I was stopped, an unknown person called me and said that my husband had told this unknown person to call me. The unknown caller told me to head home.

10.      I immediately tried calling my husband, but he did not pick up even after I called more than once. I began to worry for him.

11.      Soon after, I received another phone call, this time from a 917 number. The caller explained that his name was Detective Christopher Bastos and that he was with the New York Police Department.

12.      I was confused why an NYPD detective would be calling me, as I was in Utah at the time. My first thought and apprehension was that the call must be related to my order of protection against Individual-1. I was therefore eager to know the reason for the call.

13.     Det. Bastos did not tell me why he was calling, but instead told me to pull over, and minutes later, he pulled up in a car with other agents. I was walked to the back of the car, placed in handcuffs, and told that they had a warrant for my arrest.

14.     I was at this point very confused and emotionally off-balance from the strange series of events, and thought I might have been the victim of a false identification.

15.     I repeatedly asked Det. Bastos clarification questions, including "Am I under arrest?" and "Am I going to jail?" which were phrases I used interchangeably and thought of as the same thing.

16.     Det. Bastos never answered either question, but repeatedly said words to the effect of, "We just want to talk to you" and "I promise we just want to talk to you." He also told me more than once that "We just want to make sure you're OK."

17.     Det. Bastos's statements led me to believe I might be in danger, and that the police might be there to help me. I was still confused, however, because I had been placed in handcuffs. I was at this point consumed with a desire to know why I had been placed in handcuffs and apparently arrested.

18.     While I did not know this at that time, I later learned that Det. Bastos was well acquainted with Individual-1, as Det. Bastos and I discussed Individual-1and his brother during my interrogation.

19.     Det. Bastos drove me to the ICE headquarters and brought me to a break room with a circular table and three chairs. Det. Bastos and an HSI agent handcuffed me to one of the chairs and then joined me at the table. Det. Bastos read me *Miranda* warnings from a printed paper. He also handed me a copy to sign as I read along.

3

20.     Although I heard the words Det. Bastos read clearly, my contact lenses, which were in my eyes, were dry, and I did not have my reading glasses, so my vision was blurry and I was unable to read the paper in front of me.

21.     Even while being read my rights, I did not fully understand what was going on, and still thought that one explanation might be a potential misidentification. I was eager to find out what was going on, what Det. Bastos "just wanted to talk to" me about, and why he "wanted to make sure [I was] OK." Because I was not getting answers to my questions, I believed that the only way I was finally going to get an answer was to sign the paper and waive my rights.

22.     Each time Det. Bastos asked if I understood my rights, he told me to initial next to the relevant statement of rights. At one point, I signed next to the wrong line because I could not see the paper. Det. Bastos re-read the missed line to make sure I knew what I had signed. After I stated that I understood that I could stop the questioning at any time for the purpose of consulting an attorney, Detective Bastos told me that I "gotta sign there." I followed his instructions.

23.     After I signed the waiver, even though I could not read it, but before Det. Bastos began his questioning, I informed the detective that my contact lenses were blurry. Det. Bastos and the agent found my contact solution in my bag, uncuffed me, and allowed me to fix the contact. They then re-cuffed one of my hand to the chair and began the interrogation.

24.     I was never told, and did not suspect, that the entire conversation was being recorded.

25.     I did not know the purpose of the conversation or what, if anything, I was being charged with until close to the end of the 1 hour, 20-minute interrogation, shortly after Det. Bastos said, "I want to conclude."

**Further Points**

26.     During the period from approximately December 1, 2017 through May 29, 2020, I used a cellphone with the number (801) 597-3434.

27.     During the period from approximately December 1, 2017 through March 2, 2021, I also used a cellphone with the number (385) 775-9584.

28.     I have not set forth all facts of which I am aware about the events I have described above, which I set out in substance and in part.


I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of June, 2021 in Salt Lake City, Utah.


_____
JENNIFER SHAH