UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                     :

UNITED STATES OF AMERICA        :

                                  :

        - v. -            :               S4 19 Cr. 833 (SHS)

                                  :

JENNIFER SHAH,             :

                                  :

                Defendant.     :

                                  :

-------------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO THE DEFENDANT'S PRETRIAL MOTIONS**

AUDREY STRAUSS
United States Attorney
Southern District of New York

Kiersten A. Fletcher
Robert B. Sobelman
Sheb Swett
Assistant United States Attorneys
*- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ............................................................................................................... 1

ARGUMENT .................................................................................................................... 7

I.      The Defendant's Motion to Dismiss Should Be Denied ...................................... 8

   A.   Applicable Law ................................................................................................ 8

      1.   Sufficiency of an Indictment's Allegations ............................................ 8

      2.   Elements of Conspiracy to Commit Wire Fraud ................................... 10

   B.   Discussion ...................................................................................................... 11

      1.   The Indictment Sufficiently Alleges Wire Fraud Conspiracy ................... 11

      2.   The Indictment Sufficiently Alleges Materiality ..................................... 12

      3.   The Indictment's Allegations Are Legally Sufficient ............................. 18

II.     The Defendants' Motion for a Bill of Particulars Should Be Denied ............................. 21

   A.   Applicable Law .............................................................................................. 21

   B.   Discussion ...................................................................................................... 24

III.    The Defendant's Motion to Suppress Evidence From Two Search Warrants Should Be
        Denied ............................................................................................................. 33

   A.   Relevant Facts ............................................................................................... 33

      1.   The Email Warrant ............................................................................... 33

      2.   The Cell Site Warrant .......................................................................... 34

   B.   Applicable Law .............................................................................................. 36

      1.   Mootness ............................................................................................. 36

      2.   Probable Cause .................................................................................... 36

      3.   Misrepresentations and Omissions in a Search Warrant Affidavit............................ 37

   C.   Discussion ...................................................................................................... 40

1.   The Defendant's Motion Should be Denied as Moot ................................ 40

2.   The Affidavits Did Not Contain Knowingly False or Misleading Information ........ 41

    a.   Alleged False Statements …………….……………………………………………… 41

    b.   Alleged Intentional or Reckless Omissions…………………….………………….. 44

3.   The Alleged False Statements and Omissions Were Not Material ........................... 47

IV.   The Defendant's Motion to Disclose Grand Jury Testimony Should Be Denied............. 51

  A.   Applicable Law ........................................................................................... 51

  B.   Discussion .................................................................................................. 52

V.   The Defendants' Motion to Disclose Purported *Brady* and *Giglio* Material and a Co-Conspirator's Post-Arrest Statement Should Be Denied ................................................ 54

  A.   Request for Purported *Brady* Material ........................................................... 54

  B.   Request for Immediate Production of Smith's Complete Post-Arrest Statement ............. 55

  C.   Request for Immediate Production of *Giglio* Material ..................................... 56

VI.   The Defendant's Motion to Suppress Her Post-Arrest Statement Should Be Denied...... 58

  A.   Relevant Facts ............................................................................................ 58

  B.   Applicable Law ........................................................................................... 61

  C.   Discussion .................................................................................................. 63

VII.   The Defendant's Motion to Permit More Motions Should Be Denied............................ 68

CONCLUSION........................................................................................................... 70

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Boyce Motor Lines v. United States*, 342 U.S. 337 (1952) ........................................................... 10

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................................... 58

*Bruton v. United States*, 391 U.S. 123 (1968) ...........................................................................56

*Colorado v. Connelly,* 479 U.S. 157 (1986) ............................................................................. 63

*Colorado v. Spring*, 479 U.S. 564 (1987) ................................................................................ 64

*Dickerson v. United States*, 530 U.S. 428 (2000) ..................................................................... 64

*Fare v. Michael C.*, 442 U.S. 707 (1979) ................................................................................. 63

*Franks v. Delaware*, 438 U.S. 154 (1978) ................................................................ 37, 38, 40, 44

*Giglio v. United States*, 405 U.S. 150 (1972) .......................................................................... 57

*Green v. Scully*, 850 F.2d 894 (2d Cir. 1988) ..................................................................... 64, 67

*Hamling v. United States*, 418 U.S. 87 (1974) ............................................................. 8, 9, 19, 21

*Illinois v. Gates*, 462 U.S. 213 (1983) ................................................................ 37, 38, 49, 50, 51

*In re Grand Jury Subpoena*, 103 F.3d 234 (2d Cir. 1996) ......................................................... 51

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177 (2d Cir. 2008) ................ 62

*Jones v. United States*, 526 U.S. 227 (1999) ............................................................................. 8

*McNeil v. Wisconsin*, 501 U.S. 171 (1991) .............................................................................. 62

*Miranda v. Arizona*, 384 U.S. 436 (1966) ............................................................................... 62

*Moran v. Burbine*, 475 U.S. 412 (1986) ................................................................................. 62

*Neder v. United States*, 527 U.S. 1 (1999) .............................................................................. 19

*New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004) ................................................................. 10

*Oregon v. Elstad*, 470 U.S. 298 (1985) ............................................................................. 63, 64

*Rivera v. United States*, 928 F.2d 592 (2d Cir. 1991) ............................................................. 38

*Russell v. United States*, 369 U.S. 749 (1962) .......................................................................... 9

*SEC v. Ahmed*, No. 3:15-CV-675 (JBA), 2018 WL 4266079 (D. Conn. Sept. 6, 2018) ............ 60

*Stein v. New York*, 346 U.S. 156 (1953) ................................................................................. 64

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) .............................................................. 9

*United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) ........................................................... 59

*United States v. Avenatti*, 432 F. Supp. 3d 354 (S.D.N.Y. 2020) ............................................ 17

*United States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003) ............................................... 38, 39, 40

*United States v. Bell,* No. 19 Cr. 550 (NSR), 2020 WL 7260518 (S.D.N.Y. Dec. 10, 2020) ..... 31

iii

*United States v. Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003) ................................................. 22

*United States v. Bidloff*, 82 F. Supp. 2d 86 (W.D.N.Y. 2000) ....................................................... 17

*United States v. Binday*, 908 F. Supp. 2d 485 (S.D.N.Y. 2012) ...................................... 24, 26, 27

*United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. May 28, 2013) ....................................................................................................................................... 23, 26

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) .................................... 24, 26, 27, 28-29

*United States v. Bout*, No. 08 Cr. 365 (SAS), 2011 WL 2693720 (S.D.N.Y. July 11, 2011) ..... 19

*United States v. Brown*, 744 F. Supp. 558 (S.D.N.Y. 1990) ........................................................ 38

*United States v. Calandra,* 414 U.S. 338 (1974)..……………………………………………..52

*United States v. Canfield*, 212 F.3d 713 (2d Cir. 2000) .................................................... 38, 40, 48

*United States v. Capacho*, No. 17 Cr. 19 (NFA), 2018 WL 1334812 (S.D. Tex. Mar. 15, 2018) ............................................................................................................................................... 15

*United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446 (S.D.N.Y. Apr. 14, 2020)... 33

*United States v. Castro*, No. 08 Cr. 268 (NRB), 2008 WL 5062724 (S.D.N.Y. Nov. 25, 2008)  21

*United States v. Chen*, 378 F.3d 151 (2d Cir. 2004) ................................................................. 24

*United States v. Clark*, 638 F.3d 89 (2d Cir. 2011) ................................................................. 38

*United States v. Conyers*, No. S13 15 Cr. 537 (VEC), 2016 WL 7189850 (S.D.N.Y. Dec. 9, 2016) ....................................................................................................................................... 36

*United States v. Cook*, 348 F. Supp. 2d 22 (S.D.N.Y. 2004) ......................................... 44, 45, 47

*United States v. Coppa*, 267 F.3d 132 (2d Cir. 2001) ............................................................. 55

*United States v. Culligan*, No. 04 Cr. 305A (RJA), 2007 WL 3232484 (W.D.N.Y. Nov. 1, 2007) ............................................................................................................................................... 13

*United States v. Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310 (S.D.N.Y. Sept. 24, 2009) ....................................................................................................................................... 23, 27

*United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) ........................................................ 29

*United States v. Davis*, No. 06 Cr. 911 (LBS), 2009 WL 637164 (S.D.N.Y. Mar. 11, 2009) ..... 57

*United States v. De La Pava*, 268 F.3d 157 (2d Cir. 2001) ................................................. 10, 20

*United States v. DiSalvo*, 34 F.3d 1204 (3d Cir. 1994) ........................................................... 60

*United States v. Dunn*, No. 05 Cr. 127 (KMK), 2005 WL 1705303 (S.D.N.Y. July 19, 2005) .. 52

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) ............................................ 22

*United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403 (S.D.N.Y. Feb. 7, 2012) .......... 9

*United States v. Facciolo*, 753 F. Supp. 449 (S.D.N.Y. 1990) ............................................. 21-22

*United States v. Falso*, 544 F.3d 110 (2d Cir. 2008) ....................................................... 38, 40, 44

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987) ............................................... 22, 39

*United States v. Foley*, 73 F.3d 484 (2d Cir. 1996) ........................................................... 16, 17

*United States v. Fruchter*, 104 F. Supp. 2d 289 (S.D.N.Y. 2000) ............................................ 28

iv

*United States v. Gatto*, 295 F. Supp. 3d 336 (S.D.N.Y. 2018) .................................................... 18

*United States v. Ghavami*, No. 10 Cr. 1217, 2012 WL 2878126 (S.D.N.Y. July 13, 2012) ....... 33

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) ................................................. 22

*United States v. Goldberg*, 756 F.2d 949 ........................................................................... 18-19

*United States v. Gonzalez*, No. 04 Cr. 078 (DAB), 2004 WL 2297341 (S.D.N.Y. Oct. 8, 2004) .................................................................................................................................... 31

*United States v. Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 4115810 (S.D.N.Y. Nov. 14, 2007) ............................................................................................................................ 23-24, 27

*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) .............................................. 22-23

*United States v. Heredia*, No. 02 Cr. 1246 (SWK), 2003 WL 21524008 (S.D.N.Y. 2003) ........ 24

*United States v. Hester*, No. 19 Cr. 324 (NSR), 2020 WL 3483702 (S.D.N.Y. June 26, 2020) ................................................................................................................................... 36, 41

*United States v. Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) ........ 32

*United States v. Ivic*, 700 F.2d 51 (2d Cir. 1983) ............................................................... 16, 17

*United States v. Johnson*, 21 F. Supp. 2d 329 (S.D.N.Y. 1998) ................................................. 21

*United States v. Kaba*, 999 F.2d 47 (2d Cir. 1993) .................................................................... 63

*United States v. Kaplan*, 886 F.2d 536 (2d Cir. 1989) ............................................................... 30

*United States v. Kenyatta*, No. 16 Cr. 273 (DLC), 2017 WL 972114 (S.D.N.Y. Mar. 9, 2017) . 57

*United States v. Ketabchi*, 832 F. App'x 41 (2d Cir. 2020) ....................................................... 45

*United States v. Khalil*, 214 F.3d 111 (2d Cir. 2000) ................................................................. 67

*United States v. King*, No. 10 Cr. 122 (JGK), 2011 WL 1630676 (S.D.N.Y. Apr. 27, 2011) ..... 57

*United States v. Klein*, 476 F.3d 111 (2d Cir. 2007) ............................................................ 13, 16

*United States v. Klump*, 536 F.3d 113 (2d Cir. 2008) .......................................................... 38, 48

*United States v. Kolfage*, No. 20 Cr. 412 (AT), 2020 WL 7342796 (S.D.N.Y. Dec. 14, 2020) .. 59

*United States v. Lahey*, 967 F. Supp. 2d 698 (S.D.N.Y. 2013) ............................................. 40, 48

*United States v. LaSpina*, 299 F.3d 165 (2d Cir. 2002) ............................................................. 10

*United States v. Leavitt*, No. 11 Cr. 501 (DN) (PMW), 2016 WL 297452 (D. Utah Jan. 22, 2016) ................................................................................................................................... 15

*United States v. Leung*, 40 F.3d 577 (2d Cir. 1994) ................................................................... 52

*United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ............................................................................................................................... 21, 23

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010) .................................... 21, 26, 39

*United States v. Markey*, 131 F. Supp. 2d 316 (D. Conn. 2001) ...................................... 44, 45, 47

*United States v. Martin*, 426 F.3d 68 (2d Cir. 2005) ...................................................... 37, 49, 50

*United States v. Mathieu*, No. 16 Cr. 763 (LGS), 2018 WL 5869642, at *1 (S.D.N.Y. Nov. 9, 2018) ................................................................................................................................... 36

*United States v. Mathis*, No. 19 Cr. 265 (SDJ) (CAN), 2020 WL 7409089 (E.D. Tex. Nov. 3, 2020) ............................................................................................................. 58

*United States v. McAuliffe*, 490 F.3d 526 (6th Cir. 2007) ...................................... 14

*United States v. Medunjanin*, 752 F.3d 576 (2d Cir. 2014) .................................... 62

*United States v. Mitchell*, 966 F.2d 92 (2d Cir. 1992) ............................................ 64

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001) ....................... 31-32, 33

*United States v. Moten*, 582 F.2d 654 (2d Cir. 1978) ............................................ 52

*United States v. Murgio*, 209 F. Supp. 3d 698 (S.D.N.Y. 2016) ............................ 18

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) .......................... 31

*United States v. Nojay*, 224 F. Supp. 3d 208 (W.D.N.Y. 2016) ............................. 60

*United States v. Okwumabua*, 828 F.2d 950 (2d Cir. 1987) ................................... 64

*United States v. Olin Corp.*, 465 F. Supp. 1120 (W.D.N.Y. 1979) ......................... 14

*United States v. Orena*, 32 F.3d 704 (2d Cir. 1994) ............................................. 27

*United States v. Pena*, 227 F.3d 23 (2d Cir. 2000) ............................................... 46

*United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ....................................................................................................... 36, 41

*United States v. Perez*, 247 F. Supp. 2d 459 (S.D.N.Y. 2003) .............................. 39

*United States v. Peter*, No. 17 Cr. 54 (NRB), 2018 WL 5282878 (S.D.N.Y. Oct. 24, 2018) ..... 67

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ............................................ 8, 17

*United States v. Post*, 950 F. Supp. 2d 519 (S.D.N.Y. 2013) ............................. 8, 11

*United States v. Rajaratnam*, 719 F.3d 139 (2d Cir. 2013) ..................... 39, 40, 46, 47

*United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996) ................................. 39, 44-45

*United States v. Reinhold*, 994 F. Supp. 194 (S.D.N.Y. 1998) .............................. 29

*United States v. Remire*, 400 F. Supp. 2d 627 (S.D.N.Y. 2005) ........................... 26

*United States v. Richards*, 204 F.3d 177 (5th Cir. 2000) ..................................... 14

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003) ........................ 24

*United States v. Rivera*, 750 F. Supp. 614 (S.D.N.Y. 1990) ................................. 39

*United States v. Rodriguez*, 496 F.3d 221 (2d Cir. 2007) .................................... 56

*United States v. Rodriguez*, 556 F.2d 638 (2d Cir. 1977) .................................... 14

*United States v. Roy*, 783 F.3d 418 (2d Cir. 2015) .............................................. 18

*United States v. Rudaj*, No. 04 Cr. 1110 (DLC), 2006 WL 1876664 (S.D.N.Y. July 5, 2006) ... 19

*United States v. Ryan*, No. 20 Cr. 65, 2021 WL 795980 (E.D. La. Mar. 2, 2021) ..................... 58

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc) ........................... 50

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ......................................... 63

*United States v. Salemo*, 499 F. App'x 110 (2d Cir. 2012) ................................... 19

*United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721 (S.D.N.Y. Jan. 23, 2009) ...................................................................................................... 23-24, 26

*United States v. Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604 (S.D.N.Y. Nov. 4, 2002) .. 28

*United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326 (S.D.N.Y. Oct. 20, 2015) ...................................................................................................................... 9, 32

*United States v. Smith*, 9 F.3d 1007 (2d Cir. 1993) ...................................................... 37

*United States v. Soliman*, No. 06 Cr. 236A (RJA), 2008 WL 2690281 (W.D.N.Y. July 1, 2008) ...................................................................................................................... 14

