**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     Plaintiff,

  v.

JENNIFER SHAH,

     Defendant.

No. S4 1:19-cr-0833 (SHS)

**ORAL ARGUMENT REQUESTED**

### REPLY MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT JENNIFER SHAH'S PRE-TRIAL MOTIONS

Daniel R. Alonso
Michael S. Chu
BUCKLEY LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: (212) 600-2400
dalonso@buckleyfirm.com
mchu@buckleyfirm.com

Henry Asbill
BUCKLEY LLP
2001 M Street NW
Washington, DC 20036
Tel: (202) 349-8000
hasbill@buckleyfirm.com

*Attorneys for Defendant Jennifer Shah*

## TABLE OF CONTENTS

<u>**PRELIMINARY STATEMENT**</u> ................................................................ **2**

<u>**DISCUSSION**</u> ....................................................................................... **2**

**I.**      <u>**THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT FOR FAILING TO SET FORTH A DEFINITE STATEMENT OF THE ESSENTIAL FACTS**</u> ......................................................................................... **2**

   **A.**   **The Indictment Fails to Allege Specific Intent** ............................ **3**

   **B.**   **The Indictment Fails to Allege Materiality** ................................. **7**

**II.**     <u>**THE GOVERNMENT'S VOLUMINOUS DISCOVERY DOES NOT FULFILL ITS OBLIGATION UNDER *UNITED STATES V. BORTNOVSKY* TO PROVIDE THE REQUESTED PARTICULARS**</u> ........................................................... **9**

**III.**    <u>**THE COURT SHOULD ORDER DISCLOSURE OF THE GRAND JURY MINUTES BASED ON THE MULTIPLE FALSE AND MISLEADING STATEMENTS MADE OUTSIDE THE GRAND JURY THAT IT IS REASONABLE TO INFER WERE REPEATED INSIDE THE GRAND JURY**</u> ... **12**

   **A.**   **Sworn Statements About "Promised" Returns** ............................ **12**

   **B.**   **Sworn Statements that No One Made Money** ............................... **14**

   **C.**   **Sworn Statements that Ms. Shah "Operated" Thrive and Red Steele** .................. **15**

   **D.**   **Because a Ground May Exist to Dismiss the Indictment, the Court Should Order Disclosure of the Grand Jury Minutes** ....................................... **16**

**IV.**     <u>**THE COURT SHOULD ORDER PRODUCTION OF *BRADY* MATERIAL**</u> ......... **16**

   **A.**   **Exculpatory Material** ................................................................ **16**

   **B.**   **Impeachment Material** ............................................................... **18**

**V.**      <u>**MS. SHAH'S MOTION TO SUPPRESS HER POST-ARREST STATEMENTS SHOULD BE GRANTED**</u> ........................................................... **20**

<u>**CONCLUSION**</u> ................................................................................... **24**

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Durland v. United States*
    161 U.S. 306 (1896)................................................................................4
*Hamling v. United States*
    418 U.S. 87 (1974)................................................................................4
*Leka v. Portuondo*
    257 F.3d 89 (2d Cir. 2001)................................................................17
*Lynumn v. Illinois*
    372 U.S. 528 (1963)..........................................................................21
*Neder v. United States*
    527 U.S. 1 (1999)............................................................................7, 8
*Russell v. United States*
    369 U.S. 749 (1962).........................................................................2, 5
*St. Germain v. United States*
    2004 WL 1171403 (S.D.N.Y. May 11, 2004).................................17
*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*
    822 F.3d 650 (2d Cir. 2016)................................................................3
*United States v. Basurto*
    497 F.2d 781 (9th Cir. 1974)............................................................16
*United States v. Bin Laden*
    92 F. Supp. 2d 225 (S.D.N.Y. 2000)............................................2, 10
*United States v. Bortnovsky*
    820 F.2d 572 (2d Cir. 1987)....................................................9, 11, 18
*United States v. Comyns*
    248 U.S. 349 (1919)............................................................................3
*United States v. Coppa*
    267 F.3d 132 (2d Cir. 2001)..............................................................17
*United States v. Cruikshank*
    92 U.S. 542 (1875).............................................................................2
*United States v. Curtis*
    506 F.2d 985 (10th Cir. 1974)............................................................2
*United States v. Davidoff*
    845 F.2d 1151 (2d Cir. 1988)..............................................................6
*United States v. De La Pava*
    268 F.3d 157 (2d Cir. 2001)................................................................7
*United States v. Dupree*
    870 F.3d 62 (2d Cir. 2017)..................................................................2
*United States v. Foley*
    73 F.3d 484 (2d Cir. 1996)..................................................................7
*United States v. Gil*
    297 F.3d 93 (2d Cir. 2002).........................................................17, 18
*United States v. Gonzalez*
    686 F.3d 122 (2d Cir. 2012)................................................................2
*United States v. Hamilton*
    538 F.3d 162 (2d Cir. 20008)............................................................21

*United States v. Ivic*
   700 F.2d 51 (2d Cir. 1983)............................................................................................7
*United States v. Klein*
   476 F.3d 111 (2d Cir. 2007).........................................................................................7
*United States v. Nance*
   533 F.2d 699 (D.C. Cir. 1976).....................................................................................2
*United States v. Okwumabua*
   828 F.2d 950 (2d Cir. 1987).......................................................................................21
*United States v. Pirro*
   212 F.3d 86 (2d Cir. 2000)........................................................................................2, 7
*United States v. Rodriguez-Perez*
   2020 WL 6487509 (S.D.N.Y. Nov. 4, 2020) ...........................................................20
*United States v. Rybicki*
   354 F.3d 124 (2d Cir. 2003).........................................................................................4
*United States v. Shellef*
   507 F.3d 82 (2d Cir. 2007)...........................................................................................5
*United States v. Starusko*
   729 F.2d 256 (3d Cir. 1984).......................................................................................20
*United States v. Stringer*
   730 F.3d 120 (2d Cir. 2013)......................................................................................4, 5
*United States v. Tuzman*
   301 F. Supp. 3d 430 (S.D.N.Y. 2017).......................................................................11
*United States v. Walker*
   191 F.3d 326 (2d Cir. 1999) (*en banc*) (Raggi, J., concurring) ...............................4
*United States v. Walsh*
   194 F.3d 37 (2d Cir. 1999)...........................................................................................6
*United States v. Weigand*
   482 F. Supp. 3d 224 (S.D.N.Y. 2000).........................................................................8

