L7n2ShaA kjc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

        v.                                  19 Cr. 833 (SHS)

CAMERON BREWSTER and JENNIFER
SHAH,

              Defendants.

------------------------------x              Argument

                                 July 23, 2021
                                 10:40 a.m.

Before:

                        HON. SIDNEY H. STEIN,

                                 District Judge


                           APPEARANCES

AUDREY STRAUSS
    United States Attorney for the
    Southern District of New York
BY:  ROBERT B. SOBELMAN
    KIERSTEN A. FLETCHER
    SEBASTIAN SWETT
    Assistant United States Attorneys

STEPTOE & JOHNSON, LLP
    Attorneys for Defendant Brewster
BY:  RYAN P. POSCABLO

BUCKLEY, LLP
    Attorneys for Defendant Shah
BY:  DANIEL R. ALONSO
    HENRY W. ASBILL

CHAUDHRY LAW, PLLC
    Attorneys for Defendant Shah
BY:  PRIYA CHAUDHRY

L7n2ShaA kjc

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE DEPUTY CLERK:  Counsel and the visitors, |
| 3 | spectators, everyone is reminded that, whether you are present |
| 4 | in the courthouse or listening to this proceeding from |
| 5 | elsewhere, the recording or rebroadcasting of it in any manner |
| 6 | is prohibited by law. |
| 7 | Counsel, please state your names for the record. |
| 8 | MR. SOBELMAN:  Robert Sobelman, Kiersten Fletcher, and |
| 9 | Sheb Swett for the United States.  Good morning, your Honor. |
| 10 | THE COURT:  Good morning. |
| 11 | MR. SWETT:  Good morning. |
| 12 | THE COURT:  You may be seated in the back. |
| 13 | MR. POSCABLO:  Ryan Poscablo, on behalf of Cameron |
| 14 | Brewster, your Honor.  Good morning. |
| 15 | THE COURT:  Good morning. |
| 16 | MR. ALONSO:  Good morning, your Honor.  Daniel Alonso, |
| 17 | Henry Asbill, and Priya Chaudhry on behalf of Jennifer Shah. |
| 18 | THE COURT:  Good morning. |
| 19 | MS. CHAUDHRY:  Good morning. |
| 20 | MR. ASBILL:  Good morning, your Honor. |
| 21 | THE COURT:  And are any of your clients here, |
| 22 | gentlemen? |
| 23 | MR. ALONSO:  Yes.  Ms. Shah is sitting next to me, |
| 24 | your Honor. |
| 25 | DEFENDANT SHAH:  Good morning. |

L7n2ShaA kjc

1        MR. POSCABLO:  Mr. Brewster is on the line, your

2   Honor, pursuant to your Honor's order.

3        THE COURT:  Okay.  Good morning to him.

4        All right.  We have two motions.  I will call them the

5   Brewster motion and the Shah motion.  I would like to handle

6   the Shah motion first, and I will hear from the movant.

7        Let's handle the Shah motion.  Go item by item.  I may

8   ask questions, but in any event I will let the government

9   respond.  I think that's the way to get some order here.

10        MR. ALONSO:  Thank you, your Honor.  If I may proceed.

11        THE COURT:  Mr. Alonso, you will be dealing, all

12   right, with the motion.

13        Let's first handle the motion -- you will tell me if

14   you are withdrawing some of these issues, so that there is no

15   need to deal with them, to the extent the motion seeks a

16   dismissal of the superseding indictment.  Go ahead.  Speak to

17   that.

18        MR. ALONSO:  So I will speak to that.

19        I just want to telegraph for the Court that I think

20   that four of our motions are actually quite intertwined, so I

21   may refer to some of them while I am talking about others.

22        So I think the motion for dismissal obviously is

23   paramount --

24        THE COURT:  You are talking about subsections of your

25   motion.

L7n2ShaA kjc

1          MR. ALONSO:  No.  I actually am saying that there are

2     themes that run through the motion to dismiss, the bill of

3     particulars, the motion for inspection of the grand jury

4     minutes, and the motion for *Brady* material.  It all is related

5     to the fundamental question of what exactly the government is

6     charging here.

7          That's obviously very important in terms of the

8     dismissal of the indictment.  It's crucial in terms of notice.

9     They simply haven't alleged appropriately the requisite intent

10    to harm the victims on the part of Ms. Shah in this indictment.

11    What the government has tried to do, as I think we pointed out

12    in quite some detail in both our opening memorandum and our

13    reply brief, but what the government has tried to do is simply

14    rest on, you know, cases that say that they do little more than

15    allege the elements of the crime and the time and place.  But

16    the reality is, they have to do more.  And there are a number

17    of cases --

18          THE COURT:  Well, what they have to do is, they have

19    to state the elements of the offense, they have to inform the

20    defendant what she is charged with so that she can defend.

21    That's pretty straightforward, sir.

22          MR. ALONSO:  It is straightforward.

23          THE COURT:  It's not a high burden.  It's an important

24    burden, but it's not a high burden.  You have to know what you

25    are being charged with, and you have to know it in such a way

L7n2ShaA kjc

1    that you can defend against it.  You don't have to know each

2    and every aspect of it.  She doesn't have to know, from the

3    standpoint of the request to dismiss, each material

4    misrepresentation.  She doesn't have to know each of her

5    contact -- I'm sorry, the government doesn't have to set forth

6    in the indictment the list of the victims or the

7    representations, the false -- allegedly false representations

8    made to each victim.  That is for other issues.  We are talking

9    about the dismissal of the superseding indictment.  The burden

10   isn't -- again, it is important, but I would characterize it

11   under the case law as not very high.

12          Would you accept that?

13          MR. ALONSO:  I would accept that the case law says

14   what your Honor says, and I would also submit to your Honor

15   that the Second Circuit has either upheld or dismissed a

16   number of indictments under the standard that I am urging.

17          When they are setting forth a general -- a general

18   statute, like wire fraud and conspiracy, which are so

19   incredibly broad, they have to, in the words of the Supreme

20   Court in *Russell*, descend to particulars.  I'm not saying they

21   have to set out all the things that your Honor just said.

22   Clearly that's correct.  You don't have to set forth a bill of

23   particulars inside an indictment, nor have we asked for them to

24   lay out a road map to their evidence.  What we are simply

25   pointing out is a fundamental defect in the indictment in that

L7n2ShaA kjc

```
1    wire fraud requires a specific intent to harm, and here that

2    has not been alleged.  What -- other than the boilerplate

3    elements of the indictment -- of the statutes have been

4    alleged, but they are not saying --

5         THE COURT:  In other words, you do agree, as you have

6    to, that they do charge intent.

7         MR. ALONSO:  Only when they are tracking the language

8    of 18 United States Code 1349 and 1343, right?  There --

9         THE COURT:  At no point -- I am quoting from paragraph

10   four.  "At no point did the defendants intend that the victims

11   would actually earn any of the promised return on their

12   intended investment nor did the victims actually earn any such

13   returns."

14        MR. ALONSO:  Correct.  Those words are there, and I

15   will point your Honor to two things.  One is, the government's

16   responses here mischaracterizes what that says.  That does not

17   say what it should say.  If they are going to allege a false

18   promise fraud case, like this one, they need to say, based on

19   ample case law going back over a hundred years, they need to

20   say, at the time of the promises made, they had no intention

21   specifically of performing.

22        That's not what they say here.  They are saying

23   here -- the government mischaracterizes this in their response.

24   They are saying here that at no point did they form the intent

25   that good things would happen.  They are not saying in this
```

L7n2ShaA kjc

1      indictment that they formed the intent that bad things would

2      happen.  The requirement is they have to intend to harm the

3      victims or the purchasers here.  What they are saying is at no

4      point did they form the intent for them to make money.

5              That's not the same thing, your Honor.  It really

6      isn't.  And I think the reason it is so intertwined, and I

7      bring up these other things, it's intertwined because I'm not

8      sure they can allege this.  Right?  That's why the *Brady*

9      motion and the grand jury motion are so important.  Because of

10     the material that we have uncovered that the government, you

11     know, claims they didn't have until the day of this indictment.

12     Not true.  They have had it for years.  The fact is that, at

13     the time that these promises were being made, as far as we can

14     tell, from the millions of documents that they have given us,

15     they are -- the purchasers were being in fact told, it was

16     being disclaimed that any promises were being made.

17              So I think that careful wording it's very cute but it

18     does not follow --

19              THE COURT:  Wait just a moment.  Go ahead.  Go ahead.

20              MR. ALONSO:  I'm saying I think that the careful

21     wording in the indictment, it is -- sorry, I have it over

22     there, it is the paragraph where you said at no point did they

23     intend, that careful wording is, I think, because they are

24     unable to allege what they really need to allege, which is that

25     the defendants specifically intended, right -- Ms. Shah,

L7n2ShaA kjc

1   selling leads, you know, brokering leads to -- ultimately to

2   sales floors intended that those people would not make money

3   from this, when the government knows -- it has in their

4   files -- that they are being told exactly the opposite, that

5   nobody is promising you any particular return.  So that

6   language --

7           THE COURT:  But isn't that a jury issue as to what

8   they were told and what they weren't told?

9           MR. ALONSO:  Of course.  Of course.  What they were

10  told and what they weren't told is a jury issue, but the

11  allegation has to be -- it has to be, your Honor -- that

12  Ms. Shah intended to harm each and every one of these people

13  whose leads she sold.  And it seems --

14          THE COURT:  Wait.  The indictment has to say that she

15  intended to harm each and every person?  No.  You don't mean

16  that.

17          MR. ALONSO:  Each and every person is a bit of

18  hyperbole.  I apologize.  She -- it has to allege --

19          THE COURT:  The intent had to be there to harm

20  somebody.

21          MR. ALONSO:  To harm them.  Exactly.  And given that

22  their theory is that they are being promised somehow -- I don't

23  know how you are promised returns on tax preparation services,

24  but be that as it may, the theory appears to be that they are

25  being promised, at the time of these sales, that they are

L7n2ShaA kjc

1    going to make some specific monetary return.  That appears to

2    be the theory.  It's vague in the indictment, but that appears

3    to be the theory.

4         If that's the theory, then the indictment must

5    descend into particulars, and it must say that she did not --

6    that she specifically intended that they would be harmed,

7    which means she specifically intended they wouldn't make any

8    money.

9         They didn't allege that --

10        THE COURT:  You may be -- perhaps your language is a

11   little too precise, that they wouldn't profit from it.

12        MR. ALONSO:  That's not what they are saying.  That's

13   not what they are saying.  They are saying promised returns.  I

14   don't know what that means.  That's vague.  So we are not

15   prepared to concede profit.  Perhaps if we were drafting this

16   anew, perhaps that's what they meant.  That's not where we are.

17   We have a grand jury who heard evidence and who returned these

18   exact words, so we are stuck with these words.  So they are

19   saying the promised returns.  So they did not properly allege

20   that Ms. Shah intended that they would not make the promised

21   returns.  That's not what they are saying.  They are saying at

22   no point did she form the intent that they would make the

23   returns.  Those are two very different things.

24        THE COURT:  Go ahead.

25        MR. ALONSO:  There are cases in the Second Circuit,

L7n2ShaA kjc

1    including in the wire fraud context.  The *Shellef* case, that we

2    cite in our reply brief, is relatively on point, where the

3    Second Circuit applied this principle to wire fraud, where the

4    government had not laid out that the misrepresentations went to

5    the benefit of the bargain.

6          There are other cases -- the *Pirro* case is a famous

7    one, where Judge Parker dismissed that indictment, the Second

8    Circuit up held it.  So there is not -- it is not enough, as I

9    think Judge Sand says, it's not enough to sort of say these

10   kind of generalities and then -- by the government, and then

11   say, okay, Judge, that's it.  We rarely dismiss indictments in

12   this courthouse.  I get it.  We rarely dismiss indictments in

13   this courthouse.  This is one that should be dismissed.  Not

14   just for that reason.  There is a second reason we allege it

15   should be dismissed, your Honor.

16         They didn't allege materiality.  It is extremely

17   ironic that they are relying on all we need to do is allege the

18   elements, that's all we need to do, yet this element they

19   didn't allege.

20         THE COURT:  When you are talking about an investment,

21   isn't materiality inferred?  That is, you are making alleged

22   misrepresentations in regard to investment, it is -- the

23   alleged misrepresentation is you are going to make money, you

24   are going to profit.

25         MR. ALONSO:  If this were a stock investment case or

L7n2ShaA kjc

1   real investment case, I might agree.  This is not an investment

2   case at all.  This is a purchase of services.  These are

3   contracts to purchase coaching services.

4           I expect the government will tell you that everyone

5   who bought coaching services got coaching services.  Right?

6   That everybody who paid for whatever these business services

7   are -- again, we want them to particularize them -- but they

8   are not going to contest, I suspect, that they got what they

9   paid for.

10          So it's completely different than an investment case.

11  And, frankly, I don't know that it was material.  We point out

12  in our --

13          THE COURT:  I don't think -- we will hear from the

14  government.

15          MR. ALONSO:  No, no.

16          THE COURT:  I don't think they are going to say they

17  got what they paid for.

18          MR. ALONSO:  No.

19          THE COURT:  The argument -- if it's like the *Ketabchi*

20  trial --

21          MR. ALONSO:  Yeah.

22          THE COURT:  -- the argument is that they got some

23  piece of junk, as it were --

24          MR. ALONSO:  I agree that there --

25          THE COURT:  -- that allegedly is a coaching service or

L7n2ShaA kjc

1   a business opportunity, but there was no substance to it.  It

2   was a nothing.  But they got something.

3        MR. ALONSO:  I agree they are not going to concede

4   that there was, but the fact is that the contracts at issue did

5   contract for coaching services.  I don't think there is going

6   to be any question that they got it.  I don't think even these

7   prosecutors have alleged that substandard services are

8   criminal.  What they are saying is, in connection with selling

9   these services, salespeople, not Ms. Shah, but salespeople

10  somewhere across the country, said things, like made promises

11  that people would be making money, not on their investments,

12  it's not an investment, on their fee that they are paying for

13  these services.  Right?  That's their theory.

14        And how -- first of all, they haven't said material.

15  I can show you lots of indictments within the Second Circuit

16  that say "by means of materially false and fraudulent

17  pretenses, representations, and promises."  There are cases

18  that we have cited -- the *Ivic* case is one, there are others --

19  where implied elements of crimes are -- must be alleged.  And

20  the element of materiality is not on the face of 1341.  It must

21  be alleged.

22        The *Neder* case, the Supreme Court held that

23  materiality is an element of mail and wire fraud and bank

24  fraud, right?  It wasn't so obvious in 2000, or 1999, whenever

25  that case was decided.  It wasn't so obvious.  Right?  Because

L7n2ShaA kjc

1    the Supreme Court had a circuit split before it.  And it

2    decided materiality is an element.

3            Okay.  Since then, you can see all around the country,

4    indictments say "materially false."  Were these material or

5    not?  That's -- that may be a question for the jury, but they

6    have to allege it in the indictment, and they didn't.

7            So if I can move on -- is there water somewhere?

8            THE COURT:  I don't know if the government supplies

9    water.  You know what, sir, let me give you mine.  There you

10   are.  I have not opened it.  As a matter of fact, Ms. Blakely,

11   do we have a cup or something, where we can save some of the

12   judge's water for the judge?

13           MR ALONSO:  Judge, I appreciate your kindness.  You

14   don't have to --

15           MS. FLETCHER:  Judge, the government --

16           MR ALONSO:  -- do that.

17           MS. FLETCHER:  We will supply water.

18           MR. ALONSO:  I appreciate the government's kindness.

19   I'm glad she did it in open court, so everybody saw it.  Thank

20   you very much, Ms. Fletcher.

21           Moving on to the bill of particulars motion, your

22   Honor, as I said, it is related, and it is basically related

23   because defending this case has been and will continue to be

24   like boxing with ghosts, right?

25           So the government has alleged a nine-year conspiracy

L7n2ShaA kjc

1    to commit wire fraud with some unspecified number of

2    coconspirators, with unnamed, you know, sales floors, and with

3    victims that we don't know who they are.  So when I say boxing

4    with ghosts, I really mean it.

