UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

JENNIFER SHAH,

                                   Defendant.

Case No. S4 1:19-cr-0833 (SHS)

**DEFENDANT JENNIFER SHAH'S MEMORANDUM OF LAW
IN SUPPORT OF HER OMNIBUS MOTION *IN LIMINE***

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..................................................................................ii-iii

**PRELIMINARY STATEMENT** ........................................................................ 1

**I.      THE GOVERNMENT'S 404(b) EVIDENCE SHOULD NOT BE ADMITTED** ....... 3

    1.      Evidence That Ms. Shah Did Not Disclose To The IRS Certain Income From Her Participation In The Crimes Charged .................................................. 3

    2.      Evidence That The Defendant Failed To Maintain Records Relating To Foreign Financial Accounts................................................................. 5

    3.      Evidence That In June 2018, The Defendant Directed Stuart Smith To Lie During A Federal Trade Commission Deposition............................................ 5

    4.      Evidence Relating to the Use of a Credit Card of Mastery Pro Group by the Defendant........................................................................... 6

    5.      Evidence That During The Period Of The Indictment The Defendant Threatened Smith and Smith's Wife ...................................................... 6

**II.     DEFENDANT OPPOSES THE USE OF ANY CLIPS FROM *THE REAL HOUSEWIVES OF SALT LAKE CITY* AT TRIAL IN THE GOVERNMENT'S CASE-IN-CHIEF OR FOR CROSS EXAMINATION** ............................................. 7

**III.    THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING STATEMENTS OF ALLEGED CO-CONSPIRATORS UNTIL THE GOVERNMENT ESTABLISHES THE SCOPE OF A SINGLE CONSPIRACY** .. 12

**CONCLUSION** ........................................................................................ 16

# TABLE OF AUTHORITIES

**Cases**

*Bourjaily v. United States*,
483 U.S. 171 (1987).................................................................................................... 12

*Huddleston v. United States*,
485 U.S. 681 (1988)...................................................................................................... 3

*Old Chief v. United States*,
519 U.S. 172 (1997)...................................................................................................... 2

*United States v. Barrett*,
153 F.Supp.3d 552 (E.D.N.Y. 2015) ........................................................................... 4

*United States v. Bertolotti*,
529 F.2d 149 (2d Cir. 1975)........................................................................................ 14

*United States v. Coplan*,
703 F.3d 46, (2d Cir. 2003)......................................................................................... 12

*United States v. Figueroa*,
618 F.2d 934 (2d Cir. 1980).......................................................................................... 4

*United States v. Halper*,
590 F.2d 422 (2d Cir. 1978).......................................................................................... 3

*United States v. Impasto*,
535 F. Supp.2d 732 (E.D.La. 2008).............................................................................. 4

*United States v. LaFlam*,
369 F.3d 153 (2d Cir. 2004).......................................................................................... 2

*United States v. Martino*,
664 F.2d 860 (2d Cir. 1981)........................................................................................ 14

*United States v. McCallum*,
584 F.3d 471 (2d Cir. 2009).......................................................................................... 3

*United States v. Scott*,
677 F. 3d 72 (2d Cir. 2012)........................................................................................... 3

*United States v. Vanwort*,
887 F.2d 375 (2d Cir. 1989)........................................................................................ 14

**Rules**

Fed. R. Evid. 402 ................................................................................................................... 1

Fed. R. Evid. 401 ................................................................................................................... 1

Fed. R. Evid. 801(d)(2)(E) ................................................................................................... 12

Fed. R. Evid. 404(b) ..................................................................................................... *passim*

Jennifer Shah, by and through her attorneys, hereby submits this Memorandum of Law in Support of her Omnibus Motion *In Limine* requesting an order: (1) precluding the government's proposed 404(b) evidence; (2) precluding the government from using any clips from The Real Housewives of Salt Lake City in its case-in-chief or for cross examination; and (3) precluding the government from introducing statements of alleged co-conspirators.

