# Exhibit C



45 West 29th Street, Suite 303
New York, New York 10001
chaudhrylaw.com

June 6, 2022

<u>Via Email</u>

AUSA Kiersten A. Fletcher
AUSA Robert B. Sobelman
AUSA Sheb Swett
United States Attorney's Office
Southern District of New York
1 St. Andrew's Plaza
New York, NY 10007

      **Re:**    *United States v. Jennifer Shah*, S4 19 Cr. 833 (SHS)

Dear Counsel:

     We represent Defendant Jennifer Shah in the above-captioned case. Pursuant to Federal Rule of Criminal Procedure 16(b)(1)(C), Ms. Shah hereby provides supplemental disclosure of potential expert testimony that she intends to offer from Przemyslaw Jeziorski, a professor at the Haas School of Business at the University of California at Berkeley, regarding Marketing Analytics.[1] Pursuant to Rule 702, Professor Jeziorski may offer technical and specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue.  Professor Jeziorski's proposed testimony complies with Rule 702 as it is: (1) based on facts and data; (2) the product of reliable principles and methods; and (3) reliably applied to the facts of this case.

     The bases for Professor Jeziorski's potential testimony and opinion are his: (1) research in the field of marketing analytics, (2) his professional experience teaching a course entitled "Marketing Analytics" at the renowned Haas School of Business, (3) his personal professional experience running a company that implements these core techniques, and (4) scholarly articles that are well accepted in the field of marketing analytics.

**<u>Summary of Anticipated Expert Testimony</u>**

     If called at trial, Professor Jeziorski may testify regarding marketing analytics, specifically regarding the following standard techniques and concepts that apply in data-driven marketing: (1) lead qualification; (2) targeting; (3) lead generation; (4) lead brokering; (5) data scraping; (6) the use of outside salesfloors and fulfillment companies; (7) the use of customer

---

[1] Professor Jeziorski's *curriculum vitae* was previously provided and contains additional bases for his opinions.

relationship management software (CRMs); (8) the use of up-selling and cross-selling methods; (9) chargebacks; and (10) small business success rates.

After discussing the standard techniques and concepts, Professor Jeziorski is expected to testify, *inter alia*, that companies generate and qualify leads, and leads are brokered and purchased by companies, for the purpose of increasing the overall profit margin of the company. Similarly, companies invest substantial sums of money into qualifying leads and/or buying qualified leads. Lead providers have emerged as a profitable industry in which the only product sold is proprietary qualified leads (*e.g.,* Google). Professor Jeziorski is also expected to opine on the basis and use of outside salesfloors and fulfillment companies and the commission splits that occur.

While Professor Jeziorski may provide his opinion regarding the concepts and techniques described above, the Advisory Committee Note to Rule 702 also permits his testimony to educate the jury and provide background regarding the industry:

> [I]t might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or blood clotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed.R.Evid. 702 Advisory Committee Note.[2] Ms. Shah reserves the right to call Professor Jeziorski without attempting to apply his testimony to the facts on this case.

Professor Jeziorski's specific proposed testimony and bases are outlined below.

**Lead Qualification**

Professor Jeziorski is expected to testify regarding the standard practice of lead qualification for the purpose of decreasing the overall cost of marketing and increasing profits. The practice of lead qualification is intended to permit targeted marketing for only those leads who are potentially interested consumers and exclude those who are not.

---

[2] See also *United States v. Herron*, No. 10-CR-0615 NGG, 2014 WL 1871909, at *8 (E.D.N.Y. May 8, 2014), aff'd, 762 F. App'x 25 (2d Cir. 2019) (permitting expert testimony to contextualize the evidence and provide general principles).

Professor Jeziorski is expected to testify that there are three main methods of lead qualification: (1) neural network marketing; (2) RFM (recency, frequency, monetary); and (3) logistic regression. Neural network marketing is the most efficient, state-of-the-art method. Neural network marketing allows leads to be segmented into small, granular subsets. This allows companies to contact only the individuals that are most likely to purchase the product or service. Due to the specific segmentations created, neural network marketing requires a significant amount of data and is the costliest form of lead qualification. RFM is a simpler form of marketing, wherein existing customers are qualified, and companies attempt to sell to previous customers using data regarding the customers' past purchases. Logistic regression builds upon the RFM model and allows companies to form segments by augmenting demographic data with data regarding past purchases.

Professor Jeziorski is expected to testify that approximately 95% of lead qualification applications use one of these three models. Professor Jeziorski is further expected to testify that implementing lead qualification techniques allows companies to increase profit in the most cost-effective manner. This is because instead of contacting all leads, only individuals that are more likely to purchase are contacted. While revenue is the highest if all leads, and not only qualified leads, are contacted, it costs companies more money to do so. Thus, by narrowing the pool of leads, the cost of marketing decreases, and profit is increased because a higher percentage of leads convert into customer sales.

