**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 23, 2022

**BY ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Jennifer Shah*, S4 19 Cr. 833 (SHS)

Dear Judge Stein:

      The Government respectfully writes in advance of the sentencing of defendant Jennifer Shah, currently scheduled for January 6, 2023, at 2:30 p.m.

      For nearly a decade, the defendant was an integral leader of a wide-ranging, nationwide telemarketing fraud scheme that victimized thousands of innocent people. Many of those people were elderly or vulnerable. Many of those people suffered significant financial hardship and damage. At the defendant's direction, victims were defrauded over and over again until they had nothing left. She and her co-conspirators persisted in their conduct until the victims' bank accounts were empty, their credit cards were at their limits, and there was nothing more to take.

      The defendant was not deterred by the Federal Trade Commission's investigations or enforcement actions, nor by learning that dozens of her co-conspirators had been arrested by federal law enforcement, pled guilty for their roles in the scheme, and that two were convicted at trial. To be clear, the defendant was not ignorant of these developments: she took a series of increasingly extravagant steps to conceal her criminal conduct from the authorities. She directed others to lie, she put businesses and bank accounts in the name of others, she required payment in cash, she instructed others to delete text messages and electronic documents, she moved some of her operations overseas, and she tried to put computers and other evidence beyond the reach of investigators. These efforts were not short-lived or narrow in scope. She engaged in a yearslong, comprehensive effort to hide her continued role in the scheme.

      Despite the defendant's best efforts, she got caught. She then went on a public offensive and tried to profit off the charges by selling "Justice for Jen" merchandise. She pled guilty at the eleventh hour, only after receiving the Government's trial exhibits and witness statements. In light of her conduct and her post-arrest behavior, her belated expressions of remorse ring hollow.

      The defendant is the most culpable person charged in this case. For the reasons set forth below, she should be sentenced to a term of 120 months' imprisonment.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 2

## I.      Background

### A.  The Defendant's Conduct

From at least 2012 until March 2021, when she was arrested, the defendant was a leader of a wide-ranging, nationwide telemarketing fraud scheme that used false representations to defraud thousands of victims (the "Victims"), many of whom were over the age of 55, by selling those Victims so-called "business services" in connection with the Victims' purported online businesses (the "Business Opportunity Scheme").  (PSR ¶ 14.[1])  In particular, the defendant knowingly and intentionally facilitated the sale of "leads"—contact information for potential Victims who had been identified as susceptible to the scheme's lies—to sales floors that were perpetrating the Business Opportunity Scheme and, during the latter portion of her participation in the scheme, owned and operated one of the sales floors that was part of the scheme.  (*Id.*)

### 1.  The Defendant Supplied "Leads" to Facilitate the Scheme

From 2012 until 2016, the defendant worked for so-called "coaching fulfillment" companies called Thrive Learning LLC ("Thrive") and Guidance Interactive ("Guidance").  (PSR ¶ 14.)  Both Thrive and Guidance obtained "leads" from lead generators, that is, marketing companies that offered products—such as pamphlets—to individuals who indicated an interest in earning money from home.  (*Id.*)  The defendant, while employed at Thrive and Guidance, sold those leads to individuals operating sales floors that sold Victims so-called "coaching sessions."  (*Id.*)  At times, these sales floors included those operated by co-defendants Kevin Handren and Cameron Brewster in Utah and Nevada; those operated by William Sinclair and Michael Finocchiaro, both of whom were defendants in the related case of *United States v. Ketabchi, et al.*, 17 Cr. 243 (SHS); and those operated by Ryan Hult and Jason Sager, who were also charged in *Ketabchi*.

Once the Victims were sold "coaching" sessions, the defendant typically required the coaching sales floors to use Thrive or Guidance to provide Victims with the so-called "business coaching" sessions, which were merely part of the scam.  (PSR ¶ 15.)  While Victims of the Business Opportunity Scheme were falsely told during the "coaching" sessions that the sessions would help Victims earn money from their internet businesses, at no point did the Victims earn any of the promised return on their intended investment.  (*Id.*)  Instead, the purpose of the "coaching" sessions was to convince Victims that, to make their internet businesses succeed, the Victims needed to purchase additional "products" and "services" (which were also of little or no value).  (*Id.*)

---

[1] "PSR" refers to the Presentence Investigation Report dated September 23, 2022 (Dkt. No. 606); "Def. Mem." refers to the defendant's sentencing memorandum dated December 16, 2022 (Dkt. No. 644); "Ex." refers to exhibits attached hereto; "GX" refers to proposed Government trial exhibits that were produced to the defendant's counsel in anticipation of her trial scheduled for July 18, 2022, in advance of her guilty plea on July 11, 2022.  The Government Exhibits referenced in this letter are attached hereto.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 3

Consistent with her role as a leader of the Business Opportunity Scheme, the defendant frequently controlled which sales floors were permitted to sell the Victims these additional "products" and "services." (PSR ¶ 15.) At the defendant's direction, the Victims' information was first passed on to what was known by members of the Business Opportunity Scheme as a "tax floor," which would fraudulently convince Victims to purchase tax preparation services, business plans, business entity set up, and/or corporate credit; the defendant and her co-conspirators knew these products were of little or no value. (*Id.*) After Victims were contacted by a tax floor, and while they were still receiving "coaching" sessions, Victims were contacted—at the defendant's direction—by an "upsell floor," which would convince the Victims to purchase yet more "products" and "services" that the defendant and her co-conspirators knew were of little or no value, including a website, social media packages, and marketing.[2] (*Id.*) While the Victims were falsely told these "products" and "services" would help their internet businesses succeed, the defendant and her co-conspirators knew the truth was that the "products" and "services" were essentially valueless, and the Victims never earned the promised internet business income. (*Id.*)

After the Victims were sold additional bogus "products" by the tax floor, their information was transferred—at the defendant's direction—to an "upsell floor" that sold the Victims yet more "services" and "products," including a custom website and marketing for their website. (PSR ¶ 16.) The defendant and her co-conspirators knew that the Victims, many of whom were elderly, sometimes lacked the basic ability to use a computer and often had limited financial resources, but were typically sold as many different "products" and "services" as possible before the credit limits on their credit cards were reached. (*Id.*)

