**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

JENNIFER SHAH,

               Defendant.

S4 19 Cr. 833 (SHS)

**SENTENCING MEMORANDUM ON BEHALF OF JENNIFER SHAH**

Dated: December 16, 2022
       New York, New York

ChaudhryLaw PLLC

By:    */s/ Priya Chaudhry*
       Priya Chaudhry
       Seth J. Zuckerman
       Beth Farber
       147 West 25th Street, 12th Floor
       New York, New York 10001
       Tel: (212) 785-5550
       priya@chaudhrylaw.com
       szuckerman@chaudhrylaw.com
       farber@chaudhrylaw.com

       *Attorneys for Defendant*
       *Jennifer Shah*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

   I.  PRELIMINARY STATEMENT .................................................................. 1

  II.  JENNIFER SHAH'S PERSONAL HISTORY AND CHARACTERISTICS ............. 5

    A. Ms. Shah Comes from an Unusual Background that Placed Great Demands on Her at a Young Age and Throughout Her Life ...................................... 5

    B. Jen Dropped out of the University of Utah, So that She Could Support Her Husband and Newborn Son ................................................................ 9

    C. Ms. Shah is Not Only a Devoted Mother and Family Member, But Has Provided Emotional and Physical Support and Help to Many of the People in Her Life .. 11

        1. Jen Is a Devoted and Loving Mother ............................................. 12

        2. Jen Helps Many Extended Family Members .................................. 13

        3. Jen Is Admired By Many Friends Whom She has Helped Through the Years .............................................................................................. 15

████████████████████████████████████████

    D. How Did Ms. Shah, an Otherwise Law-Abiding and Model Citizen, Get Involved in This Crime? ......................................................................... 23

  III.  THE ADVISORY GUIDELINES CALCULATION .................................... 28

    A. The Probation Department Recommendation ...................................... 28

    B. The Loss Calculation Here ................................................................. 29

  IV.  A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) DEMONSTRATES THAT A SENTENCE WELL BELOW THE GUIDELINES RANGE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING .......................... 31

    A. A Sentence Well Below the Guidelines Range is Consistent with Sentences Imposed on Substantially Similar Defendants Convicted of Similar Conduct ... 32

    B. Jen's Unquestioned Devotion to Her Sons and Husband Warrants Leniency .... 35

    C. A Sentence Well Below the Guidelines Range Will Be More Than Sufficient to Achieve the Goals of Specific and General Deterrence .......................... 36

**D. An Extended Period of Incarceration Will Impose Substantial Burdens on Jen's Family in The Middle of a Global Pandemic** .......................................................... 37

**E. A Sentence of Thirty-Six Months Serves the Interests of the Federal Prison System and is Fair to Jen** ........................................................................................ 40

    **1. COVID-19** ............................................................................................................ 40

    **2. Jen Will Be Able to Pay Restitution Faster Without an Extended Period of Incarceration** ..................................................................................................... 43

    **3. Due to Her Celebrity Status, Which She Has Used to Significantly Advance the Rights of Marginalized and Disenfranchised Communities, Jen is Uniquely Positioned to Benefit Society** ............................................................. 44

    **4. Additional Public Interest Considerations** ....................................................... 47

**V. CONCLUSION** ........................................................................................................... 49

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Rita v. United States*,
    551 U.S. 338 (2007)..................................................................... 32

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................ 35

*United States v. Bills*,
    401 Fed. Appx 622 (2d Cir. 2010).................................................. 38

*United States v. Booker*,
    543 U.S. 220 (2005)..................................................................... 38

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013).......................................................... 30

*United States v. Crosby*,
    397 F.3d 103 (2d Cir. 2005)..................................................... 28, 32

*United States v. Dorvee*,
    616 F.3d 174 (2d Cir. 2010).......................................................... 32

*United States v. Gupta*,
    904 F.Supp.2d 349 (S.D.N.Y. 2012) ....................... 1, 29, 30, 31, 36

*United States v. Isola*,
    548 Fed. Appx 723 (2d Cir. 2013).................................................. 38

*United States v. Johnson*,
    964 F.2d 124 (2d Cir. 1992).......................................................... 38

*United States v. Nkanga*,
    18-CR-713 (JMF), 2020 WL 1529535 (SDNY Mar. 31, 2020) ...................................... 42

*United States v. Velazquez*,
    No. 16-cr-233 (AKH), 2017 WL 2782037 (S.D.N.Y. May 26, 2017) ........................... 37

**STATUTES**

18 U.S.C. § 1349 ........................................................................... 5

18 U.S.C. § 2326 ........................................................................... 5

18 U.S.C. § 3553(a) .............................................................. *passim*

18 U.S.C. § 3553(a)(1) ............................................................................... 31

18 U.S.C. § 3553(a)(2) ......................................................................... 31, 36

18 U.S.C. § 3553(a)(3) ............................................................................... 31

18 U.S.C. § 3553(a)(4) ............................................................................... 31

18 U.S.C. § 3553(a)(6) ............................................................................... 32

**OTHER AUTHORITIES**

Faulders, Katherine, Former Trump Campaign Chairman Paul Manafort Released to Home
    Confinement Amid Coronavirus Concerns, ABC News (May 13, 2020) ...................... 43

Federal Bureau of Prisons COVID-19 Resource Page, available at
    https://www.bop.gov/coronavirus/index.jsp. ...................................................... 41

Former St. Gabriel mayor released early from federal prison, WAFB9, (May 28, 2020) ............ 43

Richard A. Frase, A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform
    (Punishment Purposes), 58 Stan. L. Rev. 67 (2005) ........................................... 37

Gurman, Sadie, Trump's Lawyer Michael Cohen Released To Home Confinement, *The Wall
    Street Journal*, (May 21, 2020) ................................................................ 43

Killman, Curtis, Former Arrow Trucking CEO released from prison to go to home confinement,
    Tulsa World, (May 7, 2020) ..................................................................... 43

Judge Colleen McMahon, In Her Own Words: Federal Judge Slams 'Morons' Running NYC
    Jails, NY DAILY NEWS, May 7, 2021 ............................................................ 41

United States Sentencing Commission, Recidivism Among Federal Offenders: A Comprehensive
    Overview (March 2016) .......................................................................... 37

United States Sentencing Commission, *Recidivism And The "First Offender"* (May 2004) ....... 37

> *18 U.S.C. Section 3553(a) "requires a court to take account of a defendant's character in imposing sentence. And how could it be otherwise, for on this day of judgment, must not one judge the man as a whole?"[1]*

## I.    PRELIMINARY STATEMENT

This Court is faced with deciding the appropriate sentence for Jennifer Shah, who has pleaded guilty to one count of conspiracy to commit wire fraud in relation to a long-lasting telemarketing scheme in which victims, many of them elderly, lost money buying worthless services from companies in which Ms. Shah was involved.  There were many, many people involved in perpetrating this fraud, which operated openly and as part of an industry operating with a fine line between what is legal and illegal; many businesses conducted legitimate and legal business.  Ms. Shah was involved in both the legitimate and fraudulent sides of this industry.

Some of the defendants in this extensive government investigation have been sentenced to probation or extremely short sentences, while others have received sentences up to 87 months. These sentences have been based, as is always the situation, on the defendant's role in the offense, whether they went to trial, pleaded guilty, or cooperated, as well as the defendants' backgrounds.

Ms. Shah is not like the other people involved in this vast conspiracy.  She is different from them in many ways that are obvious—such as religion, race, gender, and cultural background—and in other ways more nuanced and equally important.  First, most of her co-defendants are essentially career conmen: people who have spent their lives hopping from scheme to scheme; professional fraudsters without an honest dollar to their names; men who

---

[1] *United States v. Gupta,* 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

outran the FTC over and over again to erect another fly-by-night salesfloor to grab cash before getting shut down.  Jen bears no resemblance to these men.  Before she committed these acts, Ms. Shah's entire life, for more than four decades, was marked by hard, honest work, respectable achievement, and a hard-earned reputation for true generosity.

 This, along with other reasons set forth below, should be a basis for this Court to vary downward from the sentences imposed on other defendants in this case.

Though Ms. Shah admittedly played an important role in the particular fraud in which she was involved, she was only one of many people involved, was not involved in all facets of the conspiracy, never communicated with any of the victims, and she clearly did not invent this particular fraud.  Nor was she a mastermind.

Ms. Shah originally started to work in telemarketing on the legitimate and legal side of the business and was slowly drawn into working with a group of men who were committing fraud.  These men recognized in Ms. Shah a talent for organization, hard work, and relationship building, and they took advantage of her skills to further their own criminal ends.  At a certain

point, Ms. Shah became an active and knowledgeable participant, which her guilty plea and profound remorse reflect.