*United States v. Spencer*, 995 F.2d 10 (2d Cir. 1993) .................................................... 62

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) ........................................ 10, 12, 20

*United States v. Stein*, 424 F. Supp. 2d 720 (S.D.N.Y. 2006) ...................................... 56

*United States v. Stewart*, 151 F. Supp. 2d 572 (E.D. Pa. 2001) .................................... 13

*United States v. Stringer*, 730 F.3d 120 (2d Cir. 2013) ................................................ 9

*United States v. Swanson*, 210 F.3d 788 (7th Cir. 2000) .............................................. 38

*United States v. Taylor*, 745 F.3d 15 (2d Cir. 2014) ................................................ 62-63

*United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489 (S.D.N.Y. Dec. 3, 2013) ...................................................................................................................... 8, 11

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) .................................... 22, 31, 52

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ...................... 22, 24, 26, 28, 57

*United States v. Trzaska*, 111 F.3d 1019 (2d Cir. 1997) ................................................ 38

*United States v. Tuzman*, 301 F. Supp. 3d 430 (S.D.N.Y. 2017) .................................... 29

*United States v. Valenti*, 987 F.2d 708 (11th Cir. 1993) ................................................ 59

*United States v. Ventresca*, 380 U.S. 102 (1965) .......................................................... 37

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013)…………………………………..………9

*United States v. Vilar*, No. S3 05 Cr. 621 (KMK), 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ...................................................................................................................... 39

*United States v. Wagner*, 989 F.2d 69 (2d Cir. 1993) .................................................... 37

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ................................................ 21, 24

*United States v. Wang*, No. 11 Cr. 730 (PGG), 2013 WL 452215 (S.D.N.Y. Feb. 5, 2013) ....... 67

*United States v. Weigand*, 482 F. Supp. 3d 224 (S.D.N.Y. 2000) .................................... 15

*United States v. Williams*, 681 F.3d 35 (2d Cir. 2012) .................................................. 64

*United States v. Wilson*, --- F. Supp. 3d ----, 2021 WL 480853 (W.D.N.Y. Feb. 10, 2021) ....... 58

*United States v. Wydermyer*, 51 F.3d 319 (2d Cir. 1995) .......................................... 19-20

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008) ........................................ 9-10, 20

*United States v. Yi*, 791 F. App'x 437 (4th Cir. 2020) .................................................. 55

*United States v. Zelaya-Romero*, No. 15 Cr. 174 (LGS), 2018 WL 1033235 (S.D.N.Y. Feb. 21,

2018) .............................................................................................. 36, 41

*Walczyk v. Rio*, 496 F.3d 139 (2d Cir. 2007) ............................................. 37

**Statutes**

18 U.S.C. § 666 ............................................................................................. 16

18 U.S.C. § 1001 .......................................................................................... 14

18 U.S.C. § 1343 ................................................................................ 10-11, 12

18 U.S.C. § 1349 ................................................................................. 1, 10, 12

18 U.S.C. § 1956 ............................................................................................. 1

18 U.S.C. § 1962 .......................................................................................... 17

18 U.S.C. § 2326 ....................................................................................... 1, 12

18 U.S.C. § 3500 ......................................................................... 7, 25, 27, 54

**Rules**

Fed. R. Crim. P. 5 ................................................................................... 57, 58

Fed. R. Crim. P. 6 ....................................................................................... 51

Fed. R. Crim. P. 7 .............................................................................. 8, 9, 19, 21

Fed. R. Crim. P. 14 ....................................................................................... 55

Fed. R. Crim. P. 16 ....................................................................................... 55

Fed. R. Crim. P. 29 ......................................................................................... 9

Fed. R. Evid. 403 ......................................................................................... 69

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendant's motions (1) to dismiss the superseding indictment, (2) for a bill of particulars, (3) to suppress certain evidence obtained by search warrants, (4) for disclosure of the grand jury minutes, (5) for disclosure of *Brady* and *Giglio* material and a co-defendant's post-arrest statement, (6) to suppress the defendant's post-arrest statement, and (7) to file additional motions. (Dkt. Nos. 259-62.) The defendant's motions are entirely without merit and should be denied.

## BACKGROUND

On March 25, 2021, a grand jury sitting in this District returned Superseding Indictment S4 19 Cr. 833 (SHS) (the "Indictment"), which was filed under seal, charging the defendant and co-defendant Stuart Smith with carrying out a wide-ranging telemarketing scheme that defrauded hundreds of victims throughout the United States, many of whom were over the age of 55, by selling those victims so-called "business services" in connection with the victims' purported online businesses, and for participating in a related money laundering conspiracy. (Dkt. No. 186 at 1, 5-7.) Specifically, the defendants were charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1349 and 2326, and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). (*Id*. at 4-7.) The Indictment contained a detailed, four-page overview of the defendants' scheme that included, among other things, descriptions of the false representations made to the victims, the various phases and aspects of the scheme, and the respective roles of the defendant and Smith in the scheme. (*Id*. at 1-4.)

That same day, the Honorable Kevin Nathaniel Fox, United States Magistrate Judge for the Southern District of New York, issued a warrant for the defendant's arrest. (Dkt. No. 188.)

On March 30, 2021, the defendant was arrested, and the Superseding Indictment was unsealed. (Dkt. No. 185.)

Since the defendant's arrest, the Government has provided substantial discovery materials—including several detailed affidavits describing the defendant's criminal conduct—to the defendant and has engaged in numerous, lengthy telephone and video conferences with the defendant's counsel in an effort to provide as much assistance and guidance that the Government reasonably can provide in helping counsel to navigate the Government's discovery productions, understand the theory of the Government's case, and preview the types of evidence the Government would intend to introduce at the defendant's trial. In these multiple conversations, the Government has answered numerous questions about its view of the facts and the contours of the case it currently intends to present at trial. In addition, as a further courtesy, the Government has referred the defendant's counsel to publicly available materials—including pretrial motion and *in limine* briefing and decisions on such motions; plea, trial, and sentencing transcripts; and sentencing submissions—in the related cases of *United States v. Morris*, 17 Cr. 201 (SHS), *United States v. Ketabchi*, *et al*., 17 Cr. 243 (SHS), and *United States v. Medeiros*, 17 Cr. 704 (NSR), and has produced to the defendant a copy of the Jencks Act material and admitted Government exhibits produced in advance of the *Ketabchi* trial.

In order to further assist the defendant in her preparation for trial, during the course of the Government's lengthy discussions and correspondence with the defendant's counsel, the Government has provided substantial details regarding certain of the relevant facts that the Government intends to establish at trial. As a further courtesy to the defendant, and to provide

additional context to the Court, the Government provides the following overview of certain of the facts that the Government presently anticipates it will establish at trial.[1]

In order to perpetrate the Business Opportunity Scheme (as identified in the Indictment), the Telemarketing Companies (as identified in the Indictment) used lists of potential victims or "lead lists." The lead lists that fueled the Business Opportunity Scheme were first created when individuals who was victimized by the scheme (the "Victim") made a small online purchase (typically less than $100) in response to an ad offering "work from home" or other online business opportunities. Once the Victim made this initial purchase, the Victim's information was provided to an online "education" or "coaching" company, which historically was Thrive Learning ("Thrive") or Guidance Interactive ("Guidance"). Beginning in around 2012, the defendant worked at Thrive, which later became Guidance, and was responsible for selling the leads (that is, the information on the Victims who made the sub-$100 purchase) to "downstream" sales floors. Leads typically flowed from the defendant to coaching sales floors operating in Arizona, Nevada, or Utah, (such as the Telemarketing Companies operated by co-defendants Kevin Handren and Cameron Brewster) which sold the Victims coaching sessions. During those sessions, the Victim would have phone calls with a "coach" whom the Victim understood would teach the Victim how to operate a successful business, but in fact operated to prime the Victim on the additional services the Victim would ostensibly need to purchase in order for the business to be successful. The coaching floor then passed the Victim's information to a "BizOp" telemarketing company (such

---

[1] The information provided is based on the Government's current understanding of the facts, and the Government does not intend to limit or bind itself to this information for any purpose, including in its presentation at trial. As the Government's investigation is ongoing, its understanding of the facts and its intended presentation at trial may evolve as that investigation continues.

as the Telemarketing Companies operated by, among others, co-defendant Anthony Cheedie or defendants in the *Ketabchi* case such as William Sinclair and Ryan Hult), which then proceeded to sell the Victim services that the Victim had been instructed to buy by their "coach," including tax services, corporate credit, and business plans (all of which are of little or no value).

The defendant controlled her stream of leads from start to finish. The defendant obtained the initial lead after the sub-$100 purchase and determined which coaching floor could buy leads from her and Smith, selected the downstream sales floors to which the coaching floor was permitted to pass the leads, chose the firm(s) to provide fulfillment (which sometimes involved selecting a firm operated directly by the defendant herself or to the company she worked for), set limits on how much the downstream sales floors could charge, and determined which products each of the downstream sales floors could sell. Unless the coaching sales floor purchased the lead outright (and could therefore decide whether and how to sell it to downstream sales floors), typically when a sales floor sold additional services to the Victim, the sales floor paid a percentage of the revenue from the sale to the defendant. From approximately 2012 to 2013, the defendant provided leads to Top Shelf Marketing ("Top Shelf"), a marketing floor which Hult and his co-defendant Jason Sager operated in exchange for a revenue share of Top Shelf's sales. From approximately 2013 to 2014, the defendant provided leads to Reliable Business Consultants ("RBC"), a sales floor run by Hult as well as ███ and ███████ in New Jersey. In approximately 2014, the defendant provided leads (in part through Hult) to Olive Branch Marketing, a sales floor run by Sinclair and his co-defendant Michael Finocchiaro in New Jersey. From approximately 2013 and 2019, the defendant provided leads to coaching floors operated by Handren, who passed them along to BizOp floors, including Corporate Development Center ("CDC") and Alliance Education Services, the New Jersey-based sales floors at the center of

Indictment 19 Cr. 833 (SHS).

The online "education" and "coaching" industry and, specifically, sales floors that employed the defendant, previously were subject to significant Federal Trade Commission ("FTC") enforcement. In April 2015, the defendant was deposed by the FTC in the FTC's investigation of Top Shelf. During the deposition, the defendant admitted that she previously worked for Thrive and was responsible for managing Thrive's relationships with "outside sales organizations," that is, sales floors like those operated by Hult. The defendant further testified that she stopped working at Thrive and began working for a similar company in Utah called Guidance, where she was then-employed in April 2015. Top Shelf and RBC were both sued by the FTC and enjoined from further operation in January 2016.

In approximately June 2017, the FTC filed parallel civil actions against both Thrive and Guidance alleging unfair and deceptive business practices in connection with coaching and work from home businesses.[2] Thrive entered into a simultaneous settlement in which it agreed to an injunction on marketing business coaching and work-at-home opportunities. In January 2018, the FTC entered into a settlement with Guidance, as well as several related entities and individuals who worked at Guidance, in exchange for a money judgment of $29 million.

In around early 2017, the defendant and co-defendant Stuart Smith began operating their own lead generation business using a number of business names, including Red Steele Co. ("Red Steele"), Fortitude Holdings, and Mastery Pro Group LLC (collectively, "Mastery Pro"). Mastery Pro was incorporated in Wyoming and its incorporation documents list another individual as the

---

[2] *See Lift International, LLC*, FTC, https://www.ftc.gov/enforcement/cases-proceedings/152-3233/lift-international-llc (updated Jan. 16, 2018); *Thrive Learning, LLC*, FTC, https://www.ftc.gov/enforcement/cases-proceedings/152-3233/thrive-learning-llc (updated June 26, 2017).

registered agent, but do not list the defendant or Smith. Beginning in 2017, the defendant became increasingly careful about being connected to any coaching or Business Opportunity Scheme floor, and directed those doing business with her to incorporate companies in the names of third parties in Wyoming and to communicate only via encrypted messaging applications such as Telegram.

Though ███████████ was named in the FTC case against RBC, his brother ████ was not, and the defendant continued to provide █████████ leads until 2017. In around 2017, after a falling out with █████████, the defendant began operating Mastery Pro as a Manhattan-based sales floor that sold "business opportunity" products to victims on lead lists provided by the defendant as part of the Business Opportunity Scheme. The defendant hired multiple employees who had previously been employed by █████████, and shared leads with Cheedie's sales floor, which was responsible for selling those Victims tax products. Between 2018 and 2020, the defendant controlled the day-to-day operations of Mastery Pro, and installed multiple sales managers on the floor (including one introduced to the defendant by Cheedie, "Sales Manager-1") who reported to the defendant. The defendant and Sales Manager-1 also created a fulfillment company for Mastery Pro based in Kosovo, and the defendant and Smith directed other participants in the scheme to direct payments to accounts in Kosovo. The sales practices at Mastery Pro were no different than the fraudulent sales practices implemented by the other Telemarketing Companies whose owners, operators, and salespeople were the subject of successful prosecutions arising out of the Government's investigation. In other words, at the defendant's direction, the salespeople at Mastery Pro lied to and misled Victims into purchasing so-called BizOp products to ostensibly advance their non-existent online businesses.

## **ARGUMENT**

First, the defendant moves to dismiss the Indictment and for a bill of particulars, claiming that such relief is required due to a lack of notice. The defendant fails to meet her substantial burdens to demonstrate that she is entitled to such relief. The Indictment comports with the applicable standards and the Government has exceeded its notice obligations such that the defendant's request for additional particulars is meritless.

Second, the defendant moves to suppress evidence obtained from two search warrants. The motion to suppress should be denied as moot and, in the alternative, on the merits, because the alleged false statements and misleading omissions were neither false nor misleading, and, in any event, were immaterial. The defendant's request to inspect the grand jury minutes is entirely derivative of her baseless motion to suppress, and therefore also should be denied.

Third, the defendant moves for disclosure of what she characterizes as *Brady* material. This motion should be denied because the Government has and will continue to make good-faith efforts to comply with its obligations and confer with the defendant concerning her requests for supplemental disclosures. The defendant also seeks immediate production of *Giglio* material. The defendant offers no persuasive justification for departing from the general practice in this District of producing *Giglio* material with 18 U.S.C. § 3500 material in advance of trial, and therefore her request should be rejected. The defendant further seeks disclosure of a co-defendant's post-arrest statement, claiming it may contain *Brady* material and that the defendant wishes to raise any *Bruton* issues. This request also should be rejected, as the Government already has disclosed the portion of the statement that potentially may be favorable to the defendant, the Government does not presently intend to seek to admit at trial the co-defendant's post-arrest statement in its case-in-

chief, and the Government has already committed to producing the entirety of the statement in advance of trial.

Fourth, the defendant moves to suppress her post-arrest statement on the ground that she purportedly did not voluntarily waive her *Miranda* rights. She is wrong. Even assuming the facts alleged in her affidavit are accurate, those facts taken together with her fully executed *Miranda* waiver form and the recording of the post-arrest interview make plain that her waiver was, indeed, voluntary, rendering her challenge meritless.

Finally, the defendant seeks permission to file unspecified additional motions in the future. That request should be rejected as unripe.

## I.     The Defendant's Motion to Dismiss Should Be Denied

The defendant argues that the Indictment should be dismissed because it does not contain sufficient factual allegations regarding the defendant's conduct and the term "material." The defendant is wrong, and the motion should be denied.

### A.     Applicable Law

#### 1.     Sufficiency of an Indictment's Allegations

"A criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones v. United States*, 526 U.S. 227, 232 (1999); *Hamling v. United States*, 418 U.S. 87, 117 (1974); Fed. R. Crim. P. 7(c)). "A defendant faces a 'high standard' in seeking to dismiss an indictment." *United States v. Thompson*, No. 13 Cr. 378 (AJN), 2013 WL 6246489, at *6 (S.D.N.Y. Dec. 3, 2013) (quoting *United States v. Post*, 950 F. Supp. 2d 519, 527 (S.D.N.Y. 2013)).