## Statutes

15 U.S.C. §§ 41–58....................................................................................................................5
18 U.S.C. § 1349........................................................................................................................6
Fed. R. Crim. P. 6(e)(3)(E)(ii) .................................................................................................16
Fed. R. Crim. P. 7(c)..................................................................................................................2
Fed. R. Evid. 403......................................................................................................................23
N.Y. Penal Law § 155.05(2)(d)..................................................................................................6
Utah Code Ann. § 13-26-3..........................................................................................................5

## Other Authorities

Arthur R. Pearce, "Theft by False Promises," 101 U. Pa. L. Rev. 967 (1953). ........................4
Charlotte Buxton, ed., *Oxford English Mini Dictionary* (8th ed. 2013).................................15
William C. Donnino, Practice Commentary to N.Y. Penal Law § 155.00 ..................................6

## PRELIMINARY STATEMENT

Defendant Jennifer Shah respectfully submits this memorandum of law in reply to the government's response to Ms. Shah's motions (1) to dismiss the superseding indictment, (2) for a bill of particulars, (3) for disclosure of the grand jury minutes, (4) for *Brady* and *Giglio* disclosures, and (5) to suppress her post-arrest statement. Based on the government's representation that it does not intend to use the fruits of either the Cell-site warrant or the Email warrant, Ms. Shah is no longer pressing the *Franks* motion. However, the evidence provided in support of that motion, and additional responsive materials submitted in the accompanying Declaration of Heather L. Jones, are directly relevant to the pending motion for disclosure of grand jury materials.

The motions to dismiss, for a bill of particulars, for *Brady/Giglio* information, and for grand jury disclosures, although they all seek different relief, revolve around a key issue in this case: the nature of the promises allegedly made by Ms. Shah's alleged coconspirators to the purchasers of the business services at issue. The government has resisted this issue in all of these contexts, arguing that the indictment is clear; Ms. Shah needs no formal particulars; all favorable information indicating either that that promises of specific returns were disclaimed at the time of sale, or that the purchasers *did* make money, has been turned over; and there is no need to disclose the grand jury minutes. We demonstrate below that the government's positions are without merit, and we point out that its response contains several troubling mischaracterizations of the record.

In urging the Court to flatly deny all relief we have requested, the government repeatedly cites to what it terms the "general" or "widespread practice in this District," its view that certain motions are "routinely denied," and rote recitation of "well-settled law." *See* ECF No. 290 at 7, 21, 23, 26, 28, 31, 53, 56, 57. But these are little more than rhetorical crutches that invite the Court to reject our motions based on *ipse dixit.* We can all cite to well-settled formulations, and we do,

but as Judge Sand wrote two decades ago, such "oft-repeated generalities provide little guidance" to courts seeking to exercise their discretion. *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93 (2d Cir. 2008) (bill of particulars motion). Each case is unique on its facts, and we respectfully submit that Ms. Shah's motions have been carefully considered.

## DISCUSSION

### I. THE COURT SHOULD DISMISS THE SUPERSEDING INDICTMENT FOR FAILING TO SET FORTH A DEFINITE STATEMENT OF THE ESSENTIAL FACTS

The government places great weight on the oft-repeated truism that an indictment "need do little more" than track the elements of a crime and state the time and place. ECF No. 290 at 9, 12. But it nevertheless *must* do *more*, and most importantly, that "more" requires the government, under Fed. R. Crim. P. 7(c), to set forth a "definite written statement of the essential facts constituting the offense charged." That much is plain from the numerous cases we cited in our opening brief in which courts dismissed charges in indictments. ECF No. 260 at 4 (citing *Russell v. United States*, 369 U.S. 749, 770 (1962); *United States v. Cruikshank*, 92 U.S. 542, 558 (1875); *United States v. Dupree*, 870 F.3d 62, 70 (2d Cir. 2017); *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012)); *id.* at 4–5 (citing *United States v. Pirro*, 212 F.3d 86, 92–93 (2d Cir. 2000)); *id.* at 12 (citing *United States v. Nance*, 533 F.2d 699, 702 (D.C. Cir. 1976); *United States v. Curtis*, 506 F.2d 985, 992 (10th Cir. 1974)). The problem here is that, with respect to the crucial element of intent to defraud, a close read shows that essentially *all* they have done is set forth the elements of the crime. And with respect to the element of materiality, they have neither pled it nor do the essential facts establish the materiality of the promises at issue.

**A.      The Indictment Fails to Allege Specific Intent**

The question of *what type* of promises are alleged to constitute the gravamen of the alleged fraud scheme is at the heart of this motion and our motion for a bill of particulars. The scheme described in the superseding indictment suggests two possibilities: (1) that the conspirators lied about whether or not they would provide the services mentioned—coaching and business services, tax preparation, and web site design; or (2) that the conspirators lied about specific financial returns the purchasers would make if they bought these services. As to the first, the indictment never alleges that the services were not provided, and at one point suggests that they were in fact provided, albeit with qualifiers like "so-called." ECF No. 186 ¶ 4. Indeed, from discussions with the government and review of discovery materials, it appears there will be no serious factual dispute that those who ordered these services received these services—notwithstanding the suggestion in the indictment that such services were substandard. *See id.* ¶ 3. Not even the prosecutors have suggested that shoddy service makes for a criminal fraud case.

The second possibility is therefore likely to be correct: the government means to allege that the conspirators lied by promising specific financial returns while intending at the time of the promise that purchasers would not make such returns. *See United States v. Comyns*, 248 U.S. 349, 353 (1919) (false promises are within mail fraud statute where "there is no intention to perform"); *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016). The problem is that the superseding indictment does not do that. In its response, the government wrongly claims that the indictment "states that the defendant did not 'intend that the Victims would actually earn any of the promised return on their investment, nor did the Victims actually earn any such returns.'" ECF No. 290 at 14. But that is *not* what it actually alleges. The full passage reads: "*at no point did the defendants intend* that the Victims would actually earn any of the promised return on their intended investment." ECF No. 186 ¶ 4 (emphasis added). This is

crucial: as we argued in our opening brief, not ever forming an intention for purchasers to *earn* certain returns is simply not the same as intending them *not to*, or, in the words of the Second Circuit, forming "the specific intent to harm or defraud the victims of the scheme."[1] *United States v. Rybicki*, 354 F.3d 124, 151 (2d Cir. 2003) (*en banc*) (Raggi, J., concurring) (internal quotations omitted); *United States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999).