5              They are pointing, they are saying, listen, you don't

6    need us to particularize.  Literally, they have responded to

7    our request by, no, no, no, that's not really required.  We

8    don't have to do that here, because we have given you a

9    boatload of discovery.

10             Now, they have given us a boatload of discovery.

11   That's clear.  We have said in our -- I said in my declaration

12   more than a million pages.  I think that grossly understates

13   it.

14             THE COURT:  I saw that argument.

15             MR. ALONSO:  It's millions and millions of pages.

16             Now, it is great that they gave that to us.  A lot of

17   it is from *Ketabchi*, which, by the way, I submit has nothing to

18   do with this case.  It may be a similar theory of theirs, but

19   we can't have a road map to what our trial is.  We don't want

20   the evidence.  We just want the particulars.  What is he

21   charging -- what is he charging us with, the government?  So we

22   can't do that from the *Ketabchi* case.  It's completely

23   different.  You know, it's completely a different matter with

24   different players.

25             So what we are asking for, we had originally asked for

L7n2ShaA kjc

seven items.  You said, your Honor, what are we abandoning?  We

are now asking for five, right?  In response to the -- our

motions, the government put forward a statement of facts, which

gives us at least a little bit of information.  So what we are

asking for now is basically the coconspirators, the victims,

the sales floors, the money laundering activity, and one more

thing, which escapes me at this moment, but it's in my reply

brief.

        So what is crucial here is basically to be able to

know what is it that we have to defeat, right?  So in science,

you need -- a falsifiable proposition is something that can be

attacked.  Right?  Same thing in law.  Right?  So what are they

saying?  Right?  They are saying there are -- there are

literally thousands and thousands and thousands of names of

leads in the discovery materials.  I don't know which ones

apply to Ms. Shah.  I don't know which ones they are saying

were victimized.  I don't know which ones they are saying were

intended to be victimized.  So we could very easily pick out a

hundred of them, do a great job in front of the jury, and show

that those people were not defrauded at all, or certainly that

Ms. Shah knew nothing about it, what does she know about what

the sales floors are saying?  We could show all that and then

they could come up and say no, no, no, it's these other 100

people we are alleging.

        The point is, if you are going to allege that somebody

L7n2ShaA kjc

1    is being victimized -- and here there is a sentencing

2    enhancement for it, right, which specifically talks about more

3    than ten victims over 55 -- if you are going to allege

4    somebody is being victimized, tell us who.  Let's talk about

5    what we are trying here.  Let's join issue.  Otherwise, we have

6    millions of pages and we are almost literally at sea in terms

7    of wading through those pages.

8            Now, they said -- I anticipate that they will clarify,

9    but in their response, they said essentially that they allege

10   that some unspecified number of telemarketing operations with

11   which Ms. Shah allegedly worked were always defrauding people.

12   Now, if that's the case, I think they need to say that clearly.

13   That's not what they have said clearly.

14           And if they are saying that, then we have a different

15   issue.  Right?  Then we have an issue of, okay, well, what's

16   the case about?  I mean, there are still millions and millions

17   of people here.

18           So I think they do need to clarify, and I would --

19           THE COURT:  I'm not sure what that means, millions and

20   millions of people here.

21           MR. ALONSO:  Well, millions and millions of pages

22   which shows thousands and thousands of victims in there.

23           And by the way, more than a hundred sales floors are

24   listed there.  Which ones are we supposed to defend against?

25           THE COURT:  Listed where?

L7n2ShaA kjc

1          MR. ALONSO:  Listed within the discovery.  We have

2     cited --

3          THE COURT:  In discovery.

4          MR. ALONSO:  Yes.

5          And coconspirators.  You know, there is very good

6     case law that the government hasn't really addressed about

7     factors courts are supposed to consider in terms of giving

8     over coconspirators.  I want know who are we supposed to

9     defend against.  This is not a case where there is any danger

10    here.  Ms. Shah, obviously, is not somebody who poses a danger

11    to anybody.  So it would not be difficult for the government to

12    tell us, okay, it's these ten people, it's not these other 20

13    people.  That way we could all focus -- everybody here, your

14    Honor, us and the prosecution -- on what the case is about.

15          Also related, your Honor, if I could move on --

16          THE COURT:  Go ahead.

17          MR. ALONSO:  -- is the *Brady* issue.

18          THE COURT:  Go ahead.

19          MR. ALONSO:  So we obviously, we obviously had made a

20    point this morning and in our papers about what exactly are the

21    misrepresentations here.  In the *Brady* context, it's been

22    clear, it's become clear, just from this motion practice, that

23    there is material out there that's favorable to the defense

24    that the government hasn't identified for us.

25          THE COURT:  Wait.  The -- I take it you are not

L7n2ShaA kjc

1   arguing that -- or are you, that in the discovery material,

2   which you say is billions of documents, the government has to

3   tell you what is exculpatory and what's not.  Is that your

4   argument?

5          MR. ALONSO:  I am saying that in part.  Right?  I am

6   saying that in part and, I have some authority, which I am

7   happy to discuss with the Court.  The issue is that, if you

8   have got this quantity of material, right, you can't expect the

9   defense to wade through it in a lifetime.

10          THE COURT:  Indeed.  I want to hear what the

11   government has told you -- because obviously there are things

12   the government has told you that the Court is unaware of -- in

13   terms of how that discovery has been organized and, indeed,

14   what they have -- the information they have given you about the

15   victims.  So in broad view, yeah, they can't just dump things

16   on you for millions of pages.  But I don't think you have

17   authority that says the government has to tell you what's

18   exculpatory and what's not.

19          MR. ALONSO:  I do have some authority for that, your

20   Honor.  I just don't have it this far in advance of trial.

21   Right?  But I think the principle applies.

22          So there are two cases -- *Gil* in the Second Circuit

23   and *St. Germain* -- which is a case of Judge McMahon here in the

24   Southern District, which I have cited, where the government did

25   turn over material days before trial.  In the *Gil* case, it was

L7n2ShaA kjc

1    a memorandum that was buried among, you know, some 2700

2    documents.  In the *St. Germain* case, it was transcripts that

3    were also -- that were similarly buried.  Neither was

4    identified as what it was, which is something that was

5    specifically helpful to the defense.

6            And in the *Gil* case, the Second Circuit reversed that

7    conviction, even though the government argued -- and I know

8    this from painful experience.  I argued the case on behalf of

9    the United States at least before the motion panel in *Gil*, and

10   the government argued that the document had been turned over.

11   The defense had it.  They had it five days before trial.

12   That's what I argued to the Second Circuit.  I lost, because

13   the Second Circuit said -- Judge Jacobs didn't like that the

14   government had buried it.  I didn't try the case, so thank God

15   I'm not the one who buried it, but that it had been inside five

16   boxes of 3500 material, right, when it was something that was

17   clearly favorable to the defense.

18           In the *St. Germain* case, Judge McMahon made a similar

19   analysis.

20           But it all goes back to the *Bortnovsky* principle.

21   Right?  This is the motion for a bill of particulars.  Right*?*

22   *Bortnovsky* reversed a denial of the bill of particulars, and

23   your Honor is obviously familiar with the case I know --

24           THE COURT:  I know *Bortnovsky*.

25           MR. ALONSO:  -- and as I wrote in my papers, it was a

L7n2ShaA kjc

quainter time when 4,000 documents was deemed to be a lot by
the Second Circuit.  You can't just give 4,000 documents and
expect the defense to glean it.  Well, we are well beyond 4,000
documents here.

          So I think it is the same principle, and it is driven
home by what's happened just since this motion practice.
Right?  In the motion practice, in the *Franks* motion, which we
are abandoning, because the government has represented that
they are not going to offer anything that was seized pursuant
to those two warrants, so we are abandoning that, but because
of that motion practice, and some of those facts related to the
grand jury motion as well, it has become clear that there is
exculpatory material within the discovery material and there
may be things outside of it.  Right?  It's not just the
evidence that they have given us.  The discovery material are
things -- are documents and presumably things they might try to
introduce or other.

          But generally speaking, they haven't given us notes
and memoranda and things like that.  They have given us some of
it.  But what the government did in its response is it said to
the Court, Ms. Shah's lawyers identified a document, one
document, which is a compliance coaching script, and that
document, which we did identify, we said, look, this document
says that the promises of returns -- the central theory of the
case -- were specifically being disclaimed at the time of the

L7n2ShaA kjc

1    sale.  They may argue as a factual matter that that was part of

2    the scheme.  Maybe they will say that.  But certainly it is

3    something that goes to materiality, goes to intent to defraud,

4    goes to fraud in itself, and we are entitled to have that.

5            So when you have got the theory that --

6            THE COURT:  This is a 2011 document that you have

7    attached to your papers?

8            MR. ALONSO:  Yes.

9            THE COURT:  All right.

10           MR. ALONSO:  Exactly right.  And if I could finish,

11   because this is, I think, actually very, very important.

12           This kind of information that promises were

13   specifically disclaimed at the time of sale, if the theory is

14   promises were specifically made at the time of sale, it's

15   clearly favorable to the defense.  Maybe they have a way to

16   defeat it, maybe they don't.  It's clearly favorable.  We

17   identified the one document, a cursory review, because I

18   thought -- I think there is something in here.  Let's find it.

19   Of course, we found one document.  Okay?  We attached it to our

20   papers.

21           The government comes back and says, that document

22   doesn't prove anything, because we only got that document on

23   March 25, 2021.  That happens to be the date of the indictment

24   in this case, so I doubt it was presented to the grand jury,

25   but they got it on that day.

L7n2ShaA kjc

1          We then went back to the drawing board and said, wait

2    a minute, that doesn't make any sense.  In a case of false

3    promises of returns, how could they only have gotten this

4    document the day they went to indict Ms. Shah?  And the answer

5    is they didn't.  They have had it for years.  We found it in

6    the very first *Ketabchi* production that they made, right?  So

7    they have had that document for years.

8          And what's more, it doesn't make sense that there is

9    just one document.  Right?  They say in their response that we

10   only identified two documents -- a contract and one script.

11   Okay.  So we went back to the drawing board and we found eight

12   more.  It's all attached to our papers now.  So it's clear that

13   there is lots of stuff like this out there, probably not just

14   within the discovery material, which they should identify for

15   us, but also within the heads of the agents.  Right?

16         The agents say in the affidavits, and probably before

17   the grand jury, they interviewed a hundred people and none of

18   them made any money.  First of all, that's not fraud obviously.

19   The result by itself isn't fraud.  But let's just take that

20   moment a moment.

21         Okay.  But what about the people they didn't

22   interview?  How did they decide not to?  Who are they?  Do

23   they know about people who made money or who will admit to

24   having promises disclaimed?  Those are very important pieces.

25   And of course *Brady* material and *Giglio* material doesn't need

L7n2ShaA kjc

1   to be written down.  It has to be in the minds of the

2   investigative team, including all the agents.

3          So I think this is just a very, very important point

4   about that.  Under the *Gil*, *Bortnovsky* principle, they have to

5   identify it, and I think that the Court should order them to

6   do a more thorough review for this exact piece, for this exact

7   piece about promises being made about returns.

8          Which brings me to my grand jury motion.  Very well

9   aware, your Honor, that in this courthouse it is very rare for

10  the Court to go beyond a facially valid grand jury indictment,

11  which is, of course, presumed valid, putting aside the other

12  complaints we have about the face of this indictment.

13         Our motion papers, I think, have established pretty

14  clearly that the agents in this case pretty regularly either

15  made or passed on false statements about Ms. Shah about this

16  scheme in sworn affidavits to the magistrates.  That is a

17  serious allegation.  We don't make it lightly.  But they told

18  the magistrates that the purchasers were promised returns on

19  their investments without saying -- without clarifying that

20  misleading statement, oh, listen, Judges, you should know,

21  there were conversations at the time and scripts and contracts

22  that said exactly the opposite of what we just swore to you.

23  They did not tell the magistrates that.  They actually told the

24  magistrates, as well, that Ms. Shah operated two companies that

25  she didn't operate; that she was affiliated with, that she

L7n2ShaA kjc

|  |  |
|---|---|
| 1 | worked for, perhaps, but did not operate.  And their attempt to |
| 2 | use operate -- |
| 3 | THE COURT:  What does "operate" mean when she is |
| 4 | listed, I think, as a vice president of marketing or something |
| 5 | of that nature?  What does "operate" mean? |
| 6 | MR. ALONSO:  Well, vice president of marketing, if you |
| 7 | look at that chart, is middle management.  Right?  It's not |
| 8 | the -- "operating" in terms of a company means -- |
| 9 | THE COURT:  Conceding your point for purposes of |
| 10 | discussion, I would say it's middle management as opposed to |
| 11 | middle management. |
| 12 | MR. ALONSO:  Well, that's not what the agent said. |
| 13 | The agent didn't say anything like -- |
| 14 | THE COURT:  What does "operate" mean? |
| 15 | MR. ALONSO:  "Operate" means what the Oxford English |
| 16 | dictionary says it means, which is that it means to work |
| 17 | machinery or to direct the activities of a company.  Right? |
| 18 | That's what it says in the footnote where we cited the |
| 19 | dictionary -- |
| 20 | THE COURT:  So the operator is the CEO. |
| 21 | MR. ALONSO:  It also -- actually, I think -- I think |
| 22 | the easiest way for everybody here to interpret -- |
| 23 | THE COURT:  Aren't you parsing it far too fine for |
| 24 | purposes of 6(e)?  You started off by saying it's true that |
| 25 | review of grand jury minutes is rarely permitted here. |

L7n2ShaA kjc

1          MR. ALONSO:  I think that --

2          THE COURT:  Isn't this sort of, you will forgive me,

3    an eye shade approach to the word "operate"?

4          MR. ALONSO:  I think that "operate" means what it

5    means in chief operating officer, but I will concede your

6    Honor's point that the much stronger point is the part about

7    no one -- that the statements no one made any money and the

8    statements about the promised returns.  Right?  There were

9    promised returns maybe, but there were also specific

10   conversations saying we are not promising you anything.  That

11   wasn't -- I'm going to take -- it's a very reasonable inference

12   that those agents went in front of that grand jury and said

13   what's in the indictment, which is that they were not making

14   money on their promised returns, and that is a misleading

15   statement.  I submit that if the government had heard that

16   statement in the grand jury from a subpoenaed witness and they

17   knew all of the information we have set out, they might start

18   an investigation for obstruction of justice.  That's a very

19   serious thing.  I don't have the grand jury minutes, so I don't

20   know what was there.

21         THE COURT:  Let me ask a slightly different

22   question --

23         MR. ALONSO:  Yeah.

24         THE COURT:  -- because I'm intrigued by your making

25   money argument.  If you purchase business opportunities for a

L7n2ShaA kjc

1   thousand dollars, that's how much money you put in, and it

2   yields $20, have you made money?

3       MR. ALONSO:  Yes.  Now, you have not made profit, but

4   you have made money.  And if it's ambiguous to you and me

5   having this conversation here, what was it to the grand jury or

6   to the magistrate judges who heard that from the agent?  I mean

7   "no one makes money" can mean different things.  Now, that

8   person made money.

9       And I would also submit that that person may have been

10  perfectly happy with the services.  That may not be a fraud at

11  all.  Right?  That person bought services, paid for services,

12  and got $20 out of it.  We don't know if they lost interest.  I

13  mean, this --

14      THE COURT:  I purchased a business opportunity for a

15  thousand dollars.  At some point I receive $20 back.  I am so

16  happy.  Is that your argument?

17      MR. ALONSO:  No, your Honor.  My argument is that this

18  is not as simple as the government has painted it.  I

19  recognize --

20      THE COURT:  That may be.

21      MR. ALONSO:  I recognize that this is --

22      THE COURT:  That may be.  You may have statements of,

23  you know, we don't promise any specific rate of return, and you

24  may have people on sales floors saying something very

25  different.  So it's not as simple as it appears.

L7n2ShaA kjc

1          MR. ALONSO:  Right.

2          THE COURT:  That's true.  But you have presumption of

3    regularity.  We don't -- you just are saying -- you have made

4    arguments on behalf of the government.  The court system,

5    through Rule 6(e), is highly protective of grand jury

6    proceedings, and I assume at some point in your career, given

7    what you said this morning, you in fact argued them.