## PRELIMINARY STATEMENT

The government has filed a notice of its intention to offer eight separate categories of evidence, which it claims are all admissible as "direct evidence of Counts One and/or Two" but are also admissible, in the alternative, under Rule 404(b) to show, "among other things, motive, knowledge, intent, and/or absence of mistake." Some of the items in the list provided by the government are extremely vague and lack the kind of detail required to make an argument as to whether the evidence is direct evidence of the offenses, or 404(b) evidence, and if 404(b) evidence, for what purpose it is offered. Thus, this memorandum in opposition will be based on the information the government has provided, which in many cases is insufficient for a complete argument.

The government's theory of the case is that Jennifer Shah was involved in a conspiracy to commit wire fraud through a telemarketing scheme that spanned nine years from 2012 until at least March 2021, and conspired to commit money laundering with the proceeds of the fraud. Ms. Shah's defense is that while she worked in the telemarketing industry and worked with many of the people who are witnesses in this case, including Stuart Smith, she did not participate in the fraud.

Only relevant evidence is admissible. Fed. R. Evid. 401, 402. However, even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of

1

unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403.  The

objections to the government's proffered evidence listed below are based on relevance, danger of

unfair prejudice, confusion of the issues, misleading the jury, and Federal Rule of Evidence

404(b).

Even if the court concludes that the evidence is admissible under Rule 404(b), it must still

be excluded because it fails the Rule 403 balancing test: evidence of prior acts must be excluded

if the probative value is outweighed by the prejudicial impact on the jury.  The prejudicial impact

can outweigh the probative value even though, as in this case, the prior bad acts are actually less

inflammatory than the act charged.  There can also be evidence which, although relevant to a fact

at issue, tends so strongly to show the defendant's propensity to commit crimes that its probative

value is outweighed by its prejudicial impact.  As the Supreme Court has stated: "The term

'unfair prejudice', as to a criminal defendant, speaks to the capacity of some concededly relevant

evidence to lure the factfinder into declaring guilt on a ground different from proof specific to

the offense charged… 'Unfair prejudice' . . .means an undue tendency to suggest decision on an

improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United*

*States,* 519 U.S. 172, 180 (1997).

Rule 404(b) provides in relevant part:

> (1) *Prohibited Uses*. Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) *Permitted Uses*. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

The Second Circuit has adopted an 'inclusionary' approach to "other act" evidence under Rule 404(b), which allows such evidence to be admitted for any purpose other than to demonstrate criminal propensity. *United States v. LaFlam,* 369 F.3d 153, 156 (2d Cir. 2004) (*per curiam*). However, this inclusionary rule "is not a carte blanche to admit prejudicial extrinsic act evidence when . . . it is offered to prove propensity. *See e.g., United States v. McCallum,* 584 F.3d 471, 477 (2d Cir. 2009) (holding that evidence of prior convictions was 'propensity evidence in sheep's clothing')." *United States v. Scott,* 677 F. 3d 72, 80 (2d Cir. 2012) (reversing conviction due to improper admission of 404(b) evidence which had no legitimate basis except to demonstrate defendant's propensity to be in contact with the police). To admit Rule 404(b) evidence, it must be relevant to an issue truly in dispute and the trial court must still weigh the probative value of the evidence against its prejudicial consequences before admitting it. *Huddleston v. United States*, 485 U.S. 681 (1988).

The Second Circuit has repeatedly emphasized that "introduction of such evidence should normally await the conclusion of the defendant's case, *i.e.*, under normal circumstances it should not be admitted on the government's direct case." *United States v. Halper,* 590 F.2d 422, 432-33 (2d Cir. 1978) (citations omitted). This is to ensure that the evidence is truly relevant to a disputed issue in the case.

## I.      THE GOVERNMENT'S 404(b) EVIDENCE SHOULD NOT BE ADMITTED

### 1.      Evidence That Ms. Shah Did Not Disclose To The IRS Certain Income From Her Participation In The Crimes Charged

The government seeks to introduce evidence that Ms. Shah committed tax evasion during the period of the conspiracy and that the tax fraud involved income from her participation in the crimes charged. There is no dispute that Ms. Shah worked in the telemarketing industry for

many years and received income from her employment. The government has offered no detail as to the alleged tax evasion, neither the timing of the alleged evasion nor its extent.