Professor Jeziorski has formulated these opinions based on real-world case studies that he teaches as part of his "Marketing Analytics" class, as well as the journal article *Diamonds in the Data Mine*[3] written by Gary W. Loveman.

**Lead-Generation/Lead Brokering**

Professor Jeziorski is expected to testify regarding lead-generation methods. Professor Jeziorski is expected to discuss the three primary types of lead generation methods: (1) advertising (which includes paying for an advertisement which causes potential consumers to contact the company); (2) lead brokering (purchasing a list of contacts for the business to contacts these potential consumers directly); and (3) word-of-mouth referrals.

Professor Jeziorski is expected to testify that lead brokering is a standard technique used in marketing. Professor Jeziorski teaches a case study on lead brokering as part of his course, and has conducted research and spoken with many executives regarding the use of lead brokering.

Specifically, Professor Jeziorski is expected to testify that there are two forms of lead generation processes: classic and modern. Classic lead generation occurs where lead information, such as a phone number or email, is provided by a lead broker to a sales team. This process typically begins by a customer purchasing a product, and subsequently consenting to having his or her information shared with marketing brokers. Marketing brokers then take the individual's information and provide it to companies that are looking to buy leads.

---

[3] *Available at* https://hbr.org/2003/05/diamonds-in-the-data-mine.

Modern lead generation, or digital lead brokering, occurs when the lead's information is released *via* the web. This is seen across sites such as Google, where an individual may consent to having his or her information shared with lead brokers by taking an action such as signing up for an online mailing list. Google then aggregates information about the lead such as sites visited or demographic information. Modern lead generation is more sophisticated because leads can be sold individually with a price for each person, rather than together as a list.

Professor Jeziorski is expected to further testify that while the percentage of revenue that a company will spend on purchasing leads varies, companies typically spend anywhere from 10-60% of revenue on marketing. Companies spend more on marketing as growing start-ups, where roughly 40-60% of revenue is expected to be spent on marketing. Moreover, the amount spent on purchasing leads varies based on industry. For example, in the telemarketing industry, about 100% of the marketing budget is put towards purchasing leads. However, in the software industry, companies spend close to 0% on purchasing leads.

Professor Jeziorski is expected to testify as to how lead brokers are paid. Lead brokers are generally paid per lead. The price per lead depends on the size of the list and segmentation. When the list of leads is larger, companies typically pay less per lead. However, the narrower the segment of leads, the more expensive each lead is. Modern lead brokers employ more elaborate systems, and sometimes the broker only gets paid if the lead takes a certain action such as making a purchase. In that case, the price per lead increases substantially and a lead broker generally earns 3-5% of the sale price.

Professor Jeziorski has formulated these opinions based on his research, professional experience, personal interactions with company executives, and written journals. Namely, Professor Jeziorski relied on the article, *Frontiers: How Effective Is Third-Party Consumer Profiling? Evidence from Field Studies*[4] written by Nico Neumann, Catherine E. Tucker and Timothy Whitfield, as well as *Optimal Marketing Strategies for a Customer Data Intermediary*[5] written by Joseph Pancras and K. Sudhir.

**Data Scraping**

Professor Jeziorski is expected to testify regarding data scraping, which is an automated way to collect data. This includes, but is not limited to, the use of data scraped from internet websites. Professor Jeziorski may also testify that data scraping is extensively used in many industries, including academia, and is not prohibited in any way. This technique is also commonly used for comparative marketing as an indicator of demand. The bases for Professor Jeziorski's opinion are teaching the subject matter in his course, speaking with company executives regarding their use of data scraping, as well as engaging in web scraping for his own company. Professor Jeziorski has also written "scrapers"—automated computer code that engages in scraping through publicly-available sources.

---

[4] *Available at* https://pubsonline.informs.org/doi/abs/10.1287/mksc.2019.1188.
[5] *Available at* https://journals.sagepub.com/doi/10.1509/jmkr.44.4.560.

Professor Jeziorski is also expected to testify that data scraping involves the use of publicly available information that is made available for download by companies. Data scraping is not hacking. Professor Jeziorski may testify that the process of data scraping typically begins with creating a list of requirements of what information is wanted and what information the website has. From there, an engineer or sophisticated marketer translates the list of requirements into data scripts, which explain exactly what steps to take to access that information from the website. Then, the engineer writes a code that executes those steps, downloads the information, and stores the data in a database. The data is processed and used for modeling or analytics.