## 2. The Defendant Facilitated the Continuation of the Business Opportunity Scheme After the FTC Tried to Shut It Down

In early 2013, the Tax Club, which ran a tax floor out of Manhattan as part of the Business Opportunity Scheme, was shut down by the Federal Trade Commission ("FTC") due to engaging in deceptive business practices. (PSR ¶ 16.) For approximately four years before the Tax Club was shut down, the Tax Club obtained Victim information from Thrive and made fraudulent sales to those Victims. (*Id.*) After the Tax Club was shut down, the defendant began facilitating the sale of Victim information by Guidance (Thrive's successor company) to other tax floors that opened in the wake of the Tax Club's demise, and used the same deceptive practices as the Tax Club (or, in some cases, even worse practices). (*Id.*) These included Top Shelf Marketing, which was then operated by co-defendant Joseph Minetto and *Ketabchi* defendants Hult and Sager; and Reliable Business Consultants, operated by Hult, Joseph Governara and, later, Louis Governara. (*Id.*; *see also, e.g.*, GX 602, 604, 609, 612-15 (email communications in furtherance of the scheme between Shah, Sager, and Hult in 2013).) In or about 2014, the defendant demanded that Hult cause Top Shelf Marketing to increase its dollar-per-lead revenue, which would have the effect of

---

[2] "Upsell" means "to persuade a customer to buy more products or a more expensive product than they originally intended." *Upsell*, Oxford Learner's Dictionaries, https://www.oxfordlearnersdictionaries.com/us/definition/american_english/upsell.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 4

increasing the revenue-share payable to Guidance and the defendant for the leads the defendant was providing to Top Shelf Marketing.  The Victims defrauded by these sales floors were provided so-called "fulfillment" of the business plans and other "products" by fulfillment companies including Prestige Worldwide, which was operated by *Ketabchi* defendant Raymond Quiles.

### 3.  The Defendant Concealed Her Criminal Conduct From the FTC

In April 2015, the defendant gave sworn testimony as part of the FTC's investigation of Top Shelf Marketing.  (PSR ¶ 17.)  During her testimony, the defendant admitted providing leads to Hult and Top Shelf Marketing while she was employed by Thrive, but she falsely denied engaging in any lead brokering on behalf of Guidance.  (*Id*.)  In truth, Reliable Business Consultants paid the defendant $5,000 per week for her role in obtaining leads for Reliable Business Consultants, in addition to the fees paid by Reliable Business Consultants to Guidance. (*Id*.)  After the FTC sued Top Shelf Marketing, Reliable Business Consultants, Hult, and others in 2016, the defendant continued to provide leads to Louis Governara, who opened a tax floor that employed many of Reliable Business Consultants's salespeople after the FTC shut it down.  (*Id*.)

By early 2016, the FTC's investigation shifted focus to the deceptive business practices at Thrive and Guidance, including the defendant's conduct.  (PSR ¶ 18.)  The defendant persisted in her criminal conduct, but took additional steps to conceal it from the FTC.  Specifically, while the defendant had previously received payment from Thrive and Guidance by direct deposit, in 2016 the defendant began funneling her compensation for participating in the fraud scheme into her bank accounts via structured cash deposits.  (*Id*.)  Shortly thereafter, as the FTC's scrutiny of Guidance intensified, the defendant and her co-conspirators sought to reorganize Guidance's operations (which then included lead sales and fulfillment) into two separate companies, Red Steele and Learning Systems.  (*Id*.)  The defendant controlled Red Steele (which handled lead sales) and aspects of Learning Systems (which handled so-called "fulfillment"), though, at the defendant's direction, the bank accounts for these entities were placed in the name of third parties to conceal the defendant's control of them.  (*Id*.; *see, e.g.* GX 737 (November 2018 text messages from the defendant to co-defendant Stuart Smith stating, among other things: "Red Steele is my thing.  The data was always mine."; "Those are my contacts, my leads."; and her payments from Red Steele are "not even my entire salary").)  Also in 2016, the defendant instructed others, including Quiles, to switch from regular text messages to an encrypted messaging application to discuss their involvement in the Business Opportunity Scheme.  (GX 784.)  Quiles understood that the defendant was attempting to eliminate a paper trail of their communications.  (Despite Shah's attempt to switch Quiles to an encrypted application, their communications continued, at least in part, by unencrypted text messages.)

### 4.  The Defendant Directly Targeted Victims by Operating a Sales Floor

In early 2017, the FTC sued both Thrive and Guidance for engaging in deceptive business practices.  (PSR ¶ 19.)  The defendant, in partnership with co-defendant Stuart Smith, continued to operate Red Steele, and sold leads to "coaching" sales floors throughout New Jersey, Washington, Nevada, and Utah, including sales floors operated by Handren in Utah and New

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 5

Jersey. (*Id.*)  Around the same time, the defendant, with Smith's assistance, opened her own sales floor in Manhattan called Mastery Pro Group ("MPG"), further exploiting the Victims of the Business Opportunity Scheme. (*Id.*)  The defendant ran the day-to-day operations of MPG and hired many sales and administrative personnel to work at MPG who had previously worked for Reliable Business Consultants and its successor entity run by Louis Governara. (*Id.*)  Thus, beginning in 2017, the defendant not only controlled the flow of leads from Red Steele through coaching and tax floors on to her own marketing upsell floor; she also directly supervised the salespeople at MPG who spent all day every day lying to the Victims and telling them that they could earn money through their internet business if they purchased products and services of little or no value (such as the website and marketing services referenced above). (*Id.*)  The defendant also supervised sales, addressed Victim complaints, and directed salespeople when to issue refunds in order to avoid scrutiny by the FTC or state attorneys general. (*Id.*)

Around this time, the defendant had a telling interaction with Quiles after a meeting in Manhattan.  Specifically, Quiles told the defendant that the "drop-shipping services" that MPG sold were one of the worst things he had seen.  He explained to the defendant it was impossible for the customers to make money with this service, because the prices they were being charged for the products to resell could easily be found cheaper elsewhere online, so no one would ever buy those products from the Victims' businesses.  (*See also, e.g.*, GX 785 (text messages Quiles exchanged with the defendant in March 2017, in which Quiles warned the defendant that "drop shipping" was "insanely challenging" for victims "to make money").)  Quiles also told the defendant that "corporate credit" was merely a cheap probing method to get a Victim to lower their guard so that the sales representative could learn how many assets the Victim had, in order to eventually talk them into spending all of those assets.  He explained that "corporate credit" very rarely actually resulted in someone getting funding because the victims had no real businesses, and that even if they did get funding, they would have to personally guarantee the funds.  Quiles told the defendant that doing so would then result in a financial disaster for the victims.  Lastly, Quiles explained to the defendant that the "social media" services she sold had no value and violate the social media platforms' terms of service.

Quiles specifically explained that these particular products and services never helped people, they only hurt them.  In response, the defendant feigned concern and made a vague comment about needing to do something about it.  But the defendant then went forward with selling those products and services anyway, and never did anything to eliminate or modify the predatory practices that Quiles had raised.  Her reaction shows that she was well aware of the fraudulent nature of the scheme and the damage it caused to Victims—and did not care.