And then, well before her arrest, Jen Shah left the telemarketing business, launched her own eponymously-named fashion and beauty lines, and became a reality TV star. Jen Shah indubitably proved to this Court, and her former co-conspirators, that she permanently broke from the shadowy world of telemarketing fraud when she reinvented herself completely as a glamourous "Real Housewife of Salt Lake City" ("RHOSLC"). In fact, for the past three years, Jen put her entire life under the blinding spotlight and scrutiny of video cameras, appearing on a hit reality television franchise that permanently changed the course of her life and made her a household name.

In a perfect homage to "reality" television, which in actuality is a semi-scripted, heavily-edited facsimile of "reality" intentionally manipulated to maximize ratings, episodes of the RHOSLC have been filmed and aired during the pendency of Ms. Shah's case which misleadingly suggest that Ms. Shah's statements and actions in these episodes match the posture of Ms. Shah's case or reflect her accurate sentiments about this matter. Worse, due to editing, scripting, and the network's complete control over the "story-line" of the RHOSLC, as her sentencing date approaches, Ms. Shah has been made to seem intransigent, defiant, and often even unrepentant, about her actions here. Nothing could be further from the truth. Just as Jen Shah has never been a "housewife," little else is real about her persona and caricature as portrayed by the editors of RHOSLC. The effigy of Jen Shah portrayed in the RHOSLC has no bearing on who she is, whatsoever, and should not enter this Court's calculus in fashioning an appropriate sentence for the real Jen Shah.

What is truly remarkable about this case is that the Ms. Shah who committed this crime,

and the Jen Shah that her family and friends know, are literally two different people.  It is as if the Jen Shah who spent time in New York with a group of dead-beat criminals and fraudsters, and the Jen Shah who was the devoted mother, daughter, sister, wife, and friend in Salt Lake City, are two people with little in common.  As reflected in the more than twenty-five letters written to this Court by her family, friends, and colleagues, Jen Shah is an incredibly generous, loving, and caring person who has devoted herself selflessly to all her extended family and to many friends in need of support and help.  What is astounding about these letters, from people who have known Jen their whole lives, to those who just met her a few years ago, is the consistent portrait of a woman who gives of herself to others, particularly to those in need either because of physical or mental disabilities, or because they are marginalized due to race or sexual orientation.

How then to reconcile these two parts of the same person and to determine the appropriate punishment for a person who committed a serious crime and hurt many innocent victims, yet at the same time has helped so many people?  A woman who has acknowledged her guilt and expressed remorse, and certainly will not commit further crimes, but will rather continue to devote her life to helping others?  ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
██████████████

In addition, Ms. Shah's failure to plead guilty early in the investigation is not a reflection of her lack of remorse; rather, it reflects the enormous shame and guilt she feels and the difficulty she has endured in admitting to all those who love and admire her that she had

committed this crime.  However, Ms. Shah has now been able to face her actions, admit her guilt, and begin the process of healing for herself, her family, and most importantly, for the victims of this fraud.

On January 6, 2023, this Court will make the biggest decision in the life of Jen Shah, her husband, her children, and her very large and loving extended family.  Defendant Jennifer Shah comes before this Court having pled guilty to a single count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and 18 U.S.C. § 2326, arising from her involvement in a fraudulent telemarketing scheme—a mistake that has not only ruined her own life, but has broken her heart as she has watched the damage that her actions have caused to the family that she loves so dearly.

We ask Your Honor to impose a sentence of thirty-six months imprisonment.  We submit that such a sentence is just and fair because it takes into account Ms. Shah's history and characteristics, the facts and circumstances of the offense, and meets the statutory requirement of 18 U.S.C. § 3553(a) that a court impose a sentence that is "not greater than necessary" to achieve the goals of punishment.

## II.      JENNIFER SHAH'S PERSONAL HISTORY AND CHARACTERISTICS[2]

### A.      Ms. Shah Comes from an Unusual Background that Placed Great Demands on Her at a Young Age and Throughout Her Life

Ms. Shah comes from an unusual background.  Her father, Sione, was an immigrant from the impoverished Tongan island of Tongatapu, and her mother, Charlene, also of Polynesian descent, was from Hawaii.  Sione emigrated to the United States and settled in Hawaii, where he hoped to further his education.  He eventually attended Brigham Young University in Provo,

---

[2] We rely on the Presentence Investigation Report's ("PSR") excellent description of Ms. Shah's background and supplement it here.

Utah, where he met Jen's mother.  Although Christian by birth, they both converted to

Mormonism, and Jen was born while both her parents were still in college.  Jennifer Shah was

born in 1973 in Provo, Utah.

The combination of the immigrant and Polynesian cultures had a profound impact on

Ms. Shah.  First, as is common in Polynesian culture, the first-born is commonly raised by her

grandparents.  So when Jen was only one-month old, her maternal grandparents took her to

Hawaii to raise her; this also let Jen's parents continue their educations unburdened by a small

child.  Jen lived with her grandparents and aunts in Hawaii until she was five; she was raised as

an adored princess in an environment where everyone looked like her and showered her with

attention.  But then her grandmother became ill, and Jen was suddenly returned to Utah to live

with her parents.  This was a very traumatic experience for Jen as her grandparents and aunts

were really the only "parents" she knew at the time.

Second, in Polynesian culture, the oldest daughter is called the Fahu and has

extraordinary family responsibilities to her siblings and parents—what we in Western culture

more commonly consider the responsibilities of a mother.  By the time Ms. Shah began living

with her own parents, they had had more children.  (Ms. Shah eventually became the oldest of

six children.)  So when she was plucked from Hawaii, where she was the pampered baby in the

family, she was suddenly the Fahu in Salt Lake City, living in a strict home with near strangers.

Compounding the trauma to five-year-old Jen, ripped from her beloved grandparents'

home without warning, in Salt Lake City, Utah, people of color were not common.  Jen was

deeply affected by the ridicule she had to endure from her classmates because her physical

appearance differed from the predominately Caucasian community in Utah.  As noted in the

PSR, Jen relayed one incident in which her classmates asked her why her skin was "dirty," and

thereafter, she scrubbed it until it was raw.

In her parents' home, Jen grew up in a very strict environment.  Her parents eventually had six children, and they both worked and pursued their education.  As noted above, Jen was the oldest of the six children, and as described by her mother: "One of the most revered Tonga cultural traditions identifies the eldest female sibling as the Fahu.  As the Fahu, Jen is accorded the highest respect at all formal and informal occasions from funerals to weddings and births.  She acts as the family matriarch and oversees her siblings, nieces, and nephews.  Thus, Jen holds the position of being the caretaker who is responsible for the family.  She has lived this esteemed role and accepts the responsibility and has exemplified this role throughout her life."[3]

Jen's parents demanded and expected their children to respect Tongan cultural traditions while fulfilling the immigrant vision of obtaining a good education and the American dream.  From Jen, they demanded only one thing: be perfect.  Jen excelled even as an elementary school student, being chosen the outstanding student in 6th grade, and elected the Student Body President in 9th grade.[4]  She was also a cheerleader and a dancer throughout high school.  She saw herself as a role model for her younger siblings, forging a path for them through the intricacies of being a Polynesian immigrant family in Orem, Utah, surrounded by Caucasian Mormons.  Jen's brother Kaleo, who is one and a half years younger than Jen, writes: "She paved the way for me to not be behind the curve when it came to athletics, social clubs and academics."[5]

Jen's parents were also very hard working, civically minded, and accomplished.  Her

---

[3] Exhibit A-1, Letter of Charlene Lui.

[4] *Id.*

[5] Exhibit A-2, Letter of Kaleo Lui.

father worked as a Track Manager at Geneva Steel, as well as running his own landscaping

business.  The entire family helped in the business, including Jen, who at times drove the

company truck or pounded fence posts into roads.[6]  In addition, Jen's father worked hard to bring

many of his relatives, four brothers, and cousins, from Tonga to the United States, and the family

home was always open to new immigrants from Tonga.[7]  Mr. Lui also helped establish a

Polynesian community in Utah and founded ███████████████████ an

organization of which Jen is now on the Board of Directors.[8]

      Jen's mother is also extremely accomplished.  Charlene continued her education while

still having six children and has had a distinguished career.  She is now 70 years old and has

retired after 30 years in the educational field as a teacher, and school principal and director of

Educational Equity for 20 years.  In her retirement, Charlene is the Executive Director for the

National Association for Multicultural Education which is a non-profit that advocates for social

justice and equity.[9] All of Jen's siblings have successful careers, including one who is an

environmental engineer and one who is a contractor.  As the Court will see from reading the

letters Jen's family has submitted, Jen's family writes beautifully and movingly about the role

Jen has played in their lives.  It is clear that Ms. Shah has taken her role as Fahu extremely

seriously throughout her life and has acted as a surrogate mother for her five siblings and many

other younger relatives.

      Ordinarily, the accomplishments of a defendant's parents and siblings may not be very

relevant in the determination of a sentence.  However, in this case, the family background is very

---

[6] Exhibit A-1, Letter of Charlene Lui.

[7] Exhibit A-2, Letter of Kaleo Lui.

[8] PSR at ¶ 61.