"Pursuant to Federal Rule of Criminal Procedure 7, 'the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense

charged . . . .'" *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (quoting Rule 7(c) (alterations omitted)).  To satisfy this rule, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Yannotti*, 541 F.3d 112, 127 (2d Cir. 2008) (internal quotation marks omitted).  Although there are circumstances in which greater specificity is required to pass muster under Rule 7(c) and the constitutional provisions it implicates, that heightened standard is limited to "very rare cases," such as those involving refusal to answer questions before Congress, in which "specification of how a particular element of criminal charge will be met . . . is of such importance to the fairness of the proceeding that it must be spelled out in the indictment[.]" *United States v. Stringer*, 730 F.3d 120, 125-26 (2d Cir. 2013) (discussing the special case of *Russell v. United States*, 369 U.S. 749 (1962)).  Otherwise, "[a]n indictment is sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *Stringer*, 730 F.3d at 124 (quoting *Hamling*, 418 U.S. at 117); *see also Yannotti*, 541 F.3d at 127.

"[T]he sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Alfonso*, 143 F.3d 772, 777 (2d Cir. 1998); *see also* Fed. R. Crim. P. 29; *United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) ("[T]here is no summary judgment in criminal cases. . . .  [A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." (internal quotation marks omitted)).  Accordingly, "[i]n reviewing a motion to dismiss an indictment, the Court must take the allegations of the indictment as true." *United States v. Skelos*, No. 15 Cr. 317 (KMW), 2015 WL 6159326, at *2 (S.D.N.Y. Oct. 20,

2015) (citing *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n.16 (1952); *New York v. Tanella*, 374 F.3d 141, 148 (2d Cir. 2004)).  Indeed, "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made."  *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (internal quotation marks omitted).

Even in cases involving very bare-bones charges, courts will not dismiss the indictment absent a showing of prejudice, *Stringer*, 730 F.3d at 124, because dismissal of an otherwise facially valid indictment is an "'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights."  *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (citation omitted).  Where a defendant has been given sufficient notice of the charges against him by means of, for example, discovery materials or a bill of particulars, prejudice will not have been shown, and the indictment should stand.  *See, e.g.*, *Yannotti*, 541 F.3d at 127; *De La Pava*, 268 F.3d at 162-65; *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

## 2.    Elements of Conspiracy to Commit Wire Fraud

Count One charges a violation of Title 18, United States Code, Section 1349, which provides: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  This crime has two elements: (1) "the existence of the agreement or understanding to commit the unlawful object[] of the conspiracy"; and (2) "the defendant willfully and knowingly became a member of the conspiracy with the intention of furthering its illegal purpose, that is, with the intention to commit an object of the charged conspiracy."  (*Ketabchi* Tr. 2069.[3])  The object of the conspiracy, wire fraud, in violation of 18

---

[3] "*Ketabchi* Tr." refers to the transcript of the trial held in *United States v. Ketabchi, et al.*, 17 Cr. 243 (SHS).

U.S.C. § 1343, has three elements: (1) "there was a scheme or artifice to defraud others of money or property by false or fraudulent pretenses, representations or promises"; (2) "the defendant knowingly and willfully devised or participated in the scheme or artifice to defraud with knowledge of its fraudulent nature and with the specific intent to defraud"; and (3) "the scheme was executed by using or causing others to use the interstate or foreign wires." (*Id.* at 2076.) The false or fraudulent pretenses, representations or promises "must relate to a material fact or matter." (*Id.* at 2078.)

## B. Discussion

### 1. The Indictment Sufficiently Alleges Wire Fraud Conspiracy

The defendant falls far short of establishing any pleading deficiency, let alone meeting the "high standard" she faces in seeking to dismiss the Indictment. *See Thompson*, 2013 WL 6246489, at *6 (quoting *Post*, 950 F. Supp. 2d at 527). The Indictment properly alleges that she conspired with others to commit wire fraud.

The Indictment specifies the time period of the conspiracy as between 2012 and March 2021. (Dkt. No. 186 at 4.) It goes on to allege that the object of that conspiracy was to "commit wire fraud in connection with the conduct of telemarketing . . . which did victimize ten and more persons over the age of 55." (*Id.*) The Indictment provides additional detail of the wire fraud object, explaining that the defendant, "willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice[.]" (*Id.* at 4-5.) These allegations track the language of 18 U.S.C. §§ 1343 and 1349.

11

Moreover, as described in greater detail above, the Indictment describes the wire fraud conspiracy in considerable detail over several pages, explaining how the defendant, among other things, "induced and caused victims, many of whom were over the age of 55, to pay thousands of dollars to obtain so-called 'coaching' and 'business services,' which they represented would make the management of the victims' purported online businesses more efficient and/or profitable, when, in actuality, the 'services' would provide little or no value to the victims' businesses, which were essentially non-existent." (*Id*. at 5.) In addition, the Indictment provides notice that, pursuant to 18 U.S.C. § 2326, certain sentencing enhancements may apply if the Government proves that (1) the conspiracy to commit wire fraud was "in connection with the conduct of telemarketing" and (2) the offense "victimized ten and more persons over the age of 55." (Dkt. No. 186 at 4.) Because the Indictment tracks the language of the relevant statute and provides adequate notice regarding the nature of the charged offense, the defendant's motion should be denied. *See Stavroulakis*, 952 F.2d at 693 ("We have often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." (internal citation and quotation omitted)).

### 2.    The Indictment Sufficiently Alleges Materiality

The defendant contends that the Indictment is deficient because it does not literally and explicitly use the word "material" in connection with the Indictment's allegations regarding the false or fraudulent pretenses, representations, or promises at issue in the alleged wire fraud conspiracy. This argument is meritless and should be rejected.

First, the multiple uses of variations of the term "fraud" throughout the Indictment provide ample notice that the false pretenses, representations, or promises used in the course of the scheme were material. In such circumstances, "an allegation of materiality can be inferred from the use of

the word fraud in the indictment." *United States v. Klein*, 476 F.3d 111, 113 (2d Cir. 2007) (finding "no error" in bank fraud indictment that did not "explicitly use the word 'material'" because "materiality can be inferred to be an element of criminal fraud because of the well-understood meaning of 'fraud' as a legal term"). Specifically, the Indictment refers to the defendant's scheme having "*defrauded* hundreds of victims," explains that the defendant and Smith "generated and sold leads . . . with the knowledge that the individuals . . . would be *defrauded*," states that the defendant "yielded a share of the *fraudulent* revenue," and describes how the defendant "controlled each aspect of the *frauds* perpetrated." (Dkt. No. 186 at 1-2 (emphases added)). The repeated descriptions of the defendant's conduct as perpetrating a fraud encompass the concept of materiality and satisfy any potential requirement to plead such an element in the Indictment. *See, e.g.*, *United States v. Culligan*, No. 04 Cr. 305A (RJA), 2007 WL 3232484, at *2 (W.D.N.Y. Nov. 1, 2007) (denying motion to dismiss indictment and adopting magistrate judge's holding that "[t]he lack of an expressed allegation of 'materiality' does not cause the indictment to be defective" because "the use of the words 'scheme or artifice to defraud' in the statute 'incorporate materiality'"); *United States v. Stewart*, 151 F. Supp. 2d 572, 584 (E.D. Pa. 2001) (denying motion to dismiss indictment and rejecting argument that materiality had to be explicitly pled in mail and wire fraud indictment because "fraud" is understood at common-law to "clearly encompass[] the notion of materiality.").

Second, the Indictment alleges facts that warrant an inference that the false pretenses, representations, or promises at issue in the charged conspiracy were material. "To be sufficient, the Indictment need only allege facts that support an inference of materiality," it need not explicitly "allege that the statements at issue were material." *United States v. Soliman*, No. 06 Cr. 236A (RJA), 2008 WL 2690281, at *3 (W.D.N.Y. July 1, 2008) (citation omitted); *see also United States*

*v. McAuliffe*, 490 F.3d 526, 532 (6th Cir. 2007) ("[A]n indictment is not fatally insufficient for its failure to allege [materiality] *in haec verba*, if the facts in the indictment warrant the inference of such element[]"); *United States v. Richards*, 204 F.3d 177, 192 (5th Cir. 2000) ("[I]f the facts alleged in the Indictment warrant an inference that the false statement is material, the indictment is not fatally insufficient for its failure to allege materiality in *haec verba*." (internal citations and quotation omitted)); *cf. United States v. Rodriguez*, 556 F.2d 638, 641 (2d Cir. 1977) (holding that it was "unnecessary for the indictment to further allege that the false statements were 'material'" as part of 18 U.S.C. § 1001 charges because "each count of the indictment specifies what was false about the cited document or documents"); *United States v. Olin Corp.*, 465 F. Supp. 1120, 1132 (W.D.N.Y. 1979) ("[t]he Second Circuit's Court of Appeals does not require the word 'material' to be alleged in an indictment" under 18 U.S.C. § 1001 so long as "the facts alleged show the materiality of the statement." (citing cases)).

The Indictment here states, among other things, that the defendant and her co-conspirators fraudulently "induced and caused victims, many of whom were over the age of 55, to pay thousands of dollars to obtain so-called 'coaching' and 'business services,' which they represented would make the management of the victims' purported online businesses more efficient and/or profitable, when, in actuality, the 'services' would provide little or no value to the victims' businesses, which were essentially non-existent." (Dkt. No. 186 at 5.) It also states that the defendant did not "intend that the Victims would actually earn any of the promised return on their investment, nor did the Victims actually earn any such returns." (*Id*. at 3.) These facts, among the others stated in the Indictment, provide ample basis for the inference that the false pretenses, representations, or promises used in the course of the charged conspiracy were material to the Victims. At bottom, this aspect of the scheme was a simple, classic fraud: the use of false

14

pretenses, representations, or promises to induce victims to spend thousands of dollars on services that were of virtually no value to businesses that existed, if at all, only on paper. Of course those false pretenses, representations, or promises were material, because a reasonable person would not spend thousands of dollars on a service that they are forthrightly told have no value for a business that they are candidly advised does not actually exist. These facts, among the others in the Indictment, are more than sufficient to warrant an inference of materiality that satisfies any potential pleading requirement. *See, e.g.*, *United States v. Weigand*, 482 F. Supp. 3d 224, 237 (S.D.N.Y. 2000) (denying motion to dismiss bank fraud conspiracy indictment and rejecting argument "that the indictment does not state a claim because it does not allege that the misrepresentations were material" as one that "borders on the frivolous" where indictment contained facts regarding defendants' misrepresentations permitting inference of materiality); *United States v. Capacho*, No. 17 Cr. 19 (NFA), 2018 WL 1334812, at *4 (S.D. Tex. Mar. 15, 2018) (denying motion to dismiss wire fraud indictment that did not contain explicit allegation of materiality because "the allegations in the Indictment establish that the alleged misrepresentations and fraudulently concealed information are potentially capable of being proved material by the government at trial and are sufficient to support an inference of materiality"); *United States v. Leavitt*, No. 11 Cr. 501 (DN) (PMW), 2016 WL 297452, at *4 (D. Utah Jan. 22, 2016) (denying motion to dismiss wire fraud count where "indictment includes sufficient allegations of fraud to warrant an inference that the false statement is material" (internal quotation marks and footnote omitted)).

The cases upon which the defendant relies do not counsel in favor of a different result. In *United States v. Foley*, the Second Circuit stated that when "one element of the offense is implicit in the statute, and the indictment tracks the language of the statute and fails to allege the implicit

element explicitly, the indictment fails to allege an offense." 73 F.3d 484, 488 (2d Cir. 1996), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997). As an initial matter, this statement was just that—a statement, not a holding, made in the course of a case involving a different and not-analogous statute (18 U.S.C. § 666), where the court ultimately conducted a post-trial sufficiency-of-the-evidence analysis rather than ruling on the sufficiency of the indictment. *See id*. at 488-94. The defendant's purported surprise that *Klein* did not analyze *Foley* (Def. Mem. 15) is entirely unfounded: *Foley*'s holding and reasoning—which turned on the intricacies of § 666 and the sufficiency of evidence at a trial—had no import for the analysis in *Klein*, which directly addressed and expressly rejected the very argument that the defendant advances here. *See* 476 F.3d at 113.

In any event, the statement in *Foley* is merely another formulation of the very same standard set forth in *Klein* and the other similar cases cited above. *Foley* did not state that, as the defendant puts it, certain "implicit terms" (Def. Mem. 15) must literally appear in the indictment to render it sufficient. Rather, alleging an "implicit element explicitly" does not require the literal, formulaic recitation of the term used to describe the element, but rather allegations sufficient to warrant an inference that the element is satisfied—the same requirement described in the other cases discussed above, which make clear that where terms like "fraud" are used and facts sufficient to imply materiality are alleged, the implicit element is explicitly alleged. Contrary to the defendant's suggestion, neither *Foley* nor any other case stands for the proposition that "materiality" is a magic word that must be used in every indictment alleging fraud.

Similarly, *United States v. Ivic*, 700 F.2d 51 (2d Cir. 1983), *abrogated by National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994), also is of no assistance to the defendant. *Ivic* held that an indictment charging 18 U.S.C. § 1962(c)—which, like § 666, is not

16

analogous to wire fraud or wire fraud conspiracy—was insufficient if it did not "charge that an enterprise or the predicate acts have any financial purpose[.]"  700 F.2d at 65.  To the extent *Ivic* is relevant to disposing of the defendant's argument here, it only underscores that no magic words need be used in pleading implicit elements of a crime.  *Ivic* does not decree that the indictment in that case need have used the word "enterprise" or the words "predicate acts."  Rather, it held that those elements must be pled, and not that they need be pled using certain words, which is consistent with *Klein* and the other cases cited above.

Finally, *Pirro* also offers the defendant's argument no support.  The defendant cites (Def. Mem. 14), but does not quote, the case in support of the defendant's suggestion that the word "material" must literally appear in a fraud indictment for it to be sufficient.  *Pirro* contains no such holding.  Rather, *Pirro* made virtually the same statement as *Foley*, that an indictment must "allege [an] implicit element explicitly."  212 F.3d at 93.  Like *Foley* and *Ivic*, however, *Pirro* did not state, much less hold, that a certain term must be used to describe an element, particularly with respect to an implicit element.  *See, e.g.*, *United States v. Avenatti*, 432 F. Supp. 3d 354, 361-64 (S.D.N.Y. 2020) (denying motion to dismiss and rejecting defendant's argument based on *Pirro*, among other authorities, that an honest services wire fraud indictment must use "the words 'bribe' or 'kickback'").[4]

---

[4] Moreover, the Indictment charges the defendant with a wire fraud conspiracy, not a substantive wire fraud charge.  (Dkt. No. 186 at 4-5.)  The defendant ignores this important distinction.  *See United States v. Bidloff*, 82 F. Supp. 2d 86, 91 (W.D.N.Y. 2000) ("An indictment for conspiracy to commit a federal offense need not allege the conspiracy with the same 'technical precision' and 'detail' as would be required in an indictment if the object offense had been charged.").  By tracking the statutory language, like the Indictment here, a conspiracy charge would be properly alleged even if no overt act had been taken in furtherance thereof and no actual statements—material or otherwise—were ever communicated to the victims.  *See United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) ("We agree with these courts and conclude that a conspiracy conviction under § 1349 does not require proof of an overt act.").  Accordingly, regardless of what might be required to properly allege a substantive wire fraud charge, it follows that the Indictment

### 3. The Indictment's Allegations Are Legally Sufficient

While the defendants may desire additional factual detail regarding the charged offense, their arguments that the Indictment should be dismissed for lack of specificity are meritless.

The defendant's remaining principal challenges to the Indictment boil down to three arguments that plainly are inappropriate for a motion to dismiss: (1) she denies being a member of the charged conspiracy (*see* Def. Mem. 3, 8), (2) she argues that the false or fraudulent pretenses, representations, and promises made in the course of the conspiracy were not material (*see id*. 3-4), and (3) she suggests that there were "contracts" between participants in the conspiracy and the victims that exculpate the defendant (*see id*. at 7). The defendant's "argument amounts essentially to a sufficiency of the evidence challenge, which is inappropriate at this stage of a criminal case." *United States v. Gatto*, 295 F. Supp. 3d 336, 350 (S.D.N.Y. 2018). In particular, the defendant essentially invites the Court to (a) read all allegations in the Indictment skeptically and draw all inferences in favor of the defendant and (b) consider her own proffered factual allegations, none of which are in the Indictment, and conclude that, as a matter of law, the defendant's conduct does not meet the elements of the crime charged. But a motion to dismiss an indictment is decided on the face of the charging instrument, and *its* allegations must be accepted as true—not a defendant's. *See, e.g.*, *United States v. Murgio*, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016) ("In evaluating a motion to dismiss, the Court 'accept[s] as true all of the allegations of the indictment.'" (quoting *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985))). In short, the defendant is not entitled to dismissal of a properly returned indictment because she disagrees with its allegations or believes the Government will not be able to meet its burden. *See, e.g.*, *United States v. Bout*,

---

cannot be deficient for not explicitly alleging a specific characterization of pretenses, representations, or promises that were not even required to actually have been communicated to meet all elements of the offense charged.