The government fails to respond meaningfully to this flaw in the indictment, instead falling back on the misquote above, the indictment's rote recitation of the elements of wire fraud and conspiracy, and its use of the conclusory term "defrauded." It also relies on *United States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013) to argue that only certain rare statutes require "specification of how a particular element of a criminal charge will be met (as opposed to categorical recitation of the element)" because such information "is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." The defendant in *Stringer* asked the Second Circuit to dismiss a count of his fraud indictment because it did not include the name of the victims of the fraud. *Id.* at 121. In the course of rejecting Stringer's claim, the court noted that some crimes require greater specificity in the accusatory instrument than others, particularly where specification of facts "is of such importance to the fairness of the proceeding that it must be spelled out in the indictment." *Id.* at 126; *see Hamling v. United States*, 418 U.S. 87, 118 (1974) (citing

---

[1] In a footnote, the government suggests that false promise cases might not even be a recognized concept in the law. ECF No. 290 at 20, n.5. To the contrary, before the Supreme Court's decision in *Durland v. United States*, 161 U.S. 306, 313 (1896), it was very much a question whether the mail fraud statute covered false promises of future performance, or simply false representations of present or past fact. *Durland* laid that to rest, and in 1909, Congress added the "pretenses, representations, or promises" language to the current statute. *See generally* Pearce, "Theft by False Promises," 101 U. Pa. L. Rev. 967 (1953). The controversy was very much rooted in concern over potentially criminalizing mere breaches of contract. *Id.* In any event, the government's assertion that its allegations in this case involve "false or fraudulent pretenses, representations, and/or promises—not just 'promises,' as the defendant apparently wishes to read the Indictment," ECF No. 290 at 20, n.5, makes no sense in light of the actual allegations in the superseding indictment, as well as all the affidavits and the discovery that the government points to in an effort to avoid producing a bill of particulars. On this point, the superseding indictment is clear: other than the literal words "false and fraudulent *pretenses, representations*, and promises," (emphasis added) which do no more than track the wire fraud statute, nowhere does it allege any misrepresentations of current or past fact. To the contrary, as discussed above, every indication in the indictment and elsewhere is that this case involves only allegations of (some type of) false promises made by sales floors to purchasers.

4

*Russell*, 369 U.S. at 764) (principle applies "[w]here guilt depends so crucially upon such a specific identification of fact…"). The *Stringer* court also relied on the fact that the government had made specific disclosures before trial—including the victims' names—to conclude that he "was suffi-ciently informed to … be protected against the risk of double jeopardy." 730 F.3d at 124.

The charges in this case—eight- and nine-year conspiracies to violate broad statutes—fall squarely within the category of cases where merely reciting the elements of a crime cannot be enough. Indeed, wire fraud cases are clearly in this category. In *United States v. Shellef*, 507 F.3d 82, 107–09 (2d Cir. 2007), the court held that a wire fraud indictment was insufficient because it failed to allege that victims anticipated different benefits from a contract than what they actually received, therefore opening up the possibility that the misrepresentations did not go to the benefit of the bargain. In so holding, the court framed the rule as follows: "[a]lthough the indictment need not allege that the victims of the fraud were in fact injured, *it is required to allege that the defendant contemplated actual harm* that would befall victims due to his deception in order to meet the 'scheme to defraud' prong." *Id.* at 107 (emphasis added). This is very similar to the scheme pled in the indictment, where the defendant's contemplation of harm, as described above, is vague.

It remains a fact in this country that direct marketing and sales of services are perfectly legal. Indeed, various states, *see, e.g.*, Utah Code Ann. § 13-26-3, and the federal government, 15 U.S.C. §§ 41–58, impose licensing requirements and police deceptive sales practices and the like through civil or administrative sanctions. Such problems fall far short of criminal fraud, but these statutory regimes serve the salutary purpose of acting as prophylactic measures to prevent real fraud.[2] When wide-ranging business models involving telemarketing sales are coupled with crimes

---

[2] In this regard, the government's references to FTC settlements involving companies where Ms. Shah previously worked—but not Ms. Shah herself—should be given no weight in this case. *See* ECF No. 290 at 5. Not only do such actions involve far different elements and burdens of proof, but civil settlements that admit no wrongdoing are obvi-ously proof of nothing. Tellingly, none of the people involved in the cited settlements appear to have been prosecuted in these related cases.

as broad as § 1349 conspiracies—which do not even require an overt act—and wire fraud, they cry out for actual allegations that distinguish the sales practices at issue from the millions of legitimate sales practices that are not criminally fraudulent. Indeed, in sales cases like this one, the only thing keeping these statutes from covering every contract breach are the elements of intent to defraud and materiality.[3] *Cf. United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (in bill of particulars context, holding that the breadth of RICO conspiracy allows prosecutors wide latitude, which "comes [with] an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope.").

Finally, the government argues that the defendant must show prejudice to obtain a dismissal and suggests such motions should fail where defendants have been given discovery and bills of particulars. ECF No. 290 at 10. The prejudice to Ms. Shah here should be apparent. In the first place, she has not been given a bill of particulars, and as we argue in support of our motion for one, the discovery materials are massively voluminous and contradictory (and to date incomplete). But more importantly, if Ms. Shah is prosecuted by means of an indictment that does not actually allege—other than in the conclusory language of the statute, *see* ECF No. 260 at 8–10—that she had the contemporaneous, specific intent to defraud at the time her alleged co-conspirators were making their promises, she will be prosecuted for something that is not a crime and is "devoid of a key factual element crucial to the preparation of [her] defense." *United States v. Walsh*, 194 F.3d 37, 45 (2d Cir. 1999). It is hard to imagine something more prejudicial in a criminal case.

---

[3] Notably, in 1965 when New York first authorized prosecution for larcenies by false promise pursuant to schemes to defraud, the Legislature was so concerned with this problem that it added a heightened burden of proof, unique among New York penal statutes. *See* N.Y. Penal Law § 155.05(2)(d). The concern was that false promise cases "might result in an avalanche of criminal prosecutions based upon conduct essentially civil in character and constituting little more than breach of contract." William C. Donnino, Practice Commentary to N.Y. Penal Law § 155.00 (citing Staff Notes of the Commission on Revision of the Penal Law. McKinney's Spec. Pamph. (1964), p. 352.).