8          MR. ALONSO:  Absolutely.  Of course.  But right

9    now --

10         THE COURT:  And you want me here, if I understand -- I

11   don't think this is one of your best arguments.  You can tell

12   my view.  You want me here to permit disclosure of grand jury

13   minutes to breach grand jury secrecy on the theory that

14   somebody is just hunky-dory because they made $20 on a

15   thousand-dollar investment.

16         MR. ALONSO:  Well, first of all, that's a hypothetical

17   that your Honor put forward --

18         THE COURT:  Yes.

19         MR. ALONSO:  -- but --

20         THE COURT:  Yes.

21         MR. ALONSO:  -- I will say that what I am asking for

22   right now is for your Honor to look at it.  I'm not asking

23   right now for you to give it to us immediately.  But what I'm

24   saying is, if it's true that they made these misleading

25   statements before the grand jury, it's not just about the

L7n2ShaA kjc

1   making money.  Right?  I submitted a testimonial from a

2   customer on my reply brief --

3           THE COURT:  No, I saw that.

4           MR. ALONSO:  -- who made $55,000.

5           THE COURT:  I saw that.

6           MR. ALONSO:  Yeah, so the question is, right, if they

7   are saying no one --

8           THE COURT:  I won't ask if you have interviewed that

9   person.  The name was blacked out on my copy.  Go ahead.

10          MR. ALONSO:  Right.  The -- by the way, that

11  testimonial was among 3600 pages of things the government gave

12  us.  A lot of them do have these low amounts.

13          But again, we all understand how this works.  Right?

14  If you are being sold something that is coaching for your

15  business, you have to actually work on it.  Right?  The fact

16  that somebody didn't make money doesn't mean that they would

17  say, help, help, I have been defrauded.  They might have lost

18  interest.  They might have not done the work.  Right?  I mean,

19  if you are getting web services or coaching services, whatever,

20  even if it was substandard stuff, right, they still have to go

21  out and do it and sell.  Right?  And no one is blaming the

22  victims here.  I am just saying that the fact that somebody

23  made $20 on a thousand-dollar investment is certainly no

24  evidence, without much more, that that's fraud.  But the agents

25  kept saying no one made money, no one made money, no one made

L7n2ShaA kjc

1    money.  We have put forward evidence that people did make

2    money.  So all I am asking is for you to read the minutes, and

3    if they show what I think they show, then at that point we

4    would like to make motions on it.

5            THE COURT:  All right.  What else?

6            MR. ALONSO:  All right.  So on the *Giglio* motion, this

7    is the enforcement of the Rule 5(f) order that your Honor

8    entered in late May, we are seeking simply for you to enforce

9    it.  The government has declined to obey your Honor's order.

10   They didn't object when we moved for it.  They are now saying,

11   I think --

12           THE COURT:  Are you talking about the disclosure of

13   3500 material?

14           MR. ALONSO:  Not 3500.  Your Honor ordered that both

15   impeachment and exculpatory material be identified --

16           THE COURT:  Right.

17           MR. ALONSO:  -- promptly upon its being discovered.

18   Obviously we would be reasonable about this.  We are not

19   looking for every little thing.  They don't know exactly what's

20   inconsistent with their witnesses.  But they know lots of it.

21   Right?  They know who the cooperators are.  They know what the

22   impeachment material is that they have now.

23           THE COURT:  You are asking that the impeachment

24   material be turned over immediately.

25           MR. ALONSO:  I suppose --

L7n2ShaA kjc

1          THE COURT:  Identified.

2          MR. ALONSO:  Promptly upon it's being identified,

3     which is what your Honor ordered.

4          THE COURT:  Okay.

5          MR. ALONSO:  So I don't honestly understand --

6          THE COURT:  Fair enough.

7          MR. ALONSO:  -- their argument here.

8          And I will call your Honor's attention to our reply

9     brief, where I point out how they have also misrepresented

10    your Honor's order.  They said that your Honor's order makes

11    clear the *Giglio* material need not be produced immediately upon

12    its identification, when you said the opposite.  They said that

13    the *Giglio* order does not expressly address the defendant who

14    appears intent on proceeding to trial when your order said the

15    opposite.  So all we ask for is enforcement of that order.

16    And, again, we will be reasonable.  We are not saying give us

17    everything right now indexed.  We will talk about it.

18         THE COURT:  Well, October is coming up fast.

19         MR. ALONSO:  Assuming that's the real date, but we

20    are --

21         THE COURT:  Why not?  I haven't heard anything

22    otherwise.

23         MR. ALONSO:  Well, we just had an informal discussion

24    beforehand, and I'm sure we will talk about it more, as to

25    whether the Court can try three defendants.  That's all.

L7n2ShaA kjc

1          THE COURT:  I have an October date here for this

2     trial.

3          MR. ALONSO:  And we would like to go to trial in

4     October, just to be clear, your Honor.

5          THE COURT:  All right.

6          MR. ALONSO:  And finally, finally, we have the

7     question of the suppression motion.  We urge the Court to order

8     a suppression hearing.  All right?  We do have --

9          THE COURT:  I do want to hear from the government why

10    that doesn't make sense.  It seems to me it is worthwhile

11    having the hearing, so I have a better sense of what's

12    happened.

13         MR. ALONSO:  Thank you, your Honor.  The basic point

14    is that we have submitted sufficient sworn allegations here,

15    and the government has submitted nothing but unsworn

16    statements and arguments in their legal argument.  So I don't

17    know why they didn't submit an affidavit from

18    Detective Bastos --

19         THE COURT:  Well, they don't have to do that.  I saw

20    you are trying to get them on the record.  They don't have to

21    do that.  They can have him testify at the hearing.

22         MR. ALONSO:  Well, that would be fine with us, your

23    Honor.

24         THE COURT:  All right.

25         MR. ALONSO:  So in sum, boxing with ghosts.  We urge

L7n2ShaA kjc

1    you to dismiss the indictment.  But if you don't do that, we

2    really do need a lot more information if we have any chance to

3    actually approach these charges.

4            THE COURT:  All right.  I think that's a fair way to

5    summarize your argument.  Okay.

6            MR. ALONSO:  Thank you, your Honor.

7            THE COURT:  Government.  Who is the boxer?

8            MR. SOBELMAN:  Your Honor, I have the honor of

9    addressing your Honor.

10           THE COURT:  Go ahead.

11           MR. SOBELMAN:  Your Honor, would you like me to go in

12   any particular order or should I address them in the way the

13   defense counsel addressed them?

14           THE COURT:  That probably makes the most sense.

15           MR. SOBELMAN:  Okay.  Starting with the defendant's

16   motion to dismiss, his argument entirely ignored the *Klein*

17   case, which was decided by the Second Circuit in 2007.  It

18   found "no error" in a bank fraud indictment that did not

19   "explicitly use the word 'material' because materiality can be

20   inferred to be an element of criminal fraud because of the well

21   understood meaning of fraud as a legal term."

22           That holding is directly applicable here.  There is no

23   way to distinguish it.  Defense counsel says, well, that's

24   plain error review.  But the circuit found no error, not no

25   plain error.  No error.  And every other circuit to have

L7n2ShaA kjc

1    addressed this issue, and we cited cases in our brief, have

2    come out the same way, as have all the district courts that we

3    were able to find that have rendered decisions on this in this

4    district.

5         The idea that you have to use the magic word

6    "material" in an indictment has no support in the case law.

7    The court doesn't have to engage in the sort of like trying to

8    read a specific facts --

9         THE COURT:  Your argument is the "material" can be

10   inferred.  Is that what your argument is?

11        MR. SOBELMAN:  It can be inferred in two ways.  One,

12   just based on the charge itself, under the *Klein* case.  Two,

13   there is a series of cases, including some in this circuit and

14   courts of appeals, that say that where the word "fraud" or

15   "defrauded" or the allegations involve fraud, it can be

16   inferred.

17        And then there is yet a third set of cases, in case

18   the first two weren't persuasive -- and the first is binding --

19   in case the first two aren't persuasive that say that the facts

20   in an indictment, taken in favor of the government, can be read

21   to infer materiality.

22        So there is really no need to parse the indictment the

23   way that defense counsel wants the Court to.  I am happy to go

24   through the indictment in that kind of detail, but unless the

25   Court finds that for some reason *Klein* does not apply, I don't

L7n2ShaA kjc

1    see how this argument can possibly be meritorious.

2            THE COURT:  Go ahead.

3            MR. SOBELMAN:  I want to make just one other note,

4    which is, defense counsel keeps trying to put this case in a

5    particular box that is an outdated notion of a quote/unquote

6    false promise case and wants to cast it as some kind of breach

7    of contract.  Obviously that's not what we have here.  The

8    false promise line of cases was from before the 1343 was

9    amended to include pretenses and representations.  We have

10   all three in this case.  This is not merely something was

11   promised in a contract and something else was given.  As your

12   Honor knows and I think acknowledged, it's a much more

13   complicated set of facts than that, and we don't think it is

14   appropriate to put it in that box, and therefore those cases

15   would not apply.

16           I just want to make two other notes, and then I will

17   move on to the next motion, unless your Honor has questions.

18   One is, defense counsel keeps saying an intent to harm is an

19   element.  It is not.  As your Honor instructed in the *Ketabchi*

20   case, an intent to defraud is an element of the underlying

21   object.

22           Which leads me to my final point, which is, this is a

23   conspiracy case.  It is about an agreement.  It is not about

24   specific -- and we will have evidence of this at trial, but it

25   is not about a specific transaction.  And defense counsel keeps

L7n2ShaA kjc

1    trying to use case law that has applied in sort of isolated

2    incident cases -- and this is the same as the bill of

3    particulars which I will get to in a moment -- to try to import

4    that case law into this circumstance where the case law has

5    been very clear it does not apply.

6          Just very briefly, *Shellef*, the 2007 Second Circuit

7    case, has no application here.  Defense counsel referenced it

8    in his argument in his reply brief.  Your Honor, that case

9    actually supports our argument.  It makes a distinction

10   between cases where -- it's really sort of in the puffery

11   jurisprudence cases, where there is sort of an incidental

12   comment or lie told that's not really the basis of a bargain in

13   a purchase or sale fraud.  Here, as your Honor knows from the

14   *Ketabchi* case and from the indictment, the representations that

15   were made in the course of the conspiracy were critical and

16   central to the purchase or sale of these business and --

17   business services and products, and we have alleged, and intend

18   to prove, that without those the transactions almost certainly

19   would not have occurred, which, again, is materiality, but it's

20   simply not using the magic word in the indictment.

21         I also just want to note, as factual matter, defense

22   counsel keeps characterizing his client as someone who

23   brokered leads.  That certainly is an important part of her

24   conduct, and one that we layed out in our five-page detailed

25   summary of her conduct in our opposition, but she also ran a

L7n2ShaA kjc

BizOp floor in New York City that was directly selling to

customers.  This is not someone who is sort of aloof from what

was going on on the ground.  She was running the ground troops.

So the suggestion that we are not going to prove that at trial

is going to be false.

Anything else on the motion to dismiss, your Honor,

before I turn to the bill of particulars?

THE COURT:  Go ahead.

MR. SOBELMAN:  With respect to the bill of

particulars, we have the same problem, where defense counsel

wants to use cases related to isolated incident crimes and try

to import them into sort of a continuing scheme or a

long-running conspiracy crime that we have here.  So *Bortnovsky*

involved a set of a few isolated fraudulent incidents that was

within a much larger set of transactions, and the government

didn't adequately identify the handful, literal handful of

fraudulent incidents that were at issue.

Now, cases like *Tuzman*, which is an SDNY case, have

explained that, for a bill of particulars, there are two types

of cases to apply the principles.  One is what I would call

isolated incidents or handful of incident cases, like

*Bortnovsky*; and then there is another category, which we are

very much in, which is long-running scheme where, as *Tuzman*

puts it, all or most of the conduct is alleged to be unlawful.

That's where we are, all or most.

L7n2ShaA kjc

1          The BizOp floors that the defendant run -- ran, all or

2     most of that conduct, in our view, was unlawful.  The leads

3     that she was brokering, all or most of that conduct, in our

4     view, was unlawful.  That's what the allegation is.  It's clear

5     in the indictment.  It's clear in our motion papers.  It's

6     clear to defense counsel.  There is no hiding the ball here.

7     We are not going to put on a trial where we say there were

8     three victims that were defrauded over the course of several

9     years.  We may not have a hundred victims testify at trial --

10     it will probably be more on the order of what testified at the

11     *Ketabchi* trial -- but certainly there will be ample testimony

12     and documentary evidence and communications showing this was a

13     comprehensive, long-running scheme, and not something where

14     there is a handful of isolated incidents.

15          So where does that leave us?  It leaves us in the bill

16     of particulars context with a whole series of cases that we

17     cite in our brief, like *Cuti*, *Guttenberg,* where the Courts say,

18     for these types of cases, a bill of particulars asking for the

19     things that the defendant wants are not appropriate.

20     *Bonaventure*, which is a Judge Swain decision from 2013.  They

21     have cited no case, and the government is not aware of one

22     where the Court has required the type of disclosures that they

23     are requesting in a case like this.  It is just not in that

24     category.

25          THE COURT:  No, but what about -- step back.  You have

L7n2ShaA kjc

1    got a minimum of a million documents here.  They are swimming

2    in documents.  It's no longer 4,000, to use Mr. Alonso's point.

3    They say they have no idea what they ought to be looking at.

4    How are you assisting them in that?

5              MR. SOBELMAN:  Your Honor, we have been readily

6    available to them.  We have had phone conversations.  We have

7    had videoconferences.  We have written letters, that I will

8    talk about in a second, that were attached to the defendant's

9    motion, including one -- you know, one of the things he asked

10   for today was the things he wants are coconspirators, victims,

11   sales floors.  One thing he couldn't remember.  I don't know

12   what the thing he couldn't remember is, but coconspirators,

13   victims, sales floors, we gave them a list, a while ago now, of

14   41 --

15             THE COURT:  Well, you haven't listed all the

16   coconspirators.

17             MR. ALONSO:  We haven't -- I'm not sure that's true,

18   but we haven't committed to a final, binding list.  The bill of

19   particulars asked here, your Honor, does not have a legal basis

20   and it is purely strategic.  We gave them a list in good faith,

21   as comprehensive as we could make it, of 41 individuals and

22   entities that are sales floors, fulfillment floors, and

23   coconspirators, and other people who may not be coconspirators

24   but were involved in the operations that the defendant was

25   involved in, to try to help them narrow their focus.

L7n2ShaA kjc

1         But every time we answer a question from defense

2    counsel, there is ten more follow-up questions.  And we answer

3    as many as we can, but they always want more.  It is never

4    enough.  And that is not how the bill of particulars law works.

5         What we have given is enough.  It's more than enough.

6    And the volume of discovery does not call for a bill of

7    particulars here.  First of all, they have shown that they are

8    quite deft at navigating the discovery.  They have a

9    coordinating discovery attorney who has a comprehensive

10   database for them, called Casepoint, that all their materials

11   get put into and is searchable by them.  We actually don't have

12   something like that.  When they put in a document and said, oh,

13   the government had this before the search warrant, we were able

14   to look at the Bates number and tell that particular version we

15   did not have because it was on our production log which they

16   also have and showing when we produced it to them, which is

17   usually very shortly after we receive it.

18        They were then able to go back apparently and query

19   and find other versions of the same document that we had

20   produced in earlier productions.  We actually don't even have

21   the ability to do those kind of queries across all of our

22   documents.  So I don't know the inner workings of how they are

23   dealing with the discovery; but, frankly, if anything, they

24   are in equipoise with us, but what they have suggested so far

25   makes me think they are actually much further ahead of where we

L7n2ShaA kjc

1    are.

2              And in any event, so although I understand the Court

3    wants to have a trial in October, we want to have a trial in

4    October, defense wants to have a trial in October, the remedy

5    for "we have a lot of materials to get through" is not to bind

6    the government to a bill of particulars to give essentially an

7    early witness list and an early exhibit list.  It's to give the

8    defense more time.  If their assertion is, you know, from March

9    to October is not enough time, given the volume of materials,

10   the government would have no objection to them having

11   additional time.  It would be a perfectly reasonable ask.