The issue is whether the government can prove that the funds that were the subject of the tax evasion came from the fraud. If they cannot, then this evidence would not be admissible. *See*, *Halper,* 590 F.2d at 432-33 (rejecting admission of tax evasion under 404(b) in trial for Medicaid fraud, even though the unreported income was generated by the same business that allegedly committed the Medicaid fraud, because the unreported income may have been produced by legitimate activities of the business unrelated to the fraud). *See also*, *United States v. Barrett,* 153 F.Supp.3d 552 (E.D.N.Y. 2015) (denying admission of fraudulent tax return when it was filed before the commission of the alleged offenses). Thus, in order to admit the evidence of tax evasion, the government must, initially, demonstrate that the actual tax evasion at issue was directly related to funds received by the Defendant as the result of the charged offenses.

Tax evasion is a crime associated with a generalized character trait of greed and lack of fair play. *United States v. Impasto,* 535 F. Supp.2d 732, 736 (E.D.La. 2008). Accordingly, it is more prejudicial to the Defendant than probative and demonstrates the Defendant's propensity to disregard the law and cheat. This is precisely the kind of evidence which the rule against propensity evidence seeks to prevent coming before the jury. The defense also objects under Rule 403 as its probative value is substantially outweighed by creating undue prejudice to the Defendant, confusing the issues, and misleading the jury.

Evidence of the tax evasion will present an undue burden on the Defendant as she will be forced to defend against an entirely new charge which has been essentially added just weeks before trial. The evidence the government will need to present to the jury first to prove the tax evasion, and then to connect it to the underlying offenses, will result in a "trial within a trial" and

4

will confuse the issues, mislead the jury, and lead to undue delay and lengthening of the trial. Finally, as with all Rule 404(b) evidence, the preferred course is to wait until the end of the Defendant's case and at that point, for the Court to decide whether the evidence is relevant and probative of a disputed issue at trial. *United States v. Figueroa,* 618 F.2d 934, 939 (2d Cir. 1980).

2.     Evidence That The Defendant Failed To Maintain Records Relating To Foreign Financial Accounts

The government seeks to admit evidence that from 2016-2021 the Defendant failed to maintain certain records and file certain reports relating to financial accounts in a foreign country, which she was required to maintain. The government does not provide any information as to why this allegation is relevant to the prosecution here, or even which alleged foreign accounts or foreign countries are implicated in this. As argued above, whether this is relevant and admissible will be partly determined by whether the government is able to show that the funds that were allegedly kept in foreign bank accounts were funds which were derived from the unlawful activity alleged in the Indictment. If the government is unable to demonstrate this connection, then proof of the failure to maintain records or file a report is not relevant or admissible in this prosecution.

Even if the government is able to prove such a connection, Defendant would still object on the grounds that such evidence could create an undue burden by obligating Defendant to defend against these new accusations and would confuse the issues and mislead the jury by bringing into the trial extraneous information which is not directly connected to the offenses charged.

3.     Evidence That In June 2018, The Defendant Directed Stuart Smith To Lie During A Federal Trade Commission Deposition

The government proposes to enter evidence that in June 2018, the Defendant directed Stuart Smith to lie during a Federal Trade Commission deposition.  Since the subject matter of this evidence has not been provided, it is difficult for the defense to respond; but if it does not relate to a disputed issue in this case, it should be excluded as prejudicial.  Evidence of requesting that a business associate lie in a deposition is forbidden if its only probative value is to show the Defendant's propensity for dishonesty.