Professor Jeziorski has formulated these opinions based on the article *EXPRESS: Fields of Gold: Scraping Web Data for Marketing Insights*[6] written by Johannes Boegershausen, Hannes Datta, Abhishek Borah, and Andrew T. Stephen, and the article *Web Business Intelligence: Mining the Web for Actionable Knowledge*[7] written by Jaideep Srivastava and Robert Cooley.

**Outside Salesfloors/Fulfillment Companies**

Professor Jeziorski may testify regarding the recent growth of the practice of businesses using outside salesfloors and fulfillment companies. A fulfillment company provides the goods or service sold to the customer, *e.g.*, logo design or perfume. Professor Jeziorski may opine this occurs because it has become more difficult to obtain good leads, and because highly-qualified leads are expensive to purchase directly. Smaller businesses cannot afford to have a large sales team and the use of outside salesfloors provides small businesses with the flexibility to scale up or down quickly. Professor Jeziorski may also testify regarding the division of commissions between small businesses, salesfloors, lead brokers, and fulfilment companies. He may opine that there is a wide variance in the industry regarding the percentages received by each of these components, and often the percentage received by the small business depends on whether the product sold is a service or physical product. Professor Jeziorski will base his testimony on the research he has conducted, the class that he teaches, conversations with company executives, as well as the engagement of salesfloors and fulfillment companies regarding leads for his own company.

Moreover, Professor Jeziorski is expected to testify that companies hire outside salesfloors to aid consumers in completing the purchasing process. That is, the salesfloor may ensure that contracts are executed and then processes the sale by, *inter alia,* accepting credit card payment. The amount of commission that the salesfloor receives varies depending on how much of the purchasing process the salesfloor oversees. Occasionally, outside salesfloors are in charge

---

[6] *Available at* https://journals.sagepub.com/doi/abs/10.1177/00222429221100750?casa_token=QGwFNTH9xjkAAAAA:ITULidVn_hMmt6Uqq-2uiV_KbqVQFWPMR_0MxKclLnNIFgfahoLBc59SS3Lpd6oSVaegPxjGcGbB.

[7] *Available at* https://pubsonline.informs.org/doi/abs/10.1287/ijoc.15.2.191.14447?casa_token=IvORs006g_8AAAAA:ns-YPWSFdN1aHCa2mCVI-Tq3WGCMLJDNuCAHqoT5BGhkyi0dysEQOduJLnIr4XkDea3EFLBKDA.

of scheduling appointments for the services the customers have purchased, and are paid per appointment that they schedule. In that case, the commission per appointment can be anywhere from $500 to $3,000. Additionally, different companies commonly share the same salesfloors, especially within the same industry, and often provide the salesfloor with sales scripts to use.

Professor Jeziorski is expected to testify that the compensation paid to outside salesfloors is typically a percentage of the company's revenue. The percentage of revenue is dependent on the company's margins. When the company's margins are larger, a greater percentage of the company's revenue is shared with the salesfloor. For that reason, the percentage of revenue shared is generally larger for service-based businesses than product-based businesses because, in general, service-based companies' costs are lower, and therefore the margin is larger. Professor Jeziorski is expected to testify that it is standard for a company to share anywhere from 5-30% of the company's revenue with the salesfloor.

Professor Jeziorski has formulated these opinions based on the article *Should you set up your own sales force or should you outsource it? Pitfalls in the standard analysis*[8] by William T. Ross Jr., Frederic Dalsace, and Erin Anderson.

**Customer Relationship Management Software**

Professor Jeziorski may testify regarding Customer Relationship Management software ("CRM") used to track customer relationships. CRMs assist companies in qualifying customers and leads based on data. The use of CRMs is basic and standard in the marketing industry, and in Professor Jeziorski's view, marketing cannot be done effectively without using a CRM. Professor Jeziorski has experience using and building CRMs, including building integrations of CRMs with marketing activity. Professor Jeziorski also teaches a course that includes analyzing CRM data.

Professor Jeziorski is expected to testify that almost 100% of companies use a CRM system. Many companies, especially when selling services, use Salesforce as a CRM because it allows the company to track interactions with consumers. Further, companies rely on CRMs to track sales and commissions due to salesfloors, lead brokers, and others.

Professor Jeziorski has formulated these opinions based on the journal article *Data-Driven Decision-Making in Sales: Can Marketing Analytics Enhance Sales Performance?*[9] written by Minjee Sun, Avi Goldfarb, and Mengze Shi.