### 5. The Defendant's Criminal Conduct Continued After the *Ketabchi* Arrests and She Attempted to Conceal Her Criminal Conduct From Law Enforcement

On March 21, 2017, several individuals, including Sinclair and Finocchiaro, were arrested as part of the *Ketabchi* case.  (PSR ¶ 20.)  The defendant was immediately aware of those arrests and fully understood their import.  For example, in the evening on the day of those arrests, Quiles

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 6

texted the defendant a link to the Government's press release announcing the charges. The defendant responded: "HOLY FUCKING SHIT!!!!!!!!" (GX 786, 786A.) Shortly after those arrests, the defendant communicated with co-conspirators including Smith about shifting to working from home and keeping computers out of MPG's office to avoid evidence being seized by law enforcement. (PSR ¶ 20.)

Notwithstanding the *Ketabchi* arrests, the defendant persisted in her criminal conduct through both her operation of MPG and her providing of leads to other sales floors as part of the Business Opportunity Scheme. During this time period, the defendant often joked about the Victims' suffering and her employees' ability to victimize them. For example, in October 2017, the defendant texted some of her employees about a victim who was attempting to obtain a refund after the victim realized she had been defrauded: "Do we need to refund this [victim name] lady? Or is she done crying and ready to move forward? Reyes, are you losing your touch with the ladies???" (Ex. 6.)

During consecutive periods of time between 2017 and 2019, the defendant placed two other co-conspirators in charge of aspects of MPG's operations and used them to distance herself from MPG, including putting their names on the leases of MPG's office space. (PSR ¶ 20.)) During that time period, the defendant was aware that the FTC continued to bring enforcement actions against participants in the Business Opportunity Scheme. For example, in June 2018, the defendant sent a co-conspirator a press release regarding a court order obtained by the FTC to halt a "business coaching scheme" that was materially identical to that in which the defendant was involved. (GX 804.)

The defendant also took steps to move certain aspects of Red Steele and MPG, which she continued to control, outside the United States to Kosovo in order avoid law enforcement scrutiny. (PSR ¶ 20.) For example, in a text message exchange with Smith in December 2017, the defendant explained that she wanted to move parts of their scheme abroad and use the names of "nominees" in Kosovo or Cypress for their corporate registrations to "minimize the risk," "[t]hen we can run this for a long time." (GX 708.) In particular, the defendant directed Smith to have co-conspirators, including Handren and co-defendant Anthony Cheedie, send money for leads and/or revenue share (*i.e.*, a portion of fraud proceeds from Victims) for certain sales to accounts based in Kosovo. (PSR ¶ 20.) The defendant also instructed one of her employees to keep secret from her salespeople at MPG the other sales floors to which the defendant was sending Victims' contact information for upsales: "I don't want the guys on my floor knowing where it's going so please tell Cheedie [*i.e.*, another sales floor operator] not to say anything to Phil [*i.e.*, one of the defendant's salespeople at MPG]. I don't like people knowing where my leads are going." (GX 806.)

The defendant also engaged in several other methods to attempt to conceal her criminal conduct, including the following:

- The defendant instructed Smith to direct co-conspirators to pay for leads in cash. (PSR ¶ 20.)

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 7

- The defendant told Cheedie and other co-conspirators to incorporate Victim-facing telemarketing companies in the state of Wyoming because that state's laws would permit them to conceal the true owners of the companies from the public. (*Id.*)

- The defendant told Cheedie and other co-conspirators to communicate only via encrypted messaging applications including Telegram, on which she used the fake name "Becky White." (*Id.*; GX 28.)

- The defendant and Smith discussed removing electronic versions of sales scripts from computers and removing computers from their offices. (PSR ¶ 20; *see, e.g.*, GX 809 (in July 2018, the defendant texted Smith: "Delete the sales scripts from the google drive…").)

- The defendant directed Smith to delete their communications from his phone to eliminate any paper trial connecting the defendant to MPG. (PSR ¶ 20.)

- The defendant had Smith's as the only name on the MPG bank accounts between 2017 and 2019, and the defendant was paid either in cash or through her use of the MPG credit card, the balance of which was paid from MPG's sales revenues (*i.e.*, Victim's funds). (*Id.*)

In addition to the arrests in the *Ketabchi* case, the defendant also was concerned about the arrest of another co-conspirator with whom she and Cheedie had worked closely as part of the Business Opportunity Scheme. Specifically, in March 2017, shortly after the arrests in the *Ketabchi* case, the defendant exchanged text messages with Quiles in which the defendant warned Quiles that the co-conspirator had been charged with drug-related charges, and that a review of his financials by the authorities would reveal telemarketing fraud proceeds flowing between the co-conspirator's accounts and Cheedie's accounts. The defendant specifically told Quiles that Cheedie has no "legitimate explanation" for those transactions, but assured Quiles that Quiles should not be worried about getting caught by the authorities because he was not the one who "process[ed]" victim payments. (GX 788.) Later in time, the defendant was afraid Quiles was going to reveal her participation in the scheme. She texted a co-conspirator, in part: "I have gone to great lengths to keep everything confidential. I don't need ray quillis [*sic*] running his mouth. I do not want anyone to know anything. They shouldn't be saying my name." (GX 749.)

In October 2018, the defendant was concerned that a co-conspirator who sometimes resided in the defendant's Manhattan apartment had provided her address to law enforcement. In expressing her frustration to Smith about the potential disclosure of her name and place of residence, the defendant wrote, among other things:

> Look bitch…I'm doing you a favor. You aren't on the lease and you
> don't pay rent, therefore, you don't live here! If someone is doing
> you a favor, you bring my name into a criminal federal prosecution

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 8

> case?!?!?!?  MY HOME is MY PLACE OF REFUGE.  They could
> come in with a warrant now at any time if they wanted to…plus
> Mercedes house has ALL MY LAST THREE YEARS OF
> EVERYTHING NEXT TO MY DNA RESULTS WHEN I HAD
> TO APPLY TO LIVE HERE.

(GX 709.)

At the same time she was taking steps to conceal her role in the scheme, the defendant's day-to-day involvement in the scheme became increasingly more significant and direct.  For example, in January 2018, she was consulted by her employees at MPG about how to avoid chargebacks[3] by particular Victims that could damage their company's ability to process Victims' payments.  In particular, the defendant inquired with a co-conspirator about a particular customer who had attempted to charge back.  The co-conspirator, who was one of the defendant's employees at MPG, explained: "We have been calling him everyday with no answer- he is really sick and 85 [years old]." (GX 719.)  In response, the defendant provided instructions about what company to process his payments through, questioned why they had charged his credit card for three smaller amounts instead of one large amount, and reminded them that "MPG and VQD [another entity the defendant controlled] don't have a transaction limit."  (*Id.*)

Similarly, in April 2018, one of the defendant's employees at MPG informed the defendant that he had tried to be on the phone with two Victims when they called a credit card company to raise their credit limit, but that he was unsuccessful in doing so, and noted that those Victims' credit limits were so low that they may have to spread the fraudulent charges across "3 cards." (GX 729.)  The defendant responded, showing no hesitation to completely max out the Victims' credit cards: "We can run two cards on two diff merchant accounts.  So run one card on mpg and one on our backup account."  (*Id.*)

As another example, in June 2018, when the defendant was displeased with the amount of fraud proceeds her employees at MPG were generating for her, she texted them: "I'm coming in to set appts for these guys tomorrow.  Please get my 24 karat gold headset with diamond encrusted mouthpiece ready.  Papi needs money for the weekend and [a co-conspirator] needs baby mama money." (GX 721.)