[9] Exhibit A-1, Letter of Charlene Lui.

important.[10] Jen grew up as an outsider in a hostile and strange environment.  At the same time, she was the Fahu, and had the responsibility not only for caring for her brother and sisters at home, but for forging a path for them in a place that did not welcome strange children of color. Meanwhile, her family clearly expected and demanded a high level of educational and professional achievement.  It was from this pressure cooker that Jen entered her adult life, and it has had a profound impact on the course of her life and on her conduct in this case.

Following her parents' impressive footsteps, and their uncompromising expectations, Ms. Shah capped her formidable high school career with a strong start at the University of Utah; her eyes trained on a professional career, perhaps as a lawyer.  But life had other plans for Ms. Shah.

**B.      Jen Dropped out of the University of Utah, So that She Could Support Her Husband and Newborn Son**

While Jen attended the University of Utah, she continued to help care for her siblings because her mother was pregnant with Jen's youngest sibling.  When Ms. Shah was a freshman at the University of Utah, she met her future husband, Sharrieff Shah, an African-American Muslim on a football scholarship from Los Angeles.  As Sharrieff describes their relationship, "We dated for 2 years and absolutely fell in love.  However, it was not a match made in heaven. My wife's parents did not like me because I played football, and I was not Polynesian or Mormon, but rather an African American Muslim from the dirty streets of Los Angeles."[11]

While they were dating, Jen became pregnant with their first son, which broke nearly every rule in her family.  This led to a break with her father, who disowned Jen; this was very painful for the family—especially Jen, who wanted nothing more than her father's affirmation,

---

[10] Photos of Ms. Shah and her family are attached as Exhibit B and filed under seal.

[11] Exhibit A-3, Letter of Sharrieff Shah.

approval, and love.  However, due to conversations during this period, Jen discovered for the first time that the Mormons did not formally accept African-Americans as converts.  The target of lifelong racism herself, Jen was devastated to learn that her faith and family had such strong racist views towards others.  She found resolve and stood her ground; Jen refused to break up with Sharrieff or end her pregnancy, despite her father's harsh disapproval and request.

After their son, Sharrieff, Jr., was born, Jen and Sharrieff married.  Defenseless in the innocent face of his adorable grandson, Sione thawed towards Jen, and she and her parents reconciled.  In fact, Jen became increasingly close to her father, who was devoted to his grandchildren.[12]  Jen eventually abandoned Mormonism and converted to Islam.  A new wife and mother while still a sophomore in college, Jen attempted to continue her education and pursue her academic ambitions. ███████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████

And then, Sharrieff suffered a career-ending injury while he was playing football at the University of Utah, and he had to give up his dream of playing professional football.  At that point, according to Sharrieff, "We decided as a family since I was further along in college that we would focus on getting me through undergraduate and law school faster to help our family's financial condition.  Jen dropped out of college to help support me and our baby boy.  I worked 2 jobs during graduate school and law school.  My wife worked 3 jobs while I attended law school.  During the week from 9 am to 5 pm, she was secretary for [sic] non-profit corporation.  In the

---

[12] Unfortunately, as discussed *infra*, Jen's father passed away in 2018 ███████████████ ████████████████████████████████████.

evenings, she was a nanny for a physician.  On the weekends, she worked as a model at local fashion shows, and did photo shoots for various magazines and online publications.  My wife was willing to carry more than her share of our marital obligations in order to place our family in a better position."[13]  Jen always felt tremendous guilt for not completing college because she felt that her failure to do so disappointed her parents.[14]

From the time Jen dropped out of school until the present, she has worked hard and continuously to support her family.  Her jobs have included, among others, United Auto Credit Corporation, Franklin Covey, Professional Education Institute, and Prosper, Inc.[15]

In 2009, she began to work in the telemarketing industry.  It should be noted that when Ms. Shah began to work in telemarketing and for many years, she was engaged in a legitimate business and thought she was acting in a legal manner.  There is no indication that she sought out being involved in a business that was rife with fraud, and there is no reason to believe she would have sought out illegal activity if it had not presented itself to her.

Since converting to Islam almost twenty-five years ago, Jen has steadfastly followed her faith in the raising of her family; Jen simultaneously shouldered all the responsibilities of a Fahu in a large Polynesian family.  As will be explained below, the cultural roles both placed upon Ms. Shah by birth, and those assumed by Ms. Shah as a Muslim wife and mother, have resulted in a life devoted to the wellbeing of her family and friends, and to a life filled with the burdens of a woman who is responsible for the wellbeing of many others.

**C.      Ms. Shah is Not Only a Devoted Mother and Family Member, But Has Provided Emotional and Physical Support and Help to Many of the People in Her Life**

---

[13] Exhibit A-3, Letter of Sharrieff Shah.

[14] PSR at ¶ 79.

[15] PSR at ¶ 83.

Ms. Shah is a devoted mother to her two sons: Sharrieff Shah, Jr., now 28, and Omar Shah, 17.  As the letters submitted on her behalf demonstrate, Jen is not only devoted to her sons, as most mothers would be, but she is dedicated to helping her siblings, her nieces and nephews, her husband's brother and sister, and her entire extended family.  As explained above, Jen is the Fahu of her immediate family, a responsibility that she takes very seriously; but she has also included many other family members in her circle of love and kindness.

      **1.**        **Jen Is a Devoted and Loving Mother**

Once Jen traded in her academic and career ambitions for motherhood, she transferred her natural strong work ethic to be an exceptional working mother.  Hoping to have a big family like the one she grew up in, Jen and Sharrieff tried for years to give Sharrieff, Jr., a younger

██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████

And despite this solitary, painful struggle, Jen has been extremely involved in the lives of her sons.  As her husband noted in his letter, Jen instilled in her sons the importance of education and encouraged them to strive to do their absolute best.  From the time they were in elementary school through high school, Jen helped her sons prepare for spelling bees, science fairs, debate

tournaments, and public speaking competitions.[16]  Sharrieff relayed a story about how Jen went

the extra mile to help Sharrieff, Jr., compete in a science fair in the 6th grade.  He did not win that

fair, but today he is a first-year student at Duke Medical School, and his parents were recently

able to attend his White Coat ceremony.[17]

Omar, who is a senior in high school, is a talented athlete and was recently offered a

football scholarship to Morgan State University.[18]  Jen is Omar's rock and comfort.  When the

police came to arrest Jen in the instant case, the agents found fifteen-year-old Omar in bed and

pointed an assault rifle at his head and heart.  Omar was forced out of bed at gunpoint and

escorted out of his home in handcuffs.  He still is having nightmares from this incident, and it is

only his mother who is able to calm him and help him go back to sleep.[19]  This is part of the

tremendous guilt and shame Jen feels, as her actions have harmed her family in many ways.

### 2.      Jen Helps Many Extended Family Members

Just being a good mother is not extraordinary.  But what is extraordinary is the extent to

which Jen treats many other people in her family with the same love and concern that she shows

her sons.  This Court has received letters on behalf of Jen from (1) her mother, Charlene Lui,

(2) her brothers, Kaleo, Jacob, and Jerrit Lui, (3) her two sisters, Jenohn Lui and Jessica Lui

Nelson, (4) her nephew, Jaxson Lui, (5) her mother-in-law, Clurie Watkins, (6) her father-in-law,

Naim Shah, Sr., (7) her sister-in-law, Sabria al-Jabbar, (8) her brother-in-law, Naim Shah, (9) a

niece by marriage, DaJhanane Frampton, and (10) a cousin, Danny Filipe.

What is striking about all these letters is the consistent description of Jen as someone who

---

[16] Exhibit A-3, Letter of Sharrieff Shah.

[17] Exhibit A-4, Letter of Sharrieff Shah, Jr.

[18] Exhibit A-3, Letter of Sharrieff Shah.

[19] Exhibit A-5, Letter of Omar Shah.

goes out of her way, time and time again, to help people in distress, to give of herself, of her time and her energy, and to make others feel that someone cares about them and is there to help. Many of the letters contain specific examples of how Jen has helped these family members, and just a few will be highlighted here.

Jaxson Lui is Jen's nephew and the son of her sister, Jenohn, ██████████████████ ████████████████, who was in the care of his grandparents as a child.  Jen acted like a second mother to Jaxson, took him shopping for school clothes and supplies, and made sure he always felt loved and cared for.[20]  Jen also made sure that Jaxson met his real father, which was very important to him.[21]  Today, Jaxson is twenty-one years old and ████████████ and his success in life is directly tied to the care he received from Jen Shah.

Danny Filipe and Jen grew up together, and they are cousins; they have a close relationship.  A couple of years ago, Mr. Filipe ██████████████████████████ ██████████████████████████.  Jen was one of the few people who showed up, offered emotional and practical support, and played a key role in alleviating the █████████████████████████████; he credits Jen with getting him through this difficult time and sees her as an "angel."[22]  Naim Shah, Jen's brother-in-law, credits Jen with providing the support he needed to quit his high-paying accounting job and start a non-profit fighting hunger, and as a result of her support ". . . thousands of people all across the world are being provided food and other necessities each year."[23]

---

[20] Exhibit A-6, Letter of Jaxson Lui and Exhibit A-7, Letter of Jenohn Lui.