No. 08 Cr. 365 (SAS), 2011 WL 2693720, at *5 n.73 (S.D.N.Y. July 11, 2011) ("To the extent [that the defendant's] challenges are to the sufficiency of the Government's evidence to *satisfy*— as opposed to the sufficiency of the Indictment to *allege*—the federal elements of the crimes charged, those arguments are not appropriately decided on a motion to dismiss." (internal quotation marks omitted; emphases in original)), *aff'd*, 731 F.3d 233 (2d Cir. 2013). These are issues of fact. *See Neder v. United States*, 527 U.S. 1, 8 (1999); *United States v. Rudaj*, No. 04 Cr. 1110 (DLC), 2006 WL 1876664, at *7 (S.D.N.Y. July 5, 2006); *cf. United States v. Salemo*, 499 F. App'x 110, 112 (2d Cir. 2012). As such, these issues are appropriately decided not by the Court as a matter of law based on contentions in a brief, but rather by the jury based on the evidence presented at trial. As the evidence at trial will prove beyond a reasonable doubt, none of the defendant's contentions have any merit.

Nor is there any relevance to the defendant's many arguments about information that she contends should be in the Indictment. Rule 7, not the defendant, sets forth the requirements for what must be contained in an Indictment, namely, "the elements of the offense charged[.]" *Hamling*, 418 U.S. at 117. The defendant's argument that the Government has somehow failed to satisfy Rule 7 are baseless. There is simply no requirement that an indictment for a long-running, widespread wire fraud conspiracy identify with precision the "promises . . . made by the Participants," "facts sufficient to establish that [the defendant] joined" the charged conspiracy, or detail the evidence that the defendant participated in the conspiracy "willfully and with the specific intent to defraud the telemarketing purchasers." (Def. Mem. 3.) *See, e.g.*, *United States v. Wydermyer*, 51 F.3d 319, 326 (2d Cir. 1995) (indictment for conspiracy to make false statement upheld despite failure to state exact nature of alleged falsehood as the company's objective). The defendant cites no case law that would require such unusual detail and specificity

in an indictment, and she cannot do so given the controlling law in this Circuit.  The defendant is simply not entitled to have the Indictment contain the laundry list of items she wishes to know about the Government's evidence.[5]  *See Yannotti*, 541 F.3d at 127.

In any event, as discussed in greater detail below regarding the defendant's request for a bill of particulars, the defendant has been given ample notice of the charges against her by means of, among other things, discovery materials, search warrant affidavits, the *Ketabchi* trial record, conversations with counsel, and the outline of the Government's evidence contained above, rendering any potential notice deficiency in the Indictment entirely harmless (though there is no such deficiency).  *See, e.g.*, *Yannotti*, 541 F.3d at 127; *De La Pava*, 268 F.3d at 165; *Stavroulakis*, 952 F.2d at 693.

\* \* \*

In short, the Indictment more than sufficiently alleges "the elements of the offense charged and fairly informs a defendant of the charge against which [s]he must defend, and, second, enables h[er] to plead an acquittal or conviction in bar of future prosecutions for the same offense," *Hamling*, 418 U.S. at 117; *see also United States v. Castro*, No. 08 Cr. 268 (NRB), 2008 WL 5062724, at \*2 (S.D.N.Y. Nov. 25, 2008) ("An indictment need not identify all alleged co-

---

[5] To the extent there might be such a concept as a "false promise" case that is distinct from other types of wire fraud conspiracies (*see* Def. Mem. 7), this is not such a case.  As the Indictment alleges, and the Government intends to prove at trial, the defendant and her co-conspirators engaged in false or fraudulent pretenses, representations, and/or promises—not just "promises," as the defendant apparently wishes to read the Indictment.  In any event, none of the cases cited by the defendant regarding so-called "false promises" support the notion that the Indictment here is somehow deficient.  Even a cursory reading of the Indictment makes plain that this scheme was far more complex and sinister than a mere breach of contract and, as this Court is aware from the *Ketabchi* trial, the so-called "contracts" were part and parcel of the schemers' efforts to conceal the true nature of the scheme and provide themselves ammunition to fight chargebacks initiated by defrauded victims.  The Government anticipates offering similar evidence at the trial in this case.

conspirators, nor specify the nature, time and place of every overt act the defendant or others allegedly took in furtherance of a conspiracy, nor must it set forth all the evidence the government intends to introduce.").  The defendant's motion to dismiss should be denied.

## II.    The Defendants' Motion for a Bill of Particulars Should Be Denied

The defendant moves for a bill of particulars.  (Def. Mem. 16-28.)  The defendant's motion should be denied because the defendant has not, and cannot, establish that she is entitled to a bill of particulars in light of the various forms of detailed notice that the Government has provided with respect to the charges in this case.

### A.    Applicable Law

While Federal Rule of Criminal Procedure 7(f) permits the Court to direct the Government to file a bill of particulars, it is well established that "[a] bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."  *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014); *United States v. Mandell*, 710 F. Supp. 2d 368, 384 (S.D.N.Y. 2010) (same).  Because a "bill of particulars is not an investigative tool for the defendants," *United States v. Johnson*, 21 F. Supp. 2d 329, 339 (S.D.N.Y. 1998), "[t]he important question is whether the information sought is *necessary*, not whether it is helpful," *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990) (emphasis added; citations omitted).

Consistent with the above, "demands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied."  *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (noting that "[a]cquisition of evidentiary detail is not

the function of the bill of particulars" (internal quotation and citation omitted)). Indeed, it is well established that "the defendant does not 'need' detailed evidence about the conspiracy in order to prepare for trial properly." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989); *see also id.* ("It is well settled that defendants need not know the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the Government intends to adduce to prove their criminal acts." (internal quotation and citation omitted)); *and see United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'" (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001))); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."); *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) ("This instrument should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense." (citing cases)).

There are good reasons why bills of particulars are warranted only when the allegations in the Indictment, as supplemented by discovery and elsewise, are so general as to render it impossible to prepare a defense. Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Henry*, 861 F. Supp. at 1197 (citation omitted); *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because

"[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill"); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *3 (S.D.N.Y. Jan. 23, 2009) ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."). Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197. These concerns animate the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.* (citation omitted).

Applying these principles, courts routinely deny demands for bills of particulars identifying (1) "all acts" the defendant is alleged to have undertaken as part of the crime charged, *id.* at 1197 (noting that this demand "fall[s] clearly outside the ambit of a bill of particulars"), including wires or transactions alleged to be a part of a criminal scheme, *see, e.g.*, *United States v. Bonventre*, No. 10 Cr. 228 (LTS), 2013 WL 2303726, at *5-7 (S.D.N.Y. May 28, 2013); *United States v. Cuti*, No. 08 Cr. 972 (DAB), 2009 WL 3154310, at *3-4 (S.D.N.Y. Sept. 24, 2009); *United States v. Guttenberg*, No. 07 Cr. 141 (DAB), 2007 WL 4115810, at *4-5 (S.D.N.Y. Nov. 14, 2007), or (2) "where, when, and with whom" the Government will prove the defendant conspired, *Trippe*, 171 F. Supp. 2d at 240; *United States v. Heredia*, No. 02 Cr. 1246 (SWK), 2003 WL 21524008, at *9 (S.D.N.Y. 2003); *see also*, *e.g.*, *Samsonov*, 2009 WL 176721, at *4 (noting that demand for particulars identifying co-conspirators was "a veiled attempt to discern who is cooperating with

23

the Government"); *United States v. Rittweger*, 259 F. Supp. 2d 275, 292 (S.D.N.Y. 2003) ("There is no need to provide a list of all unindicted co-conspirators.").

Moreover, "[i]f the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence, no bill of particulars is required." *United States v. Binday*, 908 F. Supp. 2d 485, 497 (S.D.N.Y. 2012) (citing *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987)); *see also United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) ("[A] bill of particulars is not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means." (quoting *Walsh*, 194 F.3d at 47).

**B.    Discussion**

Here, not only does the Indictment provide a sufficient overview of the scheme to allow the defendant to meet the charges against her, but the Government has also provided extensive additional detail to the defendants through discovery.  For example, the Government has produced numerous affidavits, which were filed in support of the many search warrants obtained in the course of the Government's investigation, outlining the scheme in great detail.  For example, one of the affidavits provides, among other things, (1) an overview of the telemarketing fraud scheme and its various phases and aspects (Dkt. No. 261-5 at 4-5), (2) a summary and specific excerpts of information learned from victim interviews (*id*. at 5-6), and (3) a detailed account of the defendant's involvement in the scheme, as relayed to law enforcement agents by CW-1 and CS-2 (*id*. at 6-11).  Although the defendant omits any reference to them in the context of her request for a bill of particulars, the defendant attached two of those detailed affidavits to her motion.  (*See* Dkt. Nos. 261-5, 261-6.)  Indeed, those two affidavits alone, each the equivalent of a detailed criminal complaint, completely obviate the need for a bill of particulars.

But there is so much more. As the defendant tacitly acknowledges, the Government has also produced in discovery substantial materials related to the defendant's conduct, including, but not limited to, certain materials provided by the FTC that were gathered in the course of prior, separate investigations of entities for which the defendant and her co-conspirators worked (*see* Def. Mem. 34-36), as well as documents provided by victims; records of "sales" to victims; financial records showing the flow of victim funds to, among others places, accounts that the defendant controlled; and written communications between the defendant and her co-conspirators related to the charged scheme. Moreover, the Government, as a courtesy and in order to assist the defendant in her preparations for trial, provided her with a copy of the admitted exhibits, voluminous 18 U.S.C. § 3500 material, and the witness statements for witnesses the Government did not even call from the trial in *United States v. Ketabchi and Owimrin*, S8 17 Cr. 243 (SHS). In addition, the jury addresses, examinations, briefs on appeal, and the Second Circuit's summary order affirming the convictions are all easily accessible to the defendant and provide detailed accounts about the Government's theory of how the scheme worked and the role of lead providers like the defendant in it. It is apparent from the defendant's motion that she understands that the trial record in that case is highly relevant to the charges against her (*see* Def. Mem. 5, 31, 33), and it is difficult to imagine the defendant being provided a better roadmap of the Government's theory of the crime than has been provided here.

The foregoing materials more than suffice to provide the defendant with the detail to which she is entitled. *See Binday*, 908 F Supp. 2d at 497 ("If the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence," no bill of particulars in required (citing *Bortnovsky*, 820 F.2d at 574)); *Mandell*, 710 F. Supp. 2d at 385 (denying request for particularization of alleged misrepresentations where

the indictment was detailed and Government had provided voluminous, organized discovery); *Samsonov*, 2009 WL 176721, at *4 (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States v. Remire*, 400 F. Supp. 2d 627, 633-34 (S.D.N.Y. 2005) (Stein, J.) (denying bill of particulars where indictment and discovery materials gave adequate information to prepare for trial); *Trippe*, 171 F. Supp. 2d at 240 (denying bill of particulars request in stock fraud case where indictment was detailed and substantial discovery had been provided).

The defendant asks for a bill of particulars that includes several categories of information, none of which she is entitled to at this time. First, she asks for a list of the victims of the charged wire fraud scheme and of the financial transactions conducted in furtherance of the charged money laundering scheme. (Def. Mem. 23-24, 28). Requests such as the defendant's—that is, requests for the Government to identify all victims of a fraud scheme or all transactions at issue in a money laundering conspiracy—are routinely denied as beyond the scope of a bill of particulars. *See, e.g.*, *Bonventre*, 2013 WL 2303726, at *5-7 (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," "all unnamed clients and allegedly fake trades referred to in" a particular count, and all allegedly false documents and records); *Cuti*, 2009 WL 3154310, at *3-4 (in accounting fraud case alleged to have spanned years, denying request for bill of particulars identifying every fraudulent transaction); *Guttenberg*, 2007 WL 4115810, at *4-5 (in insider trading case, denying request for bill of particulars itemizing trades alleged to have been based on material nonpublic information).[6] In any event, as the

---

[6] The defendant's reliance on *United States v. Orena*, 32 F.3d 704 (2d Cir. 1994), in support

defendant is aware, "[i]dentifying information for all or virtually all of the victims of the charged scheme has already been produced or made available" to the defendant within the discovery produced.  (Dkt. No. 261-4 at 4.)  Further, "[t]he Government will produce materials for each victim that was interviewed in the course of its investigation, including but not limited to those that the Government intends to call as a witness at trial, with its production of 18 U.S.C. § 3500 material sufficiently in advance of trial to allow the defendant adequately to prepare for trial." (*Id.*) Accordingly, because "the information the defendant seeks 'is provided in the indictment or in some acceptable alternate form,' such as discovery or other correspondence, no bill of particulars is required." *Binday*, 908 F. Supp. 2d at 497 (citing *Bortnovsky*, 820 F.2d at 574).

Second, the defendant asks that the Government be required to identify co-conspirators and specify certain sales floors and fulfillment companies, which essentially are the entities through which many of the defendant's co-conspirators participated in the charged scheme.  The defendant concedes, as she must, that the Government has already identified, as a courtesy to the defendant and to assist in her preparation for trial, "49 individuals and companies" (Def. Mem. 18) that were involved in the scheme charged in the Indictment (Dkt. No. 261-4 at 3-4[7]).  As the defendant well knows, the list provided consists almost entirely of co-conspirators, sales floors, and fulfillment companies with whom the defendant did business.  Though this list may lengthen over time in

---

of her demand that the Government identify by name every victim of the defendant's long-running, widespread scheme, is misplaced. (Def. Mem. 24.)  That case involved far different charges (RICO and murder conspiracy charges) and found "no deficiency" in the Government's identification of certain victims (but not others).  *Id*. at 714.  In light of the factual and legal differences between that case and this one, and the fact that the court merely found the disclosures in that case sufficient—and therefore did not opine on whether less information than was provided might also have been sufficient—there are no lessons from *Orena* to apply here.

[7] The defendant appropriately redacted the list of individuals and entities in the version of the Government's disclosure that she filed.  Upon request, the Government will provide the Court with an unredacted version.

light of the Government's ongoing investigation and preparations for trial, it provides ample notice at this stage of the case that will allow the defendant to focus her defense efforts on the individuals and companies that the Government has identified. The Government has met and exceeded its obligations, and the defendant's request for additional particulars beyond those already provided should be denied. *See, e.g.*, *United States v. Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Nov. 4, 2002) (denying request for bill of particulars that would identify alleged co-conspirators and victims); *Trippe*, 171 F. Supp. 2d at 240 ("[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied."); *United States v. Fruchter*, 104 F. Supp. 2d 289, 313 (S.D.N.Y. 2000) (denying "Defendants' request for names of all aiders, abettors, unindicted co-conspirators, and confidential informants" as "nothing more than a request for a witness list").

The defendant's reliance on the Second Circuit's decision in *Bortnovsky* to support her request for additional information about the sales floors and fulfillment companies at issue in this case is misplaced. (*See* Def. Mem. 25.) There, the defendants were charged in a twelve-count indictment in connection with a scheme to defraud the Federal Emergency Management Association and the New York Property Insurance Underwriting Association by submitting false claims for burglary losses. 820 F.2d at 573-74. At trial, the Government introduced evidence about twelve burglaries, even though it admitted only four of those twelve were fabricated. *Id.* at 574. The Second Circuit concluded that the defense had been unable to adequately prepare for trial since the Government had turned over 4,000 documents in discovery but had failed to specify the dates of the fake burglaries. *Id.* at 574-75. But this is not a case where a few false statements or fraudulent transactions are lurking in hundreds of legitimate business deals. *See United States v. Tuzman*, 301 F. Supp. 3d 430, 451 (S.D.N.Y. 2017) ("In applying these principles, courts have

differentiated between cases in which only isolated illegal activity is alleged, and cases in which most or all activity is alleged to have been illegal."). To the contrary, the Government has made clear that telemarketing businesses in which the defendant was involved were designed, by her and others, to use misleading and deceptive practices in order to induce payments from victims based on false or fraudulent pretenses, representations, or promises.