**B.      The Indictment Fails to Allege Materiality**

Recognizing that it failed to allege *in haec verba* that the false promises at issue were material, the government argues that the words it did use are sufficient to make out the concept. Putting aside the irony of that suggestion in light of its repeated argument that indictments need only recite the essential elements, the superseding indictment nevertheless fails to even adequately *imply* the essential element of materiality. ECF No. 260 at 12 (citing *Neder v. United States*, 527 U.S. 1 (1999)) ("materiality of falsehood" is an element of wire fraud). The government relies on *United States v. Klein*, 476 F.3d 111, 113 (2d Cir. 2007), *as corrected* (Mar. 8, 2007) (discussed and distinguished in our opening brief, ECF No. 260 at 15), for the proposition that the indictment need not allege materiality because it uses variations on the word "fraud," which the government argues necessarily implies materiality. ECF No. 290 at 12–13. But the government ignores that *Klein* was reviewed for plain error and not on a properly preserved record. ECF No. 260 at 15. Moreover, indictments challenged after a verdict are required to "be interpreted liberally, in favor of sufficiency." *United States v. De La Pava*, 268 F.3d 157, 162 (2d Cir. 2001). The current motion presents the argument squarely, and is not a post-verdict challenge requiring liberal interpretation.

Because this Court is not bound by *Klein*,[4] it is free to consider the arguments in our opening brief to the effect that implicit elements in statutes must be pled on the face of the indictment. We note here only that the government struggles in vain to distinguish, apparently as *dicta*, the multiple Second Circuit cases that we cited in our opening brief. *See* ECF No. 260 at 14–15 (citing *Pirro*, 212 F.3d at 93; *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996), *overruled on other grounds*, *Salinas v. United States*, 522 U.S. 52 (1997); *United States v. Ivic*, 700 F.2d 51, 64–65 (2d Cir. 1983), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S.

---

[4] Because the case was reviewed for plain error, the court's statement that there was "no error," upon which the government relies here, is *dicta*.

249 (1994)). But the government's argument that merely alleging fraud is enough to meet this element simply cannot be the law. If materiality were so obvious that one need not even mention it, there would have been no reason for the Circuit split that led to *Neder* in the first place. *Neder*, 527 U.S. at 7 (Eleventh Circuit "held that materiality is not an element of the mail fraud, wire fraud, and bank fraud statutes"). And even if the government is right that the word "materiality" need not be explicitly written—which we do not concede—the indictment would have to have *some* indication that the promises at issue were essential to the purchasers' agreement to buy the services. But here, as argued above, the promises are spelled out with so little specificity that it is not even clear which types of promises (as to the services purchased or as to the returns) are being alleged as fraudulent. This is therefore a far different case than *United States v. Weigand*, 482 F. Supp. 3d 224, 237 (S.D.N.Y. 2000), relied on by the government. *See* ECF No. 290 at 15. In that case, the indictment explicitly alleged the very definition of materiality: "that many issuing banks would not have approved these transactions if they had known marijuana was involved," which prompted Judge Rakoff to reject the motion. *Weigand*, 482 F. Supp. 3d at 237–38.

That said, the government is correct that we must read all reasonable inferences into the indictment. ECF No. 290 at 19. But the only references to the reasons that the "Victims" parted with their money are either conclusory ("would be defrauded"); relate to the absence of intent rather than the promises at issue ("at no point did the defendants intend . . . promised return"); or talk about the result of the transaction rather than the bargain itself ("nor did the Victims actually earn any such returns"; "in actuality, the 'services' would provide little or no value"). ECF No. 186 ¶¶ 3, 4, 7. Had the government simply alleged something like, "the Victims relied on false promises of future earnings to purchase the services," it would have a stronger argument that the materiality element is properly implied. It is likely no coincidence that the prosecutors did not draft these words: as the evidence cited below in section III demonstrates, it appears that purchasers

were explicitly told that *no* promises of future earnings were being made. It would be hard to assert that promises of future earnings were material—i.e. that one would not have parted with his money if only promises of future earnings had not been made—when contemporaneous representations and agreements specifically disclaimed any such promises.

## II.     THE GOVERNMENT'S VOLUMINOUS DISCOVERY DOES NOT FULFILL ITS OBLIGATION UNDER *UNITED STATES V. BORTNOVSKY* TO PROVIDE THE REQUESTED PARTICULARS

The government has commendably provided a more coherent narrative in its response than can be gleaned from the superseding indictment, its correspondence, or the mountains of discovery provided. Although the information falls far short of what Ms. Shah is entitled to under the seminal case of *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987), we are able to narrow our motion to a certain extent. Of the seven items listed on pages 23 and 24 of our opening memorandum, we now narrow our bill of particulars request to the following five: (a) the alleged victims of the conspiracy; (b) the sales floors involved; (c) identification of which particular "business services" are alleged beyond coaching, tax preparation, and web design, (d) identification of all co-conspirators, and (e) identification of the financial transactions alleged to have been "money laundering activity." These requests remain critical to the defendant's trial preparation.

The heart of the government's argument is that the "voluminous" discovery here was produced in an "organized and comprehensible fashion" and is therefore sufficient to put Ms. Shah on notice of the particulars of the allegations. *See* ECF No. 290 at 25, 30, 32. This fails both because the production is anything but organized and comprehensible, and because the government has made short shrift of the Second Circuit's admonition in *Bortnovsky* that the government cannot "fulfill its obligation merely by providing mountains of documents," 820 F.2d at 575. *First*, as explained in greater detail in the accompanying Declaration of Heather Jones ("Jones Dec."), the suggestion that the productions are "well-organized" and accompanied by "details about the source

materials," ECF No. 290 at 32, is "grossly misleading," Jones Dec. ¶ 3. The government's cover letters are often unhelpful, either not containing sufficient identifying information about the contents or source of documents, Jones Dec. ¶ 4, or containing misleading or incorrect information, *id.* ¶ 5. In just one example, attached as Exhibit A to the Jones Declaration, the government labeled entire categories as "Photographs," "Google Records," and "Financial Records." As a result of descriptions like these, Ms. Shah's "review team has spent nearly one hundred hours to date" just creating a workable production log to the best of our ability. *Id.* ¶ 4.