12             But instead, they don't ask for that.  They say we

13   want a trial soon and we want to bind the government and put a

14   strategic limitation on them, even though we know their

15   investigation is ongoing.  Your Honor, we are meeting with

16   witnesses in the case every single week, and they know from

17   discovery we are continuing to obtain new materials.  It is

18   simply not called for here.

19             Unless your Honor has any other questions about the

20   bill of particulars, I can move on to the *Brady* motion.

21             THE COURT:  Go ahead.

22             MR. SOBELMAN:  Your Honor is absolutely correct that

23   we have no duty to identify specific materials and I really

24   don't think the defense or the Court really wants that to be

25   our job.  We are not an adjunct of the defense.

L7n2ShaA kjc

1          Every Court of Appeals, about half of them have

2     considered a request like this, and I can give the citations to

3     your Honor.  We cited the most recent one, which is the Fourth

4     Circuit, the *Yi* case, in our brief, but there are another five

5     circuits or so that have considered this, and they have all

6     rejected it.

7          It is not the duty of the government to try to figure

8     out, document by document or communication by communication,

9     what is potentially useful to the defense.  Our obligation is

10    to produce the materials that might be potentially useful to

11    them, not to go through and provide them a road map.  I'm not

12    even sure if anyone wants us making those judgments, because we

13    could be wrong, which is why we take an "abundance of caution"

14    approach.  We produce virtually everything that's provided to

15    us from third parties and that we obtain.

16          The only things that haven't been produced at this

17    point are some, but not all, witness statements.  As defense

18    counsel acknowledged, we have provided witness statements

19    and -- usually in letter form disclosing specific statements

20    that are made that we view as potentially useful or helpful to

21    the defense.  We take these obligations really seriously.

22    There is no need and really no showing that would require the

23    Court going back -- requiring us to go back and do additional

24    work.

25          That being said, we are continually reviewing and

L7n2ShaA kjc

re-reviewing the small subset of items we have not produced to

make sure we can't come up with some theory that is useful to

the defense.  And at certain points when we are reviewing, we

find things and we say, you know what, in light of what they

have said and the way the case is going, this actually might

fall into that category, and we are constantly taking the

"abundance of caution" approach.

In any event, we have proposed a mutual pretrial

disclosure schedule to the defense.  We proposed it a month

ago.

THE COURT:  I don't think I have seen that, is that

right?

MR. SOBELMAN:  No, your Honor.  It is between the

parties.  We told defense, look, let's try to agree on 3500 and

*Giglio* deadlines and other things sort of keyed off of your

Honor's motions *in limine* deadline, expert disclosures, things

like that.  We haven't heard back substantively.  They said

they got it and they would get back to us.  We haven't heard

back.  We are eager to make sure that they are comfortable with

the amount of time that we are going to give them for 3500 and

*Giglio* material.  We don't want to have a trial by surprise.

We want to make sure that, in case there were a statement in

some document that we didn't view as potentially favorable to

them, but they want to follow up on, they have the time to do

that.

L7n2ShaA kjc

1          We are not going to give 3500 the Friday before trial

2    like in *Gil*.  I think our proposal is much longer than that.  I

3    don't know exactly where we will land after they hopefully

4    respond to us, but we don't anticipate it being last minute.

5    As your Honor may remember in *Ketabchi*, I believe we produced

6    3500 about two weeks out from what ended up being the trial

7    date.  That seemed to work very well.  We may land on a date

8    even further out here or closer, depending on how the

9    discussions go.

10          And your Honor, I will just note we, as a courtesy, in

11   response to their request, produced all of the 3500 from the

12   *Ketabchi* case already --

13          THE COURT:  Yes, I saw that.

14          MR. SOBELMAN:  -- all the exhibits.  So -- and some of

15   the witnesses may overlap.  So they have the *Giglio* for those

16   particular witnesses who we may call in this case.  So they are

17   actually at a much more significant advantage than the *Ketabchi*

18   defendants were.  And as your Honor saw in that case, defense

19   counsel had no problem putting on a vigorous and able defense.

20          THE COURT:  Well, Mr. Alonso is saying that case has

21   nothing to do with this case.

22          MR. SOBELMAN:  We think he is wrong and that your

23   Honor will see that at the trial.  And we think it is evident

24   from our briefing and the indictment that that's simply not

25   true.

L7n2ShaA kjc

1          Was Ms. Shah a defendant in that case?  Of course not.

2    But it's the same theory.  It's the same group of actors.  We

3    expect some of the witnesses may overlap.  I think it will be

4    strikingly similar, that these two defendants' roles were

5    slightly different than the roles of the two defendants who

6    went to trial in *Ketabchi*.  They are much higher up on the

7    chain.

8          THE COURT:  Who is much higher up on the chain?

9          MR. SOBELMAN:  Ms. Shah and Mr. Brewster.  I am

10   referring to the defendants represented here today.  And

11   Mr. Allen.  All three defendants we expect to go to trial are

12   much higher up on the chain than Mr. Owimrin, O-W-I-M-R-I-N, or

13   Mr. Shahram, S-H-A-H-R-A-M, or Ketabchi were.

14         THE COURT:  You misspelled Shahram.

15         MR. SOBELMAN:  Sorry.  I'm doing it on the fly.

16         THE COURT:  S-H-A-R-A-M.

17         MR. SOBELMAN:  Ms. Fletcher thinks the Court is wrong,

18   but --

19         THE COURT:  That may be, but she will keep that to

20   herself.  Go ahead.

21         MR. SOBELMAN:  She tried to.

22         THE COURT:  We will make sure the spelling is correct.

23   I don't mean to be flip.  We will make sure the spelling is

24   correct.  Proceed.

25         MR. SOBELMAN:  In any event, your Honor, one other

L7n2ShaA kjc

1    point, which is, the suggestion that people agents may have not

2    decided to -- have not interviewed, like disclose --

3            THE COURT:  What about the -- Mr. Alonso's point about

4    the 5(f) statement that requires promptly turning over *Giglio*

5    material.

6            MR. SOBELMAN:  Your Honor, I think that order, at

7    best, is ambiguous.  We read it the way we explained, which is

8    that, because of the modifier that says, for example, before a

9    plea there is no need for *Giglio* material to be produced, that

10   would be inconsistent with a reading that as soon as *Giglio*

11   material is identified it be produced.

12           But in any event, it is kind of an odd order if that

13   is what it was meant to say, and we would ask that, to the

14   extent the Court reads it that way, it be modified.  We don't

15   know what witnesses we are going to call at trial.  We have

16   some idea of who we may or may not call.  But to produce *Giglio*

17   material three months out from trial, one, it's inconsistent

18   with practice in this district; two, it's completely

19   unnecessary; and, three, we are not sure exactly what that

20   would mean.  So if that's what your Honor intended, we will do

21   our best to comply with it, but we don't think that's what the

22   Court --

23           THE COURT:  As you phrase it, material three months

24   out doesn't make sense.  You are right about that.  Although I

25   will hear from Mr. Alonso on that.

L7n2ShaA kjc

1          MR. SOBELMAN:  So, your Honor, we would propose, as

2     we have to defense counsel, that we try to reach agreement on

3     when 3500 and *Giglio* material be produced together and that

4     it be done in the same way it is done in virtually every case

5     in this district and seems to work quite well.  There is

6     nothing about this case that makes it different or special in

7     that way.

8          THE COURT:  Suppression.

9          MR. SOBELMAN:  Yes, your Honor.  I have a lot of

10    paper here, if your Honor will give me a second to get control

11    of it.

12         THE COURT:  Of course.

13         MR. SOBELMAN:  Your Honor, the key point with respect

14    to whether a hearing is appropriate is that the defendant's

15    state of mind does not become relevant unless and until the

16    defense makes a showing that there was some mental or physical

17    coercion by the police.  And the case --

18         THE COURT:  That argument is a bit sideways, but

19    that's really what the argument is.  The argument is because

20    Mr. Alonso's papers focus on the word "just" from Bastos, that

21    is, she was being coerced into responding because he said "we

22    just want to talk to you."  I happen to think that's freighting

23    that word with too much significance, but it would be helpful

24    to get a better sense of it if I hear the people.

25         MR. SOBELMAN:  Your Honor, I take your point, but even

L7n2ShaA kjc

1    if -- you know, it's not about the agents' intent.  It is about

2    what happened.  So the fact --

3            THE COURT:  No.  They are arguing that the word

4    "just" --

5            MR. SOBELMAN:  I understand.

6            THE COURT:  -- was misleading and coercive in a way.

7            MR. SOBELMAN:  Your Honor, but I think in light of the

8    rest of the facts, so the fact that before she -- before

9    Detective Bastos supposedly said that, he told -- he and the

10   other agents told the defendant -- and this is crediting her

11   version of the fact -- that she was under arrest, she was

12   placed in handcuffs, they then again, during the interrogation,

13   remind her that she is under arrest.  She is handcuffed the

14   entire time.  It's incredibly clear to any person what is going

15   on.  And there is no case where a Court has ordered a hearing

16   or suppressed statements off of something so benign.

17           And even crediting the defendant's statements in her

18   declaration, in light of the waiver -- and I'm not sure if your

19   Honor has listened to the audio of the interview, but it is

20   crystal clear that she is not being coerced -- in light of the

21   tone, the demeanor, the way in which they carefully go through

22   each of the items in the *Miranda* waiver; and the government's

23   view -- and I don't think this is a close call -- is that even

24   crediting that he said at some point, you know, look, trying to

25   calm her, it seems, you know, Ms. Shah, we just want to talk to

L7n2ShaA kjc

1    you, we just want to make sure you are okay, that is in no way

2    misleading.

3         This case is very much like *Colorado v. Spring*, where

4    the allegation was, well, the defendants misled them by not --

5    sorry, the agents misled the defendant by not saying, at the

6    outset of the conversation, this is what you are charged with,

7    and that is the same thing that happened here.  There is

8    nothing that the agents would say at a hearing that would

9    modify what the word "just" meant, if we are crediting, for the

10   purposes of the Court being able to dispose of this motion,

11   that Detective Bastos said that.

12        But even if you credit that, it's just simply not

13   misleading under the cases that apply to situations like this.

14   So you don't get to the defendant's state of mind, because

15   there simply is no coercion.  I suppose if your Honor thought

16   that saying some calming words like that was potentially

17   coercive, I mean, rose to the level of police coercion, a

18   hearing would be appropriate.  But it just simply isn't as a

19   matter of law.  It is not -- there is no factual dispute.  We

20   are crediting everything the defendant has said in her

21   declaration for the purposes of this motion.  But under the

22   prevailing and applicable and controlling law, it just doesn't

23   get defendant where she is trying to go.

24        THE COURT:  All right.  I understand your point.

25        I think that does it.  Is there anything else?

L7n2ShaA kjc

1          MR. SOBELMAN:  Let's see, your Honor.

2          In light of your Honor's reaction with respect to the

3     grand jury minutes argument, I am happy to not address it, but

4     if your Honor would like me to, I will.

5          THE COURT:  Briefly, go ahead.

6          MR. SOBELMAN:  Okay, your Honor.  The --

7          THE COURT:  I do think you have, by far, the better

8     part of the argument, but let me hear it.

9          MR. SOBELMAN:  We strongly agree.  The quibbling about

10    the definition of "operate" I think is emblematic of the

11    defendant's argument here.  We have one dictionary that has one

12    definition.  They say, no, please adopt a different definition.

13    Just as in the *Franks* territory, this would make it entirely

14    outside of what *Franks* would cover.  If a word -- if we are

15    arguing over the definition of a word, it by definition could

16    not have been, you know, intentionally misleading to the point

17    where the suppression of a motion -- suppression of a search

18    warrant or the inspection of grand jury minutes could possibly

19    be warranted.

20         And most of what Mr. Alonso's argument on the grand

21    jury minutes was, was his defense or his client's defense,

22    which is, we think the defense will put on a trial, and we are

23    prepared to engage with that defense, which is, well, there are

24    other facts from other people at other times that might cast

25    doubt on the government's theory.

L7n2ShaA kjc

1        And the thing he relied most on was the testimonial,

2    which of course the government didn't have at the time of the

3    grand jury presentation, and Mr. Alonso well knows that.  We

4    just got it recently and promptly produced it to him.

5        But at the end of the day, his disagreement with you

6    know, what "made money" might mean or what "operate" means

7    takes this well out of the types of circumstances where an

8    inspection of the grand jury minutes might be appropriate.

9        THE COURT:  You are right on that.

10        MR. SOBELMAN:  Your Honor, I think that's all the

11    motions.  I'm obviously happy to answer any questions the Court

12    may have.

13        THE COURT:  Thank you.

14        Mr. Alonso, did you want to briefly reply?

15        MR. ALONSO:  Briefly, your Honor, just on a couple of

16    things.

17        It sounds like the government agrees that we are going

18    to trial, which means that the *Giglio* order is operative now.

19    Right?  I mean, the statement that they are not required to

20    produce *Giglio* before a guilty plea is an unremarkable

21    recitation of Supreme Court law.  So, we are going to trial, so

22    we do urge the Court to hold them to that.  And, again, yeah,

23    if they don't know they are going to call somebody, we are not

24    unreasonable here.  We really -- we understand.  But there is

25    *Giglio* material they know about today that we should have.

L7n2ShaA kjc

1          I remembered the fifth piece, by the way, which I

2     think is pretty important here on what we are asking for for

3     the bill of particulars.  There were seven in my opening

4     papers, five in the reply.  The fifth is the nature of the

5     business services that they are claiming that Ms. Shah was

6     responsible for selling or foisting on the so-called

7     unsuspecting purchasers.

8          The reason that's important is because the

9     indictment -- the superseding indictment only mentions web

10    services, tax preparation services, and coaching, and generally

11    business services.  But if we are supposed to use *Ketabchi* as a

12    road map, I read their summation in *Ketabchi*, and we have got

13    corporate credit, Youngevity, merchant terminal, tax prep,

14    coaching services, corporate LLC, front-end web services,

15    merchant account set-up services.  You get the point.  The idea

16    is, we should at least know what theory we are supposed to be

17    defending against.  What is it they are saying that her

18    conspiracy was selling to these purchasers?  So that was the

19    fifth piece, your Honor.

20         So on *Bortnovsky*, you know, I don't see how you

21    distinguish that case in the picky way that the government

22    suggested.  There, there was a series of burglaries and only

23    some of them were operative.  Here I think I heard Mr. Swett

24    say that all or most --

25         THE COURT:  Mr. Sobelman.

L7n2ShaA kjc

1          MR. ALONSO:  I'm sorry.  Mr. Sobelman.  My apologies.

2          THE COURT:  Mr. Swett --

3          MR. ALONSO:  I think I heard him say -- I'm sorry,

4   Judge?

5          THE COURT:  Mr. Swett has not said anything today.

6          MR. ALONSO:  My apologies.

7          I think I heard Mr. Sobelman say that all or most of

8   the conduct alleged here is unlawful.  Well, I think we need to

9   know whether it is all or most, and if it is most, which is it?

10  Well, because --

11         THE COURT:  Why is that?

12         MR. ALONSO:  Because, Judge, if you saw --

13         THE COURT:  Whoa, whoa.  Why is that?

14         MR. ALONSO:  Because if you saw the millions of pages

15  that we have to look at, what is -- what does it mean to defend

16  against this case?  We could easily be trying two different

17  cases.  There could easily be ten conspiracies lurking within

18  these papers.  So if they are saying everything is -- so

19  everything now is unlawful.  "Unlawful" is the wrong word since

20  we have an entire FTC regime here.  But everything is criminal

21  I understood him to be saying.  Then, okay, so are we then

22  allowed to -- what happens if we prove that 100 of the

23  purchasers were perfectly satisfied or that Ms. Shah had

24  nothing to do with certain leads?  I just don't know what I am

25  supposed to -- like I said, boxing with ghosts.  What am I

L7n2ShaA kjc

supposed to defend against?  That's the idea here.  So if it is

literally everything, I can't imagine it's literally

everything, and I will add, and this goes to the point where --

THE COURT:  I think that was their argument in

*Ketabchi*.

MR. ALONSO:  Perhaps, and it's also what they said in

response to Brewster's motion.  But that's not what they said

in response to Ms. Shah's motion either in writing or here

orally.

So -- just give me one second, please.

Intent to harm, Judge, that's Second Circuit case law.