4.    Evidence Relating to the Use of a Credit Card of Mastery Pro Group by the Defendant

The government proposes to elicit evidence that during the period of the Indictment, the Defendant: (1) used the credit card of Mastery Pro Group for personal expenses in violation of her agreement with Stuart Smith, and (2) falsely claimed that the personal expenses she charged to the Mastery Pro Group credit card were unauthorized purchases made by her assistant in New York City.  The government has not indicated what justification there is for introducing this evidence.  On its face, without additional explanation, it would seem that this is exactly the kind of propensity evidence that is forbidden under Rule 404(b).  This evidence will only paint the Defendant in a bad light as someone who would use a business credit card for personal expenses and then try to falsely blame another for its use. Further, another trial-within-a-trial would spring up requiring Defendant to combat these irrelevant, prejudicial, and incorrect allegations.  The defense objects to this evidence.

5.    Evidence That During The Period Of The Indictment The Defendant Threatened Smith and Smith's Wife

The government will seek to admit evidence that during the time of the Indictment, which spans nine years, "the defendant threatened Smith and Smith's wife".  Without more detail, it is difficult to discuss this proffer of evidence since neither the subject matter, the content, nor the

timing is provided.  Accordingly, the defense preserves the right to object when additional details become available.

II.   **DEFENDANT OPPOSES THE USE OF ANY CLIPS FROM *THE REAL HOUSEWIVES OF SALT LAKE CITY* AT TRIAL IN THE GOVERNMENT'S CASE-IN-CHIEF OR FOR CROSS EXAMINATION**

Ms. Shah is a resident of Salt Lake City, Utah.  Since 2020, Ms. Shah has been a cast member of the Bravo television show "The Real Housewives of Salt Lake City" (hereinafter "RHOSLC" or "Housewives").  The first episode of the RHOSLC was broadcast on November 11, 2020.  In Season One, which ran from November 11, 2020, until February 17, 2021, there were 18 episodes of the show aired.  Season Two began on February 9, 2021, and as of February 6, 2022, there had been 17 episodes aired.  Each episode is approximately forty-five minutes long.  The Housewives franchise is part of the "reality TV" genre, which is defined as TV made from ordinary people "playing" themselves in a TV show.

The defense opposes the use in evidence of any clips from the RHOSLC. Any use of clips from the RHOSLC at the trial of Ms. Shah, either in the government's case-in-chief or during cross-examination of the defense's case, would have to fall under one of the exceptions to the hearsay rule of evidence, as they are, by definition, out-of-court statements. To evaluate whether any of the statements the government might seek to use falls under an exception to the hearsay rule it is necessary to examine the method used to produce and edit the Housewives show, and also the motivations and contrivances that permeate the production of the Housewives franchise.  As will be clearly shown below, there is no circumstance under which a clip of Jen Shah from her appearance on the RHOSLC should be used in court as these clips do not have any of the indicia of reliability which is the fundamental principle underlying the hearsay exception and, indeed, of the rules of evidence.

For those unfamiliar with the Bravo franchise, it would be hard to overestimate its reach and popularity.  (*See* "Real Housewives: A Beginners' Guide" https://time.com/5929741/real-housewives-beginners-guide/; briefly summarizing the ten different Real Housewives Franchises and their main storylines and characters).  Each Housewives series takes place in a different location.  For example, *The Real Housewives of Beverley Hills, The Real Housewives of New York City, The Real Housewives of Atlanta*, etc. There are literally hundreds of episodes from the Housewives' franchise and thousands of articles written about the series, its characters, its producers, and its story lines.  Such is the popularity of the show that newspapers and other on-line outlets summarize the episodes of each show and post them for public consumption.[1]  Recently, a book was published about the Housewives' franchise which delves not only into the details of many of the individual shows and their characters, but also into how the show is produced.  *See* Moylan, Brian, "The Housewives" (Flatiron Books, 2021) (hereinafter "Moylan").

Characters on the various Housewives franchises stand to make enormous sums of money if they are successful.  First, as the show progresses from one season to the next, the per-episode fee increases proportionally for a character who is popular.  Equally important, for someone like Ms. Shah, who was starting a fashion business as her participation began, the show provides an invaluable advertising platform.  Thus, all characters have an incentive to exaggerate their characters and dramatize their lives in order to participate in the currency of the Housewives' franchise: drama, conflict, and conspicuous consumption. Moylan at 234 (electronic version).