---

[8] *Available at* https://www.sciencedirect.com/science/article/abs/pii/S0007681304001041?casa_token=4RfK5PlHv6wAAAAA:jVHYk4oG_t2jxnx84fyGi4U5HMFXkASSGn-LKME4lBBYF7V0p2NH_cIxnDG4ju7OpZdTmi7ByEs

[9] *Available at* https://cpb-us-e2.wpmucdn.com/sites.utdallas.edu/dist/8/1090/files/2022/02/forms-conference-2022-data-driven-decision-making-in-sales.pdf.

**Up-Selling and Cross-Selling**

Professor Jeziorski may testify regarding up-selling and cross-selling and the core use of these techniques as a fundamental marketing analytic amongst many companies. For example, a free trial a company offers to new customers is a prime example of up-selling; an airline offering a customer to purchase travel insurance is an example of cross-selling. Professor Jeziorski teaches lectures on how to effectively use a CRM to cross-sell and/or up-sell, has conducted research on these techniques, and had professional experience using these techniques in his own company.

Professor Jeziorski is expected to testify that nearly all companies implement up-selling and/or cross-selling techniques. Up-selling and cross-selling rely on repeated interaction with the lead/customer, and therefore are very profitable. Typically, a company can charge higher prices when up-selling or cross-selling to repeated customers than it would charge to new customers, because repeated customers have already established that they like the company's products and are willing to pay.

Professor Jeziorski has formulated these opinions based on the article *Next-Product-To-Buy Models for Cross-Selling Applications*[10] by Aaron Knott, Andrew Hayes, and Scott A. Neslin and the journal article *Intuit: QuickBooks Upgrade, Darden Case No. UVA-M-0496*[11] By Phillip E. Pfeifer.

**Chargebacks**

Professor Jeziorski may also testify regarding chargebacks, a feature of credit and debit cards mostly, in which the transaction is reversed because the customer files a complaint with the bank or payment processor. Professor Jeziorski will testify that every company has chargebacks to some degree as chargebacks are impossible to avoid when credit or debit cards are used. Explanations for chargebacks include, but are not limited to, a customer losing a credit card and reporting the card stolen, or a system error in which the payment processor accidentally double-charged the customer; in both examples, the merchant is forced to return the money in the form of a chargeback.

Professor Jeziorski may also testify regarding chargeback fraud in which customers claim they did not receive what was purchased (although the customer did). Chargebacks are subject to arbitration between the bank and merchant and can take up to three months to decide and during that time period, the money remains in escrow. Professor Jeziorski will testify that banks frequently side with customers in order to keep them satisfied. In addition to his teaching and research, the bases for his opinion include that Professor Jeziorski has written chargeback integration with payment systems for his company and has experience dealing with chargebacks.

Professor Jeziorski is expected to testify that the number of chargebacks typically received is largely dependent on the industry and type of business. For example, in-store

---

[10] *Available at* https://www.sciencedirect.com/science/article/abs/pii/S1094996802701631.
[11] *Available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1280545.

transactions using a physical card are less likely to receive a chargeback than an online purchase, because it is easier to steal a credit card number than a physical credit card. Moreover, companies have been experiencing more chargebacks recently because while chargebacks were originally a method used to prevent fraud, chargebacks are now used by consumers as a quality check (meaning a customer who received the product or service is unhappy with the quality of it). It is within the discretion of the bank to decide the eligibility of the chargeback. For many chargebacks, banks do not contact the consumer, but rather, immediately begin processing and issuing the chargeback to the consumer based on the consumer-stated reason. Generally, banks only follow up with consumers for additional information and evidence in instances where the chargeback amounts to thousands of dollars. Additionally, Professor Jeziorski will testify that nearly all companies have employees designated to dispute chargebacks.

**Small Business Success Rates**

Professor Jeziorski may testify regarding small-business success rates. Professor Jeziorski, who has a Ph.D. in economics, has conducted research as to what makes small businesses succeed or fail, including conducting large-scale field experiments in which he monitors success and failure rates of small businesses.

Professor Jeziorski is expected to opine that approximately one-third of businesses fail within the first two years, and one-half of business fail within the first five years. These statistics are constant across years and industries. Professor Jeziorski is expected to testify that in light of this data, the success of a business depends more on the skill of the businessperson rather than the economic environment.

Professor Jeziorski has formulated these opinions based on data produced in an article from the Small Business Administration, entitled *Do economic or industry factors affect business survival?*[12]

**Conclusion**

Ms. Shah continues to reserve the right to call any expert witness in rebuttal to any witness called by the Government. In the event that Ms. Shah may call any additional expert witnesses, Ms. Shah will promptly provide notice to the Government.

                        Very truly yours,

                        Seth J. Zuckerman

---

[12] *Available at* https://www.sba.gov/sites/default/files/Business-Survival.pdf.