### 6.  The Defendant Directed Smith to Lie to the FTC

In early 2018, Smith received a subpoena for documents and testimony in connection with the FTC's then-public lawsuit against Vision Solutions Marketing ("VSM"), a Utah-based "coaching" floor that had, for years, purchased leads from the defendant and Smith through Red

---

[3] "Chargebacks are a consumer protection tool that allow consumers to get their money back for fraudulent charges or purchases that don't live up to standards by submitting a dispute with their card issuer."  Alexandria White, *What Is A Chargeback-And How To Dispute Credit Card Transactions*, CNBC, Aug. 19, 2021, https://www.cnbc.com/select/what-is-a-chargeback/.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 9

Steele. (PSR ¶ 21.)  The defendant was aware of the FTC's complaint against VSM, including the allegations that VSM lied to Victims.  (*Id.*)  In advance of Smith's scheduled deposition in mid-2018, the defendant sent Smith lists of questions and answers he should "practice" and instructed him to "save it on your laptop and delete the email," and gave him specific instructions on how to falsely answer certain questions.  (*Id.*; GX 723, 723B, [4] 738.[5])  Among other things, the defendant directed Smith (1) not to disclose her involvement in MPG or Red Steele, (2) not to describe himself as an owner of Red Steele, (3) not to disclose that he had spoken to the defendant about the deposition, and (4) not to reveal that Red Steele and Learning Systems were created around the same time.  (PSR ¶ 21.)  These lies were designed to hide the defendant's role in the Business Opportunity Scheme and prevent the FTC from realizing that Red Steele and Learning Systems, which the defendant controlled, were the successor entities to Thrive and Guidance.  (*Id.*)  The night before the defendant's deposition, the defendant went to Smith's hotel to discuss the deposition and "come up with an answer together" for certain of the questions the defendant anticipated Smith would be asked.  (*Id.*; GX 723.)  The day of the deposition, the defendant waited across the street and texted with Smith throughout the deposition.  (PSR ¶ 21; GX 724 (text messages in which the defendant told Smith, during the deposition, "I'm sitting here across the street in case I need to come rescue you," and in which the defendant directed Smith what to say to his attorney before the deposition).)

> **7.  The Defendant's Criminal Conduct Continued After the *Cheedie* Arrests and She Continued to Attempt to Conceal Her Criminal Conduct From Law Enforcement**

Between 2018 and 2019, the defendant sold Handren leads, which Handren used to sell "coaching" services to those Victims.  (PSR ¶ 22.)  Those "coaching" services were fulfilled by companies controlled by the defendant and Smith.  (*Id.*)  Handren's companies, including Corporate Development Center ("CDC"), which was co-owned and operated by co-defendants Joseph Ciaccio and Joseph Minetto, and which employed co-defendants Joseph DePaola, Mattie Cirilo, and Derrek Larkin, then sold the Victims worthless tax preparation and business plan "products" and "services," before passing the Victims back to the defendant's MPG to further upsell the Victims additional marketing products.  (*Id.*)

The defendant was well-aware that CDC was engaged in defrauding the Victims whom she steered to them.  For example, in May 2018, the defendant texted Smith that she was "so fucking pissed off" because a "slimy piece of shit [of] a customer recorded our sales pitch," which "tied [them] in to CDC and we sound like the crooks."  She added that CDC would "eventually get banned by the FTC and if we touch this customer we're fucked," "[b]ut we'll probably be the only one fucked bcuz now they have our sales recording."  (GX 710.)

---

[4] GX 723A-E, which are attached hereto, consist of the attachments to GX 723.  In the messages, "Daren" refers to an attorney with the FTC.

[5] "corporate@masteryprogroup.com" was used by the defendant.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 10

The defendant and Smith continued to participate in the Business Opportunity Scheme throughout 2019 and 2020, notwithstanding their awareness that Cheedie and several other co-conspirators were searched, arrested, and/or charged with crimes in connection with the scheme. (PSR ¶ 22.)  For example, in early January 2019, HSI executed a search warrant at CDC's office in Englewood, New Jersey.  (*Id.*)  Handren, Ciaccio, and Minetto co-owned that sales floor.  (*Id.*)  The defendant learned that the search had been conducted, and nonetheless continued to provide leads directly to Handren and, indirectly, to Ciaccio and Minetto.  (*Id.*)  For example, within a few days of those searches, the defendant and Smith exchanged text messages about what they had heard from other participants in the scheme about the searches, which law enforcement agencies were involved in the Government's ongoing investigation, and which defendants were referenced in an earlier press release by the Government about the *Ketabchi* case.  (GX 701.)  In that same time period, the defendant and Smith also discussed firing their accountant because he previously worked with Quiles, which the defendant understood to mean "[h]e's probably been questioned" by the authorities, and that they needed to mislead the accountant to make him "think we're shutting down" and then "rebrand mpg," shift to "working from home," and "take the fucking computer out of [the office]" to avoid law enforcement scrutiny.   (GX 801, 801A-B. [6] )  Notwithstanding her apparent concerns about her co-conspirators being apprehended, approximately two months later, in March 2019, the defendant sent text messages praising her employees at MPG for a day in which they defrauded no fewer than seven Victims out of a total of more than $15,000: "I hope this is a good sign for a record week!"  (GX 720.)  Approximately three weeks later, the defendant was continuing to monitor the status of the defendants in the *Ketabchi* case, including by Google searches and docket alerts regarding co-conspirators Jason Sager and Arash Ketabchi.  (GX 736.)