[21] Exhibit A-1, Letter of Charlene Lui.

[22] Exhibit A-8, Letter of Danny Filipe.

[23] Exhibit A-9, Letter of Naim Shah, Jr.

Likewise, Sabria al-Jabbar, Jen's sister-in-law, has written about how Jen came to her rescue time and again.  Ms. Al Jabbar, who lives in Maryland, is the caretaker of two adult children ███████████████████████████████████████████████████████. Ms. Al-Jabbar's husband ██████████████████████, further straining the family.  During some particularly difficult times over the last two years, Jen dropped everything and came to visit the family in Maryland.  As Ms. Al-Jabbar wrote about Jen: "In the midst of the chaos, Jennifer has been my lifeline in a way almost no one has despite being located in Utah. She has constantly extended herself in every way to myself and all of my children…She is the only person I can call family, through blood or marriage, that came to see me in person, unprompted, to make sure that I was surviving."[24]

### 3.  Jen Is Admired By Many Friends Whom She has Helped Through the Years

Many of Jen's friends have also written to the Court to express their love and support for Jen despite her involvement in this offense.  Like the letters from family members, the letters from friends are remarkable for the consistent portrait they paint of Jen as a loving and kind person who opens her home and her heart to all those in need, particularly those who are marginalized because of their race or sexual orientation.  Again, it is impossible to summarize all the letters that have been provided to the Court, but there are two examples that are illustrative of the sentiments expressed time and again by those who know Jen best.

Morgan Scalley works ████████████████████████████████████. He has known Jen for the past twelve years and described how she is a mother figure to many of their players and has opened her heart and home to these young men. In addition, Mr. Scalley relates that a couple of years ago, ██████████████████████

---

[24] Exhibit A-10, Letter of Sabria al-Jabbar.

████████████████████████████████████████████████

████████████, and although the allegation was false, Mr. Scalley suffered "immediate and tremendous backlash from members of [his] community and from people across the country." But Jen and her husband "were the first people of color to defend [his] name and character." He writes that Jen "was extremely loyal and her friendship knew no bounds. She did not hesitate to stand up to fight the injustice that I was subjected to."[25]

Nargis Mullahkhel is a Muslim single mother who owns a small clothing boutique in Salt Lake City. She has known Jen for six years and describes an incident from last year when she was going through a very difficult time. She writes that her store was failing because she did not have the ████████████████████████████ She reached out to Jen and told her about the situation, and Jen immediately hosted a "Shop with Shah Day." Because of that event and the revenue it generated, Ms. Mullahkhel was "able to provide for [her] children and put food back on the table."[27] There are many other letters describing how Jen has brought hope and encouragement to people in need, some of whom she has known for years, some of whom she has only recently met.

Jen also contributes consistently to the community. She was active in her sons' PTA and participated as a parent in many school activities. She recently donated dresses to Omar's high school to allow financially disadvantaged students to attend prom and homecoming.[28] When the Covid pandemic started, Jen bought a sewing machine and sat in her fashion studio with her two employees sewing masks. She came home with blisters on her fingers, and through her

---

[25] Exhibit A-11, Letter of Morgan Scalley.

[26] Exhibit A-12, Letter of Nargis Mullahkhel.

[27] *Id*.

[28] Exhibit A-3, Letter of Sharrieff Shah.

company, JXA Fashions, she made and gave away thousands of masks to healthcare workers. She and her husband delivered them personally to hospitals and nursing homes.[29]

████   ██████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███   ████████████████████████████████████████

     As previously stated, Jen dropped out of college so that her husband could complete his education and go to law school. For the next twenty years, from the early 1990s, Jen worked extremely hard both inside and outside the home to raise her sons and support her family. From 2002-2012, Sharrieff practiced law as a litigator for the largest commercial law firm in Utah. He worked every day, including weekends. In February 2012, Jen and Sharrieff decided it would be better for him to switch professions so he would have more time with the family, and so he took a job as a football coach with the University of Utah.

    Unfortunately, rather than freeing up time, the job with the football team consumed even more time as Sharrieff was constantly traveling the country to recruit athletes. Jen was left to

---

[29] Exhibit A-3, Letter of Sharrieff Shah at 2 and 4.

[30] ████████████████████████████

[31] *Id.*

raise the family while working and felt more and more alone.  As Jen wrote of Sharrieff's life as a football coach: "He flourished as a football coach. Many of his players began to gain the father they never had, and I slowly began to lose the husband that I loved and knew."[32]  Sharrieff agrees with this assessment and wrote that because of his constant traveling, "I was not able to see how badly my wife was suffering."[33]

By 2016, Jen's life was in full-blown crisis.  Her marriage was falling apart due to Sharrieff's work schedule and traveling.  As Jen wrote: "As a result of trying to balance his job, my job, and raising our boys, and our community involvement, we grew apart and our marriage began to crumble."[34]  At this point, Jen and Sharrieff began to discuss divorce, and as Jen explains: "I was so angry because I sacrificed so much to support my husband in reaching his education and career goals and now it felt as if it were for nothing. He was never around, I was doing everything alone. My heart was completely broken, and I became sincerely scared to think about life without my husband, ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████.  Jen also felt continuous financial pressure because her marriage was falling apart.  A further emotional blow occurred in January 2018, when Jen's grandmother died.  Jen had been raised by her grandmother; she was very close to her and was devastated by her death.

---

[32] In advance of Ms. Shah's interview for the PSR, Ms. Shah provided a written statement to the United States Probation Office.  A copy of the written statement is annexed as Exhibit D.

[33] Exhibit A-3, Letter of Sharrieff Shah.

[34] Exhibit D, Jen's Statement.

[35] Exhibit D, Jen's Statement at 1.

Then only nine months later, in September 2018, Jen's father died unexpectedly.[36]  As Jen

describes it, "my entire world came crashing down . . . . My father was my entire world, he was

the one place I could seek stability and feel safe."  To make matters worse, Sharrieff did not

attend Jen's father's funeral, "which felt like a devastating admission that our marriage was over

and I was totally alone."  The looming divorce, and the impact of the loss of her grandmother

and father within a short time, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

her exercising increasingly poor judgment about the people with whom she was involved in the

telemarketing business, and the business practices in which she was engaged.

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

---

[36] Exhibit B-18—21 are photos from Jen's father's funeral.

[37] Exhibit D, Jen's Statement at 2.



---

38

39 *Id.*

40 *Id.*

41 *Id.*

█████████████████████████████████████████

█████████████████████████████████████████

███████████████

█████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████

Dr. Biscardi has reached similar conclusions about Ms. Shah after months of intensive treatment with her.  He writes, "One of the main aspects of our work has been in the area of her depression.  Ms. Shah suffered from depression for many years and it was triggered again by the loss of her father in September 2018.  During our first sessions, as she began conversations about her father's death, she would become overcome with emotion.  Although well over three years had passed, the trauma and grief she was still experiencing from the event was evident.  It left her volatile at times, or shut down.  Her dad was one of the key foundation and stabilizing elements in her life and his loss created a great void for her."[42]



---

[42] Exhibit A-13, Letter of Dr. Ernest Biscardi.

[43] ████████████████████████

██████████████████████████████████████

Dr. Biscardi corroborates Ms. Shah's ███████████ and discusses their work together on these issues: "[Recently] we were working on what the future might look like and she caught herself going to a dark place.  She was able to re-focus not only on what she could do to be responsible and accountable for her actions, but in addition, what she could do to contribute to the various other communities she is committed to, which give her life purpose."[45]

█████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[44] *Id.*

[45] Exhibit A-13, Letter of Dr. Ernest Biscardi.

[46] ████████████████████████.



**D.    How Did Ms. Shah, an Otherwise Law-Abiding and Model Citizen, Get Involved in This Crime?**

The portrait of Jen Shah that emerges from the history of her family and the descriptions of her character by her family and friends make it hard to understand why she now stands before

---

[47] *Id.*

[48] *Id.*

[49] *Id.*

this Court, having pled guilty to a serious and long-lasting fraud that victimized many innocent persons.  The answer to this question can be found in understanding both Jen's past and upbringing, which has been outlined above, ██████████████████████████████████ ██████████████████████████████████████████.  The short answer is that there were two Jen Shahs.

One was the perfect daughter, Fahu, mother, and wife in Salt Lake City.  Then there was the other Jen Shah: ███████████████████████████████████████ █████████  This Jen Shah threw caution and morals to the wind as she spent more and more personal and professional time with a group of unsavory fraudsters while living in New York, a world separated both geographically and emotionally from her life in Salt Lake City.  There is no fine line that can be drawn between these two people and places, but the demarcation is significant.