Similarly, the defendant's reliance on *United States v. Davidoff*, 845 F.2d 1151 (2d Cir. 1988) is unhelpful to her cause. Specifically, the defendant relies on *Davidoff* to argue that the Government should identify every alleged victim of the charged scheme and further detail the "products" and "services" that were "sold" as part of the scheme. (Def. Mem. 24.) *Davidoff* however, is entirely unlike the present case. There, the court found that there was essentially a bait-and-switch, in that the indictment "put Davidoff on notice that he w[ould] be obliged to defend against extortionate scheme directed at one company," but at trial, "Davidoff [was] then confronted with evidence of extortions aimed at entirely different companies." *Davidoff*, 845 F.2d at 1154. It essentially held that a defendant could not be charged for one scheme and then have to defend against several other similar schemes at trial without prior notice. There simply is no comparable issue in this case. *See, e.g.*, *United States v. Reinhold*, 994 F. Supp. 194, 201 (S.D.N.Y. 1998) (denying motion for bill of particulars and finding *Davidoff* inapposite where "indictment is detailed" and "defendants have had extensive discovery"). The Government has provided substantial information about the victims of the charged scheme and has described with sufficient specificity the "products" and "services" that were "sold" as part of that scheme. Although the Government's investigation and preparations for trial are ongoing, it has and will continue its good-faith efforts to provide discovery materials and supplemental disclosures, such as the list of 49 individuals and entities included in the scheme as related to the defendant, in order to assure

that the defendant is able to adequately prepare her defense. *See, e.g.*, *United States v. Kaplan*, 886 F.2d 536, 544 (2d Cir. 1989) (distinguishing *Davidoff* and finding sufficient notice where defendant "was provided by the indictment and a proffer of the government's evidence to defense counsel with notice that the government would offer [certain types of] evidence").

Third, the defendant requests that the Government be required to "specify what specific business services" members of the wire fraud conspiracy "sold." (Def. Mem. 25.) In making her argument, the defendant ignores the examples of such items identified in the Indictment: "coaching sessions," "tax preparation or website design services," and "electronic or paper pamphlets." (Dkt. No. 186 at 3.) The numerous, detailed search warrant affidavits provide additional details, as do numerous documents provided in discovery (including sales lists, product/service descriptions from the sales floors, and "contracts" with victims). In addition, despite acknowledging elsewhere that the *Ketabchi* trial record is instructive, the defendant also ignores the voluminous and detailed testimony by numerous witnesses in that case about the precise types of "products" and "services" that were peddled by members of the scheme. As was demonstrated at trial, these "products" and "services" were nefariously designed and marketed with the sole purpose of generating profit for the telemarketers, at the expense of their victims on the other end of the phone. Contrary to the way in which they were "sold," these "products" and "services" were not designed to yield profits for the victims. Moreover, the defendant seems to suggest, wrongly, that the Government intends to prove the defendant's membership in the wire fraud conspiracy on some kind of transaction-by-transaction basis. The charge is conspiracy to engage in a scheme to commit wire fraud, and the Government need not prove any particular transaction; rather, the existence of the conspiracy and her membership therein is sufficient. While the Government may elect to call one or more of the victims to testify, the bulk of the evidence at trial likely will consist of testimony by the defendant's

former co-conspirators, her own communications, and financial records showing her reaping enormous profits at the expense of victims who were often elderly and/or vulnerable.

Fourth, the defendant requests a "timeline" of the defendant's conduct, that specifies "the time frame for the operation of particular aspects of the conspiracy." (Def. Mem. 23, 27.) Courts routinely reject defendants' attempts to require the Government to detail such charges with the level of specificity demanded by this defendant, and this Court should do the same here. *See, e.g.*, *United States v. Torres*, 901 F.2d at 233-34 (affirming denial of request for a bill of particulars seeking, among other things, the date on which the defendant joined the conspiracy and precise dates and locations relating to overt acts); *United States v. Bell*, No. 19 Cr. 550 (NSR), 2020 WL 7260518, at *4 (S.D.N.Y. Dec. 10, 2020) (denying motion for bill of particulars requesting, among other things, information regarding defendant's "status in the conspiracy, including the date she joined the conspiracy."); *United States v. Gonzalez*, No. 04 Cr. 078 (DAB), 2004 WL 2297341, at *12 (S.D.N.Y. Oct. 8, 2004) (quoting *United States v. Nachamie*, 91 F. Supp. 2d 565, 574 (S.D.N.Y. 2000)) ("[T]he courts have consistently rejected demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant[.]"); *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) ("What defendant seeks is in the nature of the 'wheres, whens and with whoms' that [c]ourts have held to be beyond the scope of a bill of particulars." (collecting cases)).

The defendant faultily relies on *United States v. Ikoli*, No. 16 Cr. 148 (AJN), 2017 WL 396681 (S.D.N.Y. Jan. 26, 2017) in support of her request for a "timeline," suggesting that in *Ikoli*, the court held that "a three-year conspiracy with no alleged key dates was too broad to put defendant 'on notice of the nature of the charges.'" (Def. Mem. 27.) The court drew no such conclusion, but instead found that while the indictment at issue was "arguably insufficient[,]" a

bill of particulars was irrelevant because the Government had already begun discussions with defense counsel about "the discovery and its relation to each defendant," and therefore denied the request for a bill of particulars as moot. *Ikoli*, 2017 WL 396681, at *15-18. This case, which is the only authority that the defendant cited in support of her request for a "timeline," provides her no assistance.

Moreover, each of the Government's productions are well-organized and accompanied by cover letters that provide, at the very least, details about the source of the materials. In this case, "the Government here has done more than merely produce 'mountains of documents'; instead, the Government has provided the information in an organized and comprehensible fashion." *United States v. Skelos*, No. 15 Cr. 317, 2015 WL 6159326, at *13 (S.D.N.Y. Oct. 20, 2015). The defendant's insistence that the Government cabin its proof at trial through a bill of particulars simply exceeds the requirement that a bill of particulars only be required when the information is *necessary*. "Defendants' request that the Government identify precisely which documents or recordings form the basis for the fraudulent transactions, the exact misrepresentations allegedly made therein, when and by whom they were made, and the specific details of the harm caused thereby, is a request for 'the very type of evidentiary minutiae that is not appropriate in a bill of particulars.'" *United States v. Ghavami*, No. 10 Cr. 1217, 2012 WL 2878126, at *4 (S.D.N.Y. July 13, 2012) (emphasis omitted) (quoting *Mitlof*, 165 F. Supp. 2d at 569).

The charging instrument, search warrant affidavits, discovery materials, and correspondence in this case, as well as the record from the *Ketabchi/Owimrin* trial, clearly put the defendants on notice of the nature of the charges against them and are more than sufficient to permit them to understand the charges and to prepare for trial. *See, e.g.*, *United States v. Carroll*, No. 19 Cr. 545 (CM), 2020 WL 1862446, at *6 (S.D.N.Y. Apr. 14, 2020) ("There is no basis for

a bill of particulars in this case. The charges against the defendants are explained in detail in the lengthy speaking Indictment, and the charges track the language of the applicable statutes while stating the time and place in approximate terms of the charged conspiracy.")

## III. The Defendant's Motion to Suppress Evidence From Two Search Warrants Should Be Denied

The defendant moves to suppress any evidence obtained pursuant to two search warrants, one that sought historical cell site location information for two cellphone numbers associated with the defendant (the "Cell Site Warrant") and one that sought the contents of an email account associated with the defendant (the "Email Warrant"). (*See* Def. Mem. 28.) The defendant's motion should be denied for at least three reasons. *First*, the motion should be denied as moot. The Government does not intend to use at trial any of the cell site location information obtained pursuant to the Cell Site Warrant.[8] In addition, and as the defendant acknowledges (*see id.* at 29), the Government did not receive any records from the provider in response to the Email Warrant, so there is nothing to suppress. *Second*, the motion should be denied because the purported false statements and alleged misleading omissions that the defendant has attempted to identify were, in fact, neither false nor misleading. (*See id.* at 28-37.) *Third*, even if the statements and omissions that the defendant has attempted to identify were false or misleading—which they were not—none of them were material to the affidavits' demonstration of probable cause. (*See id.* at 37-39.)

### A. Relevant Facts

#### 1. The Email Warrant

---

[8] The Government previously advised the defendant that it had not yet determined whether it would seek to introduce in its case-in-chief at trial any of the cell site location information. Since that conversation, and subsequent to the defendant filing her motion, the Government identified additional evidence from which the defendant's location at certain points in time can be established without the use of the cell site location information.

On August 26, 2020, the Honorable Debra Freeman, United States Magistrate Judge for the Southern District of New York, issued the Email Warrant based on an affidavit submitted by New York City Police Department Detective Christopher Bastos. (Dkt. No. 261-6 (the "Email Affidavit").) The Email Affidavit contained approximately ten pages of details regarding the telemarketing fraud scheme later alleged in the Indictment and the defendant's role in that scheme. (*Id*. at 6-16.) Among other things, the Email Affidavit described the nature and scope of several different aspects of the scheme, identified the types of victims that were targeted, listed a selection of the purported "products" and "services" that the scheme hawked, referenced the losses to victims, summarized interviews with victims that yielded information about the scheme's tactics, provided some history of the Government's investigation and prior resulting criminal cases, and reported information provided by cooperating witnesses. (*Id*. at 6-11, 14.) The Email Affidavit identified, among other things, specific companies and individuals with whom the defendant directed and worked with, the time periods of her involvement with them, her roles in different aspects of the scheme, and certain specific actions that she took. (*Id*. at 11-13.) It also set forth facts establishing probable cause that the defendant's email account contained evidence of the scheme, including descriptions of emails sent to or from the defendant's account in furtherance of the scheme. (*Id*. at 12-16.)

On May 26, 2021, the Government wrote to the defendant, in pertinent part: "As the Government has previously informed you, the search warrant for the jenshah@comcast.net account did not return any contents of that account, and therefore there are no records from that account in possession of the Government." (Dkt. No. 261-4 at 1-2.)

### 2.    The Cell Site Warrant

On March 2, 2021, the Honorable Robert W. Lehrburger, United States Magistrate Judge

for the Southern District of New York, issued the Cell Site Warrant based on an affidavit submitted by Detective Bastos. (Dkt. No. 261-5 (the "Cell Site Affidavit").) The Cell Site Affidavit contained approximately nine pages of details regarding the telemarketing fraud scheme later alleged in the Indictment and the defendant's role in that offense. (*Id*. at 4-13.) Among other things, the Cell Site Affidavit described the nature and scope of the business-opportunity aspect of the scheme, identified the types of victims that were targeted, listed a selection of the purported "products" and "services" that the scheme "sold" to the victims, explained how the victims frequently took on credit card debt to fund what they were told were "investments," summarized interviews with victims that yielded information about the scheme's tactics, provided some history of the Government's investigation and prior resulting criminal cases, and reported information provided by cooperating witnesses. (*Id*. at 4-11.) The Cell Site Affidavit identified, among other things, specific sales floors and fulfillment companies with which the defendant was involved, the time periods of her involvement with them, and named some of the other individuals with whom the defendant participated in the telemarketing fraud scheme. (*Id*. at 8-12.) It also set forth facts establishing probable cause that the historical cell site location information for the two cellphone numbers associated with the defendant constituted evidence of the scheme, including explanations of why those numbers were believed to be used by the defendant and how she appeared to use them in furtherance of the scheme. (*Id*. at 11-13.)

Although, as explained below, there is no flaw in the Cell Site Affidavit that would render the historical cell site information that the Government obtained subject to suppression, the Government does not intend to use at trial the historical cell site information obtained pursuant to the Cell Site Warrant.

### B.       Applicable Law

#### 1.       Mootness

Where the Government does not intend to use the fruits of a search warrant at trial, it is well-settled practice in this jurisdiction to deny a defendant's motion to suppress such fruits as moot.  *See, e.g.*, *United States v. Hester*, No. 19 Cr. 324 (NSR), 2020 WL 3483702, at *14 (S.D.N.Y. June 26, 2020); *United States v. Mathieu*, No. 16 Cr. 763 (LGS), 2018 WL 5869642, at *1 (S.D.N.Y. Nov. 9, 2018); *United States v. Percoco*, No. 16 Cr. 776 (VEC), 2017 WL 6314146, at *18 n.22 (S.D.N.Y. Dec. 11, 2017); *United States v. Conyers*, No. S13 15 Cr. 537 (VEC), 2016 WL 7189850, at *1 n.2 (S.D.N.Y. Dec. 9, 2016).  In addition, a motion to suppress evidence that the Government does not possess is, on its own terms, moot.  *See United States v. Zelaya-Romero*, No. 15 Cr. 174 (LGS), 2018 WL 1033235, at *3 (S.D.N.Y. Feb. 21, 2018) ("a motion to suppress is unnecessary as to hypothetical evidence that the Government does not possess.").

#### 2.       Probable Cause

A judge's finding of probable cause is afforded significant deference.  "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists. . . . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause."  *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted) (reversing suppression order).

Moreover, the determination that probable cause exists is a relatively low threshold.  "A judge's probable-cause determination is not overly strict.  Presented with a warrant application, the judge must 'simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of

knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (emphasis omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235). Moreover, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Martin*, 426 F.3d at 74 (quoting *Gates*, 462 U.S. at 232). Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Gates*, 462 U.S. at 231). "'[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

### 3. Misrepresentations and Omissions in a Search Warrant Affidavit

A search warrant affidavit is presumed reliable. *See Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008). "The task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the [issuing judge] a 'substantial basis' for making the requisite probable cause determination." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 238). "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003) (footnote omitted). But "'[e]very statement

in a warrant affidavit does not have to be true.'" *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir. 2000) (quoting *United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997)). To invoke the *Franks* doctrine, the defendant must demonstrate that there were intentional misstatements or omissions in the search warrant affidavit and that those misstatements or omissions were material. *See Awadallah*, 349 F.3d at 64. The defendant must establish both components—i.e., intent and materiality—by a preponderance of the evidence. *See Klump*, 536 F.3d at 119.

"The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). To secure a *Franks* hearing, a defendant must make a "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause." *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (emphasis added) (quoting *Franks*, 438 U.S. at 155-56, 170-71). The burden to even obtain a *Franks* hearing is a heavy one, and such hearings are thus rare. *See United States v. Brown*, 744 F. Supp. 558, 567 (S.D.N.Y. 1990) ("A defendant seeking to have the Court hold a *Franks* hearing bears a substantial burden."); *United States v. Swanson*, 210 F.3d 788, 790 (7th Cir. 2000) ("These elements are hard to prove, and thus *Franks* hearings are rarely held.").

Because "[a]ll storytelling involves an element of selectivity," it is "not shocking that every affidavit will omit facts which, in retrospect, seem significant." *United States v. Vilar*, No. S3 05 Cr. 621 (KMK), 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007) (citations and internal quotation marks omitted); *see also Awadallah*, 349 F.3d at 67; *Feola*, 651 F. Supp. at 1109. "[A]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *Mandell*, 710 F. Supp. 2d at 373 (quoting *Awadallah*, 349 F.3d at 67-68). Thus, in reviewing a challenge to a warrant, "[o]missions are not subject to

the same high level of scrutiny as misstatements." *United States v. Rivera*, 750 F. Supp. 614, 617 (S.D.N.Y. 1990). "[A]s a practical matter the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory." *Id*. at 374 (internal quotation marks omitted). This is because "allegations of omission potentially open officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Id.* (internal quotation marks omitted).

To allow for the inference that an affiant acted with reckless disregard for the truth, the omitted information must be "clearly critical" to assessing the legality of the search. *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996) (internal quotation marks omitted). The movant must make a substantial preliminary showing that a reasonable person would have known that the magistrate judge would have wanted to know the kind of information that was omitted. *See United States v. Perez*, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003).

An affiant "does not necessarily act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" *United States v. Rajaratnam*, 719 F.3d 139, 154 (2d Cir. 2013) (emphasis omitted). "Rather, the reviewing court must be presented with credible and probative evidence that the omission of information . . . was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'" *Id.* (quoting *Awadallah*, 349 F.3d at 68). "[T]he mere intent to exclude information is insufficient . . . [since] every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly." *Awadallah*, 349 F.3d at 67-68 (internal quotation marks omitted).