As importantly, the government's response does not even acknowledge the scope of the problem: that it has provided "well in excess of one million pages in discovery, from more than 500 different sources," with more incoming. *Id.*; *see also* ECF No. 260 at 16. Instead, the prosecutors merely point to the fact that they have produced documents—as if this by itself is adequate. *See, e.g.*, ECF No. 290 at 25 (government produced FTC material, records of sales, financial records, and "voluminous" material from the related *Ketabchi* trial). Just a cursory review shows the unworkability of this response. For example, at least one document contains 119,395 pages of material yet is labeled with a *single* Bates number. Jones Dec. ¶ 6; ECF No. 261 ¶ 16. Worse, it is impossible to tell whether other documents suffer from the same issue without manually opening each one, a task that we cannot reasonably undertake in a period of years, much less between now and trial. Jones Dec. ¶ 6. The government cannot seriously argue that its productions have adequately warned Ms. Shah of the particulars of the charges against her or guided her in a meaningful way. *See Bin Laden*, 92 F. Supp. 2d at 234 ("It is no solution to rely solely on the quantity of information disclosed by the government; sometimes, the large volume of material disclosed is

precisely what necessitates a bill of particulars"). And with respect to Ms. Shah, the material from the *Ketabchi* trial is hardly notice of anything inasmuch as she was not mentioned at all.[5]

*Second*, and even more importantly, the government fails to acknowledge the crucial import—and controlling character—of *Bortnovsky* and other cases that show the perils of doing precisely what it wants to do here. ECF No. 290 at 24–25 (citing cases). Simply put, notwithstanding that the government cannot "fulfill its obligation merely by providing mountains of documents," *see Bortnovsky*, 820 F.2d at 575, the government essentially argues that it has fulfilled its obligation by providing mountains of documents. It seeks to distinguish *Bortnovsky* on the ground that Ms. Shah's case is "not a case with a few false statements or fraudulent transactions lurking in hundreds of legitimate business deals." ECF No. 290 at 28 (citing *United States v. Tuzman*, 301 F. Supp. 3d 430, 451 (S.D.N.Y. 2017)). Indeed, "courts have differentiated between cases in which only isolated illegal activity is alleged, and cases in which most or all activity is alleged to have been illegal." *See Tuzman*, 301 F. Supp. 3d at 451 (collecting cases). If the government's position is truly that *all* of the sales, transactions, and other activities reflected in the discovery constitute criminal activity in service of the alleged illegal conspiracy, then it needs to say that explicitly. If not, it must produce a bill of particulars to satisfy *Bortnovsky*.

Without that, the defense will be left, for example, with a spreadsheet listing more than 150 unique entries in a column labeled "sales floor" (the "sales floor column"), *see* ECF No. 260 at 24–25 (citing Alonso Dec., ECF No. 261 ¶ 16),[6] in contrast to only 49 sales floors *and* individuals the government has represented were involved with the charged scheme. ECF No. 261-4 at 3–4.

---

[5] We acknowledge the utility of having the trial testimony and the § 3500 material for a handful of cooperators from that case, but that is simply the by-product of the government's having fulfilled its legal obligations in a previous case. It hardly constitutes a bill of particulars in this one.

[6] Our opening memorandum of law incorrectly stated that the spreadsheet contained "hundreds" of sales floors. It actually contains hundreds of transactions, and more than 150 unique entries in the "sales_floor" column, excluding the "N/A" and "test" entries.

Does the government contend that Ms. Shah *will* or *will not* have to defend against evidence regarding the hundred—or more likely hundreds when we consider all the discovery—of sales floors not on its list? The government has not been clear on this point.

To be sure, in seeking to distinguish *Bortnovsky*, the government argues that it "has made clear that telemarketing businesses in which the defendant was involved were designed, by her and others, to use misleading and deceptive practices in order to induce payments from victims based on false and fraudulent pretenses, representations, or promises." ECF No. 290 at 28–29. But in its response to co-defendant Cameron Brewster's similar motion, it claims to have "made clear that the scheme in which the defendants participated was pervasive in their telemarketing businesses and that *all solicitations made during the time period of the charged conspiracy are alleged to have been fraudulent*." ECF No. 125 at 14 (emphasis added). That makes all the difference. While the government apparently alleges that all of Brewster's activity was criminal, only some unspecified number of "telemarketing businesses" with which Ms. Shah was involved were allegedly criminal. This is not a hyper-technical reading of the arguments or allegations. If all of Ms. Shah's conduct—all of the leads she sold, all of the sales floors she worked with, all of her business in this industry—was in service of the conspiracy, the government should clearly say so in order for Ms. Shah to prepare her defense to such staggering charges.

## III.    THE COURT SHOULD ORDER DISCLOSURE OF THE GRAND JURY MINUTES BASED ON THE MULTIPLE FALSE AND MISLEADING STATEMENTS MADE OUTSIDE THE GRAND JURY THAT IT IS REASONABLE TO INFER WERE REPEATED INSIDE THE GRAND JURY

### A.    Sworn Statements About "Promised" Returns

Although Ms. Shah is no longer pressing the *Franks* motion based on the government's representation that it will not use the fruits of the two search warrants at issue, the evidence that we laid out regarding the misrepresentations and material omissions in the search warrant affidavits continues to be relevant to the grand jury motion. In fact, that evidence is now much stronger

12

in light of a newly-discovered factual misrepresentation in the government's memorandum of law that is at best highly misleading, and at worst simply false. The misrepresentation is not simply a picayune mistake but goes to the heart of the issues in this case and on this motion. If, as we have uncovered, the purchasers were explicitly told that they were *not* being promised specific returns, that would contradict (a) the apparent theory of the superseding indictment, (b) Det. Bastos's repeated representations in the search warrant affidavits, and, it is reasonable to infer, (c) the testimony before the grand jury.

The misrepresentation here relates to the government's confident assertion that Det. Bastos was truthful when he said—specifically relying on the entirety of his investigation rather than the particular "victim" interviews he conducted—"at no point did the Victims actually earn any of the promised return on their intended investment." *See* ECF No. 290 at 46; Cell-site Affidavit, ECF No. 261-5 ¶¶ 7, 7(b); Email Affidavit, ECF No. 261-6 ¶¶ 8, 8(b). In support, the government has represented to this Court that the key document we presented to show a material omission—a "Coaching Program Compliance" form that made clear that closing sales required that the purchaser understood that promises had *not* been made—was not even in the government's possession until weeks before one warrant was signed, and a year before the other. ECF No. 290 at 46. In fact, that document has been in the possession of the government for many years: as is clear from the Jones Declaration, the same document was produced to the defense in the very first production in the *Ketabchi* case, dated June 1, 2017. Jones Dec. ¶ 7; Jones Dec., Ex. D. The argument that "[t]he Government, of course, is not required to disclose the existence of a document it did not possess" (ECF No. 290 at 46) therefore falls rather flat.