Right?  That's the *D'Amato* case, where a mail fraud conviction

was versed.  Intent to harm comes from *D'Amato*.  The Second

Circuit considered *en banc* in *Rybicki*, which I also argued for

the United States, and Judge Raggi, in her concurrence, was

clear that that is what it requires.

So intent to harm is a different way to say intent to

defraud.  I'm not saying it is a new standard.  It's a

different way to say intent to defraud.

On materiality, I -- honestly I don't -- I don't

understand their argument that *Klein* controls here, Judge, for

a couple of reasons.  It was based on plain error, so the only

holding there is that it was not plain error, you know, for the

district court to do what it had done.  The statement "no

error" is clearly *dicta*, because it was an unpreserved

L7n2ShaA kjc

argument that was raised for the first time on appeal.  And as
I pointed out, because it was plain error, it is a very short
discussion.

          This case presents a great opportunity for your Honor
to really look at this issue.  There is lots of case law that
the Second Circuit in *Klein* did not address about having to --
about having to literally state *in haec verba* the implied
elements of particular crimes.  That is *Pirro*, that's other
cases, and the Second Circuit didn't even cover it.  The Second
Circuit seemed to say in that case, on plain error review, that
of course materiality is part of fraud because that's just --
fraud is materiality.  And again, if that were the case, we
would have never needed the *Neder* case.  Right?  *Neder* wouldn't
have been necessary in the first place.  The question presented
to the Supreme Court there is, is materiality an element of
mail fraud, wire fraud, or bank fraud.

          On the *Miranda* question, I think your Honor is --
based on your questions, I think you are hopefully leaning
towards a suppression hearing.

          THE COURT:  Yes, but I actually try to listen intently
to counsel --

          MR. ALONSO:  No, no.

          THE COURT:  -- and what Mr. Sobelman's argument was,
an hour and 20 minute long tape combined with your client's
affidavit showed that there is no issue but that there was no

L7n2ShaA kjc

1    coercion or misleading.

2         MR. ALONSO:  The citation to the recording would be an

3    excellent argument if we were arguing that the statement was

4    coerced.  That's not what we are arguing.  We are arguing that

5    the *Miranda* waiver was coerced.  Right?  It's a different

6    argument.  The statement itself flowed from the *Miranda* waiver,

7    and everything we know about the statement comes from

8    Ms. Shah's declaration.  So the fact is that the --

9         THE COURT:  But then that goes back to what I was

10   saying, that you are putting 100 percent, 90 percent of your

11   reliance on the word "just."

12        MR. ALONSO:  No, your Honor.  Mr. Sobelman

13   specifically said that nothing the agent said was misleading.

14   They specifically wrote in their complaint that the agent

15   didn't say anything that was incorrect in response to her

16   questions.  What they wrote is exactly the opposite of what is

17   in Ms. Shah's affidavit.  She is asking questions, and she is

18   asking lots of questions because -- she is asking, Am I under

19   arrest?  What is this about?  Am I going to jail?  To her --

20   she is less sophisticated, she is not a lawyer, she is not an

21   agent -- "am I under arrest/am I going to jail" are the same

22   thing.  She is asking those questions.  Right?  Clearly he was

23   trying to mislead her, because what he wants is to get her

24   sitting down and answering questions.  And she wants --

25        THE COURT:  I'm sorry.  Go ahead.  She wants?

L7n2ShaA kjc

1          MR. ALONSO:  She wants to know what's going on, and he

2     is simply lying to her, saying that he wants to make sure she

3     is okay.  Remember it's not just -- it's not just "just."  It

4     is also "just want to make sure you are okay."  Remember that

5     she is the beneficiary of an order of protection from a

6     New York judge, and this is a New York Police Department

7     detective saying he wants to make sure she is okay.  This cries

8     out for a hearing your Honor.  What she is saying uncontested,

9     unrebutted --

10          THE COURT:  She never even mentioned she disavows

11     knowing the guy.  It's apparently it is not as if she is really

12     concerned about the --

13          MR. ALONSO:  Well --

14          THE COURT:  -- person who is mentioned in the order.

15          MR. ALONSO:  All we have is her sworn statement

16     that --

17          THE COURT:  And in fact, according to the government,

18     it is the very end of the interview.

19          MR. ALONSO:  So this man had a temporary order of

20     protection against him.  He traveled to Utah, beat her up, was

21     convicted -- very rare in New York County -- convicted of

22     felony criminal contempt, and there is a five-year order of

23     protection in her favor that expires in 2026.

24          THE COURT:  No, but the government's point is if it

25     really were bothering her, she certainly would have said that

L7n2ShaA kjc

1   during the interview.

2            MR. ALONSO:  Perhaps, your Honor, but when we are

3   talking about these kind of situations, you know, women don't

4   necessarily always jump up, particularly when they are

5   handcuffed to a chair.  This is not a friendly conversation,

6   right?  Listen, as I signaled to your Honor --

7            THE COURT:  We don't have to argue it now, I don't

8   think, but that cuts against your argument if particularly she

9   is handcuffed to a chair, then she certainly knew it was not

10  just a discussion.

11           MR. ALONSO:  She is unsophisticated, your Honor.

12  This is not somebody -- whatever mastermind they want to say

13  she is, she is not.  She is not a sophisticated person.  All

14  she wanted to know -- she didn't know if her husband was okay.

15  She did know if the New York Police Department detective had

16  something to do with this horrible person who beat her up,

17  who -- if you saw --

18           THE COURT:  All right.  I understand the argument.

19  Let me think about that hearing point.

20           MR. ALONSO:  All right.

21           THE COURT:  I want to get into Mr. Poscablo.

22           MR. ALONSO:  The only last piece I will refer to is

23  on the discovery piece.  I don't know -- I'm not going to say

24  it's a disingenuous point, but the idea that they don't have

25  access to the third-party database strikes me as odd, as I

L7n2ShaA kjc

1    assume --

2              THE COURT:  They don't have access to Casepoint.  It's

3    paid for by the defendant.

4              MR. ALONSO:  Okay.  But it's not hard to get those

5    kind of databases.  They are ubiquitous in this world.  To have

6    a relatively --

7              THE COURT:  That I can't say.  That I don't know.  I

8    have the representation of Mr. Sobelman.  That's all I can go

9    on.

10             MR. ALONSO:  But it might be a good argument if they

11   were an ordinary litigant receiving discovery, but they have

12   been investigating this case for five years.  These documents

13   came in bit by bit.  Presumably the agents looked at them when

14   they came in --

15             THE COURT:  That doesn't mean they have a manipulable

16   database.

17             MR. ALONSO:  Right, but --

18             THE COURT:  I don't know whether they do or not.  I

19   have Mr. Sobelman's statement.

20             MR. ALONSO:  But they don't have to have a manipulable

21   database.  They have to question the agents to find out what is

22   out there that's favorable to the defense.

23             THE COURT:  Okay.

24             MR. ALONSO:  Thank you.

25             THE COURT:  All right.

L7n2ShaA kjc

1          MR. SOBELMAN:  Your Honor, before we turn to

2     Mr. Brewster, may I respond on the hearing issue?

3          THE COURT:  Yes.

4          MR. SOBELMAN:  Your Honor, just three very brief

5     points.

6          First of all, the defendant was told, even under her

7     version of the facts, that she was under arrest.  They had an

8     arrest warrant for her and placed her in handcuffs.  There was

9     no even arguable misleading about what was going on.  That is

10    her version of the facts.

11         I just want to underscore that, under Mitchell which

12    we cite in our brief, a Second Circuit case from 1992, agents

13    not answering questions is, as a matter of law, not

14    misleading.  So if the argument is she was asking questions

15    that they were not answering, that is not something that cuts

16    in her favor here.

17         And then the third and final point is, I just want to

18    reiterate, under *Salameh*, which is a Second Circuit case from

19    1988, the Court cannot inquire into her state of mind, which is

20    the most Mr. Alonso is talking about, unless and until it finds

21    police coercion.  So the order of protection, what might been

22    in her head about that or not, even if you credit her affidavit

23    on that, we don't get there because there is no coercion.

24    There is no misleading.  So he is trying to conflate the

25    inquiry to make it seem like a hearing is necessary to hearing

L7n2ShaA kjc

1   from her or from an agent, but that's just not the case.

2           THE COURT:  I don't know that we are going to hear

3   from her.  Presumably you would put the agent on.

4           MR. SOBELMAN:  If your Honor thought that it was

5   necessary.  But we don't get to the part of the inquiry the

6   defendant is focused on because even under the facts as she

7   alleged them, there is no police coercion.  It's not coercion

8   to not answer a question.  That's *Mitchell*.  It's not coercion

9   to be nice to someone and say, look, we just want to talk to

10  you.  It's going to be okay.  It's not coercion to tell

11  someone truthfully that they are under arrest and handcuff

12  them.

13          And if your Honor listens to the audio recording, you

14  hear that for several minutes where the *Miranda* warnings are

15  given very simply.  Some of them are repeated when she seems

16  not to understand them or not to hear them, out of an abundance

17  of caution.  She executes the *Miranda* form.  She is given an

18  opportunity to fix her contact.  The agents could not have been

19  more accommodating in that part of the interview.  And the

20  descriptions by defense counsel in their brief -- are there a

21  few minutes later in the interview that get heated?  Yes.  They

22  have nothing to do with the voluntary *Miranda* waiver.  That

23  happened an hour earlier.  So there is really nothing for the

24  Court to inquire into here.

25          THE COURT:  I understand your point.

L7n2ShaA kjc

1          MR. SOBELMAN:  Thank you, your Honor.

2          THE COURT:  Let's go to Mr. Poscablo.  And let me try

3    to get control of my paper here.  Just a moment.

4          Yes.  On behalf of Mr. Brewster, Mr. Poscablo.

5          MR. POSCABLO:  May it please the Court:  Good

6    afternoon, your Honor, or is it still good morning?  Nice to

7    see you.

8          THE COURT:  It's exactly noon.  Proceed.

9          MR. POSCABLO:  Judge, as the Court is aware,

10   Mr. Brewster filed an omnibus motion seeking to suppress

11   evidence, including evidence seized pursuant to a search

12   warrant, the suppression of certain unsupervised audio

13   recordings made by the failed cooperator Ryan Hult, and a

14   motion for bill of particulars.  In our motion we also discuss

15   *Brady*, *Giglio*, and the Jencks Act material.  But if I could

16   just start there very quickly, your Honor, I think that the

17   Court, and the government agrees, that the Court should enter

18   a Rule 5 order with regards to Mr. Brewster.

19         THE COURT:  Haven't I gone done that already?

20         MR. POSCABLO:  I'm not sure that you did.  I can

21   confer with the government, but I don't think so with regards

22   to Mr. Brewster.

23         THE COURT:  We will do that immediately if we haven't.

24   I will check ECF.

25         MR. POSCABLO:  Thank you, your Honor.

L7n2ShaA kjc

1           I just want to address a couple of things that Mr.

2    Sobelman said.

3           THE COURT:  Just a moment.

4           (Pause)

5           THE COURT:  Proceed.

6           MR. POSCABLO:  Judge, Mr. Sobelman, just to clarify

7    and educate a little bit with regards to Casepoint, Casepoint

8    is not as manipulable as Mr. Sobelman says, in particular

9    because thousands of pages of documents that were inserted into

10   Casepoint are photographs.  There are literally photographs of

11   documents, which renders them unsearchable, and that's a

12   problem.

13          And the other thing that Mr. Sobelman mentioned is

14   that the government produced all of the Jencks Act material

15   from the prior trial, from the *Ketabchi* trial, 117 total

16   witnesses they produced, which I don't think they called all

17   those witnesses at trial, but they produced them.  Those are

18   also --

19          THE COURT:  When you say they produced them, they

20   produced the materials concerning, is that what you mean?

21          MR. POSCABLO:  That's right, your Honor.

22          Also unsearchable.  A lot of them are handwritten

23   notes.  So literally the defense will have to go through

24   thousands -- hundreds or thousands of pages in order to do so.

25   We have started that, and I will -- I can represent to your

L7n2ShaA kjc

1    Honor that Mr. Brewster's name can't be found in the batches

2    that I have looked at.

3         They have also said, well, look, we have a transcript

4    from the *Ketabchi* trial.  Mr. Brewster's name did not appear in

5    that transcript.

6         They also said, well, you have all the discovery from

7    the *Ketabchi* trial.  I did a -- I was able to run a search.

8    Mr. Brewster's name did not appear in that discovery.  So I

9    guess my point, though, is that they have buried the defense in

10   mountains upon mountains of documents and they continue to do

11   so.  They did so last night.  They produced another --

12        THE COURT:  Just let me stop you.  I am trying to

13   understand it.

14        MR. POSCABLO:  Yeah.

15        THE COURT:  Doesn't what you have just told me show

16   the ease of your excluding significant swaths of the material

17   that has been given to you?

18        MR. POSCABLO:  With regard to all the things in

19   *Ketabchi*, the documents that they produced and the trial

20   transcript, yes.  With regards to everything else, no.  And

21   part of the reason for that is, as Mr. Alonso alluded to -- it

22   is unclear what the claims are as against Mr. Brewster.

23        (Audio feedback)

24        THE COURT:  We can't shut the system down because the

25   listen only mode would be disconnected.  We are calling the IT

L7n2ShaA kjc

1    people.

2              (Pause)

3              THE COURT:  I'm going to step off the bench and

4    anyone who wants to leave the courtroom, stay outside.  I don't

5    want people to be subjected to this noise.  We will have IT

6    come up.

7              THE DEPUTY CLERK:  All rise.

8              (Recess)

9              THE COURT:  The problem seems to be taken care of.

10   You may be seated.

11             Mr. Poscablo, you may continue.

12             MR. POSCABLO:  Thank you, your Honor.

13             Judge, I was thinking, is there a particular area you

14   would like me to start with or a particular area you would like

15   me to address?

16             THE COURT:  Why don't you start with the bill of

17   particulars.

18             MR. POSCABLO:  Okay.  That makes sense, your Honor.

19             I don't want to belabor the points that have been

20   made, because I think Mr. Alonso's argument was precise.  Even

21   though we are talking about two different charging instruments

22   here, the same principle applies.  And what I had said to the

23   Court before is that millions of pages of documents have been

24   produced, and I think one of the points Mr. Alonso pointed out

25   is, even within one document, that document can have a

L7n2ShaA kjc

1    thousand pages that needs to be reviewed, and the problem that

2    we are facing, even though, you know, we do have access to

3    this Casepoint database, is they are not searchable and the

4    handwritten notes, the photographs, you can't just rely on the

5    searches, so you have to do a document-by-document review.

6            One of the things that Mr. Sobelman said struck me,

7    when he said that this isn't about a transaction, this isn't a

8    specific transaction case, but it is, Judge.  It is about a

9    hundred transactions, according to the government.  There are

10   about a hundred transactions with a hundred victims.

11           THE COURT:  Ms. Blakely, have somebody come up here

12   and stay here.

13           (Pause)

14           THE COURT:  The system is off.  Speak loudly.

15           MR. POSCABLO:  Judge, this is, in fact, about a

16   hundred victims.  It is about a hundred different contracts

17   with a hundred different individuals who purchased services,

18   and as a result I think what's going on here is the government,

19   who has been investigating this case for over five years, they

20   know exactly or at least they say that they know exactly what

21   this case is about, but they don't want to tell us what it is.

22   They don't want to identify for us, you know, well, which

23   transactions are you talking about?  Which sales floors are you

24   talking about?  Which telemarketing floors are you talking

25   about?  Because they want to preserve their ability to charge

L7n2ShaA kjc

1    a lot of different things and prove a lot of different things

2    at trial.  And that makes it impossible to mount the defense.

3           If I have to argue why Joey Minetto's client that my

4    client didn't service, doesn't have a contract with, and didn't

5    in 2012 --

6           MR. SOBELMAN:  Your Honor, I hate to interrupt, but we

7    are told by individuals on the audio line that now they cannot

8    hear.  If your Honor would like to proceed, we would have no

9    objection, but -- oh, I'm sorry, but Mr. Brewster is on the

10   line.

11          THE COURT:  All right.  Let's get the IT people here.

12   Just stay in place.

13          (Pause)

14          MR. SOBELMAN:  Your Honor, we are told it may be back

15   on.