---

[1] *See* summary of episodes Vulture;  https://www.vulture.com/article/real-housewives-of-salt-lake-city-season-two-episode-20-memorial-meltdown.html; Salt Lake City Tribune; https://www.sltrib.com/artsliving/tv/2022/02/06/episode-recap-mary-mocks/; Reality Tea; https://www.realitytea.com/2022/02/07/real-housewives-of-salt-lake-city-season-2-episode-20-recap/.

The first hurdle for any contestant, of course, is to be chosen to be a Housewife.  The requirements for being chosen are that you have a job or a business and that you appear to have money.  As Moylan stated: "We know that many of these women are playing at being rich . . . One has to appear to have money to get on the show, to make even more money, which then needs to be used to look like one has money."  Moylan at 622.  The persona of the women on each of the franchises is that they are glamourous, incredibly rich, live lives of extreme and conspicuous consumption, and are willing to reveal their private lives in public.

The Housewives shows have been described as a cross between a soap opera and reality TV.  Moylan at 187.  There has to be a story line and a narrative to create drama and maintain the interest of the viewers.  Thus, the question arises: how fake or how real are the women and the lives portrayed on Housewives?[2]  The answer is: the women and their lives are both real and fake and it is impossible to tell where reality ends and fantasy and outright deception and fakery begins.  The women, the Housewives themselves, are real people.  The basic facts of their lives are real:  their names, their husbands, the divorces, the time in rehabs, their children.  But the more pertinent questions, accordingly to Moylan are:  How produced are these shows? How much of what you are seeing on TV is natural and spontaneous and how much is crafted and manipulated?  As Moylan puts it: "When lives get turned into story lines, how much of it is reality, how much is for the camera and how much is it manipulated in the post [production]?"  Moylan at 228.  The answer is: a great deal and probably much more than the average viewer

---

[2] Many articles have been written on this subject.  *See*, The Things: Ten Things on the Real Housewives that Are Totally Fake (and 10 Real). https://www.thethings.com/real-housewives-totally-fake/; and Smith, Nickie, "Why Real Housewives is Totally Fake" https://www.thethings.com/real-housewives-totally-fake/.

imagines.  The line between what is "real" and what is "produced" "manipulated" and "made-up" is porous and hidden.

At the beginning of every season of every Housewives production, the producers interview each character and work up a "story line" for the season: some of them are more or less real (a child going to college), some are entirely made-up (trying to have another baby, or pretending to want to open a particular business).  Moylan at 234-35.  Then the producers create what is known as the "show bible" which is an actual document that "literally outlines every woman, every story they have, and the direction we [the producers] think they're going to go." Moylan at 237.  As the season progresses, the producers guide the show to maintain the story line for each character.  It is important that the story line is compelling in order to generate interest in each character's life and plot.  As Moylan stated, in discussing the Housewives' interest in maintaining and promoting their own story line: "Couple that with the motivation to wanting to stay on this cash cow [the show], and that's a pretty healthy incentive to make sure that your story line is fresh and the drama is flowing."  Moylan at 235.

The actual episodes of Housewives, those that are seen on TV, are highly edited and crafted through post-production.  The average time it takes to edit an episode of Housewives is ten to twelve weeks, during which time the crew is whittling "more than forty hours of footage into a forty-four-minute episode. . . That means there's a little more than one minute of good material in each of the forty hours of footage."  Moyan at 258-9.[3]  Thus any actual clip of the Housewives is just a tiny portion of the footage that was shot, and an episode can turn a week of

---

[3] The book actually says that it takes 40 hours of footage to get a 45-minute show and that means one minute of good material in each of the forty hours, but this must be a mistake and it is one minute per four hours.  For our purposes, its impact on the reliability of what makes the final show is the same.

filming to just part of a day.  *Id*.  One of the main procedures the producers use for editing an episode of Housewives is what is known as a "confessional."  These are interviews of Housewife characters which take place after the shooting and when the producers have had a chance to see where there are gaps in the story or they need more explanation.  So these "confessional" portions are cut in after the scenes were shot and are deliberately crafted to help the story lines along and create additional conflict and drama.  There are other techniques used by Housewives editors like "Frankenbites" defined by Moylan as "the gruesome name given to a process where an editor splices words someone has said from different sources to make a sentence the person didn't say at all."  Moylan at 272.