In mid-2019, the defendant and Smith learned that the individual whose name was listed on several Red Steele bank accounts had stolen company money (all of which was fraud proceeds from Victims), prompting the defendant to blame Smith and ask several other individuals if they would open up bank accounts in their own names for the defendant to use.  (PSR ¶ 22.)  Ultimately, the defendant's aunt agreed to open a bank account in the name of Monetize Data Solutions ("MDS"), and MDS took over the Red Steele lead sale business.  (*Id.*)

In November 2019, Handren, Brewster, Ciaccio, Minetto, and several others, were arrested in connection with this case.  (*Id.*)  Throughout 2020, Handren and Smith continued to engage in the Business Opportunity Scheme, and the defendant and Smith continued to sell leads to Handren notwithstanding that Handren was under indictment for fraud and money laundering charges in connection with the scheme.  (*Id.*)  In mid-2020, when Handren agreed (at the direction of law enforcement) to purchase leads from Smith, Handren was directed by Smith to send the money for the leads to the MDS bank account—the same account that the defendant had set up in the name of her aunt, to mask her involvement.  (*Id.*)  Around that time, the defendant and Smith discussed the need to conceal from law enforcement their continued involvement with Handren, and Smith suggested to Handren that he pay for leads in cash and communicate via Telegram.  (*Id.*)

---

[6] GX 801A-B, which are attached hereto, consist of the attachments to GX 801.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 11

In November 2020, the defendant publicly described her employment as follows: "I own three different marketing companies and we do lead generation, data monetization, customer acquisition. The best way to describe it is, I'm the Wizard of Oz, I'm the one behind the curtain that no one knows exists but I'm the one making everything happen." *'Real Housewives' Star Jen Shah Called Herself 'Wizard of Oz' While Explaining Job Prior To Arrest For Federal Fraud Telemarketing Scam*, Access, Mar. 31, 2021, https://www.accessonline.com/articles/real-housewives-star-jen-shah-called-herself-wizard-of-oz-while-explaining-job-prior-to-arrest-for-federal-fraud-telemarketing-scam-exclusive.

### 8.   The Defendant Used Fraud Proceeds to Live a Life of Luxury

In the years leading up to the defendant's arrest, the defendant used her profits from the Business Opportunity Scheme, which inflicted serious financial injury on untold elderly and vulnerable Americans, to live a life of luxury. (PSR ¶ 20.) The defendant rented a 9,420 square foot mansion in Park City, Utah, currently listed for $7.4 million, featuring five bedrooms, eight bathrooms, a library, eight fireplaces, and a three-car garage. (PSR ¶ 20; GX 38.) The defendant publicly referred to the mansion as the "Shah Ski Chalet."

The defendant also used fraud proceeds to rent an apartment in midtown Manhattan, lease a Porsche Panamera (GX 26), purchase hundreds of thousands of dollars' worth of luxury goods (*see, e.g.*, GX 33-35 (photographs of luxury clothing, shoes, and accessories in the defendant's home), GX 308-09 (luxury goods receipts seized from the defendant's home)), and fund various cosmetic procedures. (PSR ¶ 20.) Despite her enormous (unlawful) income and the ostentatious manner in which she spent the fraud proceeds, the defendant filed false tax returns for several years, and never disclosed to the Internal Revenue Service ("IRS") any income from Red Steele, MPG, or any fulfillment entities. (*Id.*) The total amount of fraud proceeds the defendant concealed from the IRS is at least hundreds of thousands of dollars. (*Id.*)

### 9.   The Defendant Lied to Federal Law Enforcement

The defendant was arrested on March 30, 2021. (PSR ¶ 23.) Following her arrest, the defendant gave a voluntary recorded interview to law enforcement. (*Id.*) During the interview, the defendant falsely told law enforcement that she had not worked with Hult or Cheedie, or anyone else who had been arrested by law enforcement for their role in the Business Opportunity Scheme. (*Id.*) She also falsely told law enforcement that she had stopped working with MPG years prior when, in fact, her control of and receipt of crime proceeds from MPG continued up until the time of her arrest. (*Id.*)

### 10. The Defendant's Post-Arrest Conduct

After her arrest, the defendant went on a public offensive against the charges in this case. She repeatedly, vehemently, and falsely proclaimed her innocence—for example, stating "I am

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 12

innocent. I did not do any of those things."—and she told the public that she was going to "fight" the charges not just for her own sake, but for a purported greater good:

> I'm fighting this, I'm innocent. I will fight this for every person out there that can't fight for themselves because they don't have the resources or the means, so they don't fight.

> I will fight because number one, I'm innocent, and number two I'm going to f***ing represent every other person out there that can't fight and hasn't been able to. I just hope we can do better in the future and not judge people.

Laura Donaldson, *What 'Real Housewives of Salt Lake City's' Jen Shah Has Said on Fraud Case*, Newsweek, Sept. 28, 2022, https://www.newsweek.com/jen-shah-real-housewives-salt-lake-city-update-crime-scam-fraud-case-pleads-guilty-1746893. The defendant, appearing to mock the charges in this case, also claimed that "the only thing I'm guilty of is being Shah-mazing." Marisa Dellatto, *'Real Housewives' Jen Shah Pleads Guilty—Could Face Up to 14 Years in Prison*, Forbes, Jul. 11, 2022, https://www.forbes.com/sites/marisadellatto/2022/07/11/real-housewives-jen-shah-pleads-guilty-could-face-up-to-14-years-in-prison/?sh=6af80abc4d65.

Before pleading guilty, the defendant attempted to profit off the charges in this case by selling "a range of apparel to promote her innocence." Samantha Holender, *Merch Mania! RHOSLC's Jen Shah Is Selling 'Not Guilty' Shirts Ahead of Her Trial*, US Magazine, Mar. 11, 2022, https://www.usmagazine.com/stylish/pictures/jen-shah-releases-not-guilty-merch-ahead-of-trial-photos/. These included a "Justice for Jen Shah" t-shirt that featured "NOT GUILTY" on the front and "#justiceforjenshah" on the back. *Id.*

**B. Impact on the Victims**

The defendant's conduct had a devastating impact on thousands of Victims. This Court is familiar with the typical harms to the Victims from the testimony of several Victims in the *Ketabchi* case and from victim impact statements received in connection with other sentencings in this case and in the *Ketabchi* case. In addition, the Government attaches hereto five victim impact statements provided by individuals who were victimized directly by MPG, the defendant's telemarketing sales floor, and a letter from a representative for another Victim that was found on the defendant's cellphone. (Exs. 1-5; GX 911-12.[7])

---

[7] Consistent with 18 U.S.C. §§ 3771(a)(8) & 3664(d)(4) and Federal Rule of Criminal Procedure 49.1, to protect the privacy interests of the Victims, the Government files herewith redacted versions of the victim impact statements and certain of the Government Exhibits on the public docket and requests that unredacted versions, which will be submitted to the Court and the defendant by email, be filed under seal.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 13

<u>Victim-1</u>

Victim-1 is a widow in her mid-70s and was prepared to travel from California to New York to testify at the defendant's trial.  In her statement, she describes how she was misled and abused by the defendant's salespeople and other participants in the Business Opportunity Scheme.  (Ex. 1.)  She explains that: "The mental anguish is still with me, today, and the guilt I harbor from being so vulnerable and easy prey to such sharks, still swim in my mind." (*Id*. at 2.)  She asks that "the punishment fit the crime."  (*Id*.)