At the outset, it must be emphasized that when Jen originally began to work in the telemarketing industry, she was involved in a legitimate business.  This is not a person who sought out illegal activity from the beginning, like a drug dealer.  It is more the story of a person who gradually, over time, got sucked into fraudulent activity and then became slowly more involved.

████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████

Jen's entire life was also spent in social environments where there were very strict and clearly defined roles for women: first as the Fahu in a Tongan family and then as the wife and mother in a Muslim family.

When Jen did go to the University of Utah, she dropped out to support her husband's career.  Jen was extremely ashamed for failing to finish university and felt that it was a great disappointment to her parents.  This experience contributed to her feelings of failure and low self-esteem.  Therefore, her marriage and her husband's career became everything to her.  This put unbearable pressure on her marriage and her husband's career, as Jen viewed each as her own her ersatz achievement.

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████.  Jen was ashamed of her problems and unable to seek help.  This only compounded her problems exponentially.

Then, in 2016, her marriage began to fall apart.  ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

When her husband failed to attend her father's funeral, Jen and Sharrieff finally decided to separate, although they had been having severe marital problems for years.  The impact of the disintegration of Jen's marriage cannot be overestimated.  ████████████████████████

███████ the end of her marriage felt like the whole world was falling apart because she had

25

always lived in environments that provided a strict sense of role and purpose, first with her family, then with her husband.  The loss of this structure left Ms. Shah feeling lost and abandoned.

At the same time, Jen had always sought comfort, security, and worth by being valued by the men in her life: her father, her husband, and her sons.  The sense of desirability and being needed by men is what gave her life meaning and undergirded her self-worth.

With her marriage collapsing, Ms. Shah was adrift and scared.  The group of men in New York with whom she worked in the telemarketing business and her job offered her the sense of purpose and value that she was terrified of losing.  She started to spend more time with these men, who became her co-defendants in this case, Anthony Cheedie, Louis Governara, and others, who were already involved in fraud in telemarketing and used Jen to help them.

███████████████████████████████████████████

██████████████████████████████████████████████

████████████.  They called her the "Lead Queen," referring to Ms. Shah's role as a lead generator for telemarketing sales.  This group of men also became the men and the family that she needed when she felt rejected and abandoned by her husband and deserted by her father, who had died.  Like a street gang that gives security and a sense of belonging to young men, this "gang" gave Jen the sense of security and validation that she needed.  They did, in fact, value Jen's ability to help them with their business, and this gave her a sense of accomplishment, importance, and self-worth.

Jen's life in New York was also totally removed from Utah, so she felt freed from the strictures of her usual life.  Also, in New York, Jen was in a place where people of color were not unusual.  For the first time, Jen could walk down the street and see that people viewed her as

beautiful, powerful, and successful. This added to her desire to be accepted and integrated into the life of these New York men. Moreover, the lifestyle in New York, dominated neither by religious Mormons nor strict Muslims, ████████████████████████████████████████

Jen can be seen as very superficial and acquisitive. She likes expensive clothes and accessories. She has had a lot of plastic surgery. But given her upbringing and her deep sense of feeling unattractive and unworthy, the plastic surgery and desire for material objects are clearly the expression of someone who needs these things to feel a sense of self-worth and value. Women who feel comfortable in their own skin do not need to obsessively alter their physical appearance or adorn themselves with more and more expensive objects. This aspect of Ms. Shah, rather than being viewed judgmentally and as a moral failing, should be seen for what it is: a very sad result of living a life in which she was made to feel ugly and valueless.

Thus the road ██████████████████████████ to this offense conduct is winding but clear. The potential loss of her marriage and the death of her father left her feeling unmoored and terrified. ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████. This offense conduct is the direct opposite of who Ms. Shah has been during most of her life and the person she is to her family and friends. Ms. Shah has clearly acknowledged her guilt and is very remorseful for the hurt and damage she has caused innocent victims.

Yet pleading guilty and acknowledging her guilt before her family, her friends, and all the world has been extremely difficult for Ms. Shah. Jen has always felt she must be perfect: the perfect daughter and family member, the perfect wife. The shame she feels from this offense is

quite literally unbearable, and although she knows she committed a serious crime that hurt many people, it is psychologically extremely difficult for her to face her friends and family.  Thus while she sometimes seems to be denying guilt in public, in private,  For more than forty years, Ms. Shah has proven to be a productive, valuable member of society. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, she is fully capable of being an asset to society once again.

## III.    THE ADVISORY GUIDELINES CALCULATION

Loss calculation is a clumsy, inarticulate way to create a mathematical formula to calculate the moral harm caused by a defendant's conduct.  Nonetheless, because this Court must determine the Advisory Guidelines, we address them here.

We do not dispute the guideline calculation set forth in Ms. Shah's plea agreement which, suggests 135–168 months.  This range is purely advisory.[50]

### A.    The Probation Department Recommendation

The Probation Department has recommended a sentence of 72 months, which is considerably lower than—and nearly half of the bottom of—the Guidelines range.[51]  While the Probation Department has considered some of the factors detailed in this sentencing memorandum that justify a downward variance from the Sentencing Guideline, it has not

---

[50] *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

[51] PSR, pg. 32.

considered all such factors.  At the time of Ms. Shah's Presentence Interview, ███████████ ████████████████████████████████████; therefore, the PSR could not incorporate this critical information.  We submit that the crucial information and assessment contained in this report warrant an even greater variance from the Guidelines than recommended by the PSR.

Furthermore, the PSR does not account for the current COVID-19-related conditions that make incarceration a particularly treacherous punishment.  We submit that when the additional relevant factors are properly considered, the appropriate sentence for Jennifer would be thirty-six months of imprisonment.

## B.    The Loss Calculation Here[52]

"Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results."[53]

Judge Rakoff shared this salient reasoning and observation in crafting the right sentence for Rajat Gupta, who was mechanically tacked with an 18-point enhancement for loss amount

---

[52] Under the ABA Shadow Guidelines (Attached hereto as Exhibit E), Jennifer's offense would be calculated as follows:

a) The base offense level is seven; b) as the total loss does not exceed $10,000,000, offense level is increased by ten levels; c) we dispute the government's ranking of Ms. Shah as "Tier A" in this conspiracy, and submit that she had moderate to high culpability, warranting a three-level increase; and d) the victim impact was high, leading to a six-level increase.  The total offense level, thus, amounts to twenty-six.

The resulting sentencing range is 63–78 months.

[53] *Gupta,* 904 F. Supp. 2d at 350.

"for the resultant but unpredictable monetary gains made by others, from which Mr. Gupta did not in any direct sense receive one penny."[54]

As Judge Rakoff profoundly noted while sentencing Mr. Gupta, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice."[55]  Nowhere is this truer than the Sentencing Guidelines' over-sized treatment of loss amount.  "The Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense.  By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentence would be irrational on their face."[56]

In a concurrence in *United States v. Corsey*,[57] Judge Underhill, sitting by designation, noted the flawed nature of the Guidelines for high-loss cases:

> The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. ***The higher the loss amount, the more distorted is the guideline's advice to sentencing judges***. As a well-known sentencing commentator has put it, "For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."[58]

---

[54] *Id.*

[55] *Gupta,* 904 F. Supp. 2d. at 351.

[56] *Id.*

[57] 723 F.3d 366 (2d Cir. 2013).

[58] *Id*. at 380 (emphasis added).

Here, the loss calculation for Jen perfectly proves this Court's hypothesis in *Gupta* and Judge Underhill's observation, and if loss calculation dominates this Court's rationale, it would lead to an irrational sentence.  First, the Guidelines offense level calculation of 33 results from an 18-level loss enhancement.  In other words, loss amount comprises over 54% of the offense level.  Put another way, the loss enhancement proposed by the Guidelines constitutes more than half of the offense level here.  As in *Gupta*, the PSR's loss calculation "overwhelm[s] all other factors."[59]

## IV.   A BALANCED CONSIDERATION OF ALL RELEVANT FACTORS UNDER 18 U.S.C. § 3553(a) DEMONSTRATES THAT A SENTENCE WELL BELOW THE GUIDELINES RANGE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING

18 U.S.C. § 3553(a) directs that a court "shall impose a sentence *sufficient*, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of this subsection," which include: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," "(B) to afford adequate deterrence to criminal conduct," "(C) to protect the public from further crimes of the defendant," and "(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[60]  In addition to considering each of these purposes, the Court also "shall consider" "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)), "the kinds of sentences available" (18 U.S.C. § 3553(a)(3)), "the kinds of sentence and the sentencing range established" under the applicable Sentencing Guidelines (18 U.S.C. § 3553(a)(4)), and "the need to avoid

---

[59] *Gupta,* 904 F. Supp. 2d at 353.

[60] 18 U.S.C. § 3553(a)(2) (emphasis added).

unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).