"To prove reckless disregard for the truth, the defendant[] [must] prove that the affiant in

fact entertained serious doubts as to the truth of his allegations." *Rajaratnam*, 719 F.3d at 154 (internal quotation marks omitted); *see also Falso*, 544 F.3d at 126 ("Allegations of negligence or innocent mistake are insufficient." (quoting *Franks*, 438 U.S. at 171)).

"To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *United States v. Lahey*, 967 F. Supp. 2d 698, 711 (S.D.N.Y. 2013). "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.* (internal quotation marks omitted).

### C.    Discussion

#### 1.    The Defendant's Motion Should be Denied as Moot

As a preliminary matter, the defendant's motion to suppress evidence obtained pursuant to the execution of the Email Warrant should be denied as moot, because she seeks to suppress evidence that the Government does not possess. The defendant herself acknowledges that the evidence is not in the possession of the Government; nonetheless, she asks the Court to entertain the motion because she asserts, based on defense counsel's "experience, providers sometimes make mistakes about what evidence they do and do not possess." (Def. Mot. 29.) Defense counsel's speculation about the potential future existence of hypothetical evidence is insufficient to warrant consideration of the motion, because "[a] motion to suppress is unnecessary as to hypothetical evidence that the Government does not possess." *Zelaya-Romero*, 2018 WL 1033235, at *3.

In addition, the defendant's motion to suppress evidence obtained pursuant to the Cell Site Warrant should also be denied as moot because, for reasons unrelated to the defendant's motion, the Government does not intend to use that evidence at trial. *See, e.g.*, *Hester*, 2020 WL 3483702, at *14 (denying suppression motion as moot where Government intended not to use that evidence at trial); *Percoco*, 2017 WL 6314146, at *18 n.22 (same).

### 2. The Affidavits Did Not Contain Knowingly False or Misleading Information

The defendant's motion also fails on the merits, as her assertions that the affidavits contained deliberate or reckless falsehoods and omissions are incorrect for several reasons.

#### a. Alleged False Statements

*First*, the defendant claims that the statements in the affidavits that the defendant "operated" the company Thrive are false. (Def. Mot. 30, 33-35.) Not so. The defendant contends that she did not "operate Thrive," but, instead, was merely a "vice-president" of the company. (*Id.* at 34.) If this is a distinction at all, it is a distinction without a difference. In support of her argument, she cites an organizational chart that shows at least four executives above her in the company, a deposition in which she "described her role at Thrive as involving 'business development' rather than in any way operating or managing the company," and the fact that an FTC civil complaint against Thrive did not name her as a defendant. (*Id.*)

The defendant's argument appears to turn on a misreading of the word "operate" that equates "operating" a company with "owning" or "managing" it. There is no basis for such a reading. *See Operate*, Merriam-Webster's Online Dictionary, merriam-webster.com/dictionary/operate (defining "operate" as "to perform a function: exert power or influence," "to produce an appropriate effect," "to perform an operation or a series of operations," "to follow a course of conduct that is often irregular," to "bring about, effect," "to cause to

function: work," "to put or keep in operation," and "to perform an operation on.").

Read consistent with its plain meaning, the affidavits appropriately describe in detail the manner in which the defendant "operated" Thrive, including by selling leads and providing fulfilment services to other telemarking companies participating in the fraudulent scheme and "upselling" additional products to victims of the scheme. (Dkt. No. 261-5 at 9.) Nowhere in the affidavits did Detective Bastos state that the defendant owned or managed Thrive, and indeed, he was careful to distinguish the two. (*Compare id.* at 11 ("BREWSTER provided leads to Telemarketing companies *operated* by SHAH") (emphasis added) *with id.* ("CW-2 *owned* Prestige") (emphasis added).

In addition, the defendant, by her own admission, was a "vice-president" of Thrive who "worked" performing "business development" functions for the company. (Def. Mem. 34.) Together, these actions are all clearly consistent with the plain meaning of the word "operate" and Detective Bastos's statements that the defendant "operated" Thrive were therefore not false, as the defendant alleges; indeed, they were *true*.

*Second*, the defendant's similar claim that Detective Bastos falsely stated that the defendant "operated" a company called Red Steele is without merit. In support of her argument, she cites a deposition of her co-defendant, Stuart Smith, in which he stated that Red Steele had three employees, including himself, as well as a phone call between a cooperating witness and Smith, in which Smith stated "No, no, Red Steele is not me. Nope, no. It was not me. There's, uh, another group—I mean, uh, I obviously have to set up to do the lead stuff but those guys—those guys are pieces of shit." (*Id.* 35-36.) Notwithstanding the fact that these statements by the co-defendant are contradictory—insofar as Smith admits involvement in Red Steele in the deposition but denies it in the call—these statements hardly contradict Detective Bastos's statement that the

42

defendant "operated" Red Steele.

As the affidavits detail, the defendant solicited leads from an individual associated with Cameron Brewster—who, as the court is aware, was charged in connection with his participation in the same fraudulent scheme as the defendant—and asked that the leads be sent to the email account "customersupport@redsteeleco.com." (Dkt. No. 261-5 at 12.) As the defendant herself acknowledges, this is consistent with her "working or being associated with Red Steele, like Smith." (Def. Mem. 36-37.) Just as with Thrive, soliciting leads for the fraudulent scheme falls well within the plain meaning of the word "operate," and Detective Bastos's statements that the defendant "operated" Red Steele were therefore *true*.

*Third*, the statements that the defendant challenges were sourced to information provided by cooperating witnesses and/or confidential sources. (*See, e.g.*, Dkt. No. 261-5 at 6 ("Based on my interviews of CW-1 . . ."), 9 ("Based upon my interviews of CS-1 . . ."), 10 ("Based on my interviews of another individual who has been charged in connection with his role in the Business Opportunity Scheme . . ."), 11 ("Based on my interviews of CW-2").) The defendant does not argue—nor could she—that Detective Bastos was not truthful in reporting what he learned from the interviews referenced in the affidavits. To the extent the defendant is attempting to challenge the accuracy of the cooperating witnesses' and/or confidential sources' information, as relayed in the affidavits, such a challenge fails as a matter of law. *See United States v. Cook*, 348 F. Supp. 2d 22, 29 (S.D.N.Y. 2004) ("If there is an inaccuracy in the affidavit based upon information provided by a third party, a *Franks* hearing is inappropriate . . . There is no right to a hearing when the challenge is to information provided by an informant or other source." (internal quotation marks and citation omitted)); *United States v. Markey*, 131 F. Supp. 2d 316, 324 (D. Conn. 2001) ("The agents were simply relating to the court information that was provided by the postal letter

carrier.  *Franks* is implicated only when the false statement is made by, or the reckless disregard is that of, the affiant.  There is no right to a hearing when the challenge is to information provided by an informant or other source.").

In sum, because Detective Bastos accurately reported what he learned in interviews with other witnesses and that, in any event, the statements that the defendant "operated" Thrive and Red Steele were plainly *true*, the defendant has not made the requisite "'*substantial preliminary showing*' that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit."  *Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (emphasis added) (quoting *Franks*, 438 U.S. at 155-56, 170-71).

### b.  Alleged Intentional or Reckless Omissions

The defendant also contends the affidavits contained two intentional or reckless omissions: the "fact that (a) at least some alleged 'victims' in fact made money, and (b) that alleged 'victims' were explicitly told that no earnings promises were being made."  (Def. Mem. 30.)  Neither "omission" is intentional or reckless, nor are her characterizations of those "omissions" accurate. She has not—and cannot—meet her burden of showing that these alleged omissions were "clearly critical" to assessing the legality of the search.  *Reilly*, 76 F.3d at 1280.

*First*, in support of her contention that the "fact that … at least some alleged 'victims' made money" (Def. Mem. 30), the defendant cites the testimony from the *Ketabchi* trial of cooperating witness William Sinclair.  (*Id.* 31.)  This ignores the context of Detective Bastos's statement about the victims not earning any of the investment returns they were promised.  (*See, e.g.*, Dkt. No. 261-5 at 6.)  Detective Bastos's statement was sourced to the interviews of over 100 victims in the course of his investigation.  (*Id.* at 5 ("Based on my interviews of more than 100 Victims . . .").  The defendant strains to frame Detective Bastos's statement differently, but it was

simply relating and summarizing information that he heard from the victims whom he interviewed. Her argument, therefore, is yet another baseless challenge to the original source of information accurately related by the affiant that fails as a matter of law. *See Cook*, 348 F. Supp. 2d at 29; *Markey*, 131 F. Supp. 2d at 324.

In any event, as the defendant correctly notes, Sinclair testified that he was aware of "maybe a very few" number of victims who made money, so few he could count them on one hand. (*See* Trial Tr. 226:4-10.) The defendant contends that this critically undermines the language in the search warrant affidavits that "no" victim ever made "any" of the returns they were promised. (*See, e.g.* Dkt. No. 261-5 at 5.) While the language in the affidavit may arguably be imprecise, it is by no means critically so. Indeed, the Second Circuit, in affirming the convictions of the defendants in the *Ketabchi* trial, characterized Sinclair's testimony at trial in the same way the search warrant affidavits characterize the scheme: "[i]n reality, as co-conspirator William Sinclair testified, the businesses were not operational and did not have any 'structure,' so '*nobody made money*.'" *United States v. Ketabchi*, 832 F. App'x 41, 44 (2d Cir. 2020) (emphasis added).

That somewhere between one and five victims of the scheme—out of hundreds—may have generated *some* revenue (not profit), while the overwhelming majority did not, clearly was not the type of information a judge would require in assessing a search warrant affidavit, *Rajaratnam*, 719 F.3d at 154; indeed the judges on the panel in *Ketabchi* read the same testimony as cited in the defendant's motion and characterized the scheme in exactly the same way as did the affidavits at issue here, 832 F. App'x at 44. This is for good reason: that a single witness cited to a miniscule number of victims may have made *some* money (but no profit whatsoever) does not change the fundamental character of the overall fraudulent scheme, which was designed to and did cause hundreds of victims, many of whom were elderly or vulnerable, to suffer severe losses. The

defendant has not made a substantial preliminary showing that any arguable imprecision in the language used in the affidavits was the result of a reckless disregard for the truth, as she is required to do to prevail on her motion. *Rajaratnam*, 719 F.3d at 154.

*Second*, the defendant's contention that Detective Bastos omitted critical information showing that victims were never promised returns (*see* Def. Mem. 32-33) similarly misses the mark. In support of her contention, the defendant first cites two email attachments stating that sales representatives could not make promises to "customers." (*See id.*) As an initial matter, the first document she cites, Dkt. No. 261-8, was not in the Government's possession until on or about March 25, 2021—almost a year after the Email Warrant was signed, and three weeks after the Cell Site Warrant was signed.[9] The Government, of course, is not required to disclose the existence of a document it did not possess. *See, e.g. United States v. Pena*, 227 F.3d 23, at 27 n. 3 (2d Cir. 2000). This fact alone renders the defendant's contention as to that document baseless.

Even if Detective Bastos had possessed that document at the time he swore to the veracity of the affidavits—which he did not—the two documents and the trial testimony the defendant cites are irrelevant. Through his participation in the investigation, including interviewing over 100 victims (*see, e.g.*, Dkt. No. 261-5 at 5), Detective Bastos learned that victims were, indeed, made promises that they would earn money. (*Id.*) That two internal documents existed saying that sales representatives should not make promises, and that at trial Sinclair arguably provided a perspective slightly different than that shared with Detective Bastos by victims—who have a very different vantage point—is plainly not "clearly critical" information, the omission of which was "designed to mislead." *Rajaratnam*, 719 F.3d at 154. As several victims testified at the *Ketabchi*

---

[9] The Government also obtained the documents filed as Dkt. Nos. 261-10 and 261-14 on or about the same date, that is, after the Cell Site Affidavit and Email Affidavit were sworn out.

trial, victims of the charged scheme often were made promises. That two documents—one of which was not even in the Government's possession—existed saying that sales representatives should not have made such promises does not undermine the reality that they, in fact, did. Moreover, Detective Bastos accurately related in the affidavits the information that he learned during his interviews of victims, and any attack on the underlying information provided by those sources is precluded as a matter of law. *See Cook*, 348 F. Supp. 2d at 29; *Markey*, 131 F. Supp. 2d at 324.

In sum, the "omissions" the defendant identifies were not "clearly critical" information and plainly were not "designed to mislead." *Rajaratnam*, 719 F.3d at 154. The defendant therefore has not and cannot show that the "omissions"—to the extent there were any—were made with a "reckless disregard for the truth." *Id.*

### 3. The Alleged False Statements and Omissions Were Not Material

Even if the statements or alleged omissions in the affidavits that defendant points to were false or made with reckless disregard for the truth—which they were not—her motion still fails the next step of the *Franks* inquiry: proving by a preponderance of the evidence that the statements were material to a finding of probable cause. *See Klump*, 536 F.3d at 119.

As explained in greater detail above, "[t]o determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *Lahey*, 967 F. Supp. 2d at 711. "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." *Canfield*, 212 F.3d at 718. In other words, "[t]he ultimate inquiry is whether, after putting aside erroneous information and material omissions, there remains a residue of independent and lawful information sufficient to support probable cause." *Id.*

(internal quotation marks omitted).

As "corrected," the affidavits would contain the following statements: First, that Shah "worked" at Thrive and Red Steele by "purchas[ing] 'customer relationship manager' tools (essentially, a sales database) from a cooperating witness, and sold leads at Thrive to certain telemarketing companies," (Def. Mot. 38 (citations omitted)); second, that between one and five victims made some money—but no profits—while hundreds of others made absolutely no money; and third, that victims were promised returns but the company's internal policies, which were repeatedly violated, stated that sales representatives should not have made such promises. Contrary to the defendant's suggestion (Def. Mem. 38), the affidavits would still contain ample evidence establishing probable cause.

The affidavits would still describe the multiple, far-reaching criminal schemes to defraud victims of money, and state that the overwhelming majority of victims, in fact, were so defrauded. (*See, e.g.*, Dkt. No. 261-5 at 5-11.) They would still describe how the defendant actively participated in activities vital to the schemes, including buying and selling leads, fulfilment services, and other products to and from persons who, at the time of the affidavits, had been criminally indicted for the same fraudulent practices. (*See, e.g.*, *id*. at 10.) In short, the affidavits would still show that the defendant was an active participant in the criminal scheme, wherein victims were promised substantial returns—contrary to company policy—and where only between one and five out of hundreds of victims ever actually made any money.

The defendant claims this would not be enough to establish probable cause. (Def. Mot. 37-39.) Not so. The determination that probable cause exists is a relatively low threshold, and the facts as "corrected" would still far exceed the standard. "A judge's probable-cause determination is not overly strict. Presented with a warrant application, the judge must 'simply . . . make a

practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Martin*, 426 F.3d 74 (emphasis omitted) (quoting *Gates*, 462 U.S. 238).

Here, the affidavits demonstrated that the defendant actively participated in the same criminal scheme as scores of others who had previously been indicted for their similar roles in the schemes. Indeed, the affidavits detail a specific exchange, typical of the transactions at the heart of the scheme, between the defendant and an individual associated with a co-conspirator, Cameron Brewster. (*See, e.g.*, Dkt. No. 261-5 at 12.)

In analyzing whether "corrected" affidavits would establish probable cause, it is important to recognize the types of evidence that were being sought. The Cell Site Affidavit sought a warrant for cellphone location information relating to two phones that the defendant admits were associated with her. (Def. Mem. 28; Dkt. No. 262 ("Shah Decl.") ¶¶ 26-27.) Given the evidence of her participation in the scheme as set forth in the affidavits, including the description of her co-conspirators' activities (many of whom had already been indicted), her location information could establish that she was in the same location at the same time as others involved in the scheme, at times critical to the scheme. This plainly was a showing of "a fair probability that . . . evidence of a crime [would] be found" in the contents of the cell site location information. *Martin*, 426 F.3d 74 (2d Cir. 2005) (emphasis omitted) (quoting *Gates*, 462 U.S. 238).