The government then doubles down and minimizes our proffered evidence by arguing that it amounts to just "two documents—one of which was not even in the Government's possession." ECF No. 290 at 47. We already know that *both* were in the government's possession, but more

13

importantly, it is not just "two documents." We found and proffered those two documents in a relatively cursory search undertaken before this motion. But based on the government's affirmative misrepresentation in its response to this Court, we undertook a further search and found numerous additional examples, eight of which are attached to the Jones Declaration. *See* Jones Dec. ¶ 8. These range from scripts to customer contracts to service agreements—every one of which makes clear that purchasers were specifically told financial returns were not being promised.[7]

## B.     Sworn Statements that No One Made Money

Our opening memorandum established that Det. Bastos's allegations that literally no one made money were false. For example, relying on his "participation in th[e] investigation" in general rather than citing to interviews of purchasers, he swore that "at no point did the Victims actually earn any of the promised return on their intended investment," ECF No. 261-5 ¶¶ 7, 7(b); ECF No. 261-6 ¶¶ 8, 8(b). The government does not dispute the falsity but minimizes it, noting that our proffered evidence at best shows that a very few people made money. ECF No. 290 at 45. (Notably, the government ignores the stipulation in the *Ketabchi* trial that Sinclair said half of the customers were "happy." ECF No. 261-7 at 1472:21). Now, however, the government has turned over documents that appear to be from the database of a fulfillment company that provided coaching services. Numerous such testimonials show customers reporting they made money, and one is attached to the Jones Declaration as Exhibit F. That example shows that the customer made $55,000 through her web site, and was satisfied with the coaching she received. Among other things, she stated that "[t]he coaches were always available to help" and that she "could not have

---

[7] Examples include Exhibit E-2, a compliance script (requiring customer confirmation that "there were no earnings claims made"); Exhibit E-3, a consulting compliance script ("CANNOT GUARANTEE THAT [THE CUSTOMER] WILL MAKE A SPECIFIC AMOUNT OF MONEY WITHIN A CERTAIN PERIOD OF TIME"); and Exhibit E-6, a software access agreement ("[e]arnings or income statements are merely examples and are not indications of future results or expectations").

accomplished this with out [sic] their help and encouragement." Jones Dec., Ex. F. She further

noted, "This program is really worth it in the end," and "there is not question that it is worth it."

*Id.*

Whatever the government's position with respect to these testimonials, taken together with

the other evidence, they render Det. Bastos's sworn statements highly misleading. If such state-

ments were repeated by him or other agents before the grand jury without any clarification, that

would create an unacceptable risk that this indictment was based on perjured testimony.

**C.      Sworn Statements that Ms. Shah "Operated" Thrive and Red Steele**

Last, the government argues that Det. Bastos was truthful when he said that Ms. Shah "op-

erated" Thrive and Red Steele because "operate" means the same as simply working somewhere.

ECF No. 290 at 41–42. That is preposterous. No reasonable magistrate judge would take the state-

ment that these companies were "operated by Target Subject JEN SHAH" to mean merely that she

worked there. In the context of *companies*, such statements in an affidavit would be understood in

the sense it is used in the title "chief *operating* officer" rather than in the sense of operating a piece

of machinery.[8] Clearly the company was "operated" by the executives at the top of the organiza-

tional chart attached to our motion papers. *See* ECF No. 261-10. And with respect to Red Steele,

there is no contradiction between Stuart Smith's deposition and the cited statement to a cooperating

witness, especially since they were made at least two years apart. *See* ECF No. 260 at 36.

This is another example of the government getting out over its skis: it has ample evidence

that Ms. Shah worked in marketing services but unnecessarily gilds the lily. The false implication

to the magistrate judges, and likely to the grand jury, is that Ms. Shah is some kind of leader of the

"scheme" the government has charged. Any testimony to that effect with respect to Thrive or Red

---

[8] Unsurprisingly, the *Oxford English Mini Dictionary* defines "operate" as "control the functioning of a machine or
the activities of an organization." Charlotte Buxton, ed., *Oxford English Mini Dictionary* (8th ed. 2013), at 391.

Steele was false. That it was sourced to cooperating witnesses does not make it any better: faced with documentary evidence contradicting those witnesses' assertions, the government should have qualified the categorical assertions that Ms. Shah *operated* these businesses.

### D.    Because a Ground May Exist to Dismiss the Indictment, the Court Should Order Disclosure of the Grand Jury Minutes

The above facts demonstrate that that the government's various representations about this case—to the magistrate judges, in the superseding indictment, in the government's motion response, and even in its press release[9]—were at a minimum highly misleading, if not outright false. Although the government did the right thing by turning this material over to us, it was not right to present the agents' representations, to the grand jury or elsewhere, without qualification. Any absolute statements made by agents before the grand jury about promises would be false or misleading, and therefore "a ground may exist to dismiss the indictment," allowing the Court to order disclosure of the grand jury minutes. Fed. R. Crim. P. 6(e)(3)(E)(ii); *United States v. Basurto*, 497 F.2d 781, 787 (9th Cir. 1974). We therefore urge the Court to grant this motion.

## IV.    THE COURT SHOULD ORDER PRODUCTION OF *BRADY* MATERIAL

### A.    Exculpatory Material

In response to our motion for *Brady* material relating to purchasers who either made money or who were told that promises of monetary returns were not part of the purchase, the government relies on the voluminous discovery that it has produced thus far, and its promise to produce § 3500 material, at some point in advance of trial, related to all "victims" it has interviewed, whether or not it intends to call them at trial. ECF No. 290 at 53–54. As pointed out in detail above, the discovery in this case is unusually massive, and not well-organized. Jones Dec. ¶¶ 4–6. For that

---

[9] Relying on the allegations in the superseding indictment, the U.S. Attorney specifically alluded to the "promised returns." "Reality Show Cast Members Charged with Running Nationwide Telemarketing Fraud Scheme," *available at* https://www.justice.gov/usao-sdny/pr/reality-show-cast-members-charged-running-nationwide-telemarketing-fraud-scheme.

reason, the risk that the defense will miss a piece of *Brady* material is great. We agree with the general principle that due process is satisfied if "a defendant possesses *Brady* evidence in time for its effective use." *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001); *see also Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001). But that general principle must yield when the material is either buried within voluminous evidence such that identifying it, investigating it, and making use of it would be difficult for the defense, or when the material is produced as part of a larger production without any indication that such production contains exculpatory information.

*United States v. Gil*, 297 F.3d 93 (2d Cir. 2002) is instructive in this regard. There, the Second Circuit reversed a conviction based on a *Brady* violation relating to one memorandum that the government in fact turned over. *Id.* at 96. But because it was produced "among five reams" of documents labeled as § 3500 material, three days before trial, the court held that the evidence had been suppressed and due process violated. *Id.* at 105–06. The court noted that "[t]he two-page memo was not easily identifiable as a document of significance, located as it was among reams of documents, and indexed as Dorfman § 3500 material on page twelve of the exhibit list." *Id.* at 106. Similarly, in *Leka*, 257 F.3d at 99, the prosecution turned over the name of a favorable witness just a week before trial even though the defense had been requesting the information for 22 months.