16          THE DEPUTY CLERK:  It should be on.  I have 11 people

17   showing.

18          THE COURT:  Okay.  Let's proceed.  Let's do two

19   tracks.  Let's proceed, and let's have somebody from IT come

20   up.

21          MR. POSCABLO:  I will try not to yell, then, Judge.

22          You know, the United States Supreme Court in *Dennis v.*

23   *United States* said that in a conspiracy case, particularly one

24   that was charged as broadly as this one, spanning a long time,

25   across multiple jurisdictions, and involving a lot of people,

L7n2ShaA kjc

1   poses a significant risk of wrongful attribution of

2   responsibility to one or more of the multiple defendants.

3          (Audio feedback)

4          THE COURT:  Let's wait.

5          (Pause)

6          THE COURT:  I am going to step off.  When the person

7   comes up, Ms. Blakely, I want him to remain here for the rest

8   of the argument.

9          THE DEPUTY CLERK:  Okay.

10          (Recess)

11          THE COURT:  All right.  Proceed.

12          MR. POSCABLO:  All right, Judge.  Third time's the

13   charm.  Fingers crossed.

14          Your Honor, we were talking about the bill of

15   particulars before we had to take a break.  I said to the

16   Court, we make this motion because, in a conspiracy case, such

17   as this one, particularly one that is charged as broadly as

18   this one, over the course of many years, multiple

19   jurisdictions, and involving a lot of named and unnamed people,

20   it poses a significant risk of wrongful attribution of

21   responsibility to one or more of the multiple defendants, and

22   that's the Supreme Court's statement in *Dennis v. United*

23   *States*.

24          And that's one of the main reasons why we ask for a

25   bill of particulars in this case.  Because, as Mr. Alonso

L7n2ShaA kjc

1   pointed out, this is a multiyear conspiracy.  I think that the

2   one they charged for Mr. Brewster is a seven-year conspiracy

3   involving ten defendants that the government stated is the

4   same exact conspiracy as the one charged in *Ketabchi*, which I

5   agree with along with Mr. Alonso.

6           Now, in response to my motion, the government argued

7   that they provided extensive detail through their discovery,

8   the mountains of documents that they produced, including

9   affidavits, and they pointed to the trial transcript.

10          THE COURT:  Just a moment.

11          (Pause)

12          THE COURT:  Apparently the listen-only mode people

13  were disconnected, so we are going to try to establish,

14  reestablish that.  Just wait to see if we can do it.  It is

15  unfortunate, but we are doing what we can.  There is no -- this

16  is legal argument, this whole hearing is legal argument, so

17  there is no actual right of a defendant to be present of

18  course.

19          (Pause)

20          THE COURT:  Of course I do want every defendant who

21  wants to be here to be able to be here, either listening in or

22  physically present, but we are going to proceed regardless.

23          I think we have reestablished that listen-only mode

24  call.  Go ahead, sir.

25          MR. POSCABLO:  Thank you, your Honor.  Before the

L7n2ShaA kjc

1   technical difficulties, we were speaking with the Court about

2   the bill of particulars motion that Mr. Brewster filed, and I

3   echo in many of the argument -- I echo many --

4           THE COURT:  What is it that you want in the bill of

5   particulars?  I'm going to ask Mr. Alonso the same thing,

6   because Mr. Alonso, I think, was a little hard to follow

7   exactly what areas he wanted.

8           What are the areas that you want, and I also -- well,

9   go ahead.  Let's start with that.

10          MR. POSCABLO:  Well, Judge, I actually, you know,

11  reviewed Mr. Alonso's brief on behalf of his client, Ms. Shah,

12  and I think that the way that he outlined it is exactly right.

13          THE COURT:  All right.  Mr. Alonso, what are the now

14  current areas that you want?  You were talking about how you

15  wanted a particular area.  Go ahead, Mr. Alonso.

16          MR. ALONSO:  They are --

17          THE COURT:  One, two, three.

18          MR. ALONSO:  One, purchasers, victims; two,

19  conspirators; three, the precise business services that they

20  are talking about; four, sales floors --

21          THE COURT:  Just a moment.  Yeah.

22          MR. ALONSO:  -- and, five, money laundering activities

23  under Count Two.  Count Two is a similarly broad eight-year

24  conspiracy.

25          THE COURT:  When you say money laundering activities,

L7n2ShaA kjc

1    what are you asking for?

2           MR. ALONSO:  I'm asking for whatever it is they mean

3    by money laundering activities.  The Count Two is similarly

4    vague, as Count One, so it talks about --

5           THE COURT:  All right.  Victims, conspirators,

6    business services, sales floors, money laundering activities.

7    Thank you.

8           Mr. Poscablo.

9           MR. POSCABLO:  Judge, can I just add to that, because

10   I think Mr. Alonso's initially had two more, which is, the

11   fulfillment companies, and when he said business services, he

12   also, I think, in his brief wrote coaching, coaching services;

13   and, lastly, time frame, your Honor.

14          THE COURT:  The time frame in the indictment.

15          MR. POSCABLO:  Well, Judge, that may be correct that

16   they charge a seven-year time frame, but if you look at the

17   specific affidavits in particular -- we will go over one

18   today, the one affidavit that relies on Ryan Hult -- we are

19   talking about a six-month period of time from 2018 to 2019.

20   What I am trying to understand from the government is are they

21   saying that Mr. Brewster -- when did Mr. Brewster purportedly

22   enter this conspiracy?  It's not clear from the indictment, and

23   so I would like to know that.

24          THE COURT:  All right.  Go ahead.

25          MR. POSCABLO:  That is really it for the bill of

L7n2ShaA kjc

1    particulars, your Honor.

2              If there are other things that you want to ask --

3              THE COURT:  Let me ask the government, with those

4    items in mind, government, those seven items in mind, how has

5    your production been organized in a way that that information

6    can or cannot be obtained by the defense?

7              MR. SOBELMAN:  I'm happy to go through them

8    individually, your Honor.

9              THE COURT:  Go ahead.

10             MR. SOBELMAN:  With respect to victims, our production

11   has sales records, e-mails with particular victims,

12   communications with particular victims.

13             THE COURT:  How do they know who the victims are?  To

14   what extent can they determine from your production who the

15   victims are?

16             MR. SOBELMAN:  Those are the victims, your Honor.

17             THE COURT:  Who are?

18             MR. SOBELMAN:  The people --

19             THE COURT:  Who are the victims?

20             MR. SOBELMAN:  The people to whom sales were made.  I

21   mean, that is the universe of victims that we are talking

22   about.  There was no victim that we are going to put forth at

23   trial for whom we do not have some type of record --

24             THE COURT:  Is that hundreds of people?  Thousands of

25   people?  It's hundreds of people.

L7n2ShaA kjc

1          MR. SOBELMAN:  Probably thousands, your Honor.

2          THE COURT:  All right.  How are they to make sense of

3    that?

4          MR. SOBELMAN:  The same way that defendants make sense

5    of it in any large-scale fraud case.  There are no cases, your

6    Honor, with thousands of victims where the Court has ordered

7    that we enumerate each one.  It's not practical.  It's a

8    conspiracy case, where we are seeking to prove an agreement.

9          THE COURT:  How do the defendants -- I take it you are

10   not producing, or are you, producing files to them under the

11   category of victims?

12         MR. SOBELMAN:  May I just talk to Ms. Fletcher for a

13   moment?

14         THE COURT:  Yes, of course.

15         MR. POSCABLO:  They have not, Judge.

16         (Counsel confer)

17         MR. SOBELMAN:  Your Honor, there are a few categories

18   of documents that --

19         THE COURT:  Talk to Ms. Fletcher or anyone you need

20   to.  My questions are, how is your production organized such

21   that this information, each of those seven categories, can be

22   obtained by the defense?  So talk to her.  Ms. Fletcher, you

23   certainly can speak, if you are the expert on this.  It makes

24   no difference to me.

25         MR. SOBELMAN:  Your Honor, I just want to make one

L7n2ShaA kjc

1    point, which I am happy to circle back to more substantively,

2    which is, under the law, the defendants are not entitled to

3    any of these things.  So to the extent your Honor is

4    considering ordering us to give them some of these things, I

5    just want the opportunity to go back and point you to some

6    cases that show that they are not entitled to them.

7              THE COURT:  Okay.

8              MR. SOBELMAN:  I understand your Honor asking a

9    practical question, and I am happy to answer it.

10             THE COURT:  Yes.

11             MR. SOBELMAN:  Our --

12             THE COURT:  That can perhaps obviate the case

13   analysis --

14             MR. SOBELMAN:  Understood, your Honor.

15             THE COURT:  -- but in the interest of having this

16   October date actually go forward and getting them the

17   information.  Go ahead.

18             MR. SOBELMAN:  Yes, your Honor, and we have no

19   interest in hiding the ball and every interest in helping the

20   defense identify relevant items.

21             THE COURT:  The government is here to help them and

22   they are here to help you.  I understand.  Proceed.

23             MR. SOBELMAN:  Yes, your Honor.

24             Production is generally organized by source.  So there

25   are victim names, identifiers, documents in a variety of

L7n2ShaA kjc

different places.  One is the internal business records of the

various sales floors that have communications with them, that

have lead lists or sales lists, that have victims names and

identifying information, and the sales data associated with

those individuals.  We have --

        THE COURT:  It's your position that everything that

every sales floor -- every person that every sales floor

entered into a contract with is part of this conspiracy?

        MR. SOBELMAN:  No, your Honor.  It potentially could

be.  We have not interviewed every person listed in the

documents.  We have interviewed a lot of people, but we have

not and will not interview every single person.  It is the

same as any other, you know, large-scale conspiracy.  Our goal

and what we intend to prove at trial is that these people

agreed to commit this crime, and we will show that there were

many acts taken in furtherance of that crime, but our view, as

I said earlier, this is sort of a *Tuzman* "all or most" case,

not a "handful of discrete acts" case.  But we don't know, we

don't have documents from or interviews with every single

potential victim, same as in the *Ketabchi* case.

        But in terms of the defense being able to identify

victims, we have the internal business records, sales records,

lead lists from the sales floors and fulfillment floors and the

coaching floors.  There are documents the victims provide us

which we --

L7n2ShaA kjc

1      THE COURT:  And how are those, again, produced to the

2  defense?

3      MR. SOBELMAN:  In a few different ways.  It depends

4  where they come from.

5      So, for example, if they are from a Google share

6  drive that we obtained, they are within the Google share drive,

7  and we say Google share drive from X account.

8      If it's from the computer sales floor, they are

9  produced, when we -- if they request the contents of that

10  computer.

11      If it's from an e-mail search warrant that we did, it

12  is in the set of materials that's in that account.

13      We have not gone through, for our own purposes or for

14  the defense, and pulled out every document that lists a victim

15  on it.  There are -- it is voluminous.  But in order to -- for

16  us to try the case or for them to try the case, no one needs to

17  identify every single of the thousands of people that were

18  marketed to in the course of the scheme.  It's just not going

19  to be part of the case.  If that's something they want to do

20  and they want more time to do it, again, we have no objection

21  if they want more time to review discovery materials which are

22  substantial in this case, but this is not -- it's not like we

23  have a comprehensive list that we are sitting on and we could

24  just hand over pursuant to a Court order.  It would be --

25      MR. POSCABLO:  But they do have that, your Honor. they

L7n2ShaA kjc

1    do have that.  They know which victims that they want to put on

2    trial.

3              THE COURT:  No, but you are not entitled to your

4    witness list now.

5              MR. POSCABLO:  Understood.  But what they are

6    saying --

7              THE COURT:  You will get it, but you are not entitled

8    to it.

9              MR. POSCABLO:  That's right.

10             MR. SOBELMAN:  And, your Honor, the --

11             MR. POSCABLO:  But what they are saying --

12             THE COURT:  Let me hear Mr. Poscablo.

13             MR. POSCABLO:  What they are saying is there are

14   thousands of victims on hundreds of pages of discovery, and

15   every single one of them is a victim in this case.

16             THE COURT:  I have to do this in an orderly fashion.

17   Let Mr. Sobelman respond to those seven items.

18             MR. SOBELMAN:  Your Honor, just on this first item and

19   then I can move on, one thing that's interesting about the

20   defense argument here is, the documents I am talking about are

21   their documents.  So the defense is almost certainly in a

22   better position to know how their own clients and their

23   coconspirators saved and categorized these items.  So the most

24   compelling documents for Mr. Brewster's counsel are going to be

25   the documents that were on Mr. Brewster's computer, in his

L7n2ShaA kjc

1    e-mail, on the computers --

2              THE COURT:  But it is a conspiracy case, sir.

3              MR. SOBELMAN:  Agreed, your Honor.  I'm just saying

4    the victims that we would call for a Brewster trial are going

5    to be victims of Brewster's floor.  So the -- it's not that

6    they have to identify and look at every single victim of the

7    overall conspiracy.  There is a way for them to be targeted

8    about their review and identification of the materials and to

9    the extent they want to do their own investigation, it is not

10   boundless.

11             THE COURT:  Conspirators.

12             MR. SOBELMAN:  Yes, your Honor.

13             THE COURT:  41 names.  List.  Go ahead.

14             MR. SOBELMAN:  Yes.  We gave Ms. Shah a list of 41

15   names and entities, both individuals and entities that were

16   involved in the scheme.  As far as we are concerned, the

17   coconspirator request is just something trying to bind us.

18   They have the notice that they are entitled to.  If

19   Mr. Brewster wants a similar --

20             THE COURT:  What is the 41 -- the 41 names are those

21   who you claim are her coconspirators, correct?

22             MR. SOBELMAN:  It's individuals and entities that were

23   involved, that were in sort of her orbit of her involvement in

24   the scheme.  So we don't want to bind ourself, because our

25   investigation is ongoing and we are still beginning our

L7n2ShaA kjc

1    preparations for trial, but the coconspirators who would be

2    relevant to her trial, we believe, are on that list.

3          THE COURT:  Business services and coaching services,

4    in other words, that's Mr. Alonso's list --

5          MR. SOBELMAN:  Yes, your Honor.

6          THE COURT:  -- taken from the *Ketabchi* summation,

7    which were essentially the services that were offered by the

8    sales floors in that conspiracy.

9          MR. SOBELMAN:  Yes, your Honor.  Just on the

10   coconspirator point, we have not given a similar list to

11   Mr. Brewster.  He never -- really didn't ask for one.  If he

12   wants us to do something similar, because we haven't had the

13   kind of dialogue with him that we had with Ms. Shah's counsel,

14   we are happy to have that same dialogue with him and --

15         THE COURT:  Have the dialogue with anyone who wants a

16   dialogue.  Remember, you are the government and you are here to

17   help them.  You just told me that.

18         MR. SOBELMAN:  Yes, your Honor, but we can't answer

19   questions that are not asked of us.

20         THE COURT:  No, I understand that.  Proceed.

21         MR. SOBELMAN:  With respect to the business services,

22   they have notice.  It's in the indictment.  It's in the search

23   warrants.  We give --

24         THE COURT:  It's not in the indictment, the specific

25   services.

L7n2ShaA kjc

1          MR. SOBELMAN:  Yes, your Honor.  A number of them are

2     named.  We quote that portion of the indictment in our

3     opposition.

4          (Pause)

5          THE COURT:  I'm reading the original indictment, sir.

6     Show me.

7          MR. POSCABLO:  It's not in the indictment, Judge.

8          THE COURT:  Let him finish.

9          MR. POSCABLO:  Sorry.

10         THE COURT:  I will give you a full opportunity, sir.

11         MR. POSCABLO:  I'm sorry, your Honor.

12         MR. SOBELMAN:  Your Honor, I was looking at the

13    superseding indictment, although they sort of are --

14    essentially they are the same.

15         THE COURT:  Which one are you looking at?  S4?

16         MR. SOBELMAN:  Yes, your Honor, on page -- I believe

17    it is 3 of the indictment.  It lists examples of business

18    services as coaching sessions, tax preparation, or website

19    design services, and electronic or paper pamphlets.

20         THE COURT:  Just a moment.  I'm trying to find it.

21         MR. SOBELMAN:  Yes, your Honor.  Take your time,

22    please.