Thus the characteristics of film clips which make it into the final episodes that are on TV make them particularly unsuitable to be admitted under the rules of evidence.  First, there is a generalized motivation to exaggerate wealth and drama into order to remain on the show and obtain the economic advantages that come with being a character on the show.  The story lines of each character are manipulated by the producers to build toward the dramatic arc of the season and enhance the draw of the shows.  The characters are well aware of the need for them to participate in this kind of drama to stay on the show.  The editing process ensures that it is impossible to understand the actual context of any particular statement as it was drawn out of footage, one minute per four or forty hours, that the viewers never see and have no way of knowing the context with any certainty.  Finally, all footage has been edited with great care and can be subject to such techniques as "Frankenbites," described above, which makes it particularly unreliable.  Thus, while some of what goes on in any particular Housewives' episode has some aspect of reality, in that Ms. Shah is playing a character called Jen Shah and not a totally fictional character who never existed, she is nonetheless playing a "character" who is

11

molded by the requirements of being on the RHOSLC and any statements, made in the context of playing that character on a show that has been highly curated and edited to satisfy its dramatic requirements, do not have the indicia of reliability that would allow admission into a trial under the hearsay rule or any rules of evidence.  Nor should these clips be used for cross-examination as prior inconsistent statements for the same reason.

The defense reserves the right to supplement this opposition if and when the government seeks to use any clip or quote from the filming of the RHOSLC at trial and to address at that time any additional specific evidentiary objections in the context of what the government seeks to admit.

## III.   THE GOVERNMENT SHOULD BE PRECLUDED FROM INTRODUCING STATEMENTS OF ALLEGED CO-CONSPIRATORS UNTIL THE GOVERNMENT ESTABLISHES THE SCOPE OF A SINGLE CONSPIRACY.

Ms. Shah expects that the government will attempt to introduce certain written and oral statements of alleged co-conspirators under the exception to hearsay provided by Federal Rule of Evidence 801(d)(2)(E). "To admit hearsay testimony under Rule 801(d)(2)(E), the district court 'must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered [ (the "nonoffering party") ], and (c) that the statement was made during the course of and in furtherance of the conspiracy.' These are 'preliminary questions of fact' to be resolved by the district court under a preponderance of the evidence standard." *United States v. Coplan,* 703 F.3d 46, 82 (2d Cir. 2003) *citing Bourjaily v. United States*, 483 U.S. 171, 175 (1987), internal citation omitted.

The government, however, has failed to establish the scope of the conspiracy it alleges against Ms. Shah in a way that allows Ms. Shah or the Court to determine which individuals could qualify as co-conspirators and therefore provide admissible testimony. The government

should be precluded from introducing such hearsay evidence unless or until it can establish the scope of the particular conspiracy for which Ms. Shah is charged.

Statements of alleged co-conspirators are only admissible as exceptions to the Hearsay Rule when they are made by co-conspirators during the course of and in furtherance of the conspiracy.  In expounding on the charges against Ms. Shah, the government has repeatedly harkened to its prior case and trial, *United States v. Ketabchi*, 17 CR 243 (SHS).  While the *Ketabchi* case involved telemarketing fraud spanning several states, fifteen defendants, and countless bad actors doing a variety of illegal things, Ms. Shah was not part of that case whatsoever. And yet, the government stands by its position that the charges against Ms. Shah are related to its *Ketabchi* case without explaining exactly how Ms. Shah fits into that case, or who in that case, if anyone, allegedly conspired with Ms. Shah in her Indictment. Furthermore, Ms. Shah's own Indictment charged 12 people, across many states and years, most of whom are complete strangers to Ms. Shah.  The defense contends that what the government has portrayed as a wide-ranging, state-skipping, decades-long telemarketing conspiracy may actually be a collection of parallel illegal schemes, often done by different means, different groups, and different actors, some of whom may overlap with each other.