The defendant was personally and directly involved in defrauding Victim-1.   On February 21, 2018, the defendant was informed about the fraudulent sale as it was occurring and personally approved splitting the sale across multiple credit cards because Victim-1's credit limits were too low for the amount the salesperson was charging for bogus "products" and "services." (GX 716.)  When the defendant's salesperson texted the defendant that he had convinced Victim-1 to pay more than a typical "sale," nearly $10,000, and added "She's laughing and excited and I think she's in love with me. Lol," the defendant responded callously: "If she's in love with you then you better make sure she loves you for at least 16 weeks so she doesn't charge back.  Lol." (*Id*.)  The defendant then doubled down: "close this lady.  Solid.  Send a selfie, whatever you need to do so she stays in love with you.  Lol."  (*Id*.)

On April 3, 2018, the defendant was informed that Victim-1 had attempted to charge back on her original purchase, and that one of the defendant's employees was concerned she may try to charge back on an "upsale for 2995" that was made by MPG thereafter.  (GX 776.)  The following day, on April 4, 2018, the defendant was consulted about what to do in light of Victim-1's attempt to charge back through her credit card company, after discovering that she was defrauded.  The defendant instructed co-conspirators to try to convince Victim-1 not to charge back or, if needed, provide her with a partial refund to avoid the chargeback.  (GX 718.)

<u>Victim-2</u>

Victim-2 is a widow in her mid-70s and was prepared to travel from North Carolina to testify at the defendant's trial.  In her statement, she describes how the defendant's sales floor and others participating in the scheme defrauded her of approximately $40,000—more than half of her life savings.  (Ex. 2 at 1.)  Victim-2 explains that, like her, "[e]ach person scammed has their own story with a dream of a better retirement and life," which was "taken away when they were co[erc]ed to give their money for false promises."  (Ex. 2 at 2.)  She asks that the Court's "judgment carry the same hardships [the defendant] has caused her victims."  (*Id*.)

The defendant was involved in defrauding Victim-2.  On February 18, 2018, after Victim-2 had attempted to cancel her purchases upon realizing she had been defrauded, the defendant's salesperson reached out to the defendant and Smith: "Stu and Jen I've been blowing up [Victim-2] a vsm lead for the last week but there's a problem with her phone.  I emailed her with no response.  Can we contact the coaching team to let her know she has to speak with me to cancel.  We brought her on board in Sept btw her canceling is total bullshit."  (GX 714.)  The purpose of forcing

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 14

Victim-2 to speak with the salesperson was to give the salesperson an opportunity to persuade Victim-2 into recanting her cancellation request in an effort to permit the defendant's company to retain Victim-2's money.  Smith responded to the salesperson and the defendant, "Yes…we [*i.e.*, the defendant and Smith] will coordinate with them for sure."  (*Id.*)

Victim-3

Victim-3 is a 60-year-old woman and was prepared to travel from Nevada to testify at the defendant's trial.  In her statement, she describes how she was defrauded out of approximately $35,000.  (Ex. 3 at 1.)  She also explains that she is still, years later, trying to pay off the credit card debt she incurred from the scheme, and describes the heartbreaking mental and physical toll that her victimization has brought upon her.  (*Id.* at 1-2.)  She asks that the defendant be "given the maximum prison sentence allowed by law."  (*Id.* at 2.)

The defendant was personally and directly involved in defrauding Victim-3.   On December 23, 2017, the defendant passed along a message from a co-conspirator to Smith explaining that although Victim-3 did not yet "officially cancel," she had "voice[d] her concerns to our fulfillment dept. over the investments and said she may consider canceling."  (GX 734.) The defendant instructed Smith and certain of her employees to have Victim-3 "called" by another one of her employees for the purpose of persuading Victim-3 not to cancel despite having been defrauded.  (*Id.*)  Specifically, the defendant told one employee that a co-conspirator "is having [another co-conspirator] reach out now and I'll keep you posted."  (GX 735.)  Smith then sent a screenshot of a text message exchange between co-conspirators regarding Victim-3, who was contacted at the defendant's direction, explaining that the co-conspirator "was able to reach her" and that Victim-3 "is just super nervous because she said she spent 30 grand total on this program so far.  [The co-conspirator who spoke with Victim-3] helped her out, but she did ask for a breakdown of what she paid the sales floor to be sure she knows exactly what she bought and we will be doing for her."  (GX 734A.)   The defendant then sent that screenshot to one of her employees.  (GX 735A.)

Victim-4

Victim-4 explains that she lost over $100,000 due to her victimization by the Business Opportunity Scheme.  (Ex. 4 at 1.)  She describes the terrible "emotional, mental, physical and financial anguish" she has suffered.  (*Id.*)  Due to the financial devastation visited upon her by the defendant and her co-conspirators, "[i]t's an every day struggle and an every day worry wondering where [Victim-4 is] going to get money for the next set of bills that need to be paid and the food and shelter [Victim-4 and her family] need to survive, as well as providing care for [Victim-4's] critically ill husband and a 90 year old father who is also critically ill and both need [Victim-4] to help provide for them financially."  (Ex. 4 at 2.)  Victim-4 addresses the defendant directly: "The burden you have caused me is overwhelming, I can't even really put words to the amount of anguish you have caused."  (*Id.*)

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 15

Victim-5

Victim-5 explains that she was pushed by the defendant's employees and her co-conspirators into approximately $30,000 of debt. (Ex. 5 at 2.) Victim-5, who suffers from several serious health conditions, ultimately "became homeless." (*Id*. at 1.) Victim-5 concludes: "I could go on and on but the point is," as a result of the defendant and her co-conspirators' conduct, "I have the problem of faith and trust." (*Id*. at 2.)

Victim-6

Victim-6 is a 77-year-old woman and was prepared to travel from California to testify at the defendant's trial. The defendant's cellphone contained a copy of a letter that a *pro bono* attorney sent to one of the defendant's co-conspirators on June 9, 2016, describing how Victim-6 was defrauded. (GX 911-12.) Victim-6 took extensive steps, with the help of the *pro bono* attorney, to get approximately $8,000 of her hard-earned money back, but was never able to do so. On one occasion, Victim-6 expressed appreciation to the Government for contacting her because she was upset about what the Business Opportunity Scheme had done to "senior citizens."

**C. The Advisory Guidelines Range**

The defendant was convicted, following a guilty plea, of participating in a conspiracy to commit wire fraud in connection with the conduct of telemarketing, in violation of 18 U.S.C. §§ 1349 and 2326. Consistent with the stipulated Guidelines range set forth in the plea agreement, the Probation Office has calculated that the defendant has an advisory Guidelines range of 135 to 168 months' imprisonment. (PSR ¶ 90.)