Accordingly, the range calculated under the Guidelines is purely advisory and serves as just one of many factors that the Court is required to "consider" when fashioning an appropriate sentence.[61]  "[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."[62]  Indeed, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the [18 U.S.C.] § 3553(a) sentencing factors."[63]

After thorough consideration of all the relevant factors, Jen Shah respectfully submits that an appropriate custodial sentence in this case would be thirty-six months.  As set forth below, such a sentence is consistent with sentences imposed on similarly-situated defendants, takes account of the other circumstances of this case discussed herein, and is "sufficient, but not greater than necessary" to achieve the goals of criminal punishment under 18 U.S.C. § 3553(a).

**A.**   **A Sentence Well Below the Guidelines Range is Consistent with Sentences Imposed on Substantially Similar Defendants Convicted of Similar Conduct**

18 U.S.C. § 3553(a)(6) directs this Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

As this Court considers the right placement for Ms. Shah on the continuum of sentences received by her co-defendants, we point out several critical factors.  First, this Court has given

---

[61] *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

[62] *Rita v. United States*, 551 U.S. 338, 351 (2007).

[63] *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010).

most of the defendants sentences well below their respective sentencing guidelines ranges.  We submit that the Court should similarly grant a variance down for Ms. Shah.  Second, for the defendants who have received sentences higher than thirty-six months, they can all be distinguished clearly from Ms. Shah.  Many had direct contact with the victims of the fraud— whether as the salespeople using fake names or as managers or owners of sales floors whose job it was to convince the client not to chargeback their worthless product.  Ms. Shah, notably, never spoke with any of the customers of MPG (or anyone who actually purchased these products).  Third, several co-defendants were barred by the FTC and simply reincarnated their dismantled fraudulent enterprise under a new name.  This is not true of Ms. Shah. Fourth, many of Ms. Shah's co-defendants have prior criminal histories, whereas Ms. Shah does not.

Fifth, we dispute the government's ranking of Ms. Shah as "Tier A" in this conspiracy. While it is true that Ms. Shah provided the "leads" to many of the people involved in this crime, she certainly did not create, organize, control, or run this multi-pronged/multi-state conspiracy. Proof of this are the facts that a) many of these co-defendants neither received their leads from Ms. Shah, had any contact with her, nor even knew her, b) many of these co-defendants who did know Ms. Shah complained that she controlled who received her leads and when Ms. Shah did not give them "her leads," they were still able to carry out their crimes, and c) the myriad telemarketing frauds involved in this conspiracy, though different in the various iterations regarding what "product" was being sold, required not just "leads" but also marketing, a salesfloor, and a fulfillment center.  Thus, Ms. Shah's piece of the puzzle, though important, was not enough to carry out this fraud without these other crucial pieces controlled and directed by experienced criminals (who were not Ms. Shah).  There is neither reason nor evidence to place

Ms. Shah at the "Godfather" or "Kingpin" level of this fraud.  The fraud started before her, often carried on without her involvement, and she was never the *sine qua non* of this conspiracy.[64]

In addition to avoiding sentencing disparities between Ms. Shah and co-defendants, in this case, this Court should equally avoid a sentencing disparity between Ms. Shah and other fraud defendants generally.  Fraud cases in this District, as well as nationally, have *frequently* resulted in sentences substantially below the Guidelines range.  The national average sentence in 2019 for fraud cases was 21 months, and in the S.D.N.Y. it was 19 months.  The median sentences in both were 12 months.  Significantly, 54.2% of fraud cases in the Second Circuit received a variance from the Guidelines at sentencing and only 26.2% of fraud cases in the Second Circuit received a guideline sentence.[65]   In 2020, the national mean sentence in fraud cases was 19 months, and the median was 8 months; the Second Circuit mean was 19 months, and the median was 12 months.[66]  And in 2020, **59.2%** of fraud cases in this Circuit received a downward variance.[67]  In 2021, the national average sentence for fraud cases was 20 months, and in the S.D.N.Y. it was also 20 months.  The median sentence in both were 12 months.[68] In 2021, **66.3%** of fraud cases in the S.D.N.Y received a downward variance.[69]

---

[64] While the Indictment alleges conduct commencing in 2012, well before the creation of MPG, notably, the government only seeks forfeiture and restitution from Ms. Shah for MPG victims— and not victims of countless other companies involved in this conspiracy.

[65] Exhibit F.

[66] Exhibit G.

[67] *Id.*

[68] Exhibit H.

[69] *Id.*

**B.** **Jen's Unquestioned Devotion to Her Sons and Husband Warrants Leniency**

One of the first factors identified for consideration under 18 U.S.C. § 3553(a) is "the history and characteristics of the defendant." As recognized by Judge Rakoff in *United States v. Adelson*:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.
>
> This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics" of the defendant.[70]

One goal of the justice system is to catch and stop bad conduct in the present; a sentence serves to both punish and deter a defendant, with the intent of changing future behavior. But this Court is tasked with essentially reaching its long arm through time, into the past, to punish the Jen Shah of 2016–2018. Only 2023 Jen Shah stands before this Court to be sentenced. This is a 49-year-old mother of two sons, 28 and 17 years old, who are the center of her life. The woman before this Court needs no deterrent, as she has already suffered great punishment and proven that she permanently abandoned her old ways.

In her family, she has been the lynchpin between generations—the perfect daughter and mother at the same time. Her mother, husband, and innocent children are the priorities in her life. At only forty-nine years old, Jen has much more to offer to the world. Extended incarceration does not serve the ends of justice here.

---

[70] 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006).

### C.     A Sentence Well Below the Guidelines Range Will Be More Than Sufficient to Achieve the Goals of Specific and General Deterrence

18 U.S.C. §3553(a)(2) requires this Court also to consider the need to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant," which courts have interpreted to mean both specific and general deterrence.[71]

Jen has spent the last several years of her life unwittingly proving to this Court that she will not re-offend.  She not only left the telemarketing industry, but she put herself onto the world's stage in a completely different arena.  In the unique fishbowl of reality television, the world has watched her every move, seen the truth behind Jen (flaws, family fights, and all), and thus the world knows that Jen has completely broken from her old life.  As a very well-recognized television personality, whose prosecution has been the centerpiece of nearly every newspaper and tabloid since March 2021, there is absolutely zero chance that Jen could anonymously slip back into the criminal schemes of the telemarketing world.  Or, for that matter, there is zero chance that Jen will ever do anything unnoticed by the press and public ever again.

The PSR also recognizes that Jen's likelihood to re-offend is low.[72]  Thus, there is no need for specific deterrence in this case, as Jen is extremely unlikely to be a repeat offender.

In addition, this case has already cost Jen dearly.  Jen—who desperately wanted to be the best mother in the world—has now been the cause of embarrassment, fear, and shame for her beloved sons.  Jen would never do anything to risk more harm to her children.  She knows the emotional and psychological toll that her sons have already been forced to pay.  These are harms for which she will spend the rest of her life atoning.

---

[71] *See Gupta*, 904 F. Supp. 2d at 352.

[72] PSR, pg. 33.

Statistics also show that Jen is highly unlikely to be a repeat offender. Publications by the U.S. Sentencing Commission confirm that true "first offenders" like Jen, with no prior convictions or arrests, have an "extremely low recidivism rate."[73] The U.S. Sentencing Commission has also reported that defendants convicted of fraud-related crimes are less likely to recidivate than defendants convicted of any other crimes.[74]

Although Jen understands that the Court must also consider the needs of general deterrence when fashioning an appropriate punishment, we respectfully submit that the goals of general deterrence have already been achieved and that extended prison time will not advance those goals. Moreover, scholars have consistently concluded that it is the *certainty* of punishment, rather than its *severity*, that is the most effective deterrent for financial crimes.[75]

### D.    An Extended Period of Incarceration Will Impose Substantial Burdens on Jen's Family in The Middle of a Global Pandemic

---

[73] United States Sentencing Commission, *Recidivism And The "First Offender"* (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf at 17 (reporting a 6.8% recidivism rate for true first time offenders). This study notably does *not* differentiate between different types of crime even though defendants convicted of fraud are the least likely to recidivate.

[74] United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (March 2016), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf at 20.

[75] *See United States v. Velazquez*, No. 16-CR-233 (AKH), 2017 WL 2782037, *4 (S.D.N.Y. May 26, 2017) ("Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, 'increases in severity of punishments do not yield significant (if any) marginal deterrent effects . . . Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence.'") (citation omitted). This is especially true with white-collar offenders. *See* Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform (Punishment Purposes)*, 58 Stan. L. Rev. 67, 80 (2005). Thus, there is no empirical reason to believe that Jennifer's further incarceration beyond the time she has already served will provide more effective general deterrence.

Even before the Supreme Court's ruling in *United States v. Booker*[76] clarified that the Sentencing Guidelines are only advisory, the Second Circuit held that "extraordinary family circumstances" were a valid basis for granting a downward departure from the Sentencing Guidelines.[77]  Post-*Booker*, the Second Circuit has continued to recognize that courts should consider the burden a sentence will impose on innocent family members when fashioning an appropriate sentence.[78]  Consistent with this guidance, judges within the Southern District have repeatedly issued sentences well below the Guidelines range in comparable cases based, in part, on determinations that lengthy incarcerations would place significant burdens on the defendant's family members.