Second, the Email Affidavit sought a warrant for the contents of the defendant's email account. Given that the affidavit included scores of evidence that the scheme was conducted by the transmission of leads, including by email (*see, e.g.*, Dkt. No. 261-6 at 12-13), and that the defendant was an active participant in the scheme, the Email Affidavit clearly established a fair

probability that evidence of a crime would be found in the contents of the defendant's email account.

In her strained arguments to the contrary, the defendant ignores the evidence set forth in the affidavits described above; grossly overstates the nature of the alleged "false statements" and "omissions" and the "powerful" nature of the "corrections" (Def. Mot. 39); and, crucially, misstates the standard for probable cause. The defendant claims that:

> Not one of these allegations contains a hint or a suggestion that, even if these companies were engaged in a fraud conspiracy, Ms. Shah had any *knowledge* of that fact, such that her cellphone location information would constitute evidence of a crime. There is no "telemarketing fraud" exception to the general rule that probable cause determinations require that a *crime*, complete with *mens rea*, be committed using the target instruments.

(Def. Mot. 38 (emphasis in original)). To be sure, *mens rea* is an element of fraud. *See, e.g., United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (en banc). But that is of no moment to a showing of probable cause. "The quanta of proof necessary to establish probable cause is 'only the probability, and not a prima facie showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235). The defendant's claim that a showing of *mens rea* in a search warrant affidavit is required to make out probable cause is flatly incorrect. In any event, even if—contrary to fact and logic—the defendant had no knowledge of the fraudulent scheme of which she was a leading member, the fact that she was involved in supplying leads to other members of the scheme, and was meeting with and communicating with those individuals, provided probable cause that her cellphone location information and the contents of her email account constituted evidence of the offenses; a person can possess evidence of a crime without having committed it herself (though here, as charged, the defendant did so).

In sum, even if the statements and "omissions" the defendant points to were made intentionally or with reckless disregard for the truth—which they were not—her motion fails to

establish that the statements and omissions were material to a showing of probable cause, and therefore cannot satisfy the second step of the *Franks* inquiry.

## IV.    The Defendant's Motion to Disclose Grand Jury Testimony Should Be Denied

The defendant moves for disclosure of the grand jury proceedings in this case.  (Def. Mem. 40-42.)  This motion is baseless and should be denied.

### A.    Applicable Law

Grand jury proceedings carry a presumption of regularity, and are secret and closed.  *See In re Grand Jury Subpoena*, 103 F.3d 234, 239 (2d Cir. 1996); *see also* Fed. R. Crim. P. 6(e). However, under Rule 6 of the Federal Rules of Criminal Procedure, a defendant may seek the disclosure of grand jury minutes where the defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  The strong presumption of grand jury secrecy and regularity can only be overcome by a defendant's strong showing of "particularized need that outweighs the need for secrecy."  *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978) (internal citations and quotations omitted).  "[R]eview of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  *United States v. Torres*, 901 F.2d at 233; *see also United States v. Leung*, 40 F.3d 577, 582 (2d Cir. 1994).  Furthermore, "[g]enerally, a facially valid indictment returned by a duly constituted grand jury suffices to call for a trial on the merits of the charges set forth therein."  *United States v. Dunn*, No. 05 Cr. 127 (KMK), 2005 WL 1705303, at *2 (S.D.N.Y. July 19, 2005) (quotation marks omitted; alteration in original).  Thus, "an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence."  *United States v. Calandra,* 414 U.S. 338, 345 (1974).

## B. Discussion

The defendant falls well short of the high burden she must satisfy to initiate a review of the grand jury proceedings. Her argument is entirely derivative of the claims she makes related to the Cell Site Affidavit and Email Affidavit. (Def. Mem. 41.) For the reasons explained above, the affidavits correctly and accurately described the defendant as one who "operated" Thrive and Red Steele. (*See id.*) The defendant is correct that her role as an operator of those entities is "highly prejudicial to her" (*id.*), just as any damning, inculpatory evidence is prejudicial to an individual being considered for indictment before a grand jury. However, the evidence of her role, as recounted in the affidavits, was not *unfairly* prejudicial. Detective Bastos accurately related in the affidavit what he had learned from cooperating witnesses, confidential sources, and documentary evidence about the defendant's role in the scheme. Of course, the defendant's apparent disagreement with the facts as articulated by the grand jury in its Indictment and by Detective Bastos in the affidavits is unsurprising—the defendant is entitled to challenge the Government's evidence at trial and, if she so chooses, present competent evidence and appropriate argument to contest the Government's case. But the defendant is not entitled to challenge a grand jury proceeding—or the contents of an indictment or search warrant affidavits—because she disagrees with the facts asserted. At bottom, that is the challenge she brings, and it is inappropriate for a pretrial motion.

The court should reject the defendant's baseless assertion that the testimony in the grand jury proceeding was "potentially perjured" (*id.*) based on the affidavits' accurate recounting of what victims told law enforcement agents in interviews and the proper, classic use of the word "operate" to describe the defendant's role in the scheme. At best, the defendant's arguments are classic factual questions for a jury (or a grand jury) to resolve, as they relate to the nature and

meaning of representations made in the course of a scheme, the defendant's role relative to her co-conspirators, and the defendant's knowledge and intent. The well-settled law regarding grand jury regularity and secrecy, as set forth above, plainly does not permit the defendant to initiate a review of the grand jury proceedings on the mere basis that she contests her guilt or certain of the Government's evidence, just like every other defendant who proceeds to trial. The defendant's apparent disagreement with what words should be used to describe her lengthy and serious course of criminal conduct, and her interest in contesting what potential inferences a jury should draw from that evidence, supply no reason to doubt the validity and regularity of the grand jury proceedings. To the contrary, it would be an unusual case in which a defendant who persists in her denial of guilt adopts the Government's understanding of the evidence gathered in an investigation and the Government's inferences (or those of the grand jury) concerning her knowledge, intent, and role.

## V.    The Defendants' Motion to Disclose Purported *Brady* and *Giglio* Material and a Co-Conspirator's Post-Arrest Statement Should Be Denied

### A.    Request for Purported *Brady* Material

The defendant asks that the Government be required to immediately disclose "any information that tends to show that customers were *not* being made such promises [of financial returns]—or that contradicts the government's evidence that they were—as well as information about all purchasers who made at least some money." (Def. Mem. 44.) The defendant's request should be denied for several reasons.

The defendant concedes that the Government has already provided such information to the defendant. (Def. Mem. 45 ("we have located some such information").) The defendant speculates, without articulating any support for her claim, that the Government has possession of and has not provided other such information, even though her own review of the discovery materials for such

information remains ongoing. (*See id*.) Such speculation provides no basis for relief. To the contrary, the Government has diligently and timely produced the materials it has gathered related to this case (with the exception of certain *Giglio* and 18 U.S.C. § 3500 materials, which will be produced in advance of trial), satisfying any potential *Brady* obligations. Moreover, as the defendant acknowledges (*id*. at 45-46), the Government has committed to producing all statements made by victims, regardless of whether the Government intends to call them as witnesses at trial, and is reviewing those statements to ensure compliance with its discovery obligations:

> [I]dentifying information for all or virtually all of the victims of the charged scheme has already been produced or made available. The Government will produce materials for each victim that was interviewed in the course of its investigation, including but not limited to those that the Government intends to call as a witness at trial, with its production of 18 U.S.C. § 3500 material sufficiently in advance of trial to allow the defendant adequately to prepare for trial. At the present time, the Government is not aware of the identities of any victims with whom your client had direct communications. The Government also is not aware of any victims that made a profit during their victimization by the scheme. The Government is in the process of reviewing its witness statements to ascertain whether it is aware of the identities of any victims who "made at least some money," and such information will be produced to the defendant to the extent it has not already been provided.

(Dkt. No. 261-4 at 2.)

The defendant does not merely ask for the Government to produce or disclose any potential *Brady* material, however. The defendant suggests that the Court should require the Government to go far beyond its *Brady* obligations: the defendant wants the Government to review all of the evidence that the Government has already produced to the defendant and then highlight for the defendant anything the Government believes might be useful in the defense of the charges in this case. (*See* Def. Mem. 45.) The Government has no such burden, as its *Brady* obligations are satisfied when the Government provides or discloses the existence of any potentially exculpatory

54

materials to the defendant. *See United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001) ("we reiterate the longstanding constitutional principal that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law"). The Court should reject the defendant's unprecedented request to compel the Government to act as an adjunct of the defense team. *See, e.g.*, *United States v. Yi*, 791 F. App'x 437, 438 (4th Cir. 2020) ("We reject as without merit Yi's argument that fulfillment of the Government's obligation under *Brady* requires it to identify exculpatory material.").

### B. Request for Immediate Production of Smith's Complete Post-Arrest Statement

The defendant also requests that the Court require the Government to produce the entirety of co-defendant Stuart Smith's post-arrest statement. (Def. Mem. 46-47.) The defendant claims that Smith's post-arrest statement could "implicate the need for a severance or redaction pursuant to *Bruton v. United States*, 391 U.S. 123 (1968) and Fed. R. Crim. P. 14" (Def. Mem. 46) and that "Smith's statement will be part of [the Government's] case in chief" (*id*. at 47). She is mistaken. The Government does not anticipate it will seek to admit any portion of Smith's post-arrest statement in the Government's case-in-chief at the defendant's trial, and therefore no potential *Bruton* issue is presented and no potential Rule 16 obligation is triggered. In any event, the defendant candidly concedes that "most courts hold that discovery of co-defendant statements that could implicate *Bruton* is not mandatory." (Def. Mem. 47 (citing *United States v. Stein*, 424 F. Supp. 2d 720, 727 (S.D.N.Y. 2006).) Even if the Government did intend to introduce Smith's post-arrest statement, there is no justification here for departing from the general rule of not requiring early production of such a statement.[10] In any event, the Government intends to produce

---

[10] As the defendant acknowledges, the Government has provided disclosure to the defendant of the substance of several portions of Smith's post-arrest statement in order to ensure

the entirety of Smith's post-arrest statement with its production of witness statements, sufficiently in advance of trial to permit the defendant to make any *Bruton* motion and adequately to prepare for trial.

## C. Request for Immediate Production of *Giglio* Material

*Third*, the defendant further requests that the Court "require production of *Giglio* material" immediately, several months in advance of trial. (Def. Mem. 48.) This request should be rejected. Production of *Giglio* material need only take place "in sufficient time that the defendant will have a reasonable opportunity to act upon the information efficaciously." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007). The Government will do so, and, as the defendant notes (Def. Mem. 42), it is in the process of conferring with the defendant and those of her co-defendants who appear poised to proceed to trial in order to formulate a comprehensive, fair, and reasonable timeline for mutual pretrial disclosures.[11]

In any event, the Government recognizes its obligations under *Giglio v. United States*, 405 U.S. 150, 154 (1972), and intends to follow the general practice in this District of producing such materials, if any, simultaneously with Jencks Act materials, substantially before trial, taking into account the nature and length of the trial. *See, e.g.*, *United States v. King*, No. 10 Cr. 122 (JGK), 2011 WL 1630676, at *7 (S.D.N.Y. Apr. 27, 2011) (noting, and approving over defense objection, Government's agreement to produce *Giglio* material at same time as Jencks Act disclosures); *Trippe*, 171 F. Supp. 2d at 238 ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act

---

compliance with its discovery obligations. (Def. Mem. 46.)

[11] The Government has proposed a comprehensive mutual pretrial disclosure schedule but had not yet received a substantive response from the defendant or her co-defendants.

material[.]").  Early disclosure of such material is not warranted simply because the defendant

prefers it.  *See, e.g.*, *United States v. Kenyatta*, No. 16 Cr. 273 (DLC), 2017 WL 972114, at *3

(S.D.N.Y. Mar. 9, 2017) (denying motion to compel production of *Giglio* material because the

Government "asserts . . . that it will provide any *Giglio* and Jencks material before the start of trial

pursuant to its customary schedule for such productions, and in sufficient time for defense counsel

to prepare to cross examine its witnesses"); *United States v. Davis*, No. 06 Cr. 911 (LBS), 2009

WL 637164, at *14 (S.D.N.Y. Mar. 11, 2009) ("The Second Circuit has held that a request for

immediate or early disclosure [of *Giglio* material] has no basis in the law.").

Seeking an end-run around this District's general timeline and manner of producing *Giglio*

material, the defendant invites the Court to read Rule 5(f) and this Court's order issued pursuant

to that rule to somehow modify the widespread practice in this District.  However, the newly

enacted Rule 5(f) does nothing more than require judges to remind the government of its disclosure

obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  Critically, it does not

*change* those obligations.  *See United States v. Ryan*, No. 20 Cr. 65, 2021 WL 795980, at *2 (E.D.

La. Mar. 2, 2021) ("The DPPA . . . does not purport to alter the government's substantive

obligations under governing law."); *United States v. Wilson*, --- F. Supp. 3d ----, 2021 WL 480853,

at *3 n.3 (W.D.N.Y. Feb. 10, 2021) ("The Due Process Protections Act, Pub. L. 116-182, 134 Stat.

894 (Oct. 21, 2020), which amended Rule 5 of the Federal Rules of Criminal Procedure to require

confirmation through an oral and written order at the first scheduled court date of the government's

*Brady* obligations, did not change the substance of those obligations."); *United States v. Mathis*,

No. 19 Cr. 265 (SDJ) (CAN), 2020 WL 7409089, at *6 n.2 (E.D. Tex. Nov. 3, 2020) ("The Court

is aware of the recent change to Federal Rule of Criminal Procedure 5(f), but notes that such change

does not alter the Government's obligation under *Brady*, but rather merely serves as a further

reminder of the Government's disclosure obligations.").

The order entered by this Court pursuant to Rule 5(f) makes clear that *Giglio* material need not be produced immediately upon its identification, as the defendant requests. Although it does not expressly address a defendant who appears intent on proceeding to trial, its confirmation that "the Government is not required to disclose impeachment material prior to a guilty plea" (Dkt. No. 246 at 2) logically must mean that such material need only be produced sufficiently before trial, in accord with longstanding practice in this District and consistent with the law in this Circuit.

## VI. The Defendant's Motion to Suppress Her Post-Arrest Statement Should Be Denied

The defendant moves to suppress her post-arrest statement on the ground that she purportedly did not voluntarily waive her *Miranda* rights. (Def. Mem. 48-56.) Her challenge is baseless and should be rejected without holding a hearing.

### A. Relevant Facts

The defendant was arrested on March 30, 2021.[12] (Shah Decl. ¶ 8.) Prior to her arrest, Detective Bastos called the defendant and asked her to pull over. (*Id.* ¶¶ 11, 13.) A few minutes later, Detective Bastos and other law enforcement agents arrived. The defendant was escorted to the back of a car, placed in handcuffs, and told the agents had a warrant for her arrest. (*Id.* ¶ 13.) Detective Bastos did not tell the defendant her charges at that time. He told her, in sum and substance, that the agents wanted to talk to her and wanted to make sure she was okay. (*Id.* ¶¶ 15-16.)

Detective Bastos drove the defendant to ICE headquarters. Upon arrival, the agents

---

[12] For purposes of this memorandum, the Government relies solely on facts alleged in the defendant's declaration, a recording of the interrogation, and the signed waiver form, as the motion to suppress should be denied even accepting her version of events as true. If the Court orders an evidentiary hearing, the Government reserves the right to present testimony and other evidence regarding her arrest and interrogation.

brought the defendant to a break room and handcuffed her to a chair. (*Id.* ¶ 19.) Detective Bastos

turned on a recording device and introduced himself and Special Agent Kathleen Corbett. (Exhibit

1, Recording of March 30, 2021 Post-Arrest Interrogation at 00:00:00-00:00:16.[13]) He showed

the defendant the "Statement of Rights" form and advised that he would read it "verbatim" to her.