Although the government did not address *Gil* in its response to our motion, it would no doubt point out that the favorable memorandum in *Gil* was provided to the defense only five days before trial, whereas the prosecutors here have provided millions of documents months before trial. That is of course true, but the principle remains that the Second Circuit takes a dim view of satisfying constitutional discovery obligations by burying information without some amount of identification or differentiation. *Gil*, 297 F.3d at 105–07; *see also St. Germain v. United States*, 2004 WL 1171403, at *16, *19 (S.D.N.Y. May 11, 2004) (vacating conviction where exculpatory transcripts were turned over shortly before trial but government did not call attention to them or their

17

importance). This is no different than the *Bortnovsky* principle in a related context: the government cannot rest easy that it has fulfilled its obligations simply because somewhere in a large volume of documents lurks the information to which a defendant is entitled. *See Bortnovsky*, 820 F.2d at 575. And of course, the 4,000 documents in *Bortnovsky*, *id.* at 574, and the 2,700 in *Gil*, 297 F.3d at 106, are infinitesimal fractions of what we are dealing with here.

This is already an enormous problem with respect to the Casepoint database, containing as it does over a million documents and quite likely more than that. But it becomes untenable when we consider the more than 200 computers, hard drives, and cellphones that the government has seized. Jones Dec. ¶ 4; *see also* ECF No. 261 ¶ 16 ("more than 400 electronic devices" in general, without specification to types of electronic devices). Although the government has provided us access to most of it, it is unreasonable to expect the defendants to search through hundreds of devices, with information measured in terabytes, to find favorable material. This is true in general, but in light of the material that we *have* been able to identify (see section III above), it is particularly likely that the devices belonging to alleged coconspirators will also have information showing that purchasers made money and that promises of financial returns were specifically disclaimed. The government has at least forensically analyzed the vast majority of these devices, and as part of a diligent investigation may be presumed to have identified the type of information we seek. It is hardly unreasonable for it to identify the information as such and avoid the *Gil/Bortnovsky* problem. Only by doing so now would the defense have sufficient time to investigate in advance of the October 18 trial date.

### B.    Impeachment Material

This motion simply asks for enforcement of the Court's existing order, issued on May 28, 2021 pursuant to Fed. R. Crim. P. 5(f), yet the government treats it as though we are moving for that order for the first time. It even accuses the defense of relying on the Court order to seek an

"end-run" around "this District's general timeline and manner of producing *Giglio* material." ECF No. 290 at 57. Worse, the government's response mischaracterizes the order, which by its terms applies *both* "to evidence that affirmatively tends to exculpate the defendant, as well as information that impeaches the credibility of the Government's witnesses," and requires that such material be produced "promptly after its existence becomes known to the Government." ECF No. 246 at 2. Ignoring this plain language, the government claims the order says the opposite: "The order entered by this Court pursuant to Rule 5(f) makes clear that *Giglio* material need not be produced immediately upon its identification, as the defendant requests." ECF No. 290 at 58. End-run, indeed.

Doubling down and further ignoring the Court's actual language, the government incorrectly claims that the order "does not expressly address a defendant who appears intent on proceeding to trial." *Id.* In fact, it does: "The Government must disclose such evidence to the defense promptly after its existence becomes known to the Government, so as to enable the defense to have an opportunity to *make effective use of the evidence in preparing its case and at trial*, including a reasonable opportunity to investigate the information." ECF No. 246 at 2 (emphasis added). The government then points to the Court's unremarkable language that "the Government is not required to disclose impeachment material prior to a guilty plea" to conjecture that this must mean "that such material need only be produced sufficiently before trial, in accord with longstanding practice in this District and consistent with the law in this Circuit." ECF No. 290 at 58 (quoting ECF No. 246 at 2)*.* In other words, that the plain language of the order—that both *Brady* and *Giglio* material must be disclosed "promptly after its existence becomes known to the Government"—should be ignored in favor of a speculative reading of a portion that applies only to guilty pleas. The Court should reject this invitation to read its own order contrary to its plain language.

The government did not object to the issuance of the Court's Rule 5(f) order at the time it was requested, nor has it moved here to modify it. That should be the end of the story: the Court

has issued an order, and the parties need to follow it. *See United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984) ("The district court may dictate by court order when *Brady* material must be disclosed, and absent an abuse of discretion, the government must abide by that order. Moreover, we expressly disapprove of the government's belated attempt to question the district court's authority."), *abrogated on other grounds*, *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 289 (3d Cir. 2021). For some reason, though, the government fixates on cases that have observed that the new Rule 5(f) does not purport to change the government's existing *Brady* obligations. It may well be that the rule does not *require* district courts to order production of both exculpatory and impeachment material promptly upon identification, but that does not mean they are not *permitted* to do so, as this Court has done here. Indeed, the order in this case is identical to one issued by Chief Judge Swain in *United States v. Rodriguez-Perez*, 2020 WL 6487509 (S.D.N.Y. Nov. 4, 2020); *see Starusko*, 729 F.2d at 261 ("We flatly reject the notion … that 'it is the government, not the district court, that in the first instance is to decide when to turn over *Brady* material.'").

We therefore request enforcement of the Court's May 28 order.

## V.   MS. SHAH'S MOTION TO SUPPRESS HER POST-ARREST STATEMENTS SHOULD BE GRANTED

Ms. Shah's declaration of facts on this motion is uncontested, as the government has conspicuously failed to submit a sworn statement from Det. Bastos, notwithstanding the accusation that he made false statements to Ms. Shah during her arrest. As set forth in the uncontested facts, Det. Bastos's statements and actions, including the circumstances surrounding her arrest (well *before* Det. Bastos secretly turned on his recorder) functioned to overbear her will, thus rendering her waiver involuntary. The government misapprehends Ms. Shah's primary argument as merely a complaint "that the agents did not tell her the charges against her until the end of the interrogation." ECF No. 290 at 63. This is a gross oversimplification of a portion of Ms. Shah's actual

argument, which is that the circumstances, taken together, show that Det. Bastos used affirmative misrepresentations to coerce the defendant into giving up her rights.