23         THE COURT:  What indictment are you on?

24         MR. SOBELMAN:  This is the S4 indictment, at page --

25         THE COURT:  S4 indictment, page 3.

L7n2ShaA kjc

1          MR. SOBELMAN:  Yes, your Honor.

2          THE COURT:  Paragraph?  I see it, paragraph 4.  Tax

3    preparation or website design services.

4          All right.  Proceed.  Go ahead.

5          MR. SOBELMAN:  There are also other lists of similar

6    services in our search warrant affidavits that provide adequate

7    notice, and we pointed to the *Ketabchi* trial record, which

8    defense counsel quoted from.  All of those are also applicable.

9    That's why we keep pointing to that record.  The only one that

10   would not come up in this trial would be Youngevity.  But the

11   rest of those are all part of the same scheme, which is why we

12   keep --

13         THE COURT:  Have you told them that?  Did you tell

14   them that?  You are the government.

15         MR. SOBELMAN:  Yes.  It's in our motion -- it's in our

16   opposition to Ms. Shah's brief, on page 30, where we said they

17   have notice of this because it's in these three places.

18         THE COURT:  All right.  Go ahead.

19         MR. SOBELMAN:  With respect to the sales floors, I

20   understand that is only -- again, that's part of the list we

21   gave Ms. Shah's counsel for her.  We are happy to give a

22   similar list to Mr. Brewster.

23         THE COURT:  Are there hundreds of sales floors?

24         MR. SOBELMAN:  No, there are not.  There certainly

25   won't be hundreds mentioned at trial.  It will be ten to 20.

L7n2ShaA kjc

1    And we are, again, happy to talk to counsel and give them a

2    list of sales floors that --

3              THE COURT:  Do that.

4              MR. SOBELMAN:  -- are in that ten to 20.

5              THE COURT:  Do that.

6              MR. SOBELMAN:  We did for Ms. Shah, and we are happy

7    to do that for Mr. Brewster.

8              THE COURT:  All right.

9              MR. SOBELMAN:  The sort of money laundering activities

10   ask, the transactions at -- you know, first of all, it's a

11   conspiracy, not any particular transaction, which is important.

12   Obviously if this were a case with a particular transaction,

13   we would identify that transaction.  It is a conspiracy.  And

14   the transactions that we would likely or potentially put

15   evidence on at trial are all within the financial records that

16   we have produced, although some of the evidence of that

17   conspiracy, maybe the majority of it, would likely be through

18   cooperator testimony that we have no obligation to disclose at

19   this time.

20             THE COURT:  Well, fulfillment company.

21             MR. SOBELMAN:  Yeah, and same thing for Brewster.  The

22   money laundering evidence is in his own bank records.  So it's

23   not as if there is something else that we are hiding the ball

24   on.  These are transactions that he engaged in.

25             THE COURT:  Fulfillment companies.

L7n2ShaA kjc

1          MR. SOBELMAN:  Your Honor --

2          THE COURT:  This is Mr. Brewster.

3          MR. SOBELMAN:  Yes.  Ms. Shah withdrew her request for

4     that because she realized they are in the list that we gave

5     her.  We are happy to do the same for Mr. Brewster and give him

6     a list of companies that we think will be relevant to his

7     trial.

8          THE COURT:  Well, why haven't you had these

9     discussions beforehand?  Do that.

10          MR. SOBELMAN:  Your Honor, he hasn't asked.

11          THE COURT:  If they haven't asked for them, you are

12     under no obligation to volunteer.  I understand that.

13          Time frame.

14          MR. SOBELMAN:  Time frame, your Honor was entirely

15     correct, which is, the time frame is listed in the indictment,

16     and there is, not to turn to a legal issue, but a ton of case

17     law on this that we have no obligation to specify precisely

18     when a defendant joined the conspiracy.  It's, frankly, not

19     even relevant to the trial.  We have to show that at some point

20     they were a member of the conspiracy.  We don't have to prove

21     and the jury will be instructed we don't have to prove that he

22     was a member at any particular point in time other than the

23     date range provided.

24          THE COURT:  All right.  Thank you.

25          Mr. Poscablo, that narrowed some of the --

L7n2ShaA kjc

1          MR. SOBELMAN:  I just want to add one thing.  That

2     being said, we are happy to talk to Mr. Poscablo and, like we

3     did in our opposition for Ms. Shah's brief, give him sort of a

4     sketch of where we understand he was -- what he was doing at

5     various points in time during the conspiracy.

6          THE COURT:  Do it.

7          MR. SOBELMAN:  We are happy to.

8          THE COURT:  All right.  Do it.

9          Mr. Poscablo, back to you, sir.

10          MR. POSCABLO:  I'm sorry for interrupting earlier,

11     your Honor.

12          THE COURT:  Go ahead.

13          MR. POSCABLO:  So --

14          THE COURT:  This has helped now definitely.  You will

15     get a list of fulfillment companies.  You will get a list of

16     sales floors.

17          Go ahead.

18          MR. POSCABLO:  And I agree with that all of that.

19          THE COURT:  You have got the coconspirators.

20          MR. POSCABLO:  The issue I still have is with the

21     victims.  And if I may explain to the Court how I believe they

22     have produced it, they have produced -- there will be a

23     document or a series of documents, a thousand pages in

24     Casepoint, and it will list in the discovery letter "Citigroup

25     bank records."  We have got to go through every single one of

L7n2ShaA kjc

1    them to see, okay, well, that is not my client's.  Oh, I think

2    that's, you know, Ketabchi's.  That's a name I don't

3    understand.  Sometimes it is redacted.  Sometimes the number is

4    redacted.  I can posit that it's a victim, but I don't know

5    that.  And if what they are saying is every person in this

6    conspiracy was a victim, then it would take us years to

7    identify them, interview them, and prepare for a trial if we

8    don't understand -- if we don't narrow the scope of who these

9    victims are.

10            THE COURT:  You are going to get the list of

11   witnesses.  You are going to get that.  You are going to get

12   the government exhibits.  You are going to get the 3500

13   material.  You are going to get the *Giglio* material.

14            MR. POSCABLO:  Then I guess we will just have to wait

15   for that, but that's really what the issue is here, Judge.

16            THE COURT:  And I want parties to be discussing a time

17   frame, because if you can't agree upon a time frame -- and

18   normally parties can for pretrial disclosures -- then I want to

19   do it, and I want to do it rather expeditiously.

20            Next.

21            MR. POSCABLO:  Judge, I know we are going to talk

22   about this later, I think, after this, but I am concerned about

23   the date of this trial and the reason is, you know, they

24   produced --

25            THE COURT:  Let's go through your motion, then we will

L7n2ShaA kjc

1    talk about the date, and then I will let everybody have lunch.

2    Go ahead.

3          MR. POSCABLO:  What would you like for me to turn to

4    next, your Honor?  Perhaps we can talk about the motion to

5    suppress evidence.

6          THE COURT:  Absolutely.  That's how you did it in your

7    brief.  Go ahead.

8          MR. POSCABLO:  Your Honor, the affidavit of Special

9    Agent Jesse Imbergamo of Homeland Security Investigations

10   contains false statements and admissions that undermine the

11   validity of the warrant.

12         THE COURT:  No, but they are so minor, as I see it,

13   from what you have.  It is the same -- in a way, the same as

14   Mr. Alonso, the word "operations," the word that you -- Money

15   Sucking Website was nefarious.  There is nothing material

16   here.  It omitted the fact that an injunction was entered

17   against one of the cooperating witnesses.  Adjectives are

18   inflammatory.  That's not the heart of the search warrant.  The

19   search warrant seems to have accurate material, at least

20   insofar as it was known.  The government in that -- it goes

21   both to the West Fourth search and East Tropicana search, at

22   least as I see it, sir.

23         MR. POSCABLO:  Judge, the criminal cause as against

24   Mr. Brewster is captured in one paragraph, paragraph 9, with

25   five subparagraphs.  And all of them rely on Ryan Hult, who is

L7n2ShaA kjc

identified in the search warrant as CW3.

Now, we know who Ryan Hult is.  Your Honor is very familiar with Ryan Hult.  He is the failed cooperator who lied to you, lied to the government, lied to his defense counsel, and committed crimes while he was a cooperating witness, and did not get a 5K from the government as a result.

THE COURT:  And what are you asking me to draw from that?

MR. POSCABLO:  I'm asking to you draw from that that the information that he provided, which the agent relied on in affecting this warrant, is false.  He said Brewster and McMurtrey operated a website.  They just know it's not true.  That is just not true.  They know it's not true.  And the way we know that is because, in subsequent situations, they have said that it's not actually operating.

You can look at the indictment, your Honor.  And let me point your Honor to the indictment in this case.  This is what they wrote about that.  "Brewster, for example" -- and I am quoting from page 3, paragraph 3 of the indictment.  This is the first indictment in this case.  "Brewster, for example, provided lead lists generated through a website referred to by Brewster and other coconspirators as the Money Sucking Website."

That is wholly different, wholly different, than what they say in order to convince this magistrate judge to grant

L7n2ShaA kjc

1    this warrant.  They say he operated it.  I'm not quibbling with

2    language here, but they didn't say that in the indictment

3    because they knew it wasn't true.  But in the search warrant

4    they did.  They made it seem like he was -- he owned it, but in

5    the indictment they didn't.  In the indictment they said he

6    sold lead lists from it.  That's what they know to be true.

7            And if you look at paragraph C, I mean, that's really

8    all we are talking about.  Paragraph E, where we are saying

9    that he operated Money Sucking Website.  If you throw that out,

10   what do you really have here?  Well, you have the consensual

11   recording, which I will -- you know, happy to discuss, but then

12   you have paragraph E that says he stopped talking to the

13   cooperator because he heard people were getting arrested.

14   Judge, he stopped talking to the cooperator because he didn't

15   want to do business with him because the cooperator kept trying

16   to induce him to say things and do things and he is like, I

17   have no reason to talk to you anymore.

18           And then in paragraph E, they say that they talked to

19   several victims of Brewster's telemarketing floor, each of whom

20   was convinced to invest in purported business services based on

21   a salesperson's false representation, a salesperson's false

22   representation.  To Mr. Alonso's point, it doesn't even say

23   that Mr. Brewster made that representation.  It says someone on

24   his -- it doesn't -- it says in fact someone else did it.  How

25   is that tied to Mr. Brewster?

1        And to that point, Judge, Mr. Alonso made a great

2   point earlier when he was talking about the language in the

3   indictment for Ms. Shah, and that was insufficient because it

4   said, if you remember, "at no point did the defendant intend

5   that the victims would actually earn any of the promised

6   return."  They don't even say that in the indictment against

7   Mr. Brewster.  All it says is, "But at no point did the victims

8   actually earn."  They didn't even say the word "intent" because

9   they can't, because they didn't.  And it's clear from this

10  search warrant that Mr. Brewster is not alleged to have said

11  anything or made any false representations to any victims.

12       So if you take away everything that Mr. Hult said, you

13  are left with a very generic explanation of what the scheme is.

14  And I offer to your Honor that that is insufficient to

15  establish probable cause, and I think a *Franks* hearing is

16  appropriate here.

17       THE COURT:  All right.  I will want Mr. Sobelman --

18  you might as well do it now, sir.

19       MR. SOBELMAN:  Yes, your Honor.

20       Defense does not come close to establishing the type

21  of showing that would be required for a *Franks* hearing.  "A

22  defendant must make a substantial ordinary showing that a

23  deliberate falsehood or statement made with reckless disregard

24  for the truth was included in the warrant affidavit and the

25  statement was necessary to the judge's finding of probable

L7n2ShaA kjc

cause."

            THE COURT:  But what Mr. Poscablo --

            MR. POSCABLO:  Your Honor --

            THE COURT:  -- wants you to do, wants me to do, is
throw out the reliance on Hult and look at what you are left
with.

            MR. SOBELMAN:  And there is literally no legal basis
to do that.  The information reported from Hult was accurately
reported by the agent, and that is the only analysis is that
the agent accurately reported the information from a third
party.  You don't then say, okay, well, maybe the third party
was wrong or the third party was lying.

            Even if Hult had lied to the agent, which he did not
do -- and Mr. Poscablo is wrong when he suggested that Hult
lied to us or to the Court.  He did violate his cooperation
agreement, as your Honor knows, by committing other crimes,
after this search warrant was sworn out, at least to the
government's knowledge at that time.  He did violate his
cooperation agreement.  He is a failed cooperator.

            THE COURT:  You are talking about the good faith of
the agent in reporting what Mr. Hult told him.  At that time he
had no reason then to think that any of this was inaccurate.
Is that your point?

            MR. SOBELMAN:  That's correct, your Honor, although
it's not a good-faith exception case, although the good-faith

L7n2ShaA kjc

exception would also apply, although the types of allegations
here don't make it directly applicable.  But the point is, the
case law is very clear that if third-party statements are being
reported in an affidavit, you look at the knowledge of the
person reporting those statements, not the underlying
statements themselves.  So there is no basis to throw out
Hult's statements at all.

          The things that might have impeached his credibility
either were not known to the government at the time, such as
his narcotics conduct, or are, as the Court already suggested,
immaterial like, the fact he might have violated an FTC order.
We disclosed in the affidavit that he had pled guilty to
multiple fraud crimes and was providing assistance in the hopes
of obtaining leniency at sentencing.  That was more than
enough.

          If your Honor looks at the *Cook* case which is SDNY
2004, and cited in our brief, "Information accurately reported
by an affiant cannot be challenged for the alleged inaccuracy
of the information provided by the third party," and that's
what the defendant is trying to do here, is reach through --

          THE COURT:  All right.  I understand that point.
Anything else?

          MR. SOBELMAN:  No, your Honor.

          THE COURT:  Okay.

          MR. POSCABLO:  But, Judge, in response to that, look

L7n2ShaA kjc

1    at what paragraph 9 says.  It doesn't say that Special Agent

2    Imbergamo spoke to CW3.  It says that "Special Agent Imbergamo

3    had conversations with other law enforcement agents and

4    reviewed law enforcement reports and learned the following."

5    Then they learned -- then she lays out what Ryan Hult falsely

6    told the government and they relied on it.  And here is my

7    argument to that.

8            They knew that paragraph B, which says that

9    Mr. Brewster owned and operated Money Sucking Website and then

10   paragraph C, where they cite a consensual recording that they

11   say Mr. Brewster says, even in that conversation, that recorded

12   conversation, your Honor, which we transcribed for the Court in

13   our declaration, Ryan Hult is talking about another person.  He

14   is talking about the actual owner of Money Sucking Website.

15   And so my point is that they want to say that Ryan Hult lied to

16   them and told them, oh, Money Sucking Website was owned by

17   Cameron Brewster and that's how they got probable cause, but

18   now they want to say, well, we didn't know that he was lying,

19   but they did.

20           THE COURT:  I understand the point.  Let's go on.

21           MR. POSCABLO:  I think I can move on --

22           THE COURT:  Suppression of the Hult calls.

23           MR. POSCABLO:  Yes, your Honor.  I don't need to go

24   into an explanation of who Ryan Hult is, but I will tell this

25   to the Court.  It appears that -- I listened to all those

L7n2ShaA kjc

calls, and I think -- and, again, the government produced, I

think, over 40 hours worth of calls.  I mean, last night the

government produced a chart, it is four pages long, of all the

calls Mr. Hult made and recorded in this case.  I can represent

to the Court that the calls I listened to for Mr. Brewster

didn't have a preamble, "this is special agent so-and-so, this

is July 1, 2021."

            THE COURT:  So?

            MR. POSCABLO:  So the point is that Mr. Hult was

running rampant making these calls.  There is no indicia of

reliability as to when the calls were made.  What was he

recording?  When was he recording them?

            THE COURT:  Where do you find the obligation for the

government to turn that over?  You can attack the calls if you

think they are not reliable.  Where in the law is there an

obligation for them to tell you that?

            MR. POSCABLO:  I can, and you are right, Judge.  Here

is my argument.  My argument is this:  The government says that

he made all these calls under the color of law enforcement

authority.  Okay?  But there is no --

            THE COURT:  Battle it out at trial.

            MR. POSCABLO:  There is no indication of that here.

            THE COURT:  Battle it out at trial.  That's a good

argument.  Make it to a jury.

            MR. POSCABLO:  They produced no discovery about it.