Where, as here, the government has made such vague and broad allegations about the conspiracy, it is impossible to determine whether an individual witness is in fact a co-conspirator, and not just a person loosely related to or somehow familiar with the actions alleged in the Indictment or the *Ketabchi* case.  By deliberately drawing a squishy, fuzzy line to define the conspiracy here, there is a real danger that the government attempts to introduce inadmissible hearsay in the form of testimony of admitted criminals who were part of separate and discrete frauds in the telemarketing world. Before the jury hears any such purported "co-conspirator"

13

testimony, the government should be required to clearly establish the firm bounds of the conspiracy charged against Ms. Shah, and to clearly establish the cast of this alleged conspiracy.

The establishment of the existence of a single conspiracy requires evidence of elements such as "mutual dependence among the participants, a common aim or purpose[,] or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Vanwort,* 887 F.2d 375, 383 (2d Cir. 1989) (*quoting United States v. Bertolotti*, 529 F.2d 149, 154 (2d Cir. 1975)) (internal quotation marks omitted). In other words, the government must show some mutual dependence or overlap of some kind to indicate "that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Martino*, 664 F.2d 860, 876 (2d Cir. 1981). The amorphous, overly-broad allegations in the Indictment make it impossible to discern whether the government alleges a single conspiracy or multiple conspiracies. As such, it is not possible to determine whether an individual is a member of the conspiracy for which Ms. Shah is charged or some other loosely affiliated telemarketing scheme that nonetheless fits under the government's broad conspiracy charge.

It is Defendant's understanding that the government will use Stuart Smith as a cord by which to tie Ms. Shah to Smith's own crime spree and a host of other conspiracies and actors with whom Ms. Shah has no real connection. But the government's own evidence suggests that Mr. Smith's testimony could be a gateway for impermissible hearsay. For example, the government used cooperators to secretly record calls with Mr. Smith in an effort to gather evidence against Mr. Smith and Ms. Shah. While talking openly with his partners in crime about his own illegal behavior, Mr. Smith specifically tells these individuals to keep Ms. Shah in the

dark about the content of their conversations.  This is but one example of distinct conspiracies with distinct casts of conspirators, and should give the Court pause before allowing the government to *carte blanche* offer hearsay testimony under the impermissibly broad umbrella of "telemarketing fraud."

Before the government can offer hearsay evidence under the guise of a co-conspirator's statement, it must first set out the scope of its conspiracy charge so that the Court may evaluate whether an individual is indeed a co-conspirator of the specific conspiracy for which Ms. Shah has been charged.  Otherwise, Ms. Shah will be prejudiced by the admission of untold amounts of impermissible hearsay testimony claiming to tie her to disparate events, conspiratorial agreements, and actors.

## CONCLUSION

For the reasons described herein, Ms. Shah respectfully requests that the Court grant her Omnibus Motion *In Limine* requesting an order: (1) precluding the government's proposed 404(b) evidence; (2) precluding the government from using any clips from The Real Housewives of Salt Lake City in its case-in-chief or for cross examination; and (3) precluding the government from introducing statements of alleged co-conspirators.

Dated:  New York, New York
        February 15, 2022

ChaudhryLaw PLLC

By:     */s/ Priya Chaudhry*
        Priya Chaudhry, Esq.
        Seth Zuckerman
        Beth Farber
        Shaelyn Gambino Morrison
        45 West 29th Street, Suite 303
        New York, New York 10001
        Tel: (212) 785-5550
        Email: priya@chaudhrylaw.com
        szuckerman@chaudhrylaw.com
        farber@chaudhrylaw.com
        shaelyn@chaudhrylaw.com

        *Attorneys for Defendant Jennifer Shah*

16