**D. Sentences of Co-Conspirators**

Several of the defendant's co-conspirators have been sentenced. The following are a list of those defendants and the sentences imposed, in the same order and categories provided in the Government's relative culpability letter submitted on July 22, 2021, which is incorporated by reference herein. (Dkt. No. 309.) The defendants whose names are followed by an asterisk (*) received the benefit of a motion pursuant to U.S.S.G. § 5K1.1.

Tier A
**Jennifer Shah**
Carl Morris – sentenced to 78 months' imprisonment
Cameron Brewster
Kevin Handren
Ryan Hult – sentenced to 60 months' imprisonment
Stuart Smith

Tier 1
Arash Ketabchi – sentenced to 87 months' imprisonment

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 16

      Christopher Wilson – sentenced to 78 months' imprisonment
      Jason Sager* – sentenced to 12 months' imprisonment
      Joseph Minetto
      Chad Allen – sentenced to 48 months' imprisonment
      Shane Hanna
      Anthony Cheedie
      Joseph Ciaccio – sentenced to time served

      <u>Tier 2</u>
      Joseph McGowan – sentenced to 72 months' imprisonment
      William Sinclair* – sentenced to 15 months' imprisonment
      Peter DiQuarto* – sentenced to six months' home confinement
      Michael Finocchiaro* – sentenced to 15 months' imprisonment
      Raymond Quiles

      <u>Tier 3</u>
      Jack Kavner – sentenced to 51 months' imprisonment
      Daniel Quirk* – sentenced to 366 days' imprisonment
      Derrek Larkin – sentenced to 72 months' imprisonment
      Anthony Medeiros – sentenced to 66 months' imprisonment
      Brooke Marcus
      Andrew Owimrin – sentenced to 52 months' imprisonment
      Joseph DePaola – sentenced to 30 months' imprisonment

      <u>Tier 4</u>
      Shahram Ketabchi – sentenced to four months' imprisonment
      Thomas O'Reilly – sentenced to 366 days' imprisonment
      Mattie Cirilo – sentenced to 12 months' home confinement

## II.   Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 17

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id*. at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## III.   Discussion

### A.  The Defendant Should Be Sentenced to 120 Months' Imprisonment

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's background, the nature and circumstances of her offense and the need to provide just punishment, to adequately deter the defendant from engaging in additional criminal conduct and protect the public from such conduct, to promote respect for the law, to avoid unwarranted sentence disparities, and to deter others from engaging in similar conduct in the future, a sentence of

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 18

120 months' imprisonment would be sufficient but not greater than necessary to satisfy the purposes of sentencing.

*First*, such a sentence is warranted due to the nature and seriousness of the offense and the need to provide just punishment. *See* 18 U.S.C. § 3553(a)(1), (2)(A). The defendant's conduct was reprehensible. She was a key leader of a multimillion-dollar, nationwide scheme that victimized elderly and vulnerable people, often pushing them into financial ruin and emotional distress. As explained above, the devastating effects of the defendant's conduct are ongoing and some of the Victims likely will never fully recover. The defendant participated in the scheme for nearly ten years, in a variety of key roles, and exercised control and day-to-day oversight of the provision of Victim information to numerous sales floors and operated her own sales floor, MPG. A sentence of 120 months' imprisonment is necessary to adequately reflect the nature and seriousness of the defendant's conduct and provide just punishment for the wrongs she visited upon the Victims.

*Second*, the need to specifically deter the defendant from committing additional crimes and protect the public from potential future crimes also warrant a sentence of 120 months' imprisonment. *See* 18 U.S.C. § 3553(a)(2)(B)-(C). The defendant has demonstrated a willingness to persevere in committing crimes even when the risk of getting caught and punished is significant. As explained above, as the FTC and the Government were dismantling the Business Opportunity Scheme over the past ten years, the defendant's only response was to take increasingly substantial steps to conceal her own conduct. Not until the defendant was arrested in this case did her conduct cease. Nothing short of her arrest was any deterrent to the defendant: she was not deterred when other telemarketing floors were being shut down by the FTC, when her co-conspirators were arrested, when her co-conspirators pled guilty, when her co-conspirators were convicted at trial, or when her co-conspirators were sentenced to lengthy prison terms. The sentence imposed should adequately reflect how difficult it is to deter someone as persistent and cunning as the defendant. The sentence should also account for the importance of protecting the public from any potential future crimes she may commit, as the defendant is hardly someone who has demonstrated that she has suddenly turned over a new leaf after nearly a decade of crime.

*Third*, a sentence of 120 months' imprisonment is necessary to deter others from engaging in telemarketing fraud generally, and the Business Opportunity Scheme specifically, and to promote respect for the law. *See* 18 U.S.C. § 3553(a)(2)(A)-(B). In sentencing several of the defendant's co-conspirators, the Court has expressed that general deterrence is one of the important considerations in this case. It is also one of the purposes of the Government's prosecution: to try to prevent anyone else from joining the Business Opportunity Scheme, or from engaging in other similar conduct. In order for the Court to ensure that others make choices different than those the defendant made, the defendant needs to be held fully accountable for her actions. The Court can and should use this case to send a message that egregious conduct like the defendant's will not be tolerated and that those who engage in such behavior will suffer significant punishment.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 19

### B. The Defendant's Requested Sentence and Probation's Recommendation Should Be Rejected

The sentence requested by the defendant (36 months' imprisonment) is woefully inadequate to satisfy the purposes of sentencing. In particular, such a sentence would generate unwarranted sentencing disparities with numerous of the defendant's co-conspirators who already have been sentenced. For example, the defendant's requested sentence would be lower than the sentences imposed on members of the conspiracy who were far less culpable than she was in the conspiracy, such as Jack Kavner (a member of Tier 3, who was sentenced to 51 months' imprisonment with a Guidelines range of 51 to 63 months' imprisonment) and Chad Allen (a member of Tier 1, who was sentenced to 48 months' imprisonment with a Guidelines range of 63 to 78 months' imprisonment). The limited mitigating circumstances present for the defendant do not come anywhere close to justifying her receiving lower sentences than Allen and Kavner.

Several of the arguments that the defendant advances in a favor of the unusually lenient sentence she seeks are entirely baseless.

*First*, the defendant misleadingly implies that she only participated in criminal conduct for three years, from 2016 to 2018. (*See, e.g.*, Def. Mem. 35 (referring to "the Jen Shah of 2016-2018").) To be clear, the defendant joined the conspiracy in 2012, not in 2016. Indeed, numerous exhibits that the Government intended to offer at the defendant's trial focused on her participation in the scheme in 2013 and 2014, including communications with co-conspirators Ryan Hult and Jason Sager. (GX 602, 604, 609, 612-15.) The defendant's suggestion that she departed the scheme in 2018 (Def. Mem. 35) or that she "left the telemarketing industry" (Def. Mem. 36) at some point before her arrest is also completely false. The defendant's communications, her control of a bank account in her aunt's name, and information from cooperating witnesses conclusively establishes that the defendant remained a part of the scheme until she was arrested in 2021.

*Second*, while the defendant is correct that the co-defendants who received sentences higher than 36 months' imprisonment "can all be distinguished clearly from Ms. Shah" (Def. Mem. 33), the comparisons to those defendants are not favorable to the defendant and support the imposition of a *longer* sentence than those defendants received, not a shorter sentence. For example, the defendant points out that some of the defendants who received substantial sentences in this case "had direct contact with the victims of the fraud," while the defendant did not. (*Id.*) This is not a mitigating factor for the defendant, it is an aggravating factor: the defendant was so high up in the scheme, that she would not need to have direct contact with the Victims—as explained above, she left that dirty work to her employees and co-conspirators, in the same way that drug crew leader do not sell drugs to individual customers on the street. As the text messages with her employees make clear, she understood, indeed, directed, that her employees use manipulative and financially ruinous tactics to defraud the Victims. (GX 716.) Similarly, she tries to use the fact that the FTC did not expressly bar her from telemarketing. (Def. Mem. 33.) Again, this is another aggravating factor, not a mitigating factor: the reason the FTC ultimately took no direct action against the defendant is apparent from the conduct described above—she took extraordinary steps to conceal her conduct from the FTC.

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 20

*Third*, the defendant is simply wrong that she is not correctly placed in "Tier A" of the scheme. (Def. Mem. 33.)  The defendant misapprehends the analysis that the Government undertook in categorizing and ordering the defendants in this case by culpability.  Instead, she suggests that because she was not the but-for cause of the entire scheme and that there were some members of the scheme who did not report to her or work with her directly, she must be in a tier other than "Tier A," though she does not identify in which tier she might be placed.  She also points to no individual that is more culpable than her.  In any event, the defendant's reasoning is faulty.  The fact that some members of the conspiracy did not work directly with her or that there were other people providing "leads" to her co-conspirators does not undermine her culpability.  The defendant had an outsized presence in the scheme, for nearly a decade.  Put simply, she was a prolific enabler and one of the main—although not only—drivers of the Business Opportunity Scheme.  And for a large number of participants in the Business Opportunity Scheme, including nearly all of those charged in this case and the related *Ketabchi* case, the defendant reigned supreme.

*Fourth*, the defendant suggests that the fraud guidelines are somehow unfairly harsh as applied to this case. (Def. Mem. 29-30.)  As the defendant's only comparator, she picks a case that is nothing like this one.  Rajat Gupta was convicted of insider trading, a crime nothing like the defendant's crime.  While Gupta's loss amount was calculated using the gain to a hedge fund manager who traded on Gupta's inside information, the loss amount in this case was calculated by totaling money defrauded from Victims by the defendant and those reporting to her.  The loss amount in this case is not some legal fiction—it represents hard-earned money stolen from Victims with false promises.  Not captured by the Guidelines calculation, of course, is the overwhelming mental, emotional, and sometimes physical, pain inflicted on the Victims through the fraud.  In addition, Gupta "did not in any direct sense receive one penny," *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012), while the defendant made a fortune off of her criminal conduct over the years.  Put simply, the *Gupta* case offers no insight on the value of the Guidelines in this case which, if anything, understate the true harm the defendant caused.

*Fifth*, the defendant attempts to analogize her case to that of David Blaszczak, who was convicted of profiting approximately $700,000 off of insider trading.  (Def. Mem. 38-39.)  Blaszczak was nothing like the defendant.  Blaszczak's conduct took place over five years and was intermittent, while the defendant committed her crime virtually every day for nearly a decade.  *See United States v. Blaszczak*, 947 F.3d 19, 26-28 (2d Cir. 2019), *vacated and remanded by* 141 S. Ct. 1040 (2021).  While Blaszczak's conduct undermined the public's trust in government and the financial markets (Def. Mem. Ex. I at 6), the defendant's conduct brought financial and emotional devastation to thousands of Victims, many of whom were elderly and vulnerable.  Blaszczak's wife suffered from serious degenerative illness, while the defendant's husband appears to suffer from no malady.  (Def. Mem. 39.)  Blaszczak had a "young son" in need of care, while the defendant's children are essentially grown—one is in medical school and the other is heading to college in the fall.  (Def. Mem. Ex. I at 7.)  To be sure, the defendant's family may find it difficult during the defendant's incarceration, as is true of the family members of anyone who is incarcerated.  But the defendant engaged in brazen criminal conduct for nearly a decade, each day

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 21

knowing that she was putting her liberty at risk and that it would hurt those closest to her if she were caught.  The harm the defendant has caused to her own family through her choices and her actions should not inure to her benefit at sentencing, especially when balanced against the horrific outcomes for the Victims of her conduct.

The Probation Office's recommended sentence is also inappropriately lenient and would generate an unjust outcome.  The defendant is far more culpable than the two defendants who received sentences of 72 months' imprisonment—Joseph McGowan (a member of Tier 2) and Derrek Larkin (a member of Tier 3).  Indeed, the defendant is also more culpable than Carl Morris (a member of Tier A, who was sentenced to 78 months' imprisonment), Arash Ketabchi (a member of Tier 1, who was sentenced to 87 months' imprisonment), and Christopher Wilson (a member of Tier 1, who was sentenced to 78 months' imprisonment).  As compared with McGowan, Larkin, Ketabchi, and Wilson, the defendant's involvement in the scheme took place over a longer period of time, she had control over more Victims and more sales, she made more money, and she took greater lengths to conceal her conduct from authorities.  In addition, unlike any of the others, the defendant had a spouse who made a very good living: she had no need to commit the crime to support herself or her family, she did so out of pure greed.

Although the defendant does present some mitigating circumstances, a below-Guidelines sentence of 120 months' imprisonment is a sufficient variance to account for those circumstances. The sentences requested by the defendant and recommended by the Probation Office are not called for by the facts of this case, would fail to recognize the seriousness of the conduct at issue and the damage done to the Victims, and would not send the appropriate message to the defendant, others similarly situated, the public, or the Victims about the defendant's criminal conduct.  There are simply no factors that justify the extraordinary leniency sought by the defendant or the substantial downward variance recommended by the Probation Office.

## IV.  Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 120 months' imprisonment, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:      /s/
Kiersten A. Fletcher
Robert B. Sobelman
Sheb Swett
Assistant United States Attorneys
(212) 637-2238/2616/6522

Honorable Sidney H. Stein
United States District Judge
December 23, 2022
Page 22


cc:     Priya Chaudhry, Esq. (by ECF)
        Seth J. Zuckerman, Esq. (by ECF)
        Beth Farber, Esq. (by ECF)