For example, in *United States v. Blaszczak*, Judge Kaplan recently imposed a sentence well below the Guidelines range on an insider trading defendant who was convicted after trial based upon the burden that lengthy incarceration would impose on his wife and child.  The facts were as follows: For six years, David Blaszczak sold inside information to hedge fund clients that they used to realize over $7 million dollars in gains.[79]  Blaszczak was paid more than $700,000 for that information.[80]  Judge Kaplan determined that Blaszczak had "aggressively" pursued sources of inside information that he could sell and was "bold, unapologetic, and giddy

---

[76] 543 U.S. 220 (2005).

[77] *See United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992).

[78] *See*, *e.g*., *United States v. Isola*, 548 Fed. Appx 723, 725 (2d Cir. 2013) (identifying "[defendant's] family circumstances and the effects of his incarceration on his daughter" as one of the factors to be considered under 18 U.S.C. § 3553(a)); *United States v. Bills*, 401 Fed. Appx 622, 624 (2d Cir. 2010) (holding that "the likely effects of [defendant's] incarceration on her daughter" were one of the "mitigating factors" that was appropriately considered under 18 U.S.C. § 3553(a)).

[79] Exhibit I at 2–3.

[80] *Id*. at 9.

about what he was doing."[81]   Under the Sentencing Guidelines, Judge Kaplan calculated an

offense level of 26, resulting in a sentencing range of 63–78 months.[82]   And yet, Judge Kaplan

sentenced Blaszczak to only twelve months and one day in jail, plus two years of supervised

release.[83]   The sole reason offered on the record for this substantial deviation from the Guidelines

was that Blaszczak's wife, who had a degenerative eye disease, and child would be severely

burdened by his absence.   Judge Kaplan stated: "[t]he wreckage that a long period of

incarceration would wreak on her and on your son is horrifying to me.   And the sentence I am

going to impose on you is going to reflect that."[84]

       While Jen's family circumstances do not rise to the standard of "extraordinary" as is

traditionally understood, the Court can consider them nonetheless in varying from the

Guidelines.   There can be no doubt that Jen's prolonged absence will impose an enormous

burden on her husband and children.   Omar, Jen's younger son, will graduate high school

without his beloved mother in the audience cheering him on; he will pack his belongings and

move into his first college dorm without Jen's doting motherly help or her famously too-large

baskets of his home-cooked favorites.   Sharrieff, Jr., her older son, will walk across the stage at

Duke Medical School to be hooded as a doctor and see the empty seat in the audience where Jen

should have been, but for her mistakes.   Rather than stand in the center of the enormous group of

Tongan and Black relatives singing their blessings on the young doctor, Jen will only hear about

this day from a federal prison.

---

[81] Exhibit J at 62:15–24.

[82] *Id.* at 22:19–23:1.

[83] *Id.* at 72:6–13.

[84] *Id.* at 70:19–22.

And Jen's husband, who has heard Jen's cheer in the crowds of the University of Utah football games—giving him courage and love for every play and game in the last decade—will be deafened by the silence in her absence.  After spending nearly thirty years with his wife behind him and at his side, Coach Shah will—for the first time—be alone in his home, on the field, and in his heart.  Jen understands that she is the reason these three men will suffer, and her own suffering is exponential for it.  We submit that a sentence of thirty-six months would mitigate the risks to her family while satisfying the requirements of Section 3553(a).

### E.   A Sentence of Thirty-Six Months Serves the Interests of the Federal Prison System and is Fair to Jen

#### 1.   COVID-19

The infamous U.S. Bureau of Prisons' COVID-19 conditions await Jen.  These are very difficult facilities for anyone, especially non-violent financial crime offenders.  But with the onset of COVID-19, the terms of Jen's confinement will be brutally harsh.  Despite the efforts of governments, citizens, and science, COVID-19 is still with us, wreaking havoc and endangering people, and silently mutating to keep one step ahead.

As Judge Gardephe recently noted while sentencing Michael Avenatti, "Conditions were terrible. Hard to believe they could occur in the United States."[85]  The Honorable Paul Oetken has stated that confinement during COVID-19 should count for up to twice the length of the incarceration.[86]

In the words of former Chief Judge McMahon while sentencing an in-custody defendant who has been incarcerated during COVID:

> [The] MCC and the MDC, two federal correctional facilities located in the City of New York that are run by morons, which wardens

---

[85] Exhibit K.

[86] *Id.*

cycle (through) repeatedly, never staying for longer than a few months or even a year. So there is no continuity, there is no leadership, there is no ability to get anything done. They lurch from crisis to crisis, from the gun smuggling to Jeffrey Epstein, none of which is the fault of [the defendant] or any of the other inmates I have sentenced or will sentence.

It is the finding of this Court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about (in) any Colombian prison, but more so because we're supposed to be better than that…. The fact that you haven't been out for a year is a result of the pandemic. Nobody's been out for a year. Nobody's had visitors. People have gotten locked up all over the country in the SHU when they've gotten sick, and you had the great misfortune to not only to get COVID but to get COVID in the earliest days, when we didn't know what we were doing. And that being so, I think you've suffered triply as a result.

But there is no excuse for the conditions in those two institutions. There is no excuse for the serial leadership that does not allow the office of warden to take control and get control of those facilities, that they just cycle through, most of them at the end of their careers, and it is unfair and unjust. You shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons.[87]

Recognizing that COVID-19 requires sentencing courts to take the brutal conditions of confinement into consideration, countless federal courts have affirmatively granted downward variances based on COVID-19.  We attach here a chart of such sentences.[88]

Sentencing Jen to thirty-six months also serves two other important interests.  First, not imposing an extended custodial sentence on Jen will greatly reduce her risk of contracting coronavirus, which has spread widely in the federal prison system, where (as of December 12, 2022) 55,310 prisoners have tested positive and 309 have died.[89]

---

[87] Judge Colleen McMahon, *In Her Own Words: Federal Judge Slams 'Morons' Running NYC Jails*, NY DAILY NEWS, May 7, 2021, available online at: https://www.nydailynews.com/new-york/ny-judge-mcc-mdc-20210507-nhcuujw6kjbmnm7qjus5pfrpdm-story.html.

[88] Exhibit L.

[89] Federal Bureau of Prisons COVID-19 Resource Page, available at

Second, both courts and the Attorney General of the United States have acknowledged that reducing the population inside crowded BOP facilities will reduce the spread of the virus.[90]

Along those lines, on March 26, 2020, the Attorney General of the United States issued a directive to the Bureau of Prisons stating that "one of the BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances."  The Attorney General directed the BOP to consider releasing "inmates who are non-violent and pose minimal likelihood of recidivism" to home confinement, and listed several factors to consider, including the CDC health risk factors of the inmate, whether the inmate was in a low security facility, the inmate's conduct in prison, the inmates score on BOP's recidivism scoring system, whether the inmate has a verifiable reentry plan (including a stable place to serve home confinement), and the inmate's crime of conviction.[91]  On April 3, 2020, the Attorney General issued another directive, making the finding under the CARES Act that BOP faces "emergency conditions," thereby granting BOP statutory authority to expand the group of inmates who could be considered for home confinement.[92]  The Attorney General further directed that "time is of the essence" and that eligible inmates should be transferred home immediately if they can successfully quarantine at home and even if electronic monitoring was not currently available.[93]  Pursuant to these

---

https://www.bop.gov/coronavirus/index.jsp.

[90] *See United States v. Nkanga*, 18-CR-713 (JMF), 2020 WL 1529535, *1 (S.D.N.Y. Mar. 31, 2020), *reconsideration denied*, 18-CR-713 (JMF), 2020 WL 1695417 (S.D.N.Y. Apr. 7, 2020) (Judge Furman stating that "the best—perhaps the only—way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible").

[91] Exhibit M.

[92] Exhibit N.

[93] *Id*.

directives, as of the date of this filing, BOP has released more than 3,800 federal inmates to home confinement.[94]

In addition, hundreds of others have been granted compassionate release either by courts or by the BOP.  Many of those being released have served only a fraction of their sentence, including, for example, Michael Cohen, who was 53 and was released to home confinement for the remainder of his three-year sentence after serving only one year;[95] Paul Manafort, who was released to home confinement after serving only three of his seven-year sentence;[96] a former mayor who was sentenced to twenty years for bribery but was released to home confinement after only eight years;[97] and a 51-year-old CEO released to home confinement after serving only four years of his 7.5-year sentence for tax evasion.[98]

### 2.    Jen Will Be Able to Pay Restitution Faster Without an Extended Period of Incarceration

Fully acknowledging her conduct, Jen has agreed to pay a hefty restitution sum of over

---

[94] *Id.* Currently, the BOP has 6,184 inmates on home confinement. The total number of inmates placed in home confinement from March 26, 2020, to the present (including inmates who have completed service of their sentence) is 50,844.

[95] Gurman, Sadie, Trump's Lawyer Michael Cohen Released To Home Confinement, *The Wall Street Journal*, (May 21, 2020) *available at* https://www.wsj.com/articles/trumps-former-lawyer-michael-cohen-released-to-home-confinement-11590075443.

[96] Faulders, Katherine, Former Trump Campaign Chairman Paul Manafort Released to Home Confinement Amid Coronavirus Concerns, ABC News, (May 13, 2020) *available at* https://abcnews.go.com/Health/trump-campaign-chairman-paul-manafort-released-home-confinement/story?id=70642927.

[97] *Former St. Gabriel mayor released early from federal prison*, WAFB9, (May 28, 2020) *available at* https://www.wafb.com/2020/05/28/former-st-gabriel-mayor-released-early-federal-prison/.

[98] Killman, Curtis, *Former Arrow Trucking CEO released from prison to go to home confinement*, Tulsa World, (May 7, 2020), *available at* https://www.tulsaworld.com/news/local/crime-and-courts/former-arrow-trucking-ceo-released-from-prison-to-go-to-home-confinement/article_e51e30a4-2f4f-5f24-9a4e-9280ae9d5cc8.html.

$6.6 million to the victims of her actions.  She is eager to make each of these people whole, and very cognizant of the fact that many of them are elderly and need this money as soon as possible. Jen does not have the funds to make this payment today; more than anything, she wishes she did. While Jen is jointly and severally liable for this amount with Stuart Smith, it is indisputable that once she has returned to society, Jen will be better positioned to be able to earn the funds to rectify this debt.[99]  The longer Jen is incarcerated, the longer the victims will have to wait to be made whole again.

### 3.   Due to Her Celebrity Status, Which She Has Used to Significantly Advance the Rights of Marginalized and Disenfranchised Communities, Jen is Uniquely Positioned to Benefit Society

From a young age, Jen took on the role of Fahu and the responsibility of being a role model.  That directive has become her personal mission, and the moment Jen got the spotlight of the world's stage on her, she redirected that light onto those who have been left in the dark for their race, religion, sexual orientation, or beliefs.  Often the only voice speaking out for the rights of disenfranchised Utahans, Jen has earned a place as a champion for the marginalized.  Her fans and followers look to Jen to speak out for them, defend them, and encourage them to swim harder when the tides of injustice pull them under.

Jen has been extremely active in a number of social justice organizations.[100]  The primary focus of her volunteer work is to combat racism, raise awareness of the mental health challenges of the LGBTQIA community and combat discrimination against that community, and support a woman's right to reproductive freedom.  Since pleading guilty, Jen has spent the majority of her time trying to help and give back to the community through the following organizations:

---

[99] As the government and Smith well know, Smith has a storied history of failed businesses, enormous personal debt, and very limited earning potential.

[100] Exhibit A-13, Letter of Dr. Ernest Biscardi.

- The National Tongan American Society

- The Yalecrest Anti-Racism Committee

- ACLU of Utah

- Planned Parenthood of Utah

- The National Association for Multicultural Education

- The Parent Teacher Association of East High School

- Talavou Mental Health Workshops

- Kipuka Ola' Native Hawaiian Resources Group

- LGBTQ organizations:

  - Encircle

  - Project Rainbow

  - Crowd Sourced Comedy (Utah's first diversely-owned comedy theater for the LGBTQ community)

The organization that Jen has spent the most time with was the one created by her father twenty-five years ago, the National Tongan American Society ("NTAS") of Utah.  The mission of NTAS is to "strengthen the Pacific Islander family by promoting health, education, cultural preservation and civic engagement."  Specifically, she is a board member and assisted the National Tongan American Society in establishing three new satellite offices located in Euless, Texas, Boise, Idaho, and Mesa, Arizona.

NTAS partners with the Utah Food Bank and helps distribute food to communities in need every week.  Jen has participated in feeding multiple families over the last few months.  She is also on the NTAS committee that arranges Covid testing and vaccine shots for the elderly and at-risk groups.

Additionally, as a NTAS "Community Caregiver," Jen assisted in helping the elderly to find basic health and social resources in Utah.  In light of the language barrier, she accompanies elderly members of the Tongan community to their doctor's appointments to help them understand the care they are receiving and voice their concerns.  Because Polynesians develop Diabetes at a higher rate than the national average, NTAS provides Diabetes screening, prevention, and education classes.  In addition, NTAS helps people go through the process of becoming U.S. citizens while encouraging the Tongan community to register to vote.

In order to protect women's rights, and on behalf of the ACLU and Planned Parenthood of Utah, Jen used her social platform to promote, organize, and attend multiple rallies throughout the state of Utah.  Also, through her social platform, Jen sponsored and promoted Talavou Mental Health Workshops to bring attention to mental health awareness in the Polynesian community.  Additionally, Jen has spent time working with Kipuka Ola' Native Hawaiian Resources Group.  This organization was created to help Pacific Islanders and native Hawaiians with economic development and job skills.  She is drafting the Pacific Islander business directory for Utah with the intention of implementing and distributing a nationwide directory.

As noted, Jen is also very active in supporting the gay and lesbian teen community. Sharrieff writes that he did not understand why his wife was drawn to this community until she explained that LGBTQ youth are the most at-risk for suicide because of being rejected by their family. [101]  Given her own background, Jen feels deeply empathetic toward anyone marginalized, fearing rejection, and struggling with mental health issues.  Jen joined "Encircle," an organization that provides housing and services to these young people, and Jen visits their center

---

[101] Exhibit A-3, Letter of Sharrieff Shah and Exhibit A-1, Letter of Charlene Lui.

in Provo to give personal support to these at-risk teens.  Jen has used her social media presence to support these causes, as well.

Jen is a Polynesian/Muslim/Mormon woman—she uniquely represents each and all of these groups, and for many of them, she is their only spokesperson.  Jen will now have the opportunity to teach her communities, followers, fans, and the world about accepting responsibility, getting help, making amends, and atoning for one's mistakes.  Her story will be powerful and watched keenly by millions, who want to see her come back having paid her debt to society so she can pay her debt to the victims here.  But more than that, they want to see Jen be the champion they need—still standing up for them, fighting for them, and leading the way in the never-ending battle for equality in America.

Rather than become a trite cautionary tale, Jen promises to be the Fahu for her family and society—a redemption story to make her ancestors and descendants proud forever.

### 4.    Additional Public Interest Considerations

Both Jen and society would benefit more from giving Jen a sentence of thirty-six months, rather than warehousing her for the six years – as suggested by the presentence investigation report – at great expense to the taxpayers, with no corresponding benefit.  At a cost in today's dollars of approximately \$44,258[102] per year, imprisoning Jen would cost at least \$265,548 for the six-year sentence recommended by the Probation Department.  Spending \$265,548 to incarcerate Jen makes no sense at all – Jen will remain a financial burden throughout her incarceration and will have lost six years of time in which she could have been working to make payments towards restitution.  Such expenditures of tax-payer money should be reserved for only

---

[102] PSR at ¶ 99.  This cost does not account for inflation.  Nor does it include the cost of any medical care that Jennifer might require due to COVID-19 or other medical issues.

the most dangerous and incorrigible offenders.  Jen is neither dangerous nor incorrigible.  She has demonstrated over the past two years that she is law-abiding, family-oriented, and peaceful—she does not need an additional custodial sentence to deter her.

We submit that under these circumstances, a sentence of thirty-six months serves the ends of punishment, is consistent with BOP's current efforts to reduce the prison population, especially with respect to non-violent offenders who present a low risk of recidivism, and serves the public interest.

## V.     CONCLUSION

Jennifer Shah is an exceptional mother and a good woman who has already been

punished extensively as a result of the sins of her past.  We respectfully request that the Court

impose a sentence of thirty-six months incarceration.  We further request the Court recommend

████████████████████████████████████████████████████████, and that the

Court recommend that Ms. Shah be incarcerated at the FPC Bryan facility in Bryan, Texas.


Dated: December 16, 2022

<div style="margin-left:40%">

Respectfully submitted,

CHAUDHRYLAW PLLC

By:___/s/_____
Priya Chaudhry
Seth J. Zuckerman
Beth Farber
147 West 25th Street, 12th Floor
New York, New York 10001
priya@chaudhrylaw.com
szuckerman@chaudhrylaw.com
farber@chaudhrylaw.com
Tel.: (212) 785-5550
Fax: (212) 898-9040

*Attorneys for Defendant*
*Jennifer Shah*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that on the 16th day of December 2022, I electronically filed this Sentencing Memorandum On Behalf Of Jennifer Shah, and the exhibits annexed thereto, using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.


<u>/s/ Priya Chaudhry</u>
Priya Chaudhry

*Attorney for Defendant Jennifer Shah*