(*Id.* at 00:00:16-00:00:32.) Before reading it, however, Detective Bastos asked the defendant the

following questions:

| | |
|---|---|
| Bastos: | And how do you pronounce your name correctly? |
| Defendant: | Jennifer Shah. |
| Bastos: | Jennifer Shah. And what's your- what's your date of birth? |
| Defendant: | [Month-Date]-73. |
| Bastos: | Okay. And you live, where? |
| Defendant: | In Park City. |
| Bastos: | What- What's- is that the Palomino address? |
| Defendant: | Yes. |

---

[13] The Government respectfully requests that Exhibit 1, which is a digital audio recording that will be provided to the Court on a disc, be filed under seal in light of the Government's ongoing investigation, *see, e.g.*, *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (citing *United States v. Valenti*, 987 F.2d 708, 714 (11th Cir. 1993) (affirming district court's refusal to unseal transcripts of *in camera* proceedings on the ground that it would damage continuing law enforcement investigations)), to protect the privacy interests of uncharged individuals and entities, *see, e.g.*, *United States v. Kolfage*, No. 20 Cr. 412 (AT), 2020 WL 7342796, at *12 (S.D.N.Y. Dec. 14, 2020) (denying unsealing request in light of, among other reasons, "privacy interests of uncharged individual and entities," which "may be of particular concern in a case such as this, which is the subject of pretrial publicity"); *SEC v. Ahmed*, No. 3:15-CV-675 (JBA), 2018 WL 4266079, at *3 (D. Conn. Sept. 6, 2018) (sealing certain documents based, in part, on privacy interests of a third party), and to avoid prejudicial pretrial publicity, *see, e.g.*, *United States v. DiSalvo*, 34 F.3d 1204, 1218 (3d Cir. 1994) ("avoidance of unwanted pretrial publicity" is a "legitimate law enforcement objective" that can justify sealing); *United States v. Nojay*, 224 F. Supp. 3d 208, 213 (W.D.N.Y. 2016) (describing "avoiding prejudicial pretrial publicity" as one of the available justifications for sealing).

Bastos:           What's the address?

Defendant:        [Street Address], Park City, Utah, 84098.

(*Id.* at 00:00:32-00:00:49.)

Detective Bastos then read the defendant her rights and she initialed next to each of them on the *Miranda* waiver form. (*Id.* at 00:00:50-00:02:15; Exhibit 2, ICE Form 73-025 signed on March 30, 2021.)[14]  After reviewing the defendant's rights, Detective Bastos read aloud from the waiver form: "'I have read, or someone has read to me, this statement of my rights and I,' meaning you, 'understand what my rights are, at this time I am willing to answer questions without a lawyer present.' Is that correct?"  The defendant replied, "Yes," and signed the form. (Ex. 1 at 00:02:15-00:02:28; Ex. 2.)

The defendant then mentioned that her contacts were blurry. Special Agent Corbett asked, "Are you okay? Do you need to go to the bathroom?"  The defendant spent the next few minutes fixing her contact lenses with the assistance of Detective Bastos and Special Agent Corbett. (Ex. 1 at 00:03:00-00:06:04.)  Once the agents confirmed that the defendant was "good," they began questioning her. (*Id.* at 00:06:55-00:07:20.)

A little over thirty minutes into the interrogation, Detective Bastos and the defendant had the following exchange:

Bastos:           Alright. So, let me- let me ask you some questions. Um, do you know anybody who's been arrested in BizOp within the last five years?

Defendant:        Arrested?

Bastos:           Like, charged federally. Like, you- like, you've been federally arrested. Do you know anybody who was arrested for working in the BizOp industry?

Defendant:        Um, well, I heard from people that- that, um, there were some people

---

[14] Detective Bastos read the rights in a different order than how they appeared on the Statement of Rights form. (*Compare* Ex. 1 at 00:01:20-00:02:00 *with* Ex. 2.)

> arrested, um, um, there was a- I don't- um, what is his name . . . I didn't
> know- a lot of them seemed to be, like, from Jersey, I didn't really- I- I
> never- I didn't know them.

(*Id.* at 00:00:39:37-00:00:40:12.)

Later in the interrogation, Detective Bastos asked the defendant if she knew "the ███████." The defendant responded, "I know who ██ - I know ██ and ███," and acknowledged that they ran a sales floor. (*Id.* at 01:11:48-01:11:58.) The defendant did not mention ████████, despite having multiple interactions with him giving rise to an order of protection. (Shah Decl. ¶¶ 3-7.) The defendant discussed the ██████ with the agents at various points throughout the remainder of the interrogation, but never specifically acknowledged that she knew ████████. (*E.g.*, Ex. 1 at 01:18:41-01:19:48, 01:21:24-01:22:07, 01:30:20-01:31:22).

## B.    Applicable Law

A statement made during custodial interrogation is admissible if the statement was made voluntarily after a valid waiver of the defendant's Fifth Amendment rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). This rule is based on the recognition that "[a]dmissions of guilt resulting from valid *Miranda* waivers 'are more than merely desirable; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law.'" *McNeil v. Wisconsin*, 501 U.S. 171, 181 (1991) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

To prove a valid waiver, the Government must establish by a preponderance of the evidence (i) "that the relinquishment of the right was voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (ii) "that it was made with the requisite level of comprehension, *i.e.*, a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v.*

*Medunjanin*, 752 F.3d 576, 586 (2d Cir. 2014) (internal quotation marks omitted). The "inquiry into the knowing and voluntariness of a waiver is 'directed to a defendant's state of mind, which can be inferred from his actions and statements.'" *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 211 (2d Cir. 2008) (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)).

A statement will be deemed voluntary unless it results from circumstances "that overbear the defendant's will at the time it is given." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (internal quotation marks and citation omitted). In *Colorado v. Connelly*, the Supreme Court held that a confession is involuntary only when it results from police coercion. 479 U.S. 157, 167 (1986). This is because "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. Indeed, the Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Id.* at 170 (quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985) (internal citations omitted)).

As a result, "while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Id.* at 165. Instead, it is well settled that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Id.* at 167; *see also id.* at 170 ("The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word."); *Moran*, 475 U.S. at 421; *Fare v. Michael C.*, 442 U.S. 707, 726-27 (1979). Following *Connelly*, the Second Circuit has recognized that a defendant's "mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that agents . . . engaged in some type of coercion." *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998); *see also id.* ("A diminished

mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." (internal quotation marks and citation omitted)).

The inquiry into voluntariness is objective; it asks whether, based on the totality of the circumstances, "the government agents' conduct was such as to overbear a defendant's will to resist and bring about confessions not freely self-determined." *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir. 1993) (internal quotation marks and alteration omitted). Factors relevant to this determination include "(1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir. 1988). The voluntariness determination ultimately "'depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Stein v. New York*, 346 U.S. 156, 185 (1953)).

At bottom, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Id.* at 444 (internal quotation marks and alteration omitted); *see also United States v. Williams*, 681 F.3d 35, 45 (2d Cir. 2012) (stating that suspect's signed waiver of rights was "'highly probative' of voluntariness" (quoting *Elstad*, 470 U.S. at 318)).

## C. Discussion

The defendant has failed to identify any undue coercion or pressure on the part of the agents and therefore the Court should deny her motion to suppress. At its core, the defendant's allegation is that the agents did not tell her the charges against her until the end of the interrogation. Yet the Supreme Court has "expressly declined" to hold that "mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver

of *Miranda* rights." *Colorado v. Spring*, 479 U.S. 564, 576 (1987); *see also id.* at 577 ("[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived [her] Fifth Amendment privilege."); *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) ("Silence by a government agent can only be equated with an affirmative misrepresentation where there is a legal or moral duty to speak or where an inquiry left unanswered would be intentionally misleading.").

The defendant attempts to circumvent this clear precedent by claiming that when Detective Bastos said he "just" wanted to talk to her, he "misled her into believing that law enforcement was just trying to clear up an issue, if not trying to help her." (Def. Mem. 54.) This argument rests on a strained and illogical interpretation of the defendant's own affidavit, which the Court should reject. When the agents arrived to meet the defendant, the first thing they did was place her in handcuffs and told her they had a warrant for her arrest. (Shah Decl. ¶ 13.) These actions were not designed to lull the defendant into a mistaken impression about the agent's intentions. Detective Bastos made clear from the outset that the defendant was being taken into custody pursuant to an arrest warrant. By later saying that he "just" wanted to talk to the defendant, Detective Bastos did not revoke his statement about her arrest or otherwise misrepresent the situation. The defendant acknowledges that at all points she remained in handcuffs, "apparently arrested." (*Id*. ¶ 17.) She does not allege that the agents said anything untruthful in response to her questions. Thus, Detective Bastos's words to the effect of "I promise that we just want to talk to you" were not meant to, and could not logically, mislead the defendant into believing that the agents' *only* purpose for stopping her was to speak with her. *See United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) (agents did not engage in impermissible trickery by "emphasiz[ing]

cooperation and deemphasiz[ing], but [] not misrepresent[ing], the criminal nature of the inquiry").

Furthermore, such a narrow reading of the word "just" to mean "exclusively" makes no sense given that Detective Bastos also told the defendant that he "*just* want[ed] to make sure [she was] OK." (Shah Decl. ¶ 16 (emphasis added).) Detective Bastos had at least three objectives when he placed the defendant in handcuffs: first, to arrest the defendant pursuant to a federal warrant; second, to speak with her about her involvement in criminal activity; and third, to make sure she was looked after during her arrest. He communicated these objectives to her as soon as she was in custody and in a way that did not deceive her about the criminal case or her Fifth Amendment rights.

This is obvious from the interrogation itself. The defendant was handcuffed to a chair during the interrogation. (*Id.* ¶ 19.) Detective Bastos gave the defendant a *Miranda* warning before asking any questions. (*Id.* ¶¶ 19, 23.) These actions could only have reinforced Detective Bastos's earlier statement that the agents had a warrant for her arrest. The defendant points to nothing during the interrogation designed to mislead the defendant about the investigation. Rather, Detective Bastos reminded her that she had been "federally arrested," which elicited no surprised reaction from the defendant. (Ex. 1 00:00:39:37-00:00:40:12.) Detective Bastos also repeatedly expressed his belief that the defendant was involved in an industry rife with fraud. (*Id.* at 00:54:05-00:55:09, 01:05:10-01:06:60.) This belies the defendant's claim that "the interrogation itself . . . presents another highly misleading set of interactions between Det. Bastos and Ms. Shah." (Def. Mem. 51.) The recorded interrogation shows no undue pressure, coercion, or trickery from the agents. Instead, it affirms that the defendant knowingly and voluntarily waived her Fifth Amendment rights and answered the agents' questions.

Even assuming the agents' actions could be characterized as coercive—which they were

not—the totality of the circumstances, including the defendant's personal characteristics and the conditions of the interrogation, all point to the same conclusion: that the defendant's written waiver of her Fifth Amendment rights was voluntary. The defendant is a 47-year-old reality-television star and businesswoman, clearly equipped with sufficient mental acuity and experience to decide whether to sign a *Miranda* waiver after being advised of the consequences of speaking with the agents, even taking into account her lack of prior interactions with the criminal justice system. *Compare Scully*, 850 F.2d at 902 (finding "nothing revealed in the characteristics of [a twenty-three-year-old with a tenth-grade education and two prior arrests] that suggest an overbearing of [the defendant's] will"); *United States v. Wang*, No. 11 Cr. 730 (PGG), 2013 WL 452215, at *8 n.1 (S.D.N.Y. Feb. 5, 2013) (twenty-six-year-old with no prior experience in the criminal justice system capable of knowingly and voluntarily waiving Fifth Amendment rights). The defendant does not argue that she lacked sufficient education to waive her rights voluntarily, but has instead claimed that a combination of circumstances left her feeling confused and vulnerable that day. (Def. Mem. 53-54.) The facts show, however, that this confusion, to the extent it existed at all, did not result in an involuntary waiver. First, as the defendant acknowledges, her blurry contact lenses had no bearing on her ability to hear the *Miranda* warnings Detective Bastos read (Def. Mem. 53), and any confusion about where to sign the waiver form was likely caused by Detective Bastos reading the rights in a different order than they appeared on the form. Regardless, courts have held upheld *Miranda* waivers where defendants were either in the midst of or recently recovered from far more serious injuries. *See United States v. Khalil*, 214 F.3d 111, 121-22 (2d Cir. 2000) (statements were voluntary where the interrogation occurred while the defendant was "being prepared for life-saving surgery" for a gunshot wound to his leg); *United States v. Peter*, No. 17 Cr. 54 (NRB), 2018 WL 5282878, at *5 (S.D.N.Y. Oct. 24, 2018) (rejecting "any

suggestion that Peter's physical condition [a recent gunshot wound] at the time of his interrogation rendered his waiver or ensuing statements inherently involuntary"). By comparison, the defendant's blurry contact lens was at most an irritant, but to the extent it was causing her any physical pain or discomfort, the agents helped her fix it before questioning her.

The defendant also claims that her belief that she had been misidentified, coupled with her fear about ███████████, weakened her mental state. Yet at no point during her interrogation did she raise either concern with the agents. Indeed, prior to signing the waiver, the defendant identified herself by name, date of birth, and address. It is implausible that she would have given up her Fifth Amendment rights to "clear up" a misidentification when the agents confirmed her identity prior to questioning her. With respect to ███████████, the agents never suggested that the defendant was in custody because he posed a threat to her. Rather, over an hour into the interrogation, the agents asked the defendant if she knew "the ██████," to which the defendant inaccurately responded that she knew "██ and ████." (Ex. 1 at 01:11:48-01:11:58.) Thus, to the extent that the defendant's "first thought" at the time of her arrest was the order of protection against ███████████, (Shah Decl. ¶ 12), by the time of her interrogation, ███████████ was either not weighing heavily on her mind or, for other reasons, the defendant simply chose not to share her years-long business and personal relationship with ███████████ with law enforcement.[15] Any lingering traumatic memories triggered by Detective Bastos's status as an NYPD detective had no noticeable effect on the defendant while she discussed the ██████.[16]

---

[15] The defendant does not argue that she was so confused she forgot about her relationship with ███████████, but rather that she was purportedly confused because her thoughts were "consumed with a desire" to know if ███████████ posed a threat to her. (Shah Decl. ¶ 18). The defendant, however, never posed such a question to the agents.

[16] If the Court orders an evidentiary hearing, the Government anticipates that it will introduce evidence relevant to the defendant's claim on the merits.

More generally, her demeanor during the interrogation undermines her claim that she was confused and vulnerable. She understood the questions, responded coherently, and, while at times she disagreed with statements the agents made, she always appeared under control.

Similarly, the conditions of the interrogation in no way pressured the defendant to waive her rights. The defendant claims no unusual delay between her arrest and her interrogation or other deprivations meant to wear her down. The setting—the agents' break room—was not designed to intimidate her. She was minimally restrained, which, the agents told her, was due to HSI "policy." (Ex. 1 at 00:06:58-00:07:07.) There were only two agents present during the interrogation, which lasted approximately 90 minutes. Finally, as noted previously, the agents took care to address the defendant's physical discomfort by helping her fix her contact lens.

For all of these reasons, the Court should deny the motion without an evidentiary hearing as nothing the agents did or said placed her under undue pressure or misrepresented the arrest and, even if the agents engaged in any form of coercion or trickery, which they did not, the totality of the circumstances show that the agents did not overbear the defendant's will.[17]

## VII. The Defendant's Motion to Permit More Motions Should Be Denied

The defendant requests an opportunity to file unspecified "additional motions," apparently at a time of her own choosing. (Def. Mem. 56.) This request should be denied as unripe. If and when the defendant determines that she wishes to file an additional motion, she should be required to seek leave of the Court before doing so. At that time, the Government can inform the Court whether it opposes or consents to additional motion practice depending on the nature of the motion,

---

[17] As the defendant acknowledges, any motion to exclude her post-arrest statement under Federal Rule of Evidence 403 is premature. (Def. Mem. 55.) If the defendant brings such a motion, the Government reserves the right to oppose it at that time.

the posture of the case, and other relevant circumstances. The Court then can rule on the defendant's request for leave. The defendant's current proposal that the Court prematurely rule in the abstract and permit her preemptive leave to file unspecified additional motions at any time of her choosing for the duration of the case is inappropriate and unnecessary. Indeed, the defendant cites no authority in support of her request, and the Government is aware of none. Accordingly, the motion should be denied.

## **CONCLUSION**

For the foregoing reasons, the defendant's pretrial motions should be denied.

Dated: New York, New York
July 7, 2021

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _Robert B. Sobelman_

Kiersten A. Fletcher
Robert B. Sobelman
Sheb Swett
Assistant United States Attorneys
Southern District of New York
(212) 637-2238/2616/6522