As the government correctly notes, a governmental agent's conduct may be deemed deceptive "*where an inquiry left unanswered would be intentionally misleading*." ECF No. 260 at 54; ECF No. 290 at 64 (citing *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) (emphasis added)). When analyzed contextually in light of "totality of the circumstances," *Lynumn v. Illinois*, 372 U.S. 528, 534–35 (1963), Det. Bastos' conduct constitutes affirmative and unacceptable deceit. Ms. Shah asked him again and again what was happening, whether she was being arrested, and if she would go to jail. ECF No. 262 ¶¶ 15–16. Rather than answer these questions, Det. Bastos met Ms. Shah's confusion with reassuring—though false—responses that he "just wanted to talk" to her and "make sure [she was] OK." *Id.*

The prosecutors respond, based on a linguistic analysis of the word "just," that Det. Bastos' conduct and words were not intended to misrepresent the situation nor imply that his sole purpose was to talk. ECF No. 290 at 64–65. This approach is odd given that Ms. Shah's declaration is uncontested, and the facts must be taken "in the light most favorable to" the defendant. *United States v. Hamilton*, 538 F.3d 162, 168–69 (2d Cir. 2008). Rather than introduce a declaration from Det. Bastos contesting his version of events, the prosecutors purport to interpret his intentions, and in the process present the Court with yet another mischaracterization: the statement that Ms. Shah "does not allege that the agents said anything untruthful in response to her questions." ECF No. 290 at 64. On the contrary, she alleges exactly that at paragraphs 15 and 16:

> 15. I repeatedly asked Det. Bastos clarification questions, including "Am I under arrest?" and "Am I going to jail?" which were phrases I used interchangeably and thought of as the same thing.
>
> 16. Det. Bastos never answered either question, but repeatedly said words to the effect of, "We just want to talk to you" and "I promise we just want to talk to you." He also told me more than once that "We just want to make sure you're OK."

ECF No. 262 ¶¶ 15–16. Not just an innocent slip, the prosecutors specifically rely on this misstatement to argue that the statement "I promise that we just want to talk to you" was "not meant to, and could not logically, mislead the defendant into believing that the agents' *only* purpose for stopping her was to speak with her." ECF 290 at 64–65. As if this mischaracterization were not bad enough, the prosecutors add their own unsworn allegation to the effect that Det. Bastos's false promise that he *just* wanted to talk to Ms. Shah "was not meant to…mislead" her. *Id.* at 64. At this stage, without a declaration or testimony at a suppression hearing, that should be given no weight.

To the extent that the linguistic gloss on "just" deserves a response, any person put in handcuffs by the police and who repeatedly asks "am I under arrest" and "am I going to jail" (which Ms. Shah does not differentiate in her own mind) would at a minimum be confused if told by police, "we just want to talk to you" and "we just want to make sure you're okay"—particularly when that person has a permanent order of protection in her favor based on a felonious assault. These statements were clearly designed to mislead her into believing she had no choice but to speak to the police, and indeed, they led Ms. Shah to be "consumed with a desire to know why I had been placed in handcuffs and apparently arrested." ECF No. 262 ¶ 17. The officer clearly did not simply want to talk, and he took advantage of her by saying so. Moreover, the statements here were more coercive than they might be in other circumstances, both because Det. Bastos is a detective with the same police agency that arrested Individual-1, and because Ms. Shah received odd phone calls that morning from a stranger and was unable to reach her husband. *Id.* ¶¶ 8–13.

The government's reliance on the interrogation itself is largely irrelevant to what happened *before* the interrogation, which was not recorded and as to which only Ms. Shah's statement illuminates the record. At best, the recording corroborates that the agents had no intention of telling Ms. Shah the truth until after she made a statement. The government counters somewhat illogically

that because Det. Bastos "repeatedly expressed his belief that the defendant was involved in an industry rife with fraud," his repeated statements belie our assertion that "the interrogation itself . . . presents another highly misleading set of interactions between Det. Bastos and Ms. Shah." ECF No. 290 at 65. That the interrogation itself was highly misleading and unprofessional is an argument we previewed for the Court in our opening brief, which will be subject to a motion *in limine* at the appropriate time pursuant to Fed. R. Evid. 403.[10]

Finally, the government seems to argue that Ms. Shah was not actually concerned about Individual-1, because she did not mention him when, more than an hour into the interrogation, she was asked whether she knew (by last name) Individual-1's family. ECF No. 290 at 67. She responded by identifying two members of the family, but not Individual-1, which, the government claims, means she was not as concerned about Individual-1 as her uncontested declaration says. *Id.* Initially, this argument does not accept Ms. Shah's declaration as true. In fact, it does the exact opposite—it all-but accuses her of making things up, when in fact her statement that she was worried about Individual-1 is uncontested. More importantly, the government's argument assumes that Ms. Shah's mental state must have been identical from the time of her arrest to 71 minutes into her interrogation, *see id.* at 67—an absurd assertion that asks us to ignore a full hour of questioning. And it mistakes custodial interrogations for friendly conversations, where both sides get to ask questions, and neither is in handcuffs. Det. Bastos shut down Ms. Shah's earlier attempts to gain

---

[10] If the Court chooses to review the recording, which the government has now filed *in camera*, it will see a textbook example of how *not* to conduct a fair interrogation. Not because any particular answer was coerced, but because Det. Bastos (a) repeatedly puts words in Ms. Shah's mouth about knowledge of various people and companies, and then fails to clarify whether such knowledge is based on rank rumor, other hearsay, or personal knowledge, and (b) cuts off Ms. Shah on many occasions as she tries to make exculpatory statements. Since the government has cited particular portions of the recording, we commend to the Court the excerpts from 1:05:41 to 1:06:20, and from 1:09:01 to 1:09:21. Those portions do not rise to a separate motion to suppress so we have not made it, but they demonstrate an abuse by Det. Bastos, and the prejudicial effect caused by the recording itself far outweighs its probative value.

information when he first refused to answer her questions. That she did not then ask questions or air her concerns to him more than an hour later tells us nothing about her mental state.

In the absence of any evidence contradicting Ms. Shah's declaration, the government's argument is without support and fails to satisfy its burden to show that Ms. Shah knowingly and voluntarily waived her rights. The Court should suppress the statements or order a hearing.

## **CONCLUSION**

The Court should grant defendant's motions in their entirety as set out in this reply brief, and order whatever additional relief it deems just and proper.

Dated:      New York, New York
            July 14, 2021

                                      BUCKLEY LLP

                                       /s/ Daniel R. Alonso
                                      Daniel R. Alonso
                                      Michael S. Chu

                                      1133 Avenue of the Americas, Suite 3100
                                      New York, New York 10036
                                      Tel: (212) 600-2400
                                      dalonso@buckleyfirm.com
                                      mchu@buckleyfirm.com

                                      Henry Asbill
                                      2001 M Street NW, Suite 500
                                      Washington, DC 20036
                                      Tel: (202) 349-8000
                                      hasbill@buckleyfirm.com

                                      *Attorneys for Defendant Jennifer Shah*