L7n2ShaA kjc

| | |
|---|---|
| 1 | THE COURT:  I don't think that changes my comment. |
| 2 | MR. POSCABLO:  Okay. |
| 3 | THE COURT:  All right.  Move on. |
| 4 | MR. POSCABLO:  Judge, like Mr. Alonso said, I'm not |
| 5 | asking -- |

THE COURT:  Your next one is *Brady, Giglio*, and
Jencks.

MR. POSCABLO:  Oh, right.  I'm sorry.  On the *Brady*
matter, I think Ms. Blakely was looking into whether an order
has been issued.

THE COURT:  It has not, and we are going to get one
out.

MR. POSCABLO:  Thank you, your Honor.  We ask that it
be the same order that was issued for Ms. Shah.

THE COURT:  I'm obviously going to look at it, but I
don't think promptly means immediately.

MR. POSCABLO:  Yes, your Honor.

I do have a *Brady* issue to raise, and I raised it with
the government many, many months ago, and it is this.  It is
that I have come to learn that Detective Bastos, in his calls
and outreach to witnesses, left messages saying:  You are a
victim of a fraud, please give me a call.  We will battle that
out at trial and the bias they have added, and I don't know
whether -- they didn't call Bastos in the last trial.  They
might call him here.  But I think that's problematic.

L7n2ShaA kjc

1          But here is the point:  This particular purchaser

2     called Detective Bostos back and said, hey, I don't know what

3     you are talking about.  I am perfectly fine and happy.  I asked

4     the government to search for any reports or indication that

5     that -- that there was something like that, that there was a

6     report like that.  They told me no.

7          THE COURT:  That there was a report.

8          MR. POSCABLO:  Yeah, so, you know, if a detective

9     calls a witness or a potential victim and they --

10         THE COURT:  Here is what you are saying, if I

11    understand.

12         MR. POSCABLO:  Yes, your Honor.

13         THE COURT:  The detective calls individual A, says you

14    have been a victim of a fraud.  You are asking for some

15    substantiation of that statement.

16         MR. POSCABLO:  Correct, your Honor.  Correct.  And I

17    was told that there was none.

18         Now, that -- in my mind, that is problematic.  Because

19    what that means, and I think what that might mean is that

20    reports weren't written if a victim didn't respond or a victim

21    responded negatively.  And so that is the request for the

22    government, is that, similar to Mr. Alonso's request, they may

23    not have a writing about it, but they need to probe their

24    agents to see if certain conversations like that took place.

25    And if so, then that 100 number it's really relative, because

L7n2ShaA kjc

1    if they called, you know, 200 people and a hundred people said,

2    hey, I wasn't victimized, well, that's a different number

3    altogether than 100 percent of the people were victims.

4            So I asked the government to produce that and look

5    into that, and I just wanted to alert the Court to that.

6            THE COURT:  That's fine.  That's something for

7    discussion between the parties.

8            MR. POSCABLO:  Thank you, your Honor.

9            THE COURT:  Mr. Sobelman, did you want to saying

10    something now?

11            MR. SOBELMAN:  Briefly, your Honor.

12            This is one of the things we have talked to

13    Mr. Poscablo about I think very shortly after he filed this

14    motion or maybe even before he filed the motion.  We probed our

15    files.  We have spoken with the agents.  We don't know what

16    interaction that might have been.  To the extent Mr. Poscablo

17    can give us -- we have asked and he declined -- any more

18    information about when or the person's name, it might be that

19    there is something there that we are not aware of and can't

20    find, but without more information, we have done the search we

21    can do.

22            THE COURT:  All right.

23            Mr. Poscablo.

24            MR. POSCABLO:  Your Honor, as to the Jencks material,

25    and I think the parties will hash this out, but I will say that

L7n2ShaA kjc

1    if it is the 55,000 pages of Jencks material that they produced

2    to us related to the *Ketabchi* case, we are going to need more

3    than two weeks -- 5500, I'm sorry, 5500, it's going to be -- we

4    are going to require more than two weeks, as the government

5    stated earlier, to review that.

6              THE COURT:  Don't tell me that now.  If the parties

7    are going to discuss that, if they can't reach an expeditious

8    conclusion, I will decide.

9              MR. POSCABLO:  Yes, your Honor.

10             And to end, I made a similar request that the Court

11   review *in camera* the grand jury testimony that had to do with

12   Mr. Hult because my -- based on what I am seeing here is that

13   the government's initial case relied almost entirely on

14   Mr. Hult as against Mr. Brewster, and all I am asking is that

15   the Court review *in camera* the testimony that was given that

16   relied on Mr. Hult's information.

17             THE COURT:  All right.  I understand.  I will look at

18   all of this.

19             I was going to render decisions today.  I don't feel I

20   am -- I should.  There are some things I need to think about,

21   some of the case law that's been cited.  So I'm not going to

22   render decisions today.

23             On the 6(e), I just don't see it.  The protections of

24   6(e) are so important, there is nothing that rises to the

25   particular need here, I can tell you, on grand jury.  I think

L7n2ShaA kjc

1   that's it.  Correct?

2            MR. POSCABLO:  I think that's it, your Honor.

3            THE COURT:  Okay.  Let me tell you, I have said now, I

4   am not going to render decisions.  I can to the extent I am

5   denying the request for the *in camera* review or production of

6   the grand jury materials.  The allegations simply don't rise to

7   the standard of my reaching 6(e) here and having either *in*

8   *camera* -- not really reach if I do it *in camera*, but there is

9   no need for me to do it *in camera*.

10           Mr. Alonso, you withdraw your request for the *Franks*

11   hearing, correct?

12           MR. ALONSO:  Correct, your Honor.

13           THE COURT:  I think I have a sense of the

14   production -- of how these documents were produced.  I want the

15   parties to continue to talk about the bill of particulars

16   issue.  I think I have made some headway here.  Talk to each

17   other.  Each of the parties here, Brewster and Shah, have said

18   they want to file additional motions if need be.  I don't have

19   to rule on that.  If something arises where a motion is

20   necessary, make your motion.

21           I think that's as far as I can take it today.  I

22   certainly intend to get you a decision on the outstanding

23   things as soon as I can.

24           Anything else, government?

25           MR. SOBELMAN:  Your Honor, very quick issue I just

L7n2ShaA kjc

1    want to flag --

2              THE COURT:  Oh, we want to talk about timing of the

3    trial.

4              MR. SOBELMAN:  Yes.

5              THE COURT:  Of course.  I heard things wafting by that

6    I didn't like hearing.  The defense, both Brewster and Shah,

7    say they are prepared to go to trial.  The government is always

8    prepared to go to trial.  I'm not going to try this case in

9    multiple tranches.  I am going to try it once.  We have an

10   October date.  What is the issue, sir?  I can sense it is out

11   there.  What is it?

12             MR. SOBELMAN:  So the issue the government wants to

13   raise is that our understanding is that the current structure

14   for trials only permits two defendants at a time and there is

15   actually a third defendant, Chad Allen, who we think is also

16   going to go to trial, and so we just wanted guidance from the

17   Court.

18             THE COURT:  You are talking COVID?  Is that what you

19   are talking.

20             MR. SOBELMAN:  Correct, your Honor.

21             THE COURT:  The structure.

22             MR. SOBELMAN:  Yes.

23             THE COURT:  You are talking about -- we don't know

24   what the state of COVID is going to be in October.  I will

25   do -- we will see what it is.  I will do whatever I can to

L7n2ShaA kjc

1    make sure that we have COVID compliant courtrooms.  If it

2    requires taking out some of the spectator seats and instead

3    having another defense table in what now is on the other side

4    of the bar, we will do that.  Maybe we can commandeer some

5    witness rooms for counsel to be able to spread out.  I will do

6    what I can.  Everything will be COVID compliant.  I can assure

7    the parties that.  If your issue is COVID compliance, leave it

8    in the hands of the COVID subcommittee of the Board of Judges

9    and my gentle ministrations in getting a COVID compliant

10   courtroom.

11              MR. SOBELMAN:  Happy to do that, your Honor.  I was

12   just flagging because our current understand is there a

13   two-defendant limit for any trials.

14              THE COURT:  There is.

15              MR. SOBELMAN:  So to the extent that continues and

16   your Honor is not able to navigate around it, we would just be

17   grateful if -- maybe today is not the time, but at whatever

18   point, we would be grateful for guidance on how you want the

19   parties to discuss, assuming you do, which defendant or

20   defendants would go first.  But it sounds like it might be

21   premature.

22              THE COURT:  A, premature; B, I'm not having two trials

23   here.

24              MR. SOBELMAN:  That's why we were flagging it.

25              THE COURT:  All right.

L7n2ShaA kjc

1          MR. SOBELMAN:  Thank you.

2          THE COURT:  To the extent --

3          MR. POSCABLO:  Judge, may I?

4          THE COURT:  To the extent I can, I will take care of

5     it.  To the extent I can't, we may have an adjournment of the

6     trial.  We don't know what the COVID situation is going to be.

7     It changes every day.  Today it doesn't look so good, I must

8     say, from the rise of this new variant.

9          MR. POSCABLO:  Your Honor --

10         THE COURT:  But I will do everything I can just to

11    have this tried on the date set.

12         MR. SOBELMAN:  Just one more data point.  In the event

13    that there are two trials -- and just something for the Court

14    to consider -- we do think there is actually a good way to

15    split it.  There is much more overlap in our case, as we can

16    currently conceive it, between Brewster and Shah than there is

17    with Allen.

18         But, again, it sounds like it is premature.  I just

19    wanted to flag for your Honor that --

20         THE COURT:  You have.

21         MR. SOBELMAN:  -- we thought about it.

22         THE COURT:  Thank you.

23         MR. POSCABLO:  Judge, I beg your indulgence.  I

24    represent an individual in the Southern District of Illinois,

25    and that Court has set a firm trial date, it appears, for

L7n2ShaA kjc

1   October 18.  I was waiting to see if we were actually going to
2   move forward on the 24th before I asked that Court to adjourn
3   that trial, and I didn't want to do that, because I was worried
4   that what would happen is, I would move that to January, and
5   then your Honor would want to move this one to January because
6   of COVID protocols because of everything else.

7             THE COURT:  Welcome to real life.

8             MR. POSCABLO:  So I guess what I am asking --

9             THE COURT:  All I can tell you is what I have told
10  you.  Go ahead, sir.

11            MR. POSCABLO:  I guess what I am asking, your
12  Honor -- and I can make this in a letter to explain to the
13  Court -- on behalf of Mr. Brewster, we are asking to adjourn
14  the trial date to a date in the first quarter, which I think
15  will provide more certainty for the Court to try all three
16  defendants.

17            THE COURT:  You are asking that now?

18            MR. POSCABLO:  I am.  I was trying to assess what the
19  situation was.  I spoke to the government about it, I spoke
20  with defense counsel about it, and I think it is -- the
21  defendants would like to do it all together as well.  And given
22  the uncertainty you have whether we are actually going to move
23  forward on October 24 I am just asking for the Court to
24  consider it.  That way I know that I will have certainty in
25  October with the other case, and I won't ask for an adjournment

L7n2ShaA kjc

1    of that case.

2              THE COURT:  What's the position of the parties?

3              MR. ALONSO:  We would like to go forward on October

4    18, your Honor.

5              THE COURT:  It's not October 18, is it?

6              MR. SOBELMAN:  Yes.

7              MR. ALONSO:  October 18.

8              MR. POSCABLO:  24.  I keep messing up those other

9    dates.  October 24 is the other date.

10             THE COURT:  What is the position of the government?

11             MR. SOBELMAN:  Sorry, your Honor, one moment.

12             (Counsel confer)

13             THE COURT:  Do you have an incarcerated defendant in

14   the other case?

15             MR. POSCABLO:  No, your Honor.

16             THE COURT:  How old is that case?

17             MR. POSCABLO:  Less than six months, Judge.

18             THE COURT:  Make the request for the adjournment

19   there.  We are going forward.  Let me hear what the government

20   says.

21             MR. SOBELMAN:  Your Honor, we don't have an objection

22   to the request.

23             I do note that if we had -- I understand defendant

24   Shah wants to go forward and the Court will consider that.

25   But if Shah also were moved to the first quarter, we could go

L7n2ShaA kjc

1    ahead on Mr. Allen in October and have the other two

2    defendants in the first quarter of next year, and that would

3    solve the --

4              THE COURT:  It doesn't solve my issue of --

5              MR. SOBELMAN:  Of not having two trials.

6              THE COURT:  Exactly.

7              MR. SOBELMAN:  Understood.

8              THE COURT:  Make the --

9              MR. POSCABLO:  May I just say --

10             MR. SOBELMAN:  Your Honor, sorry, they are not

11   duplicative.  I'm not sure there would be any overlap in

12   witnesses if that was the structure.  Obviously your Honor is

13   going to decide what the best formulation is.

14             THE COURT:  There is no overlap?  You mean Allen is,

15   in essence, *sui generis* within a conspiracy case?

16             MR. SOBELMAN:  No, your Honor, of course not, but in

17   the overall structure of the conspiracy, with the dozens of

18   people we have charged, Brewster and Shah are fairly close in

19   that web.  Allen is further away.  And so there might be

20   probably one -- we don't know exactly who our witnesses are,

21   but probably one witness who would overlap between the two

22   trials.  And otherwise it's not like Brewster and Allen or

23   Shah and Allen ran a floor together or anything like that.

24   They are further away from each other in the conspiracy.

25             So if your Honor will permit, Ms. Fletcher can address

L7n2ShaA kjc

1   this better than I can.

2             MS. FLETCHER:  Sorry, your Honor.  I think we

3   appreciate the Court's reluctance to have two trials.  We also

4   generally have that reluctance, but what we are trying to

5   grapple with is the uncertainty around getting a trial date in

6   October at all, the fact that the COVID protocol rules preclude

7   us from having three defendants, and that we see, as a matter

8   of efficiency, a potential opportunity to actually just split

9   these defendants up and have what I think would be a relatively

10  short trial of Chad Allen in October and a quarter 1 trial with

11  defendant Brewster and defendant Shah.  We sort of view those

12  two trials as -- the sum of them is no greater or smaller than

13  the parts.

14            So there could be, for example, a week and a half

15  long trial of Chad Allen in October, where we understand your

16  Honor may have a number of other trials and could be slated

17  between them, and a longer, two- to three-week trial of

18  defendants Brewster and Shah in the first quarter of next

19  year.

20            We understand Shah's position is that she would like

21  to go forward.  We understand Brewster's position is that he

22  does not want to go forward.  So we are having this

23  conversation with the Court because we see a potential

24  efficient way to solve this problem and ensure that all

25  defendants are tried, to the extent they want to be, by the

L7n2ShaA kjc

1    end of Q1 2022, even if it means two trials.  Because, as I

2    said -- I think AUSA Sobelman has alluded to this -- we don't

3    know all of our witnesses, but the witnesses that take the

4    most time, as the Court knows, are cooperating witnesses, and

5    I think, based on the landscape as I currently understand it,

6    that there is only one cooperating witness who would testify

7    at a trial of Chad Allen and also testify at a trial of

8    Cameron Brewster and Jen Shah and I'm not even certain of that

9    one.  There are no overlapping victims.  So it really is

10   possible and perhaps more efficient to split the defendants in

11   that way.

12            THE COURT:  Thank you.

13            (Pause)

14            THE COURT:  Let me speak to people who can give me a

15   better sense of what it takes to reconfigure the courtrooms for

16   COVID.  As of now, we will go on the 18th with three

17   defendants, but I need to think about it.  If change my mind on

18   that, I will let the parties know.  I don't know when you need

19   to make your request to the Illinois Court.  Right now three

20   defendants on the 18th.  I guess I will talk to the District

21   Executive's people, the people who did the buildout of the jury

22   boxes.  Oh, no, that wouldn't be different.  It would be the

23   courtroom that would have to be reconfigured.

24            All right.  Let me think about it.  Right now three

25   defendants October 18.  Thank you.

L7n2ShaA kjc

1              MR. POSCABLO:  Thank you, your Honor.

2              THE COURT:  I appreciate everybody being here.  It's

3    been a long morning and afternoon.  Thank you.

4              COUNSEL:  Thank you, your Honor.

5                